UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| ***JANE DOE 1***, *et al.*, | : | Case No. 21-cv-10649 |
| | : | |
| | : | Hon. Linda V. Parker |
| Plaintiffs, | : | Mag. Anthony P. Patti |
| | : | |
| v. | : | **EASTERN MICHIGAN UNIVERSITY BOARD** |
| | : | **OF REGENTS AND EASTERN MICHIGAN** |
| **EASTERN** | : | **UNIVERSITY POLICE DEPARTMENT'S** |
| **DISTRICT OF** | : | **ANSWER TO PLAINTIFFS' COMPLAINT** |
| **MICHIGAN** | : | |
| **UNIVERSITY** | : | |
| **BOARD OF** | : | |
| **REGENTS**, *et al.*, | : | |

Defendants.

---

Todd F. Flood
FLOOD LAW, PLLC
155 West Congress, Ste. 603
Detroit, Michigan 48226
(248) 547-1032
tflood@floodlaw.com

Michael D. Weaver
PLUNKETT COONEY
38505 Woodward Avenue
Suite 100
Bloomfield Hills, Michigan 48304
(248) 901-4025
mweaver@plunkettcooney.com

*Attorneys for Plaintiffs*

Joshua W. B. Richards
SAUL EWING ARNSTEIN & LEHR LLP
1500 Market Street, 38th Floor
Philadelphia, Pennsylvania 19102
(215) 972-7737
joshua.richards@saul.com

Bridgitte E. Mott
SAUL EWING ARNSTEIN & LEHR LLP
131 Dartmouth Street, Suite 501
Boston, Massachusetts 02116
(617) 912-0905
bridgitte.mott@saul.com

*Attorneys for Defendants Eastern Michigan
University Board of Regents and Eastern
Michigan University Police Department*

Joshua I. Arnkoff
COLLINS EINHORN FARRELL PC
4000 Town Center, 9th Floor
Southfield, Michigan 48075
(248) 355-4141
Joshua.Arnkoff@Ceflawyers.com

Michael C. Osborne
Jaskiran K. Samra
COKINOS YOUNG
611 Gateway Blvd., Ste. 233
South San Francisco, California 94080
(628) 229-9180
MOsborne@cokinoslaw.com
JSamra@cokinoslaw.com

*Attorneys for Alpha Sigma Phi Fraternity, Inc.*

## ANSWER

Defendants Eastern Michigan University Board of Regents and Eastern Michigan University Police Department[1] (together, "the University") answer Plaintiffs' Complaint as follows:

## PRELIMINARY STATEMENT

Plaintiffs' Complaint describes horrific accounts of sexual assaults perpetrated on them by four former Eastern Michigan University students. Plaintiff Jane Doe 1 alleges that she was assaulted by two students, John Doe 1 and John Doe 2 ("JD1" and "JD2")[2] in January 2018. Jane Does 2 through 10 all allege they were assaulted by John Doe 3 ("JD3") between 2015 and 2019. Jane Doe 11 alleges John Doe 4 ("JD4") assaulted her in October 2016.

The descriptions of these assaults are heart-wrenching. The University shares in Plaintiffs' – and its community's – frustration and anger that any student should experience sexual violence. However, contrary to the Complaint's allegations, the

---

[1]    The Eastern Michigan University Police Department ("EMUPD") is not a separate legal entity capable of being sued, but is instead an arm of Eastern Michigan University. EMUPD's annual budget is set by the University and its staff are University employees.

[2]    Plaintiffs identify their alleged assailants by name in the Complaint. The University, however, has federal privacy obligations as to all of its students and former students. As a result, where necessary, the University will refer to the alleged assailants using pseudonyms in this and other documents publicly filed with the Court.

University is, and has been, steadfast in its commitment to respond to reports of sexual misconduct.  The University takes <u>all</u> reports of sexual assault seriously.  It supports survivors and investigates and adjudicates all complaints of sexual misconduct that it is able to based on the participation and information contributed by survivors.

Title IX is not a strict liability statute.  It does not impose an obligation on Universities to insulate all students from all violence, as hard as the University may try to do so.  *See  Foster v. Bd. of Regents of Univ. of Michigan*, 982 F.3d 960, 965 (6th Cir. 2020) (*en banc*).  Instead, Title IX imposes an obligation to respond to *actual notice* of sex-based misconduct in a manner that is not deliberately indifferent.  As horrific as Plaintiffs' assaults were – as all sexual violence is – the University can only act when someone tells it something is wrong.  Most of the Plaintiffs never did.

Survivors of sexual violence commonly delay reporting for a variety of very good reasons.  Individual survivors make choices about when to report based on their individual circumstances, needs, and trauma.  A survivor's choice as to whether and when to report guides the University's response to an assault.  If they do report, it is their choice whether to move forward with a formal process by participating in it.

Plaintiffs' choices in this case were meaningful.  By choosing to not report their assaults to the University and/or not to participate in any proceedings against

their assailants, Plaintiffs did not provide the University any opportunity to respond or to help.  Plaintiffs simply cannot place blame on the University for not responding to information it did not have; the University cannot respond to instances of assault it does not know about.  Nor can – or would – the  University try to dissuade a survivor from moving forward or force a survivor to participate in investigations or proceedings against their assailants.  The University's mission is to educate and prepare its students for success.  As a result, it genuinely supports the choices of survivors, including the Plaintiffs in this case who earlier felt unable to participate in a process against their assailants.  But the fact that Plaintiffs are now ready to move forward does not give them a legal entitlement to relief against the University that respected their wishes years ago.

## **INTRODUCTION**[3]

1.     Upon information and belief, law enforcement authorities are currently investigating over thirty (30) brutal rapes that occurred at Eastern Michigan University ("EMU") and in the surrounding area from 2015 through 2020.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

---

[3]     For organizational purposes, the University Defendants utilize the same section headings as those used by Plaintiffs in their Complaint. These headings should not be construed as admissions by the University Defendants, and to the extent Plaintiffs' headings are deemed factual in nature, they are denied throughout.

2.      Sexual assault, both reported and unreported, was so prevalent at EMU, in large part, because EMU's officials turned a blind eye or were deliberately indifferent to reported sexual assaults.

**ANSWER:**

**Denied.  By way of further response, the University cares deeply about its students.  Contrary to Plaintiffs' allegations, the University is, and has been, steadfast in its commitment to respond to reports of sexual misconduct.  The University takes all reports of sexual assault seriously.  It investigates and adjudicates all complaints of sexual misconduct that it is able to based on the participation and information contributed by survivors.  Just as the University takes every report of sexual assault seriously, it also takes seriously the wishes and rights of survivors who may not want to participate in an investigation or adjudication that they feel may retraumatize them, or for any other reason.  In the most meaningful sense, a survivor choosing whether to report guides the University's response to their assault.  Individual survivors make choices about when to report based on their individual circumstances, needs, and trauma.  If they do report, it is their choice whether to move forward with a formal process by participating in it.**

3.      However, upon information and belief, EMU Board of Regents mandated that all employees and volunteers must report incidents of sexual assaults to proper authorities.   This mandate was enacted, in part, for the purpose of preventing sexual assaults.

**ANSWER:**

**Admitted in part and denied in part.  It is admitted that University policy requires all University employees to report sex-based misconduct to the University's Title IX Coordinator, which policy was adopted for, among other reasons, the purposes of creating a culture that encourages the reporting of sex-based misconduct at the University, raising awareness about sexual assault, and reducing the number of sexual assaults.  Except as so admitted, denied.**

4.      Between 2015 and 2020, nine (9) EMU students were viciously raped by Dustyn Durbin ("Durbin"); one (1) EMU student was gang-raped by Thomas Hernandez ("Hernandez") and D'Angelo McWilliams ("McWilliams"), and one (1) EMU student was raped by Drake Sutton ("Sutton"). Durbin, Hernandez, McWilliams, and Sutton were also students at EMU.

**ANSWER:**

**The University admits that the four students alleged to have committed the sexual assaults described in this paragraph were students at Eastern Michigan University during the time period alleged. The University lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph and they are therefore denied.**

5.      Many of the aforementioned rapes took place at EMU fraternities, Alpha Sigma Phi ("ASP") and Delta Tau Delta ("DTD"). Both ASP and DTD are and were registered with EMU.

**ANSWER:**

**Admitted in part and denied in part. It is admitted that ASP and DTD are recognized student organizations at the University. The University lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph and they are therefore denied.**

6.      Upon information and belief, ASP and DTD members were duty-bound and obligated to report any and all instances of alleged sexual assault to EMU's Title IX department.

**ANSWER:**

**Denied. By way of further response, the University's policies have never required students to report all instances of alleged sexual assault. To the**

**contrary, such a rule would in all likelihood violate existing federal regulations regarding Title IX.**

7.      Upon information and belief, Durbin has been criminally charged with assaulting and/or raping at least nine (9) different victims, including but not limited to Plaintiffs JANE DOE 2-10.

**ANSWER:**
**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

8.      Upon information and belief, Durbin was a member of ASP from 2015 to 2018.  Several of the aforementioned rapes and/or sexual assaults were reported to have taken place at the ASP chapter house during the same time period.

**ANSWER:**
**Admitted in part and denied in part.  The University admits that JD3 became affiliated with Greek life at the University in the Fall of 2015 until 2018. Except as so admitted, denied.**

9.      Upon information and belief, Hernandez and McWilliams have been investigated and/or criminally charged with counts of criminal sexual conduct involving multiple victims, including but not limited to JANE DOE 1.

**ANSWER:**
**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

10.      Upon information and belief, ASP members knew about many of the rapes, and in at least one instance conducted what was referred to as a "Mystic Circle," where an alleged rape victim was placed in the middle of an unlit room,

surrounded by ASP members, seated in a circle, who "explained" the facts and circumstances of the alleged rape to the victim.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

11.     After conducting the "Mystic Circle," ASP chapter president, Lucas Coffey ("Coffey"), contacted EMU Police Chief Robert Heighes ("Heighes") and described to Heighes the details about what transpired in the "Mystic Circle."

**ANSWER:**

**Denied.  The allegation that Coffey informed Heighes about a "Mystic Circle" is categorically false.  If Heighes, who has been in law enforcement for decades and has worked tirelessly to provide protection and relief to victims of sexual assault, had ever been informed of the "Mystic Circle" alleged in this Complaint, he would have promptly commenced an EMUPD investigation. Upon information and belief, Coffey also denies that this conversation ever took place.**

12.     Upon information and belief, Heighes is Coffey's uncle.

**ANSWER:**

**Denied.  Heighes and Coffey are not related by blood or marriage.  By way of further response, Coffey is the son of Heighes' ex-sister-in-law, born after Heighes's 1980 divorce from Coffey's aunt.  Nearly twenty years after the divorce, Heighes' ex-wife's sister had a son, namely, Coffey.  Coffey is not Heighes' nephew, and Heighes has never considered Coffey to be his nephew. Heighes had never met Coffey before Coffey began attending the University. For the avoidance of doubt, Heighes has never been Coffey's uncle, and Coffey has never been Heighes' nephew.**

13.     Upon information and belief, beginning in at least December 2016, EMU Police Department ("EMUPD") had knowledge of systemic rapes and/or sexual assaults that had taken place at EMU and in the surrounding area.

**ANSWER:**
**Denied.**

14.     Upon information and belief, a glimpse into the culture of EMUPD was captured by EMUPD Deputy Chief Daniel Karrick's ("Karrick") attempt to explain Title IX to Ypsilanti Police Department Detective Annette Coppock ("Coppock"), the officer in charge ("OIC") of the criminal investigation against several of the alleged EMU rapists: "...If you have a campus that has a lot of rapes or guys that are catcalling girls or that type of culture, 'No' means 'yes' and 'yes' means 'anal,' then Title IX comes into play to say this is not a safe school for girls to be attending because they cannot get an equal opportunity to get an education with this type of stuff going on."

**ANSWER:**

**Admitted in part and denied in part.  The University lacks sufficient knowledge or information to form a belief as to the truth of the allegation that Ypsilanti Police Department Detective Coppock is the "[OIC] of the criminal investigation against several of the alleged EMU rapists" and this allegation is therefore denied.  The University admits that Karrick made a similar, hypothetical statement to Coppock in the context of explaining generally how Title IX applies to institutions of higher education because Detective Coppock asked Karrick to explain to her how Title IX worked.  Karrick's hypothetical statement did not refer to the University, but rather referred generally to publicly-reported scandals at other universities.  Except as so admitted, denied.**

15.     Upon information and belief, EMUPD officers and/or investigators deliberately failed to enter reports from sexual assault victims into the police CRISnet system and/or other EMUPD reporting systems and/or software utilized by EMUPD to create police reports from complaining victims and/or witnesses.

**<u>ANSWER</u>:**
**Denied.**

16.     Upon information and belief, EMUPD deliberately failed to notify the Ypsilanti Police Department ("YPD") about the brutal rape against JANE DOE 1 that reportedly occurred within EMUPD's jurisdiction.  As will be explained more thoroughly herein, the following indifference by EMUPD hindered a proper investigation into JANE DOE l's sexual assault, which caused her catastrophic harm:

a.     JANE DOE 1 was raped on January 19, 2018.

b.     JANE DOE 1 was pinned down and raped by McWilliams and Hernandez while they took turns violating her.

c.     EMUPD had information about the JANE DOE l's sexual assault in early 2018.

d.     YPD did not become aware of JANE DOE l's sexual assault until 2020.  However, upon learning of JANE DOE l's sexual assault, YPD conducted a thorough investigation, which resulted in criminal charges against both Hernandez and McWilliams for not

11

only the brutal sexual assault of JANE DOE 1, but of two other

victims, as well.

**ANSWER:**
**Denied.**

17.    Defendants are responsible for Plaintiffs' damages stemming from the

sexual assaults by Durbin, Hernandez, McWilliams, and Sutton against Plaintiffs, as

Defendants placed vulnerable female students like Plaintiffs in harm's way by:  1)

covering up several reports of sexual assault despite knowing the same were

continuing, thereby creating an ongoing and increased risk of danger for EMU's

female students; 2) acting in a manner that was deliberately indifferent to the

knowledge of reported and suspected sexual assaults against EMU's female

students; 3) failing to follow EMU's Title IX policies and/or protocols; 4) failing to

sufficiently train EMU staff and/or related personnel to properly investigate sexual

assaults; and 5) committing overt acts of misfeasance and malfeasance.  In essence,

Defendants effectively provided Durbin, Hernandez, McWilliams and Sutton with a

"Get Out of Jail Free" card.

**ANSWER:**
**Denied.**

18.    This is a civil action against Defendants for declaratory, injunctive,

equitable, and monetary relief for injuries sustained by Plaintiffs as a result of the

acts, conduct, and omissions of Defendants in their official capacities, as well as

their respective employees, representatives, and agents relating to sexual assault, abuse, molestation, rape, and/or nonconsensual sexual touching and/or harassment by Durbin, Hernandez, McWilliams, and Sutton against Plaintiffs while enrolled at EMU.

**ANSWER:**

**This paragraph is a characterization of Plaintiffs' Complaint and the relief sought therein to which no response is required.  To the extent a response is required, the University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

19.     Plaintiffs file this case anonymously because of the extreme sensitive nature of the case as Plaintiffs were victims of sexual assault, and the suit will require disclosure of information "of the utmost intimacy;" Plaintiffs are therefore entitled to protect their identities in this public filing by not disclosing their names.  *Doe v. Porter*, 370 F.3d 558, 560 (6th Cir., 2004), citing *Doe v. Stegall*, 653 F.2d 180, 185-86 (5th Cir., 1981).

**ANSWER:**

**This paragraph is a characterization of Plaintiffs' Complaint and the relief sought therein to which no response is required.  To the extent a response is required, the University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

## PARTIES

20.     Plaintiffs JANE DOE 1, JANE DOE 2, JANE DOE 3, and JANE DOE 4, JANE DOE 5, JANE DOE 6, JANE DOE 7, JANE DOE 8, JANE DOE 9, JANE

DOE 10, and JANE DOE 11 (hereinafter collectively referred to as "Plaintiffs" unless otherwise identified) reside and/or at all times relevant to the instant action resided in the State of Michigan within the Eastern District of Michigan.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

21.     At all times relevant to the instant action, Plaintiffs were students at EMU located within the Eastern District of Michigan.

**ANSWER:**

**Denied.  By way of further response, the phrase "at all relevant times" is vague, but it is specifically denied that all Plaintiffs were students at the University during all time periods relevant to the allegations in the Complaint. The remaining averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

22.     Defendant EMU BOARD OF REGENTS ("Regents") is the governing body of EMU, a public university and Michigan Corporation that receives Federal financial assistance and is, therefore, among other reasons, subject to Title IX of the Education Amendments of 1972, 20 U.S.C. §1681, *et seq*., and is a body corporate, with the right to be sued, vested with the government of the University.  MCE 390.551, *et seq*.

**ANSWER:**

**Admitted in part and denied in part.  The University admits that the Eastern Michigan University Board of Regents is the governing body of Eastern Michigan University, a public university and Michigan Corporation that receives federal financial assistance.  Except as so admitted, denied.**

14

23.     At all times relevant to the instant action, Defendant MELODY

WERNER ("Werner") resided in the Eastern District of Michigan and was EMU's

Title IX Director.

**ANSWER:**

**Admitted in part and denied in part.  It is admitted that Werner was the Title IX Coordinator for the University from 2015 until November 2019 and resided in the Eastern District of Michigan during that time.  Except as so admitted, denied.**

24.     Defendant Werner is being sued in her official capacity.

**ANSWER:**
**Admitted.**

25.     At all relevant times to the instant action, Defendant Werner was acting

in her official capacity, within the course and scope of her employment as EMU's

Title IX Director, employed by EMU and Defendant Regents, and under color of

law.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

26.     Defendant EMUPD a.k.a. EMU Department of Public Safety, with its

principal location at 1200 Oakwood Street, City of Ypsilanti, County of Washtenaw,

State of Michigan, is located within the Eastern District of Michigan.

**ANSWER:**

**Admitted in part and denied in part.  It is admitted that EMUPD is headquartered at 1200 Oakwood Street, City of Ypsilanti, County of Washtenaw, State of Michigan.  It is denied that EMUPD is a separate legal**

entity capable of being sued.  **EMUPD is an arm of the University.  Its annual budget is set by the University and its staff are University employees.  Except as so admitted, denied.**

27.    At all times relevant to the instant action, Defendant EMUPD was deputized by the Washtenaw County Sheriff, expanding Defendant EMUPD's jurisdiction beyond the borders of EMU's campus as a part of the Eastern Washtenaw Safety Alliance and in collaboration with the Washtenaw County Sheriff's Office, YPD, and the Ann Arbor Transportation Authority.  The officers from each agency within the Eastern Washtenaw Safety Alliance, including Defendant EMUPD, share jurisdictional authority and have county-wide arrest powers.

**ANSWER:**
**Admitted.**

28.    Defendant EMUPD's primary mission is to "provide for the safety and security of all . . . students . . .  at our great [Eastern Michigan] University."

**ANSWER:**
**Admitted.**

29.    At all times relevant to the instant action, Defendant Karrick resided in the Eastern District of Michigan and was employed by Defendants EMUPD and Regents as EMUPD's Deputy Chief of Police.

**ANSWER:**

**Admitted in part and denied in part.  It is admitted that Defendant Karrick resided in the Eastern District of Michigan during the time period that**

**is the subject of the allegations in the Complaint, and that he was employed by the University as EMUPD's Deputy Chief of Police. Except as so admitted, denied.**

30.    Defendant Karrick is being sued in his official capacity.

**ANSWER:**

**Admitted.**

31.    At all times relevant to the instant action, Defendant Karrick was acting

in his official capacity, within the course and scope of his employment as EMUPD's

Deputy Chief of Police, employed by Defendants EMUPD and Regents, and under

color of law.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

32.    At all times relevant to the instant action, Defendant Heighes resided in

the Eastern District of Michigan and was employed by Defendants EMUPD and

Regents as the EMUPD Chief of Police.

**ANSWER:**

**Admitted in part and denied in part.  It is admitted that Defendant Heighes resided in the Eastern District of Michigan during the time period that is the subject of the allegations in the Complaint, and that he was employed by the University as EMUPD's Chief of Police.  Except as so admitted, denied.**

33.    Defendant Heighes is being sued in his official capacity.

**ANSWER:**

**Admitted.**

17

34.     At all times relevant to the instant action, Defendant Heighes was acting in his official capacity, within the course and scope of his employment as EMUPD Chief of Police, employed by Defendants EMUPD and Regents, and under color of law.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

35.     Defendant ASP - Gamma Upsilon Chapter ("ASP - Chapter"), is a Michigan corporation with its Chapter location at 411 Ballard Street, City of Ypsilanti, State of Michigan, and is located within the Eastern District of Michigan.

**ANSWER:**

**This allegation is directed to a defendant other than the University.  By way of further response, the University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

36.     Defendant ASP - Chapter has specific bylaws governing its operation and management.

**ANSWER:**

**This allegation is directed to a defendant other than the University.  By way of further response, the University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

37.     Defendant ASP - Chapter's bylaws require it to do the following:

a.     Appoint a Risk Management Director, whose duties and

obligations include but are not limited to:

18

i.      "Reduce exposure to risk and liability of the Chapter and its members;"

ii.     "Ensures that risk management policies are followed at all Chapter events;"

iii.    "Communicates at least monthly with the Risk Management Advisor on the Chapter Council;"

iv.    "Assists the President and Prudential Board with crisis management;"

v.      "Works with the House Manager to ensure proper health, safety and welfare inspections are carried out...;"

vi.     "Coordinates at least one educational program related to risk management each term;"

vii.    "Completes an incident report and submits to Headquarters for all incidents," and

viii.   Documents everything and prepares a transition binder to pass on to the next officer."

b.    Adopt a Risk Management Program that, among other things:

i.      "Aims to reduce risk;"

ii.     "To help undergraduate members of the fraternity better understand that 'risk' is a part of life and that given the

tools and resources to recognize 'risk' and individuals' liability and be greatly reduced;"

   iii.   "To inform members of all applicable federal, state, and local laws, as well as college or university and national fraternity policies," including but not limited to EMU's Title IX policies;"

   iv.   "Make sure that all Chapter policies are consistent with federal, state, and local laws, as well as college or university and national fraternity policies;"

   v.   "Ensure that every Chapter activity is evaluated for potential risks and that all possible actions are taken to manage such risks;"

   vi.   "Develop and maintain a crisis management plan and make sure each Chapter member is familiar with the actions contained within the plan;" and

   vii.   "Educate members on the ASP National Fraternity's alcohol policies."

  c.   Ensure that every appointed officer "leads by example."

**ANSWER:**

**This allegation is directed to a defendant other than the University. By way of further response, the University lacks sufficient knowledge or**

information to form a belief as to the truth of the allegations of this paragraph
and they are therefore denied.

38.    Defendant ASP - Chapter also enacted a "Code of Conduct" for which

all members must abide, which includes but is not limited to the following

affirmations:

> a.    "I will respect the dignity of all persons, and therefore, I will not
>
> physically, psychologically, or sexually abuse any human
>
> being;"
>
> b.    "I will not abuse, nor support the abuse of, alcohol or controlled
>
> substances."

**ANSWER:**

**This allegation is directed to a defendant other than the University.  By
way of further response, the University lacks sufficient knowledge or
information to form a belief as to the truth of the allegations of this paragraph
and they are therefore denied.**

39.    Defendant ASP - Chapter further follows a Health and Safety Policy

which explicitly includes that "[t]he Fraternity will not tolerate or condone any form

of sexist or sexually abusive behavior on the part of its members, whether physical,

mental, or emotional.  This is to include any actions, activities, or events, whether

on chapter premises or an off-site location which are demeaning to women or men,

including but not limited to verbal harassment, sexual assault by individuals or

members acting together."

**ANSWER:**

**This allegation is directed to a defendant other than the University.  By way of further response, the University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

40.     Every member of Defendant ASP - Chapter must sign a "Membership Agreement and Affiliation Form" which includes, but is not limited to the following acknowledgements:

      a.     "To follow and comply with all policies and procedures as outlined in the Fraternity Constitution and By-laws, ..., the chapter/provisional chapter Constitution and By-laws; and the Ritual of Alpha Sigma Phi Fraternity;"

      b.     "To familiarize myself with and comply with Alpha Sigma Phi Health and Safety Policies... These Policies forbid any form of hazing or assault;"

      c.     "To comply with the laws of the land and rules, regulations and policies of the institution where I am enrolled as a student," including but not limited to EMU's Title IX policies.

**ANSWER:**

**This allegation is directed to a defendant other than the University.  By way of further response, the University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

41.     Defendant ASP FRATERNITY, INC. ("ASP - National") is a foreign corporation which conducts business in the City of Ypsilanti, County of Washtenaw, State of Michigan.

**ANSWER:**

**This allegation is directed to a defendant other than the University.  By way of further response, the University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

42.     At all times relevant to the instant action, Defendant ASP - National governed, controlled and/or maintained Defendant ASP - Chapter via its bylaws, constitution and/or code of conduct.  Defendant ASP - Chapter is required to regularly report to Defendant ASP - National regarding all matters, including but not limited to incidents of harassment and sexual assault.

**ANSWER:**

**This allegation is directed to a defendant other than the University.  By way of further response, the University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

43.     Upon information and belief, Defendant ASP - National was on notice of Defendant ASP - Chapter's probationary status for previous violations, including but not limited to alcohol consumption on its premises in direct violation of its bylaws.

**ANSWER:**

**This allegation is directed to a defendant other than the University.  By way of further response, the University lacks sufficient knowledge or**

information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.

44.     Defendant DTD FRATERNITY - Theta Xi Chapter ("DTD - Chapter")

is a Michigan corporation with its Chapter location at 720 Lowell Street, City of

Ypsilanti, State of Michigan, and is located within the Eastern District of Michigan.

**ANSWER:**

**This allegation is directed to a defendant other than the University.  By way of further response, the University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

45.     Defendant DTD - Chapter has specific bylaws governing its operation

and management.

46.     Defendant DTD - Chapter's bylaws require:

a.      Appointment of an Executive Board;

b.      Appointment of a Risk Management Officer;

c.      Prohibition of alcohol and/or illegal substances, which is punishable by fine and/or expulsion;

d.      "Members or pledges found guilty of conduct detrimental to the best interest of the Fraternity and/or Chapter shall have a hearing with the Honor Board to determine proper action;" and

e.      "Members and pledges shall maintain proper decorum at all times with respect to the introduction of guests within the Shelter."

**ANSWER:**

**This allegation is directed to a defendant other than the University. By way of further response, the University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

47.    Defendant DTD, INC. ("DTD - National") is a foreign corporation which conducts business in the City of Ypsilanti, County of Washtenaw, State of Michigan.

**ANSWER:**

**This allegation is directed to a defendant other than the University. By way of further response, the University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

48.    At all times relevant to the instant action, Defendant DTD - National governed, controlled and/or maintained Defendant DTD - Chapter via its bylaws, constitution and/or code of conduct.  Defendant DTD - Chapter is required to regularly report to Defendant DTD - National regarding all matters, including but not limited to incidents of harassment and sexual assault.

**ANSWER:**

**This allegation is directed to a defendant other than the University. By way of further response, the University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

49.    Upon information and belief, Defendant DTD - National was on notice of Defendant DTD - Chapter's probationary status for previous violations, including

but not limited to alcohol consumption on its premises in direct violation of its bylaws.

**ANSWER:**

**This allegation is directed to a defendant other than the University.  By way of further response, the University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

## JURISDICTION AND VENUE

50.    This action arises under the United States Constitution and jurisdiction belongs to this Honorable Court pursuant to 28 U.S.C. §§ 1331 and 1343, as these matters pertain to federal questions posed by 42 U.S.C. §§ 1988.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

51.    Jurisdiction further belongs to this Honorable Court as this, in part, is an action for deprivation of civil rights pursuant to 42 U.S.C. § 1983.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

52.    This Honorable Court maintains jurisdiction over Plaintiffs' state law claims pursuant to Fed. R. Civ. P. 18 and 28 U.S.C. § 1367.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

53.     This is an action for the hostile environment and failure to protect in violation of Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681, *et seq*., 34 C.F.R. § 106.31 *et seq*., and 42 U.S.C. § 1983, and the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act of 1990, 20 U.S.C. § 1092(f) (2018) ("Clery Act").

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.  By way of further response, no Count of this Complaint asserts any claim arising from the Clery Act, which provides for no private right of action.**

54.     Defendants are not immune from suit under the Governmental Tort Liability Act, MCL 691.1401 *et seq*., or any other statute.

**ANSWER:**
**Denied.**

55.     Venue is proper in the United States District Court for the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b), as all of the events giving rise to this action occurred in the County of Washtenaw, State of Michigan, which is located within the Southern Division of the Eastern District of Michigan.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

56.     The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), excluding interest, costs, and attorney fees.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

57.   Plaintiffs' Complaint is timely filed within the applicable statutes of limitations.

**ANSWER:**

**Denied.**

## FACTUAL ALLEGATIONS

58.   Plaintiffs realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

**ANSWER:**

**All foregoing responses by the University are incorporated herein by reference.**

## JANE DOE 1

59.   JANE DOE 1 enrolled at EMU in the Fall of 2015.

**ANSWER:**

**The University admits that Jane Doe 1's first semester at EMU was the Fall of 2015.**

60.   JANE DOE 1 met Hernandez during her freshman year at EMU, as she and Hernandez lived in the same dorm and on the same floor.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

61.    JANE DOE 1 met McWilliams in 2016 through Hernandez, as McWilliams and Hernandez belonged to the same fraternity, Defendant DTD - Chapter.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

Night of the Rape

62.    On or around January 18, 2018, JANE DOE 1 went to a fraternity party, which was being held at Defendant DTD - Chapter's fraternity house, with her cousin.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

63.    Prior to arriving at the Defendant DTD - Chapter house, JANE DOE 1 and her cousin consumed alcohol so that they would not have to drink at the party.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

64.    Despite JANE DOE l's alcohol consumption, she was fully aware of her surroundings and the events that took place on or around January 18, 2018.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

65.     JANE DOE 1 and her cousin walked to Defendant DTD - Chapter's

fraternity house, which was approximately one mile from JANE DOE l's residence.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

66.     During the party, as JANE DOE 1 danced with friends, Hernandez

persistently stepped in while JANE DOE 1 was dancing with another male.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

67.     While dancing with JANE DOE 1, Hernandez repeatedly rubbed

against her and tried to kiss her.  JANE DOE 1 told Hernandez not to kiss her and

that she was not interested, rejecting Hernandez's advances.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

68.     JANE DOE 1 also danced with McWilliams during the party.

McWilliams did not make sexual advances towards JANE DOE 1 as they danced.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

69.     However, on multiple occasions during the party, McWilliams

attempted to serve JANE DOE 1 and her cousin "shots" of alcohol, which JANE

DOE 1 and her cousin both declined.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

70.     The party ended at approximately 2:00 a.m., at which time members of

Defendant DTD - Chapter began asking people to leave.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

71.     Hernandez and McWilliams told JANE DOE 1 and her cousin that they

could "stay and hang out" after the party.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

72.     After talking and making sure it was ok with JANE DOE 1.  JANE

DOE l's cousin went with a member of Defendant DTD - Chapter to another room.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

73.     JANE DOE 1 was then invited by Hernandez and McWilliams to go to

another "living room" to watch Netflix until JANE DOE l's cousin returned.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

74.     Instead of a living room, JANE DOE 1 was escorted into a private room with a bed, dresser, and television on top of the dresser.  When JANE DOE 1 entered the room, she noticed one of the men locking the door behind her.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

75.     After entering the private room, Hernandez grabbed JANE DOE 1 and pulled her into his grip, groping her breasts and buttocks as he tried to kiss her.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

76.     JANE DOE 1 was scared and wanted to leave.  She told Hernandez "no" and pleaded with him to stop several times.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

77.     Undisturbed by JANE DOE 1's pleadings, Hernandez forcefully removed all of JANE DOE 1's clothes.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

78.     As Hernandez forcefully removed JANE DOE 1's clothing against her will, McWilliams stood in the corner of the room and watched.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

79.    Once JANE DOE 1 was fully nude, Hernandez pushed her onto a bed. Hernandez then removed all of his clothes and laid on top of JANE DOE 1, where he continued to grope her as she repeatedly begged him to stop.  In response, Hernandez pushed JANE DOE 1's head into the bed, put his face into her groin, and bit down hard against her vaginal opening, causing agonizing pain.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

80.    JANE DOE 1 then heard Hernandez tell McWilliams, who had removed all of his clothes except for his shirt, to join him.  McWilliams then started to grope JANE DOE 1 and attempted to kiss her, as well.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

81.    Hernandez grabbed JANE DOE 1 by her hair and pulled her up to a sitting position by the side of the bed.  Both Hernandez and McWilliams stood side by side masturbating to make themselves erect thereinafter forcing JANE DOE 1 to give them oral sex while they both stood in front of her.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

82.     At this point, JANE DOE 1 realized that either Hernandez or McWilliams was recording the brutal sexual assault on a phone, because she could see a flash emanating from a camera phone.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

83.     Hernandez got onto the bed while forcefully grabbing JANE DOE 1's hair.  Hernandez then forced JANE DOE 1's head back onto his penis.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

84.     At the same time, McWilliams stood at the side of the bed with his leg up behind JANE DOE 1.  McWilliams then began penetrating JANE DOE 1's vagina with his penis.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

85.     As Hernandez continued to hold JANE DOE 1's hair and thrust his penis into her mouth, McWilliams penetrated her vaginally.  Hernandez and McWilliams raped JANE DOE 1 simultaneously.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

86.    Throughout the assault, Hernandez and McWilliams smacked JANE DOE l's breasts and buttocks as they continued to brutally rape her.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

87.    JANE DOE 1 begged Hernandez and McWilliams to stop, indicating that she needed to use the bathroom, needed to find her cousin, and needed to go home to her apartment to let her roommate inside.  Hernandez and McWilliams ignored JANE DOE l's pleadings and continued to rape her.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

88.    Hernandez then left the room as McWilliams continued to rape JANE DOE 1.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

89.    McWilliams sat on the bed and held JANE DOE 1 by her hair, restricting her movement, and then forced his penis down her throat.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

90.    Hernandez then returned to the room as McWilliams continued to brutally rape JANE DOE 1.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

91.    In a concerted effort, Hernandez and McWilliams pulled JANE DOE 1 to the edge of the bed, taking turns forcing their penises into JANE DOE 1 's mouth while holding her hair.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

92.    McWilliams then ejaculated onto JANE DOE 1 face, head, and neck. Once McWilliams finished, he grabbed his clothes and left the room.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

93.    JANE DOE 1 again told Hernandez that she needed to use the restroom. Hernandez escorted her, preventing any attempts by JANE DOE 1 to escape. Hernandez then followed JANE DOE 1 into the restroom where he locked the door behind them, trapping JANE DOE 1 yet again.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

94.    Inside the restroom, Hernandez continued to grope JANE DOE 1 and told her she needed to "clean up" after McWilliams had ejaculated on her face.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

95.    Hernandez pulled JANE DOE 1 by her hair back into the bedroom and continued the assault after she cleaned McWilliams's semen off of her head, face, and neck.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

96.    Hernandez continued to rape JANE DOE 1, becoming more violent after McWilliams left the room.  Hernandez referred to JANE DOE 1 as his "sex slave."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

97.    Hernandez began biting JANE DOE 1, leaving huge marks and bruises all over her body.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

98.    Hernandez then forced JANE DOE 1 to bend over the side of the bed in order to penetrate her vaginally.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

99.     Hernandez continued biting JANE DOE 1.   Hernandez became so violent that he left a huge mark on her left buttock along with smaller marks on her side.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

100.   Hernandez, unable to become erect due to intoxication, laid on his back and pulled JANE DOE 1's hair and head towards his groin.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

101.   Hernandez took JANE DOE 1's head and began thrusting his penis into her mouth.   Hernandez then pulled JANE DOE 1's head off of his penis, grabbed JANE DOE 1 by her hips, and physically placed her onto his penis, forcing her to sit while he penetrated her vaginally.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

102.   JANE DOE 1 again told Hernandez she needed to find her cousin and let her roommate into her apartment.   At this point, Hernandez finally permitted JANE DOE 1 to get up.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

103.   JANE DOE 1 quickly grabbed her phone and called her cousin, who was downstairs at the time.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

104.   Running furiously with her cousin, JANE DOE 1 escaped Defendant DTD - Chapter's fraternity house as Hernandez chased after her.  Ultimately, JANE DOE 1 arrived at her apartment where she was in shock and was given aid by her cousin.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

105.   JANE DOE 1 suffered the following physical injuries, which include but are not limited to:

a.   Severe vaginal pain and bleeding;

b.   Bruising and handprint on her right buttock;

c.   Large bruise on her calf;

d.   Bruise on side of her body;

e.   Large bite mark and bruise on her left buttock;

f.   Severe migraine headaches;

g.   Severe PTSD;

h.   Depression;

i.   Anxiety; and

j.   Any other injuries as discovery may reveal.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

Panic by Hernandez and McWilliams

106.   Both Hernandez and McWilliams started to panic and made several attempts to contact JANE DOE 1 and her cousin in the days following the assault.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

107.   After learning of JANE DOE 1's brutal sexual assault, JANE DOE l's roommate made posts on EMU's social media website, Twitter, and Facebook warning others that Hernandez and McWilliams had raped JANE DOE 1.

**ANSWER:**

**Admitted in part and denied in part.  The University admits that an individual believed to be Jane Doe 1's roommate and/or boyfriend posted on social media alleging that JD2 and JD1 sexually assaulted a female.  The University lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph and they are therefore denied.**

108.   Upon information and belief, in a concerted effort, Hernandez and McWilliams, after learning of JANE DOE l's roommate's aforementioned posts, schemed to go to Defendant Werner to mollify and kill any potential claim by JANE DOE 1 if/when she reported the incident to Defendant Regents and EMU's Title IX department.

**ANSWER:**

**Denied.   By way of further response, the University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph as they relate to the intent of JD2 and JD1; therefore, those allegations are denied.**

**The University further denies the allegation that Werner would or did attempt to dissuade Jane Doe 1 from participating in a Title IX investigation or reporting the incident to the police.  To the contrary, Werner chose to pursue a career focused on helping survivors.  Her role at the University was, among other things, to respond to complaints of sexual assault and provide complainants with general support and information about their options of choosing to pursue a Title IX investigation and/or reporting to police. In the event that a complainant decided to move forward with a Title IX investigation, Werner would assign an investigator to interview parties and witnesses.  Jane Doe 1 chose not to move forward with an investigation.**

**Additionally, as Title IX Coordinator, it was Werner's practice to explain to an alleged victim of sexual assault the benefit of reporting an assault to the police and creating a record of the victim's account of the incident so that, if at some point in the future the victim wanted to pursue criminal charges against the assailant, the victim's statement would already be on file with the police.  It was also Werner's practice to offer to accompany such a person to the police station to assist him/her with making such a report to the police.**

**In this case, Werner acted consistently with that practice.  Werner at no time said anything to dissuade Jane Doe 1 from reporting the incident.  Instead, Werner emailed Jane Doe 1 on March 13, 2018 and March 26, 2018 to offer support, help, and assistance and to set up a meeting with Jane Doe 1.  On**

**March 29, 2018, Werner met in person with Jane Doe 1 to discuss the alleged sexual assault and to explain Jane Doe 1's options, including proceeding with a Title IX investigation or reporting the assault to the police.  During their meeting, Jane Doe 1 advised Werner that she was not sure whether she wanted to proceed with an investigation.  Following their meeting, Werner emailed Jane Doe 1 to ask her if she would be willing to speak with an EMUPD officer in the Special Victim's Unit and made other attempts to encourage Jane Doe 1 to contact EMUPD.  Werner emailed Jane Doe 1 again on April 10, 2018 to check in and see if she could provide further support.  Werner also assisted Jane Doe 1 with securing academic accommodations.**

**Ultimately, despite Werner's outreach, support, and encouragement, Jane Doe 1 made a decision not to participate in any Title IX investigation and, likewise, did not report the incident to EMUPD, did not contact EMUPD, and was unresponsive to EMUPD's further outreach.  Jane Doe 1 had every right to make the decision that not proceeding with an investigation was the right choice for her under the circumstances.  Because proceeding with a Title IX investigation over the objections of a survivor often has the effect of retraumatizing the survivor, the University rarely makes the decision to override the wishes of a survivor, which, in this instance, was to not move forward with an investigation.**

109.   Upon information and belief and at all times relevant to the instant action, Hernandez was a well-known figure on EMU's campus.  He was at one time the President of Interfraternity Council, the local governing board for EMU fraternities, and had developed a working relationship with Defendant Werner based, in part, on the same.

**ANSWER:**

**Admitted in part and denied in part.  The University admits that JD2 served as the President of the Interfraternity Council at the University for the calendar year 2018.  As to the allegation that "[JD2] was a well-known figure on EMU's campus," the University lacks sufficient knowledge or information to form a belief as to the truth of that allegation and it is therefore denied.  The remaining allegations of this paragraph are denied.**

By way of further response, the allegation that there was a "working relationship" between Werner and JD2 is categorically wrong. To the contrary, the first time that Werner met personally with JD2 was in or about March, 2018 when JD2 met with Werner in the Title IX Office about this matter. Werner and JD2 did not know one another personally prior to their March 2018 meeting. Except as so admitted, denied.

Evidence of Fraudulent Concealment and Concert of Actions

110.   Upon information and belief, McWilliams had a relationship, both professional and personal, with Defendant Karrick.

**ANSWER:**

**Denied.   The allegation that Karrick and JD1 had a personal or professional relationship is categorically false.   By way of further response, prior to working at the University, Karrick served as Deputy Chief of the Westland Police Department.   Karrick retired from the Westland Police Department on or about September 10, 2012.   Upon information and belief, JD1 began working at the Westland Police Department on or about May 23, 2016, which was *over three years after* Karrick had retired from the Westland Police Department.   Thus, Karrick and JD1 did not ever work together at the Westland Police Department.   Karrick had not ever met JD1 until March, 2018 when EMUPD began investigating certain social media posts accusing JD1 of sexual assault.   Likewise, Karrick did not learn that JD1 worked at Westland Police Department until approximately March or April, 2018.**

111.   McWilliams and Defendant Karrick had, at one point, worked together at the Westland Police Department.

**ANSWER:**

**Denied.   By way of further response, the University incorporates by reference its response to paragraph 110.**

112.   Defendant Karrick became Deputy Chief of Police for Defendant EMUPD after retiring from the Westland Police Department.

**ANSWER:**

**Admitted.**

113.   McWilliams ultimately left the Westland Police Department and, while attending EMU, became a Deputy with the Washtenaw County Sheriff's Department.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegation in this paragraph, and it is therefore denied.**

114.   Upon information and belief, after McWilliams learned about social media posts accusing him of rape, he met with his former co-worker and friend, Defendant Karrick, to discuss the accusations.

**ANSWER:**

**Denied.  The University specifically denies that Karrick and JD1 were ever co-workers or friends; to the contrary, Karrick and JD1 never worked together at Westland Police Department.  By way of further response, the University incorporates by reference its response to paragraph 110.**

**By way of further response, following the allegations of the assault of Jane Doe 1 on social media in March, 2018, Werner met with JD1 and JD2 at their request.  During that meeting, Werner contacted EMUPD and requested that an officer attend the meeting.  Defendant Karrick arrived at the meeting, where he gathered information from JD1 and JD2 about the alleged assault and social media posts so that EMUPD could begin an investigation.  This March, 2018 meeting was the first time that Karrick had ever met JD1.**

115.   Upon information and belief, Defendant EMUPD started a criminal investigation into JANE DOE 1's boyfriend for allegedly publishing posts on social media about McWilliams and Hernandez.

**ANSWER:**

**Admitted in part and denied in part.  The University admits that in or about March or April 2018, EMUPD began investigating whether a certain individual, who upon information and belief was Jane Doe 1's roommate, published posts on social media following a complaint with respect to the posts made by JD1 and JD2.  During that time, EMUPD also opened an investigation as to whether a female (who was later identified as Jane Doe 1) was sexually assaulted by JD1 and JD2.  That investigation failed to progress because, despite repeated attempts to contact Jane Doe 1, Jane Doe 1 did not respond or otherwise choose to participate in any investigation of JD1 or JD2 by EMUPD. Except as so admitted, denied.**

116.  Upon information and belief, EMUPD Detective Susan McLennan

("McLennan") was assigned to the case against JANE DOE 1's boyfriend.

**ANSWER:**

**Admitted in part and denied in part.  The University admits that in or about March or April 2018, EMUPD Detective McLennan was assigned to investigate certain social media posts concerning JD1 and JD2; however, she was not the only EMUPD officer involved with this investigation.  By way of further response, EMUPD also began investigating the allegation that a female (who was later identified as Jane Doe 1) was sexually assaulted by JD1 and JD2. That investigation began but failed to progress because, despite repeated attempts to contact Jane Doe 1, Jane Doe 1 did not respond or otherwise choose to participate in any investigation by EMUPD.  Except as so admitted, denied.**

117.  Upon information and belief, during an interview with McLennan,

McLennan states the following to law enforcement: "Oh, does it involve D'Angelo

McWilliams, the deputy?  Because I took that report where he is accused of being a

rapist and I had to get him out of it."

**ANSWER:**

**Denied.   It is specifically denied that McLennan made the quoted statement alleged in this paragraph or any statement to that effect.  By way of further response, the allegation that McLennan, or any other EMUPD**

**employee or agent, made efforts to "get [JD1] out of it" is categorically false. EMUPD also opened an investigation as to whether Jane Doe 1 was sexually assaulted by JD1 and JD2. That investigation began but failed to progress because, despite repeated attempts to contact Jane Doe 1, Jane Doe 1 did not respond or otherwise choose to participate in any investigation of JD1 or JD2 by EMUPD.**

118.   After being assigned to investigate JANE DOE 1's boyfriend for

allegedly publishing material claiming McWilliams and Hernandez were rapists,

McLennan never pursued a good-faith investigation to determine whether the

accusations against McWilliams and Hernandez were true.

**ANSWER:**

**Denied. By way of further response, EMUPD engaged in a good-faith investigation of the allegation that JD1 and JD2 had sexually assaulted Jane Doe 1 within the limits of their ability in light of the fact that Jane Doe 1 chose to not participate in any investigation or respond to outreach from EMUPD.**

**On or about March 27, 2018, EMUPD became aware of an alleged assault by JD1 and JD2 through a report about social media posts concerning the alleged assault. The victim of the alleged assault was not identified in the social media posts, and Jane Doe 1 never reported her assault to EMUPD. EMUPD later learned that the victim of the alleged assault was Jane Doe 1 and that Werner had been in contact with Jane Doe 1 regarding the alleged assault. Knowing Werner was in contact with Jane Doe 1, EMUPD requested that Werner ask Jane Doe 1 if she would be willing to speak with EMUPD, and Werner did so. On April 11, 2018, Detective McLennan spoke with Werner, who indicated that she had urged Jane Doe 1 to speak EMUPD but that Jane Doe 1 was unwilling to do so. In addition to asking Werner to encourage Jane Doe 1 to speak with EMUPD, EMUPD attempted to contact Jane Doe 1 through other means, including, *inter alia*, by calling her last-known phone number on April 10, 2018 and leaving her a voicemail, calling her additional times on her last-known phone number on April 18, April 19, April 22, and April 23, 2018, and by traveling to the residence at which Jane Doe was believed to live on April 5, April 6, and April 10, 2018 (and on one occasion leaving a business card there). Despite EMUPD's diligent and good-faith efforts, Jane Doe 1 was unresponsive and chose not participate in EMUPD's investigation.**

By way of further response, McLennan individually pursued a good-faith investigation of the allegation that JD1 and JD2 had sexually assaulted Jane Doe 1 by, among other things, interviewing JD1 and JD2 (who claimed the sexual contact between them and Jane Doe 1 was consensual) and by attempting to contact Jane Doe 1 on numerous occasions, including by calling Jane Doe 1 at her last-known phone number on April 10, 2018 and leaving her a voicemail, traveling to the residence at which Jane Doe was believed to live on April 10, 2018 and leaving a business card in the door, and calling Jane Doe 1 again on April 19, 2018.

EMUPD knew, through Werner, that Jane Doe 1 was hesitant about speaking with police. Moreover, each time that EMUPD called Jane Doe 1's last-known phone number after leaving her a voicemail on April 10, 2018, Jane Doe 1's phone number went straight to a busy signal, suggesting she was declining their calls, that she had blocked their numbers, or that she had disconnected her phone. Mindful of the fact that repeated contact for a victim of sexual assault can have the effect of retraumatizing the victim, EMUPD wanted to be respectful of Jane Doe 1's choice not to pursue an investigation of her alleged sexual assault and stopped attempting to contact her.

119.   Upon information and belief, McLennan interviewed both McWilliams and Hernandez only as it related to the social media posts allegedly published by JANE DOE 1's boyfriend.

**ANSWER:**

Denied. By way of further response, when McLennan interviewed JD1 and JD2, she asked them not only about the social media posts concerning JD1 and JD2 but also about the alleged sexual encounter. JD1 and JD2 claimed that the sexual contact with Jane Doe 1 was consensual. In order to further investigate the allegations of sexual assault, EMUPD and McLennan attempted to contact Jane Doe 1 through Werner of the Title IX Office and also by calling Jane Doe 1's last-known phone number on April 10, 2018 and leaving her a voicemail, calling her additional times on her last-known phone number on April 18, April 19, April 22, and April 23, 2018, and by going to the residence at which she was believed to live on April 5, April 6, and April 10, 2018 (and on one occasion leaving a business card there). Despite EMUPD's diligent and good-faith efforts, Jane Doe 1 was unresponsive and chose not participate in EMUPD's investigation.

120.    Upon information and belief, McLennan discovered that sexual acts among McWilliams, Hernandez, and JANE DOE 1 did, in fact, occur.  However, McWilliams and Hernandez claimed that the sexual acts were consensual.

**ANSWER:**

**Admitted in part and denied in part.  The University admits that JD1 and JD2 told McLennan that the alleged sexual acts between and among Jane Doe 1, JD2, and JD1 were consensual.  The University denies the remainder of the allegations of this paragraph as stated.**

121.    Upon information and belief, McLennan gave the following account of McWilliams and Hernandez:  "They seem truthful, but they're frat boys.  They seem to be generally concerned, but . . .  I know shit happens."

**ANSWER**:

**Denied.    It is specifically denied that McLennan made the quoted statement alleged in this paragraph.**

122.    Upon information and belief, McLennan knew JANE DOE 1's residence, but failed to make contact with JANE DOE 1 to investigate her alleged sexual assaults, which were crimes that carry penalties of up to life in prison.

**ANSWER:**

**Denied.  By way of further response, the University incorporates its response to paragraph 118.**

123.    Upon information and belief, after interviewing McWilliams and Hernandez, McLennan sought criminal charges against JANE DOE 1's boyfriend for allegedly publishing posts on social media accusing McWilliams and Hernandez of rape.

**ANSWER:**

The University lacks sufficient knowledge or information to form a belief as to the truth of the allegation that the individual referenced in this paragraph was JANE DOE 1's boyfriend and this allegation is therefore denied.  The University admits that EMUPD and McLennan investigated the social media posts at issue concerning JD1 and JD2 and thereafter, per standard investigatory practice, referred the matter to the prosecutor's office, which ultimately had the authority to decide whether to seek criminal charges against the author of the social media posts.  Except as so admitted, denied.

124.  Upon information and belief, McLennan never notified local law enforcement, YPD, about the alleged gang rape of JANE DOE 1, which took place within YPD's jurisdiction.

**ANSWER:**

Denied as stated.  It is admitted that McLennan did not notify YPD of the alleged assault of Jane Doe 1 by JD1 and JD2.  Mindful of the fact that repeated contact for a victim of sexual assault can have the effect of retraumatizing the victim, EMUPD wanted to be respectful of Jane Doe 1's choice not to pursue an investigation of her alleged sexual assault.  It is furthermore specifically denied that McLennan had any duty to make a report to YPD, particularly in the absence of any communication from Jane Doe 1.  Except as so admitted, denied.

125.  Upon information and belief, McLennan had a duty to provide notice of JANE DOE 1's sexual assault to YPD.

**ANSWER:**

Denied.  By way of further response, the University incorporates by reference its response to paragraph 124.

126.  Upon information and belief, in an effort to cover up JANE DOE 1's sexual assault, McLennan stated that even if information about sexual assault was conveyed to Defendant EMUPD by a third party, they would not get involved unless

the victim contacted law enforcement.  McLennan further stated that Defendant

EMUPD "may or may not do a generic report" in such cases, despite being mandated

to do so under the Clery Act.

**ANSWER:**

**Denied.  By way of further response, the University denies the allegation that McLennan and/or EMUPD were engaged any in any effort to "cover up" Jane Doe 1's sexual assault.  The University further denies that McLennan made the quoted statement alleged in this paragraph or any statement to that effect.**

127.   Upon information and belief, more information about the cover up of

sexual assaults at EMU will be found once law enforcement reviews their police

reports regarding JANE DOE 1.  Upon reviewing the police report generated by

Defendant EMUPD about JANE DOE 1's sexual assault, it is clear that the same is

lacking critical information.  For instance, as it relates to JANE DOE 1, Defendant

EMUPD neither entered standard information and nor followed protocol for entering

sexual assault cases into a law enforcement database such as CLEMIS.  This, in turn,

hindered and continues to hinder efforts from another law enforcement agency to

investigate sexual assaults in relation to JANE DOE 1.

**ANSWER:**
**Denied.**

128.   Upon information and belief, Defendant EMUPD focused on evidence

necessary to charge JANE DOE 1's boyfriend and to clear McWilliams and

Hernandez rather than evidence of JANE DOE 1's alleged sexual assault.

**ANSWER:**

**Denied.   By way of further response, the University incorporates by reference its response to Paragraph 118.**

Mismanagement of Title IX by Defendant Melody Werner

129.   Upon information and belief, Defendant Werner met with Hernandez and McWilliams on multiple occasions wherein Hernandez and McWilliams gave statements regarding the assault on JANE DOE 1.   However, contrary to policy of Title IX investigation, none of these statements were properly recorded or memorialized.

**ANSWER:**

**Admitted in part and denied in part.   The University admits that Werner met with JD2 and JD1 on at least one occasion and discussed the allegation that JD2 and JD1 sexually assaulted Jane Doe 1.   By way of further response, Werner did not take "statements" from JD2 and JD1 because her role was not to investigate allegations.   Instead, her role was, among other things, to explain the process of investigations to students who complained about or were accused of Title IX-related misconduct.   In the event a complaining student decided to move forward with an investigation, Werner would assign an investigator to interview parties and witnesses for purpose of gathering facts relevant to the allegations.   Werner's role as Title IX Coordinator was not to investigate, but was instead to provide support and information to all students involved in the process.   Except as so admitted, denied.**

130.   JANE DOE 1's roommate called the Defendant Werner on multiple occasions to inform her of the assault of JANE DOE 1.   However, JANE DOE 1's roommate was rebuked by Defendant Werner, who told JANE DOE 1's roommate "you can't report the assault.  It must be the victim." This is in direct contrast to both

Title IX policy and Defendant Werner's admissions.  These admissions are advanced during Defendant Werner's orientation presentation explaining the Title IX policy, as seen on Youtube.

**ANSWER:**

**Admitted in part and denied in part.  The University admits that in 2018 Werner communicated with a student (who, upon information and belief, was Jane Doe 1's roommate at the time) (hereinafter the "roommate") on a number of occasions regarding the allegation that Jane Doe 1 had been sexually assaulted by JD1 and JD2.  The University admits that Werner told Jane Doe 1's roommate that, in order to proceed with a Title IX investigation, the Title IX Office needed the victim of the sexual assault to participate.  The University denies that such a statement was contrary to governing law, the University's Title IX policy, and/or any of Werner's other statements.  To the contrary, such a statement was consistent with binding Sixth Circuit case law, which requires that a university provide an accused student with an opportunity to cross-examine his/her accuser in the presence of a neutral fact finder as part of a Title IX investigation and adjudication.  *See Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018); *Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017).**

**Thus, with respect to the alleged assault of Jane Doe 1, the Title IX Office could not proceed with an investigation and adjudication without the participation of Jane Doe 1 because, among other reasons, doing so would ultimately result in a proceeding in which JD1 and JD2 could not be subject to a finding of a policy violation or subject to discipline.  In light of this, Werner's statement to Jane Doe 1's roommate was entirely appropriate, as it was intended to inform Jane Doe 1's roommate of the Title IX Office's inability to proceed with an investigation without Jane Doe 1's participation, and, in addition, intended to result in Jane Doe 1's roommate educating Jane Doe 1 on her options in light of her hesitance to report her experience.**

**By way of further response, the University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph to the extent that they refer to an inaccessible Youtube video, referenced via a broken hyperlink in the Complaint, and they are therefore denied.  Except as so admitted, denied.**

131.   Once JANE DOE 1 met with Defendant Werner, Defendant Werner told JANE DOE 1 that she had already spoken with the JANE DOE 1's alleged attackers regarding her sexual assault.   Defendant Werner further stated to JANE DOE 1: "There is no point in reporting it.   You're going to have to go through all of this to report it.   They're in a fraternity.   Greek community is going to back them up."

**ANSWER:**

**Admitted in part and denied in part.   The University admits only that Werner met with Jane Doe 1 in or about March 2018.   The remaining allegations of this paragraph are denied.   It is specifically denied that Werner made the quoted statement alleged in this paragraph or any statement to that effect.   By way of further response, the allegation that Werner dissuaded or discouraged Jane Doe 1 from pursuing a Title IX investigation and/or reporting to the police is categorically wrong.   The University further incorporates by reference its response to paragraph 108.**

132.   Defendant Werner further explained to JANE DOE 1 that she would have to contact the YPD herself, and that "no one is going to believe [her]" and "it's not even worth reporting."

**ANSWER:**

**Denied.   It is specifically denied that Werner made the quoted statement alleged in this paragraph or any statement to that effect.   By way of further response, the allegation that Werner dissuaded or discouraged Jane Doe 1 from pursuing a Title IX investigation and/or reporting to the police is categorically wrong.   By way of further response, the University incorporates by reference its response to paragraph 131.**

133.   Defendant Werner further explained that JANE DOE 1 would have to explain-in detail-the events as they occurred the night JANE DOE 1 was sexually

assaulted.  When JANE DOE 1 started to explain what happened, Defendant Werner

continuously interrupted JANE DOE 1 and made comments such as "that's not what

they said happened."

**ANSWER:**

**Admitted in part and denied in part.  The University admits that when Werner met with Jane Doe 1, Werner explained to Jane Doe 1 that, if she chose to participate in a Title IX investigation, she would have to explain the details surrounding the alleged sexual assault.  The remaining allegations of the paragraph are denied.  It is specifically denied that Werner made the quoted statement alleged in this paragraph or any statement to that effect.  By way of further response, the allegation that Werner dissuaded or discouraged Jane Doe 1 from pursuing a Title IX investigation and/or reporting to the police is categorically wrong.  By way of further response, the University incorporates by reference its response to paragraph 131.**

134.   After JANE DOE 1 finished telling her account of the sexual assault,

Defendant Werner explained that the Title IX department would not investigate

because the sexual assault happened off campus and that JANE DOE 1 would have

to contact YPD on her own.  This assertion was in direct violation of Defendant

EMUPD's mandates and investigatory powers.

**ANSWER:**

**Denied.  By way of further response, the Title IX Office's practice was to investigate  allegations of off-campus sexual assault if the alleged victim was willing to participate in the investigation irrespective of whether such investigation was required by Title IX or not.  In this particular case, the Title IX Office took reasonable steps to contact, support, and accommodate Jane Doe 1 following her roommate's report of Jane Doe 1's sexual assault, including by: (1) reaching out to Jane Doe 1 on multiple occasions to provide her with information, resources, and support; (2) meeting with Jane Doe 1; (3) explaining to Jane Doe 1 her options of choosing to pursuing a Title IX investigation and/or reporting the incident to the police; (4) assisting Jane Doe**

1 with securing academic accommodations at the University; and (5) offering to connect Jane Doe 1 with the Special Victim's Unit of EMUPD.  *See generally* **Exhibit 1**.  After a number of instances of outreach by the Title IX Office, Jane Doe 1 met with the Title IX Office.  However, following her meeting with the Title IX Office, Jane Doe 1 declined to participate in any Title IX investigation and, likewise, did not report the incident to EMUPD, did not contact EMUPD, and was not responsive to EMUPD's outreach.  *See id.*

135.   Defendant Werner continued to say: "[t]hey're [YPD] not gonna want to deal with this.  They're [YPD] not gonna believe you.  They're [YPD] gonna question everybody at the fraternity and the fraternity is gonna back these guys up."

**ANSWER:**

**Denied.  It is specifically denied that Werner made the quoted statement alleged in this paragraph or any statement to that effect.  By way of further response, the allegation that Werner dissuaded or discouraged Jane Doe 1 from pursuing a Title IX investigation and/or reporting to the police is categorically wrong.  By way of further response, the University incorporates by reference its response to paragraph 131.**

JANE DOE 1 Faces Retaliation for Pursuing Title IX Investigation

136.   JANE DOE 1 dropped out of EMU due to her sexual assault and the fact that she was unable to receive help from Defendants.

**ANSWER:**

**The University denies that Jane Doe 1 was unable to receive help from the University.  The University lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph and they are therefore denied.**

137.   After being rebuked by Defendants Regents and EMU's Title IX department, JANE DOE 1 was forced to witness her boyfriend's arrest by Defendant EMUPD for speaking up against alleged rapists, McWilliams and Hernandez.

**ANSWER:**

**The University denies the allegation that Jane Doe 1 was "rebuked by" the University's Title IX department.   The University lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph and they are therefore denied.**

138.   JANE DOE 1's boyfriend was, in fact, arrested for publishing notice of McWilliams and Hernandez as rapists on social media.

**ANSWER:**

**Admitted in part and denied in part.   The University admits it is their belief that Jane Doe 1's boyfriend ultimately pled guilty to two misdemeanors regarding posting of messages.   The University lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph and they are therefore denied.**

139.   As a result of being shut out by Defendant Regents, EMUPD, and EMU's Title IX department after attempting to disclosing her sexual assault, JANE DOE 1 engaged in self harm and developed severe depression and anxiety.

**ANSWER:**

**The University denies the allegation that Jane Doe 1 was "shut out" by the University's Title IX department after "attempting to disclosing her sexual assault."   The University lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph and they are therefore denied.**

140.   JANE DOE 1 attempted to cope with her anxiety and depression through substance abuse in hopes that the same would "numb" her existence.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

141.   In September 2018, JANE DOE 1 attempted to take her own life and was placed in a psychiatric hospital.  Upon release in October 2018, JANE DOE 1 attempted suicide for a second time and was placed back into a psychiatric hospital.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

142.   JANE DOE 1's trauma stemmed from being physically raped, her failed attempts at receiving help from Defendants, and being "mentally raped" by Defendants' mismanagement, acts, and words.

**ANSWER:**

**The University denies the allegation that Jane Doe 1 made "failed attempts at receiving help" from the University or that she was "mentally raped" by the University's "mismanagement, acts, and words."  The University lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph and they are therefore denied.**

143.  As a result of Defendants' actions, inactions, omissions, and/or detrimental conduct surrounding the knowledge of continuous and systematic sexual assaults and rapes of countless victims, including JANE DOE 1, JANE DOE 1 suffered severe and permanent damages which include but are not limited to:

      a.     Extreme emotional trauma;

      b.     Severe mental anguish;

c.      Permanent physical injury;

d.      Loss of enjoyment of life;

e.      Loss of intimacy;

f.      Vivid nightmares;

g.      Anxiety;

h.      Denial;

i.      Post-Traumatic Stress Disorder;

j.      Betrayal of Trust;

k.      Attempted suicide on two occasions;

l.      Dropped out of school; and

m.      Needed access while in school to use resources including but not

limited to education.

**ANSWER:**
**Denied.**

## JANE DOE 2

144.   JANE DOE 2 enrolled at EMU in the Fall of 2013.

**ANSWER:**

**The University admits that Jane Doe 2 first enrolled at EMU in the Fall of 2013.**

145.   JANE DOE 2 met Durbin during the Fall Semester of 2014 when they were enrolled in a mutual course.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

Night of Assault

146.   Although JANE DOE 2 cannot recall the exact date of her sexual assault, she knows that it occurred between March and early April 2016 when she was invited to watch television and "hang out" with Durbin in his dormitory suite located on EMU's campus.   JANE DOE 2 was let into the building by Durbin's roommate.   Durbin's dormitory suite consisted of a common living room, two bedrooms, and a bathroom.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

147.   JANE DOE 2 did not wish to have sex with Durbin when she went to his dormitory suite.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

148.   JANE DOE 2 and Durbin began kissing while they were alone in Durbin's common living room on a couch.   Durbin thereafter removed both his and JANE DOE 2's clothes and proceeded to get on top of JANE DOE 2.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

149.    Durbin then attempted to insert his penis into JANE DOE 2's vagina, at which point she told Durbin she was in pain and wanted him to stop.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

150.    Durbin began forcefully penetrating JANE DOE 2's vagina while JANE DOE 2 demanded that he to stop due to the pain he was causing her.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

151.    JANE DOE 2 continued to plead for Durbin to stop, during which time Durbin fully inserted his erect penis into JANE DOE 2's vagina.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

152.    Durbin continued to penetrate JANE DOE 2 against her will, "thrusting" more forcefully and and more rapidly, causing JANE DOE 2 tremendous pain and agony.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

153.   JANE DOE 2 continued to tell Durbin to stop as he continued to forcefully penetrate her.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

154.   JANE DOE 2 felt "frozen" and could not move with Durbin on top of her due largely to the significant size disparity between JANE DOE 2 and Durbin.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

155.   When Durbin finally stopped penetrating JANE DOE 2, Durbin allowed her to leave.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

156.   JANE DOE 2 returned to her dormitory room and discovered her vaginal area was very swollen and bleeding.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

157.   Her vaginal area remained swollen and sore for several days after Durbin's brutal sexual assault.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

158.   JANE DOE 2 later told two friends about her sexual assault, but without much detail, as JANE DOE 2 was still trying to process the trauma of being raped.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

159.   In July 2020, JANE DOE 2 saw a news report of Durbin being arrested and contacted YPD to provide the details of her assault by Durbin.  JANE DOE 2 began to recall previously suppressed emotions and pain after seeing the news report and after speaking to the police.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

160.   JANE DOE 2 later testified against Durbin at his preliminary examination held on October 13, 2020, in the 14A District Court before the Honorable Cedric Simpson, case number 20F2-0926-FY.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

<u>Subsequent Contact and Actionable Harassment</u>

161.   Upon information and belief, Durbin continued to harass JANE DOE 2

through text messages, phone calls, and other forms of electronic communication.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

162.   For instance, Durbin texted JANE DOE 2 asking her to spend the night.

She refused.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

163.   As a result of Defendants' actions, inactions, omissions, and/or

detrimental conduct surrounding the knowledge of continuous and systematic sexual

assaults and rapes of countless victims, including JANE DOE 2, JANE DOE 2

suffered severe and permanent damages which include but are not limited to:

a.   Extreme emotional trauma;

b.   Compartmentalizing the assault resulting in her losing trust in men;

c.   Severe mental anguish;

d.   Permanent physical injury;

e.   Loss of enjoyment of life;

f.   Loss of intimacy;

      g.     Vivid nightmares;

      h.     Anxiety;

      i.     Denial;

      j.     PTSD; and

      k.     Betrayal of trust.

**ANSWER:**

**Denied.**

## JANE DOE 3

164.   JANE DOE 3 enrolled at Defendant EMU in August 2016.

**ANSWER:**

**The University admits that Jane Doe 3's first semester at EMU was in Fall 2016.**

165.   JANE DOE 3 pledged at the sorority Sigma Kappa during her first semester at EMU.  As a result, JANE DOE 3 became friends with members of other fraternities and sororities at EMU.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

166.   On or about December 17, 2016, JANE DOE 3 met Durbin at a party held at the Tau Kappa Epsilon ("TKE") fraternity house.  JANE DOE 3 did not know Durbin before this event.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

Night of the Assault

167.   While at the TKE party, JANE DOE 3 consumed alcoholic beverages to celebrate the end of final exams.  Eventually, a friend drove JANE DOE 3 back to her dormitory where JANE DOE 3 removed her bra and underwear and changed into a tee-shirt and athletic shorts.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

168.   Sometime between midnight and 1:00 a.m., JANE DOE 3 received a text message from Durbin asking if she wanted to attend an "after-party" at Defendant ASP - Chapter's fraternity house.   JANE DOE 3 agreed.   Durbin subsequently picked up JANE DOE 3 from her dormitory while JANE DOE 3 was still in her eveningwear.   JANE DOE 3 expected the "after party" to be a relaxed social gathering.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

169.   JANE DOE 3 did not presume that Durbin wished to have sex with her when he contacted her earlier that night, because it was common for JANE DOE 3 to be invited to "after parties" with other fraternities and sororities.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

170.   JANE DOE 3 and Durbin arrived at Defendant ASP - Chapter's fraternity house and proceeded to walk through the parking lot located in the rear.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

171.   While walking through the parking lot, JANE DOE 3 slipped on a patch of ice and fell, severely smacking the back of her head on the pavement.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

172.   JANE DOE 3 immediately felt a throbbing pain and asked Durbin to take her back to her dormitory.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

173.   Instead, Durbin brought JANE DOE 3 inside of Defendant ASP - Chapter's fraternity house.  Durbin escorted JANE DOE 3 to a common living area where other fraternity members and guests were conversing.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

174.   JANE DOE 3 immediately asked some of the people who were present to take her back to her dormitory, but no one could drive due to their intoxication. JANE DOE 3 decided she could not walk home due to winter conditions and her lack of proper attire to brave the weather.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

175.   Durbin brought JANE DOE 3 into his bedroom.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

176.   Upon information and belief, Durbin's bedroom was located on the main floor of Defendant ASP - Chapter's fraternity house, down the hall from the common living area where the fraternity members and guests gathered.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

177.   JANE DOE 3 initially sat on Durbin's bed.  Durbin then suggested she lay down.  JANE DOE 3's head continued to throb in pain as she proceeded to lay on Durbin's bed.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

178.   Durbin then offered to put on a movie, to which JANE DOE 3 declined

and asked to instead be taken back to her dormitory.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

179.   JANE DOE 3 repeated her request to leave at least four more times.

Durbin either disregarded or denied each of JANE DOE 3's requests.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

180.   JANE DOE 3 started crying.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

181.   Durbin then put his arm around JANE DOE 3 and attempted to kiss her,

which JANE DOE 3 resisted.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

182.   Upon information and belief, Durbin then placed one of his hands down

JANE DOE 3's athletic shorts and groped her, putting his fingers between the folds

of her vagina.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

183.   JANE DOE 3, while uncontrollably sobbing, continued to verbally resist Durbin's advances.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

184.   The entire sexual encounter between Durbin and JANE DOE 3 was non-consensual.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

185.   After JANE DOE 3 repeatedly told him to stop, Durbin forcefully removed JANE DOE 3's athletic shorts, exposing JANE DOE 3's bare vagina and buttocks.   JANE DOE 3 continued to resist Durbin and demanded that he stop his assault.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

186.   Due largely to the injuries sustained from her fall in Defendant ASP - Chapter's parking lot, JANE DOE 3 ultimately felt powerless and unable to fight back against Durbin, who was over twice her size.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

187.   After quickly removing his clothes, Durbin forcefully removed JANE DOE 3's shirt, exposing her bare breasts.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

188.   Durbin held JANE DOE 3 down by her throat, physically choking her as she laid fully nude and helpless.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

189.   Durbin continued to assault JANE DOE 3 by penetrating her vagina with his erect penis as JANE DOE 3 continued to resist and was uncontrollably sobbing.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

190.   The penetration was excruciatingly painful for JANE DOE 3.   As Durbin was vaginally penetrating her, he inserted two to three of his fingers into JANE DOE 3's anus, causing severe tears both vaginally and rectally.   Durbin then asked JANE DOE 3, "why are you so dry?"

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

191.   By this time, JANE DOE 3 had told Durbin to stop approximately thirty (30) to forty (40) times.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

192.   Rather than stop, Durbin became angry, tightening his grip on JANE DOE 3's throat, choking JANE DOE 3 to the point where she could barely breathe.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

193.   Durbin eventually stopped his sexual assault of JANE DOE 3 because JANE DOE 3 was, in Durbin's words, "too dry."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

194.   Afterwards, JANE DOE 3 pleaded with Durbin to be taken back to her dormitory, to which Durbin responded that he would take JANE DOE 3 back to her dormitory only if she performed oral sex on him.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

195.   JANE DOE 3 refused and told Durbin that she wanted to leave.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

196.   Durbin then grabbed JANE DOE 3 by her head and forced his erect penis in her mouth and down her throat to the point where JANE DOE 3 could barely breathe.  Durbin continued to assault JANE DOE 3 orally.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

197.   After Durbin finished sexually assaulting JANE DOE 3 for a second time, JANE DOE 3 lost consciousness while laying naked on Durbin's bed.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

198.   JANE DOE 3 awoke the next morning to Durbin trying to kiss her and cuddle with her.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

199.   JANE DOE 3 immediately pushed Durbin away and demanded to be taken back to her dormitory, at which time Durbin finally complied.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

200.   As a result of her sexual assault by Durbin, JANE DOE 3 suffered heavy bleeding from both her vagina and anus over the next several days as well as minor bleeding and spotting during the remainder of that week.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

201.   As with many rape victims:

a.   JANE DOE 3 blamed herself for Durbin's vicious sexual assaults.

b.   JANE DOE 3 did not believe that EMU and Defendants Regents and EMUPD had created a protected environment for sexual assault victims, as JANE DOE 3 had heard accounts of other women that were raped and of EMU and Defendants Regents and EMUPDs' failure to provide aid, guidance, and protection to the same.

c.   When JANE DOE 3 told her sorority sisters about her sexual assault, they exclaimed "welcome to the club - it happens to everyone."

d.   Following the sexual assaults, Plaintiffs told members of Defendant ASP - Chapter and DTD - Chapter in hopes that the fraternity members would follow their fraternity's' bylaws and

regulations involving the mandatory reporting of sexual assaults within their own fraternity and/or to EMU's Title IX department and Defendant Werner.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

202.   JANE DOE 3 was told by other female victims of sexual assault at EMU that EMU, Defendant EMUPD, and/or Defendant Werner did not protect victims of sexual assault.

**ANSWER:**

**The University lacks knowledge or information to form a belief as to the truth of what Jane Doe 3 was told by other students; therefore, the allegations of this paragraph are denied.  By way of further response and to the contrary, Werner chose to pursue a career focused on helping survivors.  Her role was, among other things, to respond to complaints of sexual assault and provide complainants with general support and information about their options of choosing to pursue a Title IX investigation and/or reporting the subject incident to police or, if they chose, deciding not to pursue an investigation.  In the event that a complainant decided to move forward with a Title IX investigation, Werner would assign an investigator to interview parties and witnesses.  Additionally, as Title IX Coordinator, it was Werner's practice to explain to an alleged victim of sexual assault the benefit of reporting an assault to the police and creating a record of the victim's account of the incident so that, if at some point in the future the victim wanted to pursue criminal charges against the assailant, the victim's statement would already be on file with the police.  It was also Werner's practice to offer to accompany such a person to the police station to assist him/her with making such a report to the police.  During her tenure as Title IX Coordinator at the University, Werner acted diligently and tirelessly to provide support, information, resources, and accommodations to victims of sexual assault.**

203.   JANE DOE 3 ultimately reported her sexual assault to the YPD in or around 2020 after JANE DOE 3 discovered that the YPD were investigating Durbin and other members of Defendant ASP - Chapter for sexual assault.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

Subsequent Contact and Actionable Harassment

204.   Durbin began repeatedly contacting JANE DOE 3 after the sexual assaults.  At one point, Durbin told JANE DOE 3 that he would have sex with her to prove that "[JANE DOE 3] *did* want it the first time."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

205.   Further harassment at the hands of Durbin continued as Durbin electronically stalked JANE DOE 3 in an attempt to convince her that he did not rape her.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

206.   As a result of her sexual assaults, JANE DOE 3 ultimately transferred schools in the spring semester.  She could no longer tolerate crossing paths with

Durbin, which reminded JANE DOE 3 of the agonizing pain he caused her both during the assaults and afterwards while he was stalking her.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

207. As a result of Defendants' actions, inactions, omissions, and/or detrimental conduct surrounding the knowledge of continuous and systematic sexual assaults and rapes of countless victims, including JANE DOE 3, JANE DOE 3 suffered severe and permanent damages which include but are not limited to:

   a.   Extreme emotional trauma;

   b.   Severe mental anguish;

   c.   Permanent physical injury;

   d.   Loss of enjoyment of life;

   e.   Loss of intimacy;

   f.   Vivid nightmares;

   g.   Anxiety;

   h.   Anger and fear of being worthless;

   i.   PTSD;

   j.   Flashbacks of the assault and becoming overly upset when someone touches her neck;

   k.   Betrayal of trust;

l.   Depression; and

m.   Counseling to cope with the assaults.

**ANSWER:**
**Denied.**

## JANE DOE 4

208.   JANE DOE 4 enrolled at EMU in September 2016.

**ANSWER:**

**The University admits that Jane Doe 4 first enrolled at EMU in the Fall of 2016.**

209.   JANE DOE 4 met Durbin on the first day she moved onto EMU's campus in 2016.   She and Durbin became social acquaintances and had various degrees of social interactions during JANE DOE 4's freshman and sophomore years.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

Night of the Rape

210.   On October 12, 2017, JANE DOE 4 was invited to a "Neon Party" at EMU's Delta Sigma Phi fraternity house.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

211.   JANE DOE 4 attended Delta Sigma Phi party with two of her friends, but was unfamiliar with nearly all of the other guests in attendance.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

212.   JANE DOE 4 consumed alcohol during the event but did not feel overly inebriated.  At some point late in the evening, JANE DOE 4 became separated from her two friends.  It was at this point that JANE DOE 4 crossed paths with Durbin.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

213.   JANE DOE 4 informed Durbin that she did not wish to remain at the party.  She and Durbin agreed to leave together.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

214.   Durbin took JANE DOE 4 back to Defendant ASP - Chapter's fraternity house on Ballard Street and walked her up to his room.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

215.   JANE DOE 4 was comfortable walking up to Durbin's room because the two had known each other for approximately 18 months.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

216.   Once in Durbin's room, JANE DOE 4 sat on Durbin's bed and began to play on her phone.  Within moments, Durbin began removing JANE DOE 4's clothes without her consent.  The only two people in the room at the time were JANE DOE 4 and Durbin.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

217.   JANE DOE 4 distinctly recalls crying and verbally telling Durbin to stop.  She further informed Durbin that she was menstruating and was using a tampon at the time.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

218.   JANE DOE 4 recalls Durbin responding, "it doesn't matter," at which point Durbin forcefully ripped the tampon out of JANE DOE 4's vagina and threw it on the floor across his room.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

219.   JANE DOE 4 began sobbing uncontrollably and repeatedly demanded that Durbin stop.  Aligned with his *modus operandi*, Durbin ignored her demands.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

220.   JANE DOE 4 continued to tell Durbin to stop, during which time Durbin forcefully inserted his erect penis into JANE DOE 4's bloody vagina.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

221.   Durbin penetrated JANE DOE 4 against her will for approximately one to two minutes and then stopped.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

222.   JANE DOE 4, uncontrollably sobbing, repeatedly told Durbin to stop his assault.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

223.   JANE DOE 4 was unable to physically stop the assault, as she was laying on her back while Durbin was on top of her with his arms held over her. Moreover, JANE DOE 4 was further hindered from moving due to the significant size disparity between her and Durbin.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

224.    Despite her pleas to stop, Durbin continued raping JANE DOE 4 for at least two more minutes.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

225.    Once Durbin finally stopped, JANE DOE 4 demanded that Durbin take her home.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

226.    Durbin rolled over, facing away from JANE DOE 4, and told JANE DOE 4 to "find her clothes . . . and find your own way home." JANE DOE 4 quickly gathered her belongings and left Durbin's room.  JANE DOE 4 then texted a friend and arranged for a ride to pick her up.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

227.    Durbin's sexual assault of JANE DOE 4 was painful both during and after the forced penetration.  In particular, JANE DOE 4 felt vaginal soreness for a long period after the assault.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

228.    After her assault, JANE DOE 4 was horrified and embarrassed and confided in close friends.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

229.    In or around the summer of 2020, YPD contacted JANE DOE 4 and asked JANE DOE 4 to recount her sexual assault by Durbin.  JANE DOE 4 agreed and ultimately testified against Durbin on October 13, 2020, at the aforementioned hearing at 14A District Court.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

Subsequent Contact and Actionable Harassment

230.    Approximately three weeks after her assault, Durbin sent a series of text messages to JANE DOE 4 asking JANE DOE 4 why she was upset with him and acknowledging that he ripped her tampon out of her vagina.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

231.   Durbin likewise demanded that JANE DOE 4 stop telling people that he sexually assaulted her.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

232.   Durbin further explained to JANE DOE 4 that his fraternity brothers were questioning him about JANE DOE 4's sexual assault.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

233.   Later, in 2018, JANE DOE 4 saw Durbin at a party at Defendant DTD - Chapter's fraternity house, at which point Durbin apologized and asked to take JANE DOE 4 out to lunch.  JANE DOE 4 rejected Durbin's overture and walked away.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

234.  As a result of Defendants' actions, inactions, omissions, and/or detrimental conduct surrounding the knowledge of continuous and systematic sexual assaults and rapes of countless victims, including JANE DOE 4, JANE DOE 4 suffered severe and permanent damages which include but are not limited to:

   a.  Worsened anxiety and mental health;

   b.  Severe mental anguish;

     c.      Permanent physical injury;

     d.      Loss of enjoyment of life;

     e.      Loss of intimacy;

     f.      Vivid nightmares;

     g.      Difficulty when attending school and gatherings around campus;

     h.      PTSD and flashbacks of the assault;

     i.      Betrayal of trust;

     j.      Depression and self-blaming for the assault; and

     k.      Ongoing counseling.

**ANSWER:**

**Denied.**

## JANE DOE 5

235.   JANE DOE 5 enrolled at EMU in the Fall of 2015.

**ANSWER:**

**The University admits that Jane Doe 5's first semester at EMU was Fall of 2015.**

236.   During her first semester, JANE DOE 5 pledged at one of EMU's sororities, Delta Zeta.

**ANSWER:**

**The University admits that Jane Doe 5 pledged at Delta Zeta in the Fall of 2015.**

237.   JANE DOE 5 and Durbin became social acquaintances and had various degrees of social interactions during JANE DOE 5's freshman year through EMU's Greek community.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

Night of the Assault

238.   In November 2015, JANE DOE 5 was invited to a party at Defendant ASP - Chapter's fraternity house where Durbin was present.  JANE DOE 5 attended ASP party with her friends and roommates.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

239.   During the party, JANE DOE 5 went outside of Defendant ASP - Chapter's fraternity house to smoke a cigarette.  Durbin followed her.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

240.   Durbin approached JANE DOE 5 while she was leaning against a small sedan.  Durbin stood over JANE DOE 5 and placed his hands on the sedan in a manner such that JANE DOE 5 could not move away.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

241.   Durbin began to beg JANE DOE 5 to allow him to come to JANE DOE 5's dormitory along with her two roommates and two ASP fraternity members after the party.  JANE DOE 5 agreed.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

242.   Later, JANE DOE 5 left the party and walked back to her dormitory with her two roommates, two ASP fraternity members, and Durbin.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

243.   JANE DOE 5's dormitory room was set up with a common living area, two bedrooms, and a bathroom located in the suite.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

244.   After returning to her dormitory room with Durbin, JANE DOE 5 and Durbin moved to the common living area and began to kiss, which was consensual.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

245.   Durbin then indicated that he wanted to have sex with JANE DOE 5. JANE DOE 5 told Durbin that sex was not possible because she was on her period.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

246.    Upon information and belief, Durbin immediately became annoyed with JANE DOE 5 and was upset that JANE DOE 5 allowed him to come back to her dormitory while she was menstruating.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

247.    Durbin asked JANE DOE 5, "Why did you waste my time? Why did you bother to invite me? And why did you not tell me about your period earlier?" Durbin began audibly huffing, puffing, and grunting.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

248.    As JANE DOE 5 and Durbin continued kissing in the living room, Durbin kept pressuring JANE DOE 5 to have sex.  JANE DOE 5 reiterated that she did not want to have sex.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

249.    Durbin suddenly picked up JANE DOE 5 "like a child," lifting JANE DOE 5 in the air and pressing her chest against his own.  Durbin then brought JANE DOE 5 to the bathroom and placed her down onto the counter.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

250.   Durbin turned on the shower and proceeded to kiss JANE DOE 5. Durbin then began removing all of JANE DOE 5's clothes.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

251.   JANE DOE 5 tried to put her clothes back on while Durbin continued taking them off.  As JANE DOE 5 was physically pulling her sweater and shirt back up in an attempt to re-dress herself, she told Durbin that she did not want to get into the shower, remove her tampon, or have sex.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

252.   Durbin continued to pressure JANE DOE 5 to get into the shower and have sex.  Durbin told JANE DOE 5 that "they needed to have sex" and that "it was not a bad idea to have sex." JANE DOE 5 again told Durbin that she neither wished to get in the shower nor have sex.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

253.   JANE DOE 5 was sitting on the counter of the bathroom-still unable to leave-as Durbin stood in front of her.

88

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

254.   After JANE DOE 5's repeatedly and consistently denied Durbin's sexual advances, Durbin became upset, left the bathroom, and went into the living room.   JANE DOE 5 then left the bathroom and followed Durbin into the living room.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

255.   As JANE DOE 5 and Durbin laid next to each other on Durbin's living room couch, JANE DOE 5 and Durbin proceeded to kiss.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

256.   Durbin again tried removing JANE DOE 5's clothes while they kissed on the couch.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

257.   Durbin then placed one of his hands down JANE DOE 5's pants and tried to digitally penetrate her.   JANE DOE 5 could feel Durbin's fingers on her vagina.   Durbin then pulled on JANE DOE 5's tampon string.   JANE DOE 5 slapped Durbin's hand away saying, "please no, no, no ... I don't want that."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

258.   Again, Durbin became visibly upset and told JANE DOE 5 that it was unfair to deny him sex.  Durbin then accused JANE DOE 5 of lying to him and told her that she "at least owed him oral sex."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

259.   Out of fear, JANE DOE 5 reluctantly began performing oral sex on Durbin.  At the time, JANE DOE 5 believed that she was powerless against Durbin's sexual advances and feared that Durbin would not stop until he got what he wanted.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

260.   While JANE DOE 5 performed oral sex, Durbin became forceful.  He put his hand on JANE DOE 5's head "like palming a basketball." He continued to forcefully push JANE DOE 5's head down onto his penis, causing her extreme pain and discomfort.  Throughout the assault, JANE DOE 5 was unable to move her head away, despite several unsuccessful attempts.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

261.   JANE DOE 5 wanted him to stop.  She had told Durbin "no" at least 20 times that night.  Durbin at some point stopped holding her head onto his penis. JANE DOE 5 then curled up into a ball and fell asleep on the couch.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

262.   Following the assault, JANE DOE 5 told her sorority sisters in Delta Zeta that Durbin had raped her.  Regardless, many members of JANE DOE 5's sorority and others in EMU's Greek community chose not to believe her. Ultimately, JANE DOE 5's sexual assault was disregarded by many as being a "one-time thing."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

263.   JANE DOE 5 was subsequently judged and ostracized by the Greek community.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

264.   JANE DOE 5 did not attend any fraternity events that included Defendant ASP - Chapter or go anywhere she thought Durbin might be present.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

265.   Like other Plaintiffs, JANE DOE 5's sexual assault was neglected by

Defendants, as sexual assaults were commonplace within EMU's Greek community.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

266.   In 2020, JANE DOE 5 contacted law enforcement about her sexual

assault after learning from a friend about another assault perpetrated by Durbin.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

267.   JANE DOE 5 ultimately testified for the prosecution against Durbin at

the aforementioned preliminary hearing held in 14A District Court.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

Subsequent Contact and Actionable Harassment

268.   Durbin contacted JANE DOE 5 after learning that JANE DOE 5 had

talked about her sexual assault to other members of the EMU Greek community.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

269.   Two months after her sexual assault, Durbin and JANE DOE 5

unknowingly enrolled in a class together.   On the first day of the class, Durbin

intentionally sat directly behind JANE DOE 5.  Throughout the semester, Durbin would breathe on JANE DOE 5's neck, gaze at her, and touch her hair while she was seated.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

270.   JANE DOE 5 attended a sorority party where she felt safe and comfortable with her sorority sisters.   While walking up a stairwell, Durbin approached her and put his arm out, blocking both the stairway and JANE DOE 5's path of escape.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

271.   Durbin then told JANE DOE 5 that he heard JANE DOE 5 had been talking to others about the sexual assault.  Durbin apologized to JANE DOE 5 for what she "thought" had happened and told JANE DOE 5 that he would never want her to think that he had sexually assaulted her.  Durbin refused to move away until JANE DOE 5 verbally forgave him.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

272.   Overcome with fear, JANE DOE 5 reluctantly accepted Durbin's apology.  Durbin then forced JANE DOE 5 to give him a hug, after which he let her leave.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

273.   To this day, JANE DOE 5 continues to undergo counseling and is still experiencing symptoms of post-traumatic stress disorder.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

274.   As a result of Defendants' actions, inactions, omissions, and/or detrimental conduct surrounding the knowledge of continuous and systematic sexual assaults and rapes of countless victims, including JANE DOE 5, JANE DOE 5 suffered severe and permanent damages which include but are not limited to:

a.   Depression;

b.   Feeling worthless and having suicidal thoughts;

c.   Dealing with self-harm;

d.   Debilitating "coldness" which has affected her personal and professional relationships;

e.   Betrayal of trust in men or anyone who makes sexual advancements;

f.     Counseling to help address the anger and pain she holds towards EMU and her peers;

g.     Substance dependency;

h.     Fear and distrust of others;

i.      Gastrointestinal issues and a boarder-line eating disorder – JANE DOE 5 lost fifteen pounds after the assault and has been unable to regain the weight;

j.      Loss of interest in dating; and

k.     Fear of being intimate or not being intimate with anyone as well as a constant fear of being hurt.

**ANSWER:**
**Denied.**

## JANE DOE 6

275.   JANE DOE 6 enrolled at EMU in the Fall of 2016.

**ANSWER:**

**The University admits that Jane Doe 6 first enrolled at EMU in the Fall of 2016.**

276.   During her first semester, JANE DOE 6 pledged at one of EMU's sororities, Delta Zeta.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

277.   JANE DOE 6 and Durbin became acquaintances and had various degrees of social interactions during JANE DOE 6's freshman year through EMU's Greek community.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

Night of the Assault

278.   On or about April 8, 2017, JANE DOE 6 was invited to a registered party at one of EMU's fraternities, TKE.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

279.   That same night, but before the TKE party, JANE DOE 6 had attended a formal gathering with a member of EMU's Delta Sigma Phi fraternity.  JANE DOE 6 drank at the Delta Sigma Phi formal.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

280.   In subsequent contact by Durbin to JANE DOE 6, Durbin admitted that he drank alcohol and ingested narcotics the night of JANE DOE 6's assault.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

281.   After meeting Durbin at the TKE party, JANE DOE 6 went back to Defendant ASP - Chapter's fraternity house with Durbin.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

282.   Upon arriving to Defendant ASP - Chapter's fraternity house, Durbin led JANE DOE 6 to his bedroom located on the main level of the house.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

283.   Once JANE DOE 6 walked inside his bedroom, Durbin locked the door.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

284.   JANE DOE 6 had no intention of having sex with Durbin when she went to Defendant ASP - Chapter's fraternity house.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

285.   JANE DOE 6 and Durbin began kissing on the edge of Durbin's bed while JANE DOE 6 sat at the lower end of the bed with Durbin standing above her.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

286.   Durbin abruptly stood up and pulled his pants and underwear down as he stood over JANE DOE 6.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

287.   JANE DOE 6 told Durbin she did not want to have sex with him and to pull his pants back up.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

288.   Durbin then leaned over JANE DOE 6, putting his hands on her forearms, and held her down.  Durbin began attempting to convince JANE DOE 6 to have sex, saying, "Why come over if we're not going to have sex? I could have invited someone else over instead . . . Can we please have sex?" JANE DOE 6 expressly rejected Durbin's advances.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

289.   Durbin, standing over JANE DOE 6, used his weight to hold her down. JANE DOE 6 was unable to move her arms or legs.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

290.   Durbin, while holding JANE DOE 6, used one hand to pull her pants and underwear down.   JANE DOE 6 immediately tried pulling her pants and underwear back up.  She was in shock and started telling Durbin to stop.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

291.   JANE DOE 6 was unable to pull her pants and underwear back up as Durbin put both hands back onto her arms, continuing to restrain JANE DOE 6 on his bed.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

292.   Durbin continued kissing JANE DOE 6 despite her resistance.  Durbin then used his weight to hold JANE DOE 6 down on his bed.  JANE DOE 6's arms began hurting as Durbin used his significant size advantage to restrain her.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

293.   Throughout the assault, JANE DOE 6 repeatedly told Durbin "no" and "stop."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

294.    Durbin then wedged one leg between JANE DOE 6's legs and attempted to forcibly insert his penis into JANE DOE 6's vagina.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

295.    JANE DOE 6 began to thrash her legs so that Durbin's penis would not enter her vagina.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

296.    Durbin then continued to forcefully hold JANE DOE 6 down, but harder than before.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

297.    While prying JANE DOE 6 legs open, Durbin tried thrusting his penis into her vagina.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

298.    Durbin attempted to rape JANE DOE 6; she could feel his penis touching her vagina as he tried to push and/or thrust it inside of her.  She continued to tell Durbin to "stop."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

299.    Durbin got visibly frustrated with JANE DOE 6 because she would not stop moving.  He became visibly angry and raised his voice, upset that JANE DOE 6 was not complying.  Durbin continued to touch his penis to her vagina in a thrusting motion.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

300.    JANE DOE 6 began to sob in disbelief while she laid in shock as Durbin assaulted her.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

301.    After five to ten minutes of forced sexual assault, Durbin finally stopped and stood up over JANE DOE 6.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

302.    Durbin, clearly frustrated with JANE DOE 6, pushed her off the bed with her pants and underwear still around her calf and ankle area.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

303.   Angry with JANE DOE 6, Durbin told her "he would have invited another girl home so he could have sex," and that he "missed an opportunity for a good night." Durbin then called JANE DOE 6 a "prude."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

304.   As JANE DOE 6 tried to stand up and pull her pants and underwear back up, Durbin grabbed her by the arms and forced her to get back onto the bed with him.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

305.   JANE DOE 6 tried to leave and asked Durbin multiple times, "can I go home?" Despite her pleas, Durbin forcefully held her down.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

306.   Durbin then forced JANE DOE 6 to lay next to him in bed.  Durbin tried to cuddle with and kiss JANE DOE 6, but she refused.  JANE DOE 6 tried to leave multiple times, but Durbin's grip would tighten every time she moved or asked to go.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

307.   After another five to ten minutes, JANE DOE 6 believed that Durbin had fallen asleep and was able to leave Defendant ASP - Chapter's fraternity house.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

308.   As she walked back to her dormitory, JANE DOE 6 called two sorority sisters to pick her up.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

309.   The following day April 9, 2017, JANE DOE 6 told three of her sorority sisters about the sexual assault.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

310.   JANE DOE 6 discussed the sexual assault by Durbin with her sorority sisters and upperclassmen.  JANE DOE 6 was convinced that nothing would happen through Title IX or Defendant EMUPD.  After the discussion, JANE DOE 6 was convinced that nothing would happen with Title IX or Defendant EMUPD.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

311.    On April 11, 2017, JANE DOE 6 photographed bruising on her arm from being held down by Durbin and reported the sexual assault by Durbin to an executive board member of Delta Zeta.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

312.    One of JANE DOE 6's sorority sisters told other members of Delta Zeta about JANE DOE 6's assault.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

313.    Greek life members at EMU also influenced JANE DOE 6 into believing nothing would happen if she reported her assault to EMU's Title IX department by telling JANE DOE 6 accounts of other students' failed attempts at pursuing Title IX investigations.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

314.    JANE DOE 6's name was now associated on campus with Durbin's name and the sexual assault.  Many within EMU's Greek community consoled JANE DOE 6 but discouraged her from reporting the assault.  However, others

within EMU's Greek community bullied, harassed, ostracized, and judged JANE DOE 6.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

315.  During the summer of 2017, after enduring the physical and mental assault by Durbin and finding no place of refuge at EMU, JANE DOE 6 contemplated and prepared to commit suicide.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

316.  Members of EMU's Greek community and Durbin continued to spread rumors about JANE DOE 6.  Upon information and belief, this was a common tactic used by Durbin and other sexual predators.  This tactic was known by Greek officials at EMU as well as volunteers and student employees at EMU.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

317.  JANE DOE 6 dropped out of Delta Zeta due to depression in April 2018, despite having to live at the Delta Zeta sorority house from September 2017 to May 2018.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

318.    Although JANE DOE 6 reported her assault to several high-ranking members of EMU's Greek community, she was never given the Title IX protection that should have been afforded to a victim of assault.

**ANSWER:**

**Denied.  The University denies the allegation that University's Title IX Office failed in any way to provide protection to Jane Doe 6.  The University further denies that it had notice of Jane Doe 6's assault prior to late 2020.  By way of further response, once the University received notice, it contacted Jane Doe 6 to offer support. *See* Exhibit 2.  The University lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph and they are therefore denied.**

319.    As with many rape victims, JANE DOE 6 blamed herself for Durbin's vicious sexual assault and believed she deserved what happened to her.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

320.    JANE DOE 6 did not believe that EMU and Defendants Regents and EMUPD had created a protected environment for sexual assault victims, as JANE DOE 6 had heard accounts of other women that were raped and of EMU and Defendants Regents and EMUPDs' failure to provide aid, guidance, and protection to the same.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

321.   Rather than Greek life keeping JANE DOE 6's assault confidential there was a concerted effort by male fraternities to spread vicious rumors about JANE DOE 6.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

322.   In June 2020, JANE DOE 6 was contacted by law enforcement after hearing of her assault.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

323.   Based on a YPD investigation, Durbin has been charged and bound over in circuit court to face charges of criminal sexual conduct in the first degree.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

Continuous Contact and Threats by Durbin

324.   Durbin later contacted JANE DOE 6 via Snapchat.  When JANE DOE 6 accused Durbin of sexual assault, Durbin told her that he had no recollection of the prior night.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

325.    Durbin then told JANE DOE 6 that he did not want to discuss the assault over Snapchat and asked JANE DOE 6 to stop saving their messages.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

326.    Durbin continued to contact JANE DOE 6 for weeks.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

327.    Durbin began repeatedly apologizing to JANE DOE 6 and attempted to manipulate JANE DOE 6 into thinking that "she took it the wrong way" and that Durbin just liked being "rough."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

328.    Durbin made continuous contact and pressed for JANE DOE 6 to "un-save" any messages regarding the assault.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

329.    Durbin later contacted JANE DOE 6 via Snapchat to ask if she was afraid of him, to which JANE DOE 6 replied "yes."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

330.    In one of the contacts made by Durbin to JANE DOE 6, he became very stern and demanded that JANE DOE 6 delete any messages or proof of the sexual assault.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

331.    In or around the summer of 2017, at a party where both JANE DOE 6 and Durbin were present, JANE DOE 6 was taken, by her sorority sisters and other members of EMU's Greek community, to a room where she was questioned about her sexual assault.  As JANE DOE 6 left the party sobbing and attempted to get into her car, Durbin loudly proclaimed that JANE DOE 6 had lied about the assault.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

332.    Durbin made contact with JANE DOE 6 on multiple occasions, including at academic and social events.  During these events, it became common for Durbin to intimidate JANE DOE 6 so that she would not talk about the sexual assault.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

333.   One example of Durbin's intimidation occurred while JANE DOE 6 was using the bathroom at Defendant ASP - Chapter's fraternity house. Unbeknownst to JANE DOE 6, Durbin had been in a separate room where the toilet was located.  When JANE DOE 6 opened the door, she found Durbin waiting outside for her.  Durbin immediately stood over JANE DOE 6 and asked if they "were good." JANE DOE 6, in complete terror, said "yes" and attempted to leave.  Durbin, not allowing JANE DOE 6 to leave, repeated again and again "are we good?" After JANE DOE 6 answered "yes" again, Durbin finally allowed JANE DOE 6 to unlock the outside door and leave.

**ANSWER:**
**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

334.   Such behavior by Durbin was continuous.  Each time JANE DOE 6 came into contact with Durbin, he forced her to say that they "were good."

**ANSWER:**
**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

335.   JANE DOE 6 has suffered from and continues to suffer post-traumatic stress disorder, depression, and anxiety and is undergoing counseling for the same.

**ANSWER:**
**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

Retaliation by Defendant Regents and EMU

336.  On November 4, 2020, a member of Defendant Regents and EMU's

Title IX department contacted JANE DOE 6 via email regarding sexual assault and

discrimination.

**ANSWER:**

**Admitted that a member of EMU's Title IX office contacted Jane Doe 6 via email on November 4, 2020 after the office received information that Jane Doe 6 may have experienced conduct of concern.  The email states that the member of the Title IX office reached out to Jane Doe 6 to see if she was in need of any help and support from the Title IX office.** *See* **Exhibit 2.**

337.  JANE DOE 6 graduated from EMU in December of 2020 with dreams

of becoming a prosecutor.  Upon completing her bachelor's degree, JANE DOE 6

prepared to take the Law School Admissions Test ("LSAT") and apply to law school.

**ANSWER:**

**The University admits that Jane Doe 6 received her degree in December 2020.  The University lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph and they are therefore denied.**

338.  When attempting to apply to law schools, JANE DOE 6 was stunned to

learn that Defendant Regents and EMU had restricted her transcripts under the guise

of "pending litigation." JANE DOE 6's transcripts are being held until December

31, 2099.

**ANSWER:**

**Admitted in part and denied in part.  It is denied Jane Doe 6's transcript is being held currently or "until December 31, 2099."  The University admits Jane Doe 6's transcript was unintentionally held after a clerical error in the**

Registrar's Office for a brief period. This unintentional hold was the result of a clerical error, and was remedied within days of it being brought to the University's attention. The University lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph and they are therefore denied.

339. The only pending litigation taking place at that time was the prosecution by the state of Michigan against Durbin for sexually assaulting JANE DOE 6.

**ANSWER:**

The University admits that to its knowledge the only pending litigation involving Jane Doe 6 at that time her transcript was inadvertently held was the referenced prosecution.

340. As a result of Defendants Regents and EMU's actions and betrayal, JANE DOE 6 had to endure a set back of her dreams and is not able to advance her career goals. This is to no fault of JANE DOE 6, a survivor of sexual assault.

**ANSWER:**

The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.

341. As a result of Defendant's actions, inactions, omissions, and/or detrimental conduct surrounding the knowledge of continuous and systematic sexual assaults and rapes of countless victims, including JANE DOE 6, JANE DOE 6 suffered severe and permanent damages which include but are not limited to:

    a.    PTSD;

    b.    Fear of being alone with a man;

    c.    Fear of physical touch;

d.    Suicidal thoughts and ideations;

e.    Constant feelings of being unclean resulting in multiple showers throughout the day;

f.    Loss of enjoyment of life;

g.    Loss of intimacy;

h.    Vivid nightmares;

i.    Anxiety;

j.    Depression;

k.    Decline in grades following the assault and lack of motivation to continue her education;

l.    Withdrawal from classes and attempts to transfer schools; and

m.    Lost trust in EMU and EMU's Greek community after being ostracized for reporting her sexual assault to trusted friends.

**ANSWER:**

**Denied.  By way of further response, the University further denies that it had notice of Jane Doe 6's assault prior to late 2020.  Once the University received notice, it contacted Jane Doe 6 to offer support.  *See* <u>Exhibit 2</u>.**

### <u>JANE DOE 7</u>

342.   Plaintiff JANE DOE 7 enrolled at EMU in the Fall of 2016.

**ANSWER:**

**The University admits that Jane Doe 7 first enrolled at EMU in the Fall of 2016.**

Night of the Rape

343.   In February 2018, JANE DOE 7 went to Defendant ASP - Chapter's

fraternity house with a friend for a small party.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

344.   At the party, JANE DOE 7 consumed alcohol with friends and other

attendees as the night went on.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

345.   JANE DOE 7 also played fast-paced drinking games throughout the

night with members of ASP - Chapter.  As a result, JANE DOE 7 was unable to

gauge the amount of alcohol she had consumed.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

346.   JANE DOE 7 became intoxicated to the point where she could no

longer walk or speak.  She had trouble walking up the stairs to use the restroom and

struggled to maintain control of her body.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

347. After using the restroom, JANE DOE 7 ended up in Durbin's room located on the second level of Defendant ASP - Chapter's fraternity house.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

348. Due largely to her intoxication, JANE DOE 7 does not remember how she got into Durbin's bedroom that night.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

349. Feeling nauseous, JANE DOE 7 eventually left Durbin's room to throw up in the bathroom across the hall.  JANE DOE 7 tripped on her way to the restroom as a result of her severe intoxication.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

350. JANE DOE 7 fell asleep on Durbin's bed after returning to his room. The next thing JANE DOE 7 remembered was Durbin spreading her legs apart while she was laying helpless and intoxicated on his bed.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

351. Durbin then inserted his penis in JANE DOE 7's vagina.  JANE DOE 7 was too intoxicated to resist or move away.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

352.   The next thing JANE DOE 7 remembered was being on her stomach and wanting to get up but being pushed back down onto her stomach by Durbin.  She tried to move but was helpless due to Durbin's size and her level of intoxication.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

353.   JANE DOE 7 tried to get up multiple times but was pushed back down as Durbin continued to rape her.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

354.   The next morning, JANE DOE 7 woke up in Durbin's room but did not remember anything past Durbin pushing her back down while he raped her.  JANE DOE 7 had no clothes on except for Durbin's shirt.  She then started to dress back into her clothing.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

355.   Prior to leaving Defendant ASP - Chapter's premises, JANE DOE 7 noticed that she had bruises on her legs, inner thighs, and arms.

116

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

356.   Per protocol, JANE DOE 7's assault by Durbin was reported to EMU's Title IX department in November 2018.  Her Title IX complaint against Durbin was not investigated and subsequent rapes by Durbin took place.

**ANSWER:**

**Denied as stated.  It is admitted that in November 2018, an anonymous report was submitted via the University's online Title IX reporting system.  To submit an anonymous report, a reporting party first navigates to the University's Title IX website and reporting page at https://www.emich.edu/title-nine/reporting/index.php.  *See* Exhibit 3.  If the person wishes to submit anonymously, the person must affirmatively choose to click a checkbox that then removes identifying fields from the reporting form.  *See* Exhibit 4.  The report identified in this paragraph was submitted anonymously, with no information about who the reporting party was.  *See* Exhibit 5.  Jane Doe 7 did not identify herself to the Title IX office at any later date in order to obtain support or other services or indicate a willingness to participate in an investigation.  As a result, the University had no reporting party from whom it could gather information related to the anonymous complaint from and no means to determine who the reporting party was, so no investigation could occur.  The University further incorporates by reference paragraph 130 with respect to its ability to investigate and adjudicate a Title IX matter without the cooperation of the affected party.  Except as so admitted, denied.**

357.   JANE DOE 7's Title IX complaint explicitly stated "I don't want him [Durbin] to do this to other women."

**ANSWER:**

**It is admitted that Jane Doe 7's anonymous Title IX report contained the quoted language.**

358.   In Summer 2020, JANE DOE 7 was contacted by law enforcement after hearing of her assault.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

359.   JANE DOE 7 ultimately testified for the prosecution against Durbin at the aforementioned preliminary hearing held in 14A District Court.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

360.   JANE DOE 7 continues to undergo counseling and is still experiencing symptoms of post-traumatic stress disorder, depression, and anxiety.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

361.   As a result of Defendant's actions, inactions, omissions, and/or detrimental conduct surrounding the knowledge of continuous and systematic sexual assaults and rapes of countless victims, including JANE DOE 7, JANE DOE 7 suffered severe and permanent damages which include but are not limited to:

     a.     Extreme emotional trauma;

     b.     Severe mental anguish;

     c.     Permanent physical injury;

     d.     Loss of enjoyment of life;

e.  Loss of intimacy;

f.  Vivid nightmares;

g.  Anxiety;

h.  Panic attacks;

i.  Decline in academic performance; and

j.  Withdrawal from education.

**ANSWER:**
**Denied.**

## JANE DOE 8

362.  JANE DOE 8 enrolled at EMU in the fall of 2016.

**ANSWER:**

**The University admits that Jane Doe 8's first semester at EMU was Fall 2016.**

363.  During her second semester, JANE DOE 8 pledged at one of EMU's sororities, Delta Zeta.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

364.  JANE DOE 8 and Durbin became social acquaintances and had various degrees of social interactions during JANE DOE 8's freshman and sophomore year through the EMU's Greek community.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

Night of the Assault

365.   On May 16, 2018, JANE DOE 8 received a Snapchat call from Durbin asking her to come over that night to talk and "hang out." JANE DOE 8 agreed.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

366.   JANE DOE 8 went to Durbin's room and sat on his couch while Durbin sat on the bed across from her.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

367.   Durbin then asked JANE DOE 8 to come over to the bed to sit with him instead of sitting on the couch.  JANE DOE 8 declined and told Durbin that she preferred to stay on the couch.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

368.   JANE DOE 8 and Durbin began conversing about a traffic ticket JANE DOE 8 had received that night.  Durbin eventually asked JANE DOE 8 again to come to sit on the bed, which she ignored.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

369.   JANE DOE 8 continued the conversation before Durbin asked her to sit on the bed for a third time, to which JANE DOE 8 again declined.  At this point, JANE DOE 8 noticed that Durbin had become visibly frustrated.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

370.   Durbin then began speaking quietly in a manner that made it difficult for JANE DOE 8 to hear him.  JANE DOE 8 asked Durbin to speak up, but he continued to whisper.  JANE DOE 8 noticed Durbin's growing frustration.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

371.   Durbin once again asked JANE DOE 8 to move from the couch to the bed so that she could hear him better.  JANE DOE 8 complied.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

372.   While sitting on the bed, Durbin made excuses to touch, nudge, and grab JANE DOE 8's leg.  JANE DOE 8 told Durbin that she was "not okay with that [type of behavior]" and that she "did not come here for that [type of behavior]."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

373.   JANE DOE 8 sat roughly twelve (12) inches away from Durbin as they began playing video games.  Despite JANE DOE 8's rejection of Durbin's previous advances, Durbin continued to inch his way closer to JANE DOE 8, telling her, "oh, I don't bite."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

374.   Durbin and JANE DOE 8 moved to the head of the bed to watch a Netflix show.  JANE DOE 8 sat with her back against the wall and Durbin laid perpendicular to JANE DOE 8.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

375.   Durbin repeatedly asked JANE DOE 8 to move next to him so that the two could have a "deep talk." JANE DOE 8 agreed to sit closer but did not lay down next to Durbin.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

376.   JANE DOE 8 and Durbin began conversing about the hardships Durbin was facing in his family life.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

377.   Durbin leaned in and attempted to kiss JANE DOE 8 on at least four occasions during their conversation.  JANE DOE 8 pulled away each time and told Durbin, "I don't want to do that."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

378.   Durbin then forcefully grabbed JANE DOE 8's hand and examined it near his face.  Durbin then pushed JANE DOE 8's hand onto his groin area with his pants still on and began to use his hand with JANE DOE 8's hand underneath to squeeze his penis.  Durbin kept eye contact with JANE DOE 8 throughout.  JANE DOE 8 quickly retracted her hand and repeated to Durbin, "I don't want to do that. . . don't do that."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

379.   After JANE DOE 8 rejected his advance, Durbin sat in silence.  JANE DOE 8 then noticed Durbin becoming visibly angry.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

380.    Durbin quickly grabbed JANE DOE 8 and flipped her over, pulling her legs out.  Durbin then laid on top of JANE DOE 8, shifting his weight so that JANE DOE 8 could not move from his hold.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

381.    Durbin stuck his fingers down JANE DOE 8 throat, making it hard for her to breathe as she tried to move her arms and legs.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

382.    JANE DOE 8 was unable to speak with Durbin's fingers down her throat and felt like she was choking.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

383.    JANE DOE 8 was pinned underneath Durbin's legs as he straddled her. JANE DOE 8 could not move her arms.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

384.    Durbin then sat up and moved his groin in front of JANE DOE 8's face. Durbin ripped down his pants and shoved his penis into JANE DOE 8's mouth while forcefully thrusting.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

385.   JANE DOE 8 tried to fight back against Durbin, but he was too strong and kept thrusting.  Durbin continued to thrust his penis into JANE DOE 8's mouth making it even more difficult for her to breathe.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

386.   Durbin then took his penis out of JANE DOE 8's mouth to readjust. JANE DOE 8 flipped over, trying to escape.  Durbin grabbed JANE DOE 8, took down her pants, and began touching her vagina over her underwear.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

387.   Durbin tried to digitally penetrate JANE DOE 8's vagina while aggressively groping her over her underwear.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

388.   JANE DOE 8, still pinned down by Durbin, laid in shock as Durbin stuck his fingers back into her mouth.  JANE DOE 8 told Durbin, "I am on my period - I don't want to do anything" in an attempt to dissuade Durbin's sexual desires.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

389.   Durbin grabbed JANE DOE 8's wrists, restraining them above her head.  Durbin stood up to crouch his groin in front of JANE DOE 8's face, shoving his penis back into her mouth.  Durbin continued to thrust his penis forcefully into JANE DOE 8's mouth as she tried to escape.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

390.   Durbin went to readjust his penis again.  At this time, JANE DOE 8 rolled off the bed onto the floor and pulled her pants up.  JANE DOE 8 asked, "why did you do that? You knew I didn't want to do that.  I want to go home."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

391.   Durbin then responded, "you didn't let me finish."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

392.   JANE DOE 8 tried to collect her belongings while Durbin sat angrily.  As JANE DOE 8 was walking out of the room, Durbin told her "you better not tell anyone about this.  I'll tell your ex-boyfriend it was consensual."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

393.   Months later, JANE DOE 8 told two of her friends about what had occurred.  One of JANE DOE 8's friends laughed it off, saying "oh, he's just being aggressive."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

394.   In June 2020, JANE DOE 8 contacted law enforcement and EMUPD about her assault.

**ANSWER:**

**Admitted in part and denied in part.  It is admitted that on June 24, 2020, Jane Doe 8 contacted EMUPD regarding her assault.  Except as so admitted, denied.**

395.   After reporting her assault to EMUPD in the summer of 2020 she was told: "they had received numerous calls about Durbin assaulting women on campus." Yet EMU did not look further into any report of Durbin until 2020.

**ANSWER:**
**Denied.**

396.   JANE DOE 8 spoke to YPD and EMUPD about her assault.

**ANSWER:**

**Admitted in part and denied in part.  It is admitted that on June 24, 2020, Jane Doe 8 contacted EMUPD regarding her assault.  Except as so admitted, denied.**

397.    JANE DOE 8 ultimately testified for the prosecution against Durbin at the aforementioned preliminary hearing held in 14A District Court.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

Subsequent Contact and Actionable Harassment

398.    Durbin told JANE DOE 8 not to tell anyone of the assault and that if she told anyone about the assault, he would say it was consensual and it was "his words against hers."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

399.    Durbin approached JANE DOE 8 at a party after the assault had occurred.  Durbin asked, "how she was doing." At this point, JANE DOE 8 accused Durbin of the assault by saying "you know what you did to me." Durbin then looked at JANE DOE-8 and told her that he had no idea what she was talking about.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

400.    JANE DOE 8 continues to undergo counseling and is still experiencing symptoms of post-traumatic stress disorder, depression, and anxiety.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

401. As a result of Defendant's actions, inactions, omissions, and/or detrimental conduct surrounding the knowledge of continuous and systematic sexual assaults and rapes of countless victims, including JANE DOE 8, JANE DOE 8 suffered severe and permanent damages which include but are not limited to:

a.   Vivid and horrific memories;

b.   Frequent and uncontrollable panic attacks causing blackouts;

c.   Inability to focus in class, at social gatherings, and during intimate moments;

d.   Loss of motivation, particularly with academics;

e.   Withdrawal from classes at EMU;

f.   Decline in grades;

g.   Does not enjoy talking about sex because it makes her uncomfortable;

h.   PTSD;

i.   Loss of trust in men;

j.   Loss of trust in Defendants Regents, EMUPD and Werner;

k.   Feeling unsafe and unprotected by EMU after Durbin's name was associated with being a "known rapist" for years on campus

l.     Depression;

m.    Loss of self-care;

n.     Loss of appetite;

o.     Thoughts of suicide;

p.     Attempted suicide; and

q.     Loss of interest in dating.

**ANSWER:**

**Denied.  By way of further response, Jane Doe 8 did not notify Defendant EMUPD of her alleged sexual assault until June of 2020, over two years after the alleged assault occurred.  After learning of the alleged assault, EMUPD promptly notified the Title IX Office.  Upon notification of the alleged sexual assault, the Title IX Office contacted Jane Doe 8 on July 7, 2020, July 31, 2020, August 31, 2020, September 15, 2020, September 17, 2020, and September 18, 2020 in order to provide her with information, resources, and support.  The Title IX Office worked with Jane Doe to schedule a meeting with her for September 23, 2020; however, Jane Doe 8 did not ultimately attend her scheduled meeting with the Title IX Office.**

**JANE DOE 9**

402.   JANE DOE 9 enrolled at EMU in the fall of 2016.

**ANSWER:**

**The University admits that Jane Doe 9 first enrolled at EMU in the Fall of 2016.**

403.   JANE DOE 9 did not personally know Durbin prior to her sexual

assault at his hands.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

<u>Night of First Assault</u>

404.   On September 2, 2018, JANE DOE 9 and two friends went to a party at Defendant ASP - Chapter's fraternity house.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

405.   When JANE DOE 9 and her friends arrived to the party, there were approximately 20 other people present, including Defendant ASP - Chapter fraternity members.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

406.   JANE DOE 9 consumed alcoholic beverages with her friends and decided to stay the night at Defendant ASP - Chapter's fraternity house in Durbin's room.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

407.   JANE DOE 9 was intoxicated but coherent and still aware of her surroundings.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

408.   JANE DOE 9, her two friends, and Durbin slept together on Durbin's

bed.  Durbin slept next to JANE DOE 9 on the end of the bed, opposite the wall.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

409.   JANE DOE 9 did not intend to have any sexual encounters during her

time in Durbin's room.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

410.   JANE DOE 9 woke the next morning and found Durbin fondling and/or

squeezing her breasts with both hands.  JANE DOE 9 was in shock and unable to

move as Durbin continued to squeeze her breasts.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

411.   As she laid afraid and unsure of what to do, JANE DOE 9 could feel

Durbin intentionally breathing into her ear.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

412.    Durbin then realized she was awake and moved his hands while rolling over to the other side of the bed.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

413.    JANE DOE 9 then got up after a few moments of Durbin squeezing her breasts and went to the bathroom to calm down and process what had just occurred.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

414.    JANE DOE 9 then went downstairs to the living room and slept on the couch.  JANE DOE 9 was still in shock.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

415.    Between September 2, 2018, and May 12, 2019, JANE DOE 9 and Durbin remained acquaintances.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

**Night of Second Assault**

416.   On May 12, 2019, JANE DOE 9 went to Defendant ASP - Chapter's fraternity house to drink alcohol with members of the fraternity.   While at the fraternity house, JANE DOE 9 drank more than half of a bottle of wine.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

417.   JANE DOE 9 then received a Snapchat from Durbin asking for her to come to his room located on the second level of Defendant ASP - Chapter's fraternity house.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

418.   JANE DOE 9 entered Durbin's room and sat on the couch.   The two watched YouTube videos while Durbin sat on his bed across from JANE DOE 9.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

419.   Durbin told JANE DOE 9 to finish her bottle of wine and come over to his bed.  JANE DOE 9 complied.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

420.   Durbin then put his arm around JANE DOE 9 and started to rub one of his hands up and down the side of JANE DOE 9's body.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

421.   Durbin began to touch the band of JANE DOE 9's underwear and bra as they sat together on Durbin's bed.  JANE DOE 9 then told Durbin that she was tired and wanted to sleep.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

422.   JANE DOE 9 moved to Durbin's couch and asked if it was okay if she slept on the couch instead of sharing his bed.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

423.   Durbin began arguing with JANE DOE 9 and told her it was "wrong for him to allow her to sleep on the couch . . . he wouldn't tell anyone  . . . no one would know."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

424.   Durbin ultimately convinced JANE DOE 9 to sleep in his bed with him despite JANE DOE 9's expressed concerns of being uncomfortable.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

425.   JANE DOE 9 did not want any sexual contact with Durbin when she went to bed.  She just wanted to sleep.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

426.   JANE DOE 9 moved to the inside of Durbin's bed towards the wall and started to fall asleep.  She was awoken by Durbin asking if they could "cuddle" since he was "having issues with his girlfriend at the time," to which JANE DOE 9 replied "no."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

427.   JANE DOE 9 fell asleep again and was awoken to Durbin violently pinching her nipples.  JANE DOE 9 quickly moved away and created more space between herself and Durbin.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

428.   After the incident, JANE DOE 9 began to fall asleep again because she was tired and intoxicated.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

429.    JANE DOE 9 later awoke to Durbin biting her neck above the collarbone.  She did not move and continued to lay there shocked and uncomfortable.  Durbin bit JANE DOE 9's collarbone area two times, which hurt JANE DOE 9.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

430.    JANE DOE 9 shifted away again, creating a larger gap between her and Durbin, and then flipped onto her stomach.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

431.    Durbin woke JANE DOE 9 again, asking if she wanted a back massage.  JANE DOE 9 did not respond.  Durbin then lifted JANE DOE 9's shirt and began rubbing her back with lotion.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

432.    Durbin straddled JANE DOE 9's hips as he rubbed her back.  After Durbin had finished massaging JANE DOE 9, she fell asleep and never said a word, due largely to her shock.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

Mystic Circle

433. Upon information and belief, Defendant ASP - Chapter's fraternity members subsequently held a meeting referred to as the "Mystic Circle" in which JANE DOE 9 reported what had occurred between her and Durbin.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

434. Upon information and belief, the "Mystic Circle" is considered a judgment-free zone where members of the fraternity are able to confide with any concerns without fear of revelation, retribution and/or judgment.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

435. JANE DOE 9 asked the president of Defendant ASP - Chapter to hold the "Mystic Circle" so that she could tell the other fraternity members what their friend and brother, Durbin, had done. JANE DOE 9 believed that the "Mystic Circle" would function as an avenue to report her sexual assaults.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

436.   JANE DOE 9 explained to members of Defendant ASP - Chapter that Durbin had sexually assaulted her on multiple occasions.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

437.   JANE DOE 9 then went and sat in the middle of the room, in the dark, at Defendant ASP - Chapter's fraternity house and told her story.  Afterwards, a fraternity member of Defendant ASP - Chapter told Durbin about the "Mystic Circle" involving JANE DOE 9.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

438.   Over the following weeks, many students learned of the aforementioned "Mystic Circle" involving Durbin, including JANE DOE 9's boyfriend, who subsequently posted about Durbin's actions on social media.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

439.   JANE DOE 9's boyfriend posted, on multiple social media platforms, information about Durbin's notorious sexual assaults at EMU.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

440.  In or around June 2020, JANE DOE 9 was contacted by law enforcement about her assault by Durbin.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

441.  JANE DOE 9 ultimately testified for the prosecution against Durbin at the aforementioned preliminary hearing held in 14A District Court.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

Subsequent Contact and Actionable Harassment

442.  After both assaults took place, Durbin would contact JANE DOE 9 asking her to remind him of what he had done.  Durbin would repeatedly apologize for the assault and ask JANE DOE 9 not to tell anyone else.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

443.  Durbin continuously contacted JANE DOE 9 via phone calls and/or electronic messages to see if she had told anyone else of the assaults.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

444. Durbin told JANE DOE 9 that he blamed her for his depression, anxiety, and current relationship struggles.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

445. Durbin continued to "check-up" on JANE DOE 9 via Snapchat messages, asking JANE DOE 9 "are we good? . . . are we okay?"

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

446. JANE DOE 9 began to ignore Durbin's messages when he spoke of the assault asking if she had told anyone.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

447. JANE DOE 9 continues to undergo counseling and is still experiencing symptoms of post-traumatic stress disorder, depression, and anxiety.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

448. As a result of Defendants' actions, inactions, omissions, and/or detrimental conduct surrounding the knowledge of continuous and systematic sexual assaults and rapes of countless victims, including JANE DOE 9, JANE DOE 9 suffered severe and permanent damages which include but are not limited to:

a. Self-deprivation;

b. PTSD;

c. Suffers from flashbacks causing an increased heart rate, crying, hyperventilating, and going numb in her lips and fingers;

d. Betrayal of trust in the opposite sex;

e. Depression;

f. Vivid nightmares;

g. Sleep loss;

h. Suicidal thoughts;

i. Eating disorders; and

j. Aggression and anger.

**ANSWER:**
**Denied.**

**JANE DOE 10**

449. JANE DOE 10 enrolled at Defendant University in the fall of 2016.

**ANSWER:**

**The University admits that Jane Doe 10 first enrolled at EMU in the Fall of 2016.**

450. JANE DOE 10 and Durbin became social acquaintances through various degrees of social interactions during JANE DOE 10's college career at EMU.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

Defendants Knowledge Prior to JANE DOE 10's Assault

451.   Upon information and belief, Defendants had notice that Durbin had sexually assaulted other victim EMU students.

**ANSWER:**
**Denied.**

452.   Further, upon information and belief, Defendants had notice of the high amounts of rapes and/or sexual assaults occurring on EMU's campus, both reported and unreported, which is evidenced by Defendants' report titled "Action Planning for IFC at EMU," dated December 19, 2018.

**ANSWER:**

**Denied.  By way of further response, to the extent that the allegations of this paragraph reference the contents of a written document, the content of that document speaks for itself, and therefore any characterizations thereof are denied.**

453.   Upon information and belief, the president of IFC at the time of the aforementioned report was Hernandez, who was the subject of an investigation for sexual assault known to Defendants.

**ANSWER:**

**Admitted in part and denied in part.  The University admits that JD2 was President of Interfraternity Council on December 19, 2018.  JD2 served as the President of the Interfraternity Council at EMU from January – December**

**2018.  Except as so admitted, denied.  By way of further response, JD2 had been formerly reported by a friend of Jane Doe 1 as having engaged in a sexual assault, but the University had been unable to investigate that matter because Jane Doe 1 chose not to participate in any investigation process despite repeated invitations to do so by the Title IX Office.  By way of further response, the University incorporates its responses to paragraphs 118 and 130.  Except as so admitted, denied.**

454.    Upon information and belief, a special meeting was called on October 31, 2018, to address the rise in sexual assaults on Defendant Regents and EMU's campus and the root causes of the assaults.

**ANSWER:**
**Denied.**

455.    Although Defendants knew and were put on notice about Durbin, they failed to use ordinary care to protect future victims, including but not limited to JANE DOE 10, from a serial rapist.

**ANSWER:**
**Denied.**

Night of First Assault

456.    JANE DOE 10 went to Defendant ASP - Chapter's fraternity house while waiting for a friend with whom she was supposed to head home.  JANE DOE 10's friend failed to arrive.  JANE DOE 10 decided to stay at Defendant ASP - Chapter's fraternity house to hang out with Durbin.

144

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

457.   JANE DOE 10 went to Durbin's room.  Upon entering and sitting on Durbin's couch, Durbin insisted that JANE DOE 10 move from the couch to his bed. JANE DOE 10 agreed and moved to Durbin's bed, placing her back against the wall.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

458.   Durbin then confessed to JANE DOE 10 that he wanted to cheat on his girlfriend with JANE DOE 10 and other women.  In response, JANE DOE 10 told Durbin "don't cheat on your girlfriend . . . she's pretty . . . she's a nice girl."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

459.   Durbin then told JANE DOE 10 that she had to keep his secret and that in order to do so, she had to kiss him.  JANE DOE 10 told Durbin "no."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

460.   Durbin persisted, reiterating to JANE DOE 10 that she had to kiss him, to which JANE DOE 10 responded "no" several more times.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

461.   Durbin then grabbed JANE DOE 10 by her shoulders, pushing her down onto the bed.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

462.   Durbin mounted himself on top of JANE DOE 10 to the point where she could not move as Durbin held her down.  JANE DOE 10 told Durbin "no . . . we don't have to do this  . . .  I won't tell anyone."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

463.   Durbin then began forcefully kissing JANE DOE 10 as she tried to push him off of her.  At this point, JANE DOE 10 was terrified of Durbin.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

464.   JANE DOE 10 continued to tell Durbin to stop and repeated that she wouldn't tell anyone, but Durbin continued the sexual assault.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

465.   Durbin grabbed JANE DOE 10's breasts as he fondled and/or groped them with one of his hand.  As Durbin continued to hold her down, JANE DOE 10 fought back in an effort to get him off her.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

466.   Durbin then grabbed JANE DOE 10's shirt and lifted it to take a picture of her bare breasts.  JANE DOE 10 laid in shock, scared that Durbin would do something if she told him "no." JANE DOE 10 has a tattoo below her breast making the image identifiable to her and her closest friends.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

467.   Durbin took a picture of JANE DOE 10's bare breasts and told JANE DOE 10 that he would use the image as blackmail if she spoke of the sexual assault.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

468.   JANE DOE 10 agreed to not speak out of what happened and left Durbin's room.  She was terrified at the thought that her nude image would be disseminated by Durbin throughout EMU's campus.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

469.   JANE DOE 10 maintained contact with Durbin following the first assault in fear that he would distribute the image.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

Night of Second Assault

470.   Due to a fight with her roommates, JANE DOE 10 stayed at Defendant ASP - Chapter's fraternity house on March 30, 2019.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

471.   JANE DOE 10 stayed in her boyfriend's room located on the first level of Defendant ASP - Chapter's fraternity house.  JANE DOE 10's boyfriend was out of town and let her use his room while he was away.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

472.   Durbin contacted JANE DOE 10 via Snapchat, telling JANE DOE 10 that he was coming to her boyfriend's room.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

473.   Durbin came into JANE DOE 10's boyfriend's room and asked if she told anyone about her sexual assault on December 8, 2018.  JANE DOE 10 told Durbin that she hadn't told anyone.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

474.   Durbin then sat down on the bed next to JANE DOE 10.  As they talked, Durbin continued to inch closer to JANE DOE 10 while consistently asking if she had told any one of her sexual assault.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

475.   Durbin suddenly grabbed JANE DOE 10 by her shoulders and pushed her down onto the bed.  Durbin began kissing JANE DOE 10 as she tried to push him off while pleading for him to stop.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

476.   Durbin put his hands inside of JANE DOE 10's pants and inserted his fingers in her vagina.  JANE DOE 10 immediately told Durbin "stop . . .  I don't want to do this."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

477.   JANE DOE 10 told Durbin to stop multiple times while he was sexually assaulting her.  She tried pushing Durbin's shoulders to move him off of her, but JANE DOE 10 did not want to upset Durbin out of fear that he would become even more aggressive.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

478.   Durbin stopped after JANE DOE 10 was finally able to push him off of her.  Durbin left the room to go upstairs, telling JANE DOE 10 that he would come back down.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

479.   JANE DOE 10 locked and dead-bolted the door after Durbin left.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

480.   JANE DOE 10 went into the bathroom located within the locked bedroom and noticed she was bleeding vaginally from Durbin's violent sexual assault.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

481.    JANE DOE 10 then heard Durbin coming back downstairs for a second time.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

482.    After he arrived at the locked room, Durbin persistently knocked on the door. Durbin then proceeded to send Snapchat messages to JANE DOE 10, of which JANE DOE 10 did not respond. After several minutes, Durbin finally left and went back upstairs.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

483.    In July 2020, JANE DOE 10 was contacted by law enforcement about her sexual assault by Durbin.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

484.    JANE DOE 10 ultimately testified for the prosecution against Durbin at the aforementioned preliminary hearing held in 14A District Court.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

Retaliation by Defendant Regents and EMU

485.   JANE DOE 10 had aspirations of continuing her education after graduation.  Although her grades had dropped following her sexual assault, she still carried over a "B" average from EMU.

**ANSWER:**

**The University admits that Jane Doe 10 graduated with a "B" average from EMU.  The University lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph and they are therefore denied.**

486.   After applying to graduate school, JANE DOE 10 learned that her EMU transcripts were being withheld by Defendant Regents and EMU due to "pending litigation." Defendants' act of withholding JANE DOE 10's transcripts denies her the opportunity to excel based on her sexual assault.  The only pending litigation was the criminal prosecution of Durbin by the State of Michigan.  This act by Defendants has, in essence, victimized JANE DOE 11 once again.

**ANSWER:**

**Admitted in part and denied in part.  It is denied Jane Doe 10's transcript is being held currently or "until December 31, 2099."  The University admits Jane Doe 10's transcript was unintentionally held after a clerical error in the Registrar's Office for a brief period.  This unintentional hold was the result of a clerical error, and was remedied within days of it being brought to the University's attention.   The University lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph and they are therefore denied.**

Subsequent Contact and Actionable Harassment

487.   Durbin messaged JANE DOE 10 days after the second assault insisting

"you're not going to tell anyone right . . .  no one is going to believe you."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

488.   JANE DOE 10 was threatened, intimidated, and blackmailed by Durbin to keep quiet of her assault.  Durbin consistently told her that "it was his word against hers" and reminded JANE DOE 10 that he had a nude photograph of her.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

489.   Furthermore, JANE DOE 10 was told by others that nothing would happen unless she had other evidence besides her word, which is consistent with the actions of Defendant Werner with the other plaintiffs.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

490.   JANE DOE 10 continues to undergo counseling and is still experiencing symptoms of post-traumatic stress disorder, depression, and anxiety.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

491. As a result of Defendants' actions, inactions, omissions, and/or detrimental conduct surrounding the knowledge of continuous and systematic sexual assaults and rapes of countless victims, including JANE DOE 10, JANE DOE 10 suffered severe and permanent damages which include but are not limited to:

      a.     Betrayal of trust;

      b.     Depression;

      c.     Permanent physical injury;

      d.     Sleep loss;

      e.     Vivid nightmares;

      f.     Drop in grades;

      g.     Loss of motivation;

      h.     Anxiety that developed quickly after the assault; and

      i.     Counselling.

**ANSWER:**

**Denied.**

## JANE DOE 11

492. JANE DOE 11 enrolled at EMU in the fall of 2016.

**ANSWER:**

**The University admits that Jane Doe 11's first semester at EMU was Fall 2016.**

493.   JANE DOE 11 met Sutton for the first time the night of October 9, 2016.  JANE DOE 11 had never previously come into contact with Sutton prior to her sexual assault.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

Night of the Assault

494.   On October 10, 2016, JANE DOE 11 was at her dormitory, which was located in Putnam Hall on EMU's campus.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

495.   JANE DOE 11's suitemate invited her boyfriend and Sutton over to her and JANE DOE Il's dormitory room, where the four watched the movie "The Sound of Music."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

496.   JANE DOE 11 was on a bed with Sutton during the movie.  Her suitemate and her suitemate's boyfriend were watching across the room on a separate bed.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

497.   JANE DOE 11 only wanted to cuddle during the movie and did not want any sexual relations with Sutton.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

498.   After the movie ended, JANE DOE 11's suitemate and suitemate's boyfriend fell asleep, leaving JANE DOE 11 and Sutton awake together on the opposite bed.  At the time, both JANE DOE 11 and Sutton were fully clothed.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

499.   JANE DOE 11 and Sutton began "making out" on the bed and "cuddling" consensually.  After a short amount of time Sutton rolled over on top of JANE DOE 11 and asked, "are we going to do this?"

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

500.   JANE DOE 11 told Sutton "no . . .no" to having sexual intercourse while pushing Sutton away.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

501.   Sutton then forced JANE DOE 11's hand down onto his penis.  JANE DOE 11 could tell Sutton had an erection that she could feel over his clothing.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

502.   Sutton dropped his shorts while in the bed with JANE DOE 11.  He then grabbed JANE DOE 11's head and pushed her down onto his groin area and penis.  Sutton forced JANE DOE 11 to perform oral sex; it lasted several minutes.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

503.   Sutton then attempted to vaginally rape JANE DOE 11, who immediately started sobbing and stating "no."

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

504.   JANE DOE 11 was then physically forced by Sutton to perform oral sex again.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

505.   After the assault JANE DOE 11 left her suite-mate's dorm and walked into her room through the shared bathroom.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

506.   JANE DOE 11 woke up her roommate to tell her what had occurred. Shortly after they heard Sutton getting out of the bed and making his way into the bathroom.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

507.   Both JANE DOE 11 and her roommate were able to lock the door leading into their dorm room.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

508.   JANE DOE 11 did not return to her suite-mate's dorm until the following day.  Sutton was gone the next morning but neither her suite mate nor her boyfriend was present.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

509. JANE DOE 11 reported the assault to Defendant EMUPD, Officer John E. Phillips, on December 11, 2016. Officer John E. Phillips told JANE DOE 11 that "nothing would happen" regarding a prosecution because it was too late.

**ANSWER:**

**Admitted in part and denied in part. The University admits that Jane Doe 11 met with Officer John E. Phillips on December 11, 2016. The University denies the remaining allegations of this paragraph. It is specifically denied that Officer Phillips made the quoted statement above or one to that effect, which runs completely counter to EMUPD training and practice. By way of further response, and to the contrary, Jane Doe 11 specifically instructed EMUPD that she did not wish to pursue a criminal investigation, and instead wished only to file a police report and speak with support services at the University. Except as so admitted, denied.**

510. Upon information and belief, the officer in charge of JANE DOE 11's case did not make any attempt to contact witnesses to her assault.

**ANSWER:**

**Denied as stated. By way of further response, after Jane Doe 11 provided her statement to Officer Phillips, an EMUPD investigator was assigned to Jane Doe 11's case. That investigator did contact with and speak with witnesses about Jane Doe 11's allegations. Except as so admitted, denied.**

511. JANE DOE 11 also reported the assault to Defendant Werner and gave notice that Sutton was coming into contact with her, as his classes were next to each other.

**ANSWER:**

**Admitted in part and denied in part. The University admits that the alleged assault of Jane Doe 11 was reported to the Title IX Office, but denies that it was initially reported to the Title IX Office by Jane Doe 11. By way of further response, EMUPD informed the Title IX Office of the alleged assault of Jane Doe 11, in response to which the Title IX Office contacted Jane Doe 11 on**

159

December 13, 2016, December 22, 2016, and January 12, 2017 to provide her with information, resources, and support.  *See generally* Exhibit 6.  Jane Doe 11 eventually responded to Werner on or about January 25, 2017 after multiple instances of Werner's outreach.  Werner and Jane Doe 11 scheduled a meeting for January 31, 2017, but Jane Doe 11 did not appear for the meeting.  On March 2, 2017, Werner emailed Jane Doe 11 again to check in on her.  *See generally id.*  At some point thereafter when Jane Doe 11 chose to communicate with Werner, she expressed to Werner a concern about the possibility of seeing JD4 on campus.  Werner explained to Jane Doe 11 that the Title IX Office could issue a no contact order to JD4, which would be a letter from the University informing JD4 that he was to refrain from contacting Jane Doe 11 under University policy.  Jane Doe 11 requested that Werner issue such a no contact order to JD4, and Werner did so.  *See* Exhibit 7.  Werner provided Jane Doe 11 with a copy of the no contact order issued to JD4 by email on March 15, 2017.  *See* Exhibit 8.

In addition to issuing a no contact order to JD4, Werner provided information to Jane Doe 11 about the possibility of pursuing a Title IX investigation.  Jane Doe 11 initially agreed to participate in a Title IX investigation.  Accordingly, the Title IX Office engaged an independent investigator to investigate the allegations of the sexual assault.  The independent investigator contacted Jane Doe 11 multiple times to attempt to schedule a meeting with her, but Jane Doe 11 was unresponsive.  Werner reached out to Jane Doe 11 on March 22, 2017 to let her know that the investigator had been trying to reach her by email and to also let her know that the investigator would be reaching out to her on her cell phone (which Werner had provided to the investigator).  *See generally* Exhibit 6.  On March 28, 2017, Werner emailed Jane Doe 11 to ask if she still wanted to move forward with the investigation.  *See generally id.*  On April 4, 2017, Werner once again emailed Jane Doe 11 to let her know that the investigator continued to have trouble scheduling a meeting with her.  *See* Exhibit 9.  In that same email, Werner: (a) advised Jane Doe 11 that there was not enough information to continue the Title IX investigation without Jane Doe 11's participation, (b) asked Jane Doe 11 to Werner her know by the next day whether she wanted to continue with the investigation, (c) advised Jane Doe 11 that if Werner did not hear from Jane Doe 11 by the next day, Werner would close the investigation, and (d) reminded Jane Doe 11 that, if the investigation were closed, Jane Doe 11 could revisit her decision about whether to pursuing a Title IX investigation at any time.  *See id.*  Thereafter, Werner sent follow up emails to Jane Doe 11 on April 18, 2017 and April 20, 2017.  *See generally* Exhibit 6.

As for the remaining allegations of this paragraph, the University lacks sufficient knowledge or information to form a belief as to the truth of said allegations and they are therefore denied.

Subsequent Contact and Actionable Harassment

512.   Sutton came into contact with multiple times in her class, despite Defendant Werner telling her there was a no "contact order" in place.

**ANSWER:**

**Denied as stated.  The University denies the allegation that there was not a no-contact order in place.  To the contrary, Werner issued a no contact order to JD4 and provided a copy of said order to Jane Doe 11 by email on March 15, 2017.  The University lacks sufficient knowledge or information to form a belief as to the truth of the allegation that "[JD4] came into contact with multiple times in [Jane Doe 11] class" and it is therefore denied.  By way of further response, the University is unaware of any instance in which Jane Doe 11 alerted the Title IX Office that JD4 was violating the no-contact order.**

513.   Under information and belief, a "no contact" order was ever issued to Sutton.

**ANSWER:**

**Denied.  By way of further response, Werner issued a no-contact order to JD4 and provided a copy of said order to Jane Doe 11 by email on March 15, 2017.  *See* Exhibits 7, 8.**

514.   JANE DOE 11 suffered severe and extreme physical anxiety when Sutton intentionally came into contact with JANE DOE 11, ultimately causing her drop out of school.

**ANSWER:**

**Admitted in part and denied in part.  The University admits that Jane Doe 11 registered for courses for Winter 2017, but withdrew from all registered**

**courses and did not register for any future semesters. The University lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph and they are therefore denied.**

515. JANE DOE 11 continues to undergo counseling and is still experiencing symptoms of post-traumatic stress disorder, depression, and anxiety.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

516. As a result of Defendant's actions, inactions, omissions, and/or detrimental conduct surrounding the knowledge of continuous and systematic sexual assaults and rapes of countless victims, including JANE DOE 11, JANE DOE 11, suffered severe and permanent damages which include but are not limited to:

    a.    Suicide attempt resulting in hospitalization for a week in April;

    b.    Inability to return to school through EMU;

    c.    Loss of trust in males, including her significant other;

    d.    Loss of trust in authority figures such as police and school administrators, particularly Defendants Regents, EMUPD, and Werner;

    e.    Struggles with intimacy;

    f.    Post-Traumatic Stress Disorder ("PTSD");

    g.    Anxiety;

    h.    Panic attacks;

      i.     Loss of sexual drive/desire;

      j.     Resurfaced PTSD from childhood sexual abuse;

      k.    Depression; and

      l.     Counselling.

**ANSWER:**

**Denied. Further responding, the University incorporates by reference its response to paragraph 511.**

Fraudulent Concealment

517. The Statute of Limitations ("SOL") is tolled when "a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim." MCL 600.5855

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

518. Defendants, through their employees, agents and/or representatives, fraudulently concealed the existence of Plaintiffs' claims by committing affirmative acts and/or making misrepresentations, among other things, to victims.

**ANSWER:**
**Denied.**

519. The reporting of student-on-student sexual assault claims was systematically denied at EMU.

**ANSWER:**

**Denied.**

520.   Upon information and belief, when victims came to Defendants with reports of sexual assault, they were told *not* to report to the YPD.

**ANSWER:**

**Denied.**

521.   Upon information and belief, in an effort to discourage sexual assault victims from reporting to police, sexual assault victims, including Plaintiffs, that came to Defendants Werner and EMUPD were told by Defendants that they did not have enough evidence.  Plaintiffs relied on this erroneous advice.

**ANSWER:**

**Denied.  The allegation that Werner and EMUPD discouraged victims of sexual assault form reporting to the police is categorically wrong.  At all relevant times, Werner and EMUPD acted diligently and tirelessly to provide support, information, resources, and accommodations to victims of sexual assault.  As Title IX Coordinator, it was Werner's consistent practice to explain to an alleged victim of sexual assault the benefit of reporting an assault to the police and creating a record of the victim's account of the incident so that, if at some point in the future the victim wanted to pursue criminal charges against the assailant, the victim's statement would already be on file with the police.  It was also Werner's practice to offer to accompany such a person to the police station to assist him/her with making such a report to the police.**

522.   Upon information and belief, Defendant Werner was neither an investigator nor trained in conducting forensic interviews of sexual assault victims. Regardless, Defendant Werner was the gatekeeper of sexual assault claims at EMU.

**ANSWER:**

**Denied.  By way of further response, at all relevant times, Werner was the University's Title IX Coordinator and, in that role, she, among other things, provided complainants with information about their options of pursuing a Title IX investigation and/or reporting the subject incident to EMUPD and/or other police authorities.   As the Title IX Coordinator, Werner's role was not to investigate allegations.  The decision as to whether an investigation followed a report of sexual assault was in most material respects in the control of the complaining student, which Werner explained to all reporting students who expressed hesitancy about choosing to proceed with an investigation.  In the event that a complainant decided to move forward with a Title IX investigation, Werner would assign an investigator to interview parties and witnesses. Although Werner was trained as an investigator and trained in trauma-informed investigation techniques, her role at the University did not encompass conducting such investigations.  During her tenure as Title IX Coordinator at the University, Werner acted diligently and tirelessly to provide support, information, resources, and accommodations to victims of sexual assault.**

523.   Upon information and belief, Defendant Werner told Plaintiff that she had the authority to issue and would issue a "no contact order" against her assailant. However, this advice was contrary to Defendant Regents and EMU's policy. Furthermore, Defendant Werner did not have the authority to issue a Personal Protection Order signed by a circuit court judge and failed to inform Plaintiff about the options available to her.

**ANSWER:**

**Admitted in part and denied in part.  The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph inasmuch as there are eleven named plaintiffs and it is unclear to which plaintiff this paragraph refers.  The University further denies this paragraph as vague inasmuch as it does not identify how issuing University no-contact orders was contrary to University policy.  To the contrary, issuing no-contact orders in sexual misconduct cases is and was a common form of support offered to parties by the University.  By way of further response, it is admitted**

**that a no-contact order does not have the force of law in the manner of judicially-issued protection order, but denied that a no-contact order was described or presented to any complainant as having been issued by a court or having the force of law.**

524.   Upon information and belief, Defendants created such a hostile environment among the student body, and EMU's Greek life in particular, that victims of sexual assault, including Plaintiffs, were told that nothing would happen if they sought assistance from Defendants.

**ANSWER:**
**Denied.**

525.   Upon information and belief, Defendant Werner told authorities that she "is not an investigator" and that she neither possessed special training nor special knowledge with regard to interviewing victims of sexual assault.  Further, Defendant Werner told authorities that she was "just a coordinator" and that she would refer reported cases of sexual assault to the Title IX investigators.  However, before trained investigators could be assigned to a case, Defendants had already discouraged going forward.

**ANSWER:**
**Denied.  The allegation that Werner discouraged victims of sexual assault from pursuing investigations is categorically wrong.  To the contrary, Werner chose to pursue a career focused on helping survivors.  Her role was, among other things, to respond to complaints of sexual assault and provide complainants with general support and information about their options of choosing to pursue a Title IX investigation and/or reporting the subject incident to police or, if they chose, deciding not to pursue an investigation.  In the event that a complainant decided to move forward with a Title IX investigation,**

**Werner would assign an investigator to interview parties and witnesses. Additionally, as Title IX Coordinator, it was Werner's practice to explain to an alleged victim of sexual assault the benefit of reporting an assault to the police and creating a record of the victim's account of the incident so that, if at some point in the future the victim wanted to pursue criminal charges against the assailant, the victim's statement would already be on file with the police.  It was also Werner's practice to offer to accompany such a person to the police station to assist him/her with making such a report to the police.**

526.   Upon information and belief, Defendant Werner was given notice, via Defendant Regents and EMU's reporting system, that Durbin had sexually assaulted an EMU student in 2018.   Defendant Werner did not report the same to law enforcement, which allowed Durbin to continue his serial sexual assaults, including the rape of JANE DOE 10.

**ANSWER:**

**Denied as stated.  The University admits that in or about November 2018, the Title IX Office received an <u>anonymous</u> report regarding an alleged sexual assault by JD3 having occurred at an off-campus location in February 2018. The report contained no information about the identity of the reporting party or victim.   *See* <u>Exhibit 5</u>.  The remaining allegations of this paragraph are denied.**

527.   Upon information and belief, Defendant Werner told EMU students misinformation about violations of Title IX during a breakout session after EMU's 2016 freshman orientation.   Defendant Werner told freshmen students that "there is a grey area with violations of Title IX and alcohol - it's very complicated." Such information completely flies in the face of the Title IX protocol as laid out in EMU's handbook and in the common teaching at universities across the United States.

**ANSWER:**

**Denied.**

528.    McWilliams and Hernandez held positions of authority both with Defendants Werner and EMUPD, wherein the McWilliams and Hernandez were given special treatment by Defendants, including assistance in covering up sexual assaults.

**ANSWER:**

**Denied.**

529.    Upon information and belief, Defendant EMUPD would manipulate sexual assault reports and, at times, deliberately fail to enter sexual assault reports into police systems.

**ANSWER:**

**Denied.**

530.    Upon information and belief, Defendant EMUPD would enter sexual assault cases as "Suspicious Circumstances" as opposed to "Sexual Assaults." Furthermore, upon information and belief, Defendant EMUPD would not enter reports into the system.

**ANSWER:**

**Denied.**

531.    Defendant Werner knew that EMU students, including Plaintiffs, were particularly susceptible to believing Defendant Werner's misrepresentations because:

a.      Plaintiffs were young and naïve adults;

b.      Defendants created a culture such that nothing would happen to young college women who were raped; and

c.      Defendants knew that Plaintiffs had little to no experience with the criminal justice system and were, in fact, looking for the guidance of Title IX to ensure that they were properly informed.

**ANSWER:**

**Denied.  By way of further response, at no time did Werner make any misrepresentations to students.  The allegation that the University "created a culture such that nothing would happen to young college women who were raped" is categorically false.  Protecting students is critical to the University's educational mission. The University's staff in law enforcement, Title IX, student affairs, and elsewhere work tirelessly every day to try to create a safe and supportive community for students, faculty and staff.**

**Further responding, the University incorporates by reference its response to paragraph 108.**

532.    Plaintiffs were, in fact, particularly susceptible to believing Defendant Werner's misrepresentations.

**ANSWER:**

**Denied.  By way of further response, at no time did Defendant Werner make any such misrepresentations to the adult students who have asserted claims against the University.**

533.    Accordingly, Plaintiffs did not know, could not have reasonably known, had no reason to make inquiry, and were reasonably unaware of possible causes of action against Defendants until Plaintiffs started reading articles in late summer of 2020 and then went to Court for a preliminary examination in October of

2020.  Only after learning how Defendants betrayed their trust did Plaintiffs begin

to comprehend the actions of the Defendants.

**ANSWER:**

**Denied.**


## COUNT I
## SEXUAL HARASSMENT/ASSAULT IN VIOLATION 20 U.S.C. § 1681
## (TITLE IX)

534.   Plaintiffs hereby incorporate by reference Paragraphs 1- 533 above as

though fully stated herein.

**ANSWER:**

**All foregoing responses by the University are incorporated herein by
reference.**

535.   Title IX states, in relevant part:

> "No person in the United States shall, on the basis
> of sex, be excluded from participation in, be
> denied the benefits of, or be subjected to
> discrimination under any education program or
> activity receiving Federal financial assistance." 20
> USC §1681

**ANSWER:**

**The averments in this paragraph quote a statute, and the text of that
statute speaks for itself.  Accordingly, no response is required.**

536.   Plaintiffs are "persons" under the Title IX statutory language.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no
response is required and are accordingly denied.**

537. EMU is a recipient of federal funds and, as such, is subject to Title IX of the Education Amendments of 1972, *as amended*, 20 USC §1681, *et seq.*, 34 CFR §106.31.

**ANSWER:**

**Admitted.**

538. Defendants Regents, EMUPD, Werner, Heighes, and Karrick are required under Title IX to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

539. The U.S. Department of Education's Office of Civil Rights has explained that Title IX covers all programs of a school, including fraternities and sororities, and extends to sexual harassment and assault by employees, students and third parties.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

540. Pursuant to Title IX, EMU is prohibited from engaging in sex discrimination, including sexual harassment of a student.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

541.   Upon reporting, an appropriate person who receives Title IX complaints has an obligation to investigate the claims and report the findings.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

542.   Defendants Regents, EMUPD, Werner, Heighes, and Karrick are considered appropriate persons for Title IX purposes.

**ANSWER:**

**Denied.**

543.   Plaintiffs, female EMU students, were subjected to a known hostile environment and known systemic sexual harassment and/or sexual assaults based upon their sex, in particular by Defendants ASP - Chapter and DTD - Chapter.

**ANSWER:**

**Denied to the extent that these allegations apply to the University.  The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

544.   Defendants Regents, EMUPD, Werner, Heighes and Karrick had actual knowledge of Defendants ASP - Chapter and DTD - Chapters' sex discrimination, sexual harassment, sexual assaults, and other misconduct against Plaintiffs.

**ANSWER:**

**Denied.**

545.   The sex discrimination, sexual harassment, sexual assaults, and other misconduct suffered by Plaintiffs was severe, pervasive, and objectively offensive.

172

**ANSWER:**

**Denied.**

546.   One or more administrators or officials of Defendants Regents, and/or EMUPD, including but not limited to Defendants Werner, Heighes, and Karrick, possessed authority to take corrective and preventative action on Plaintiffs' behalf, had actual notice of said discrimination and failed to adequately respond, and failed to provide security in violation of Title IX and their own policies designed, drafted, and enacted by Defendants Regents, EMUPD, Werner, Heighes and Karrick.  Those failures amounted to deliberate indifference toward the repeated sex discrimination, sexual harassment, sexual assaults, rapes and other misconduct by Durbin, Hernandez, McWilliams, Sutton and Defendants ASP - Chapter and DTD - Chapter.

**ANSWER:**

**Denied.**

547.   Defendants Regents, EMUPD, Werner, Heighes, and Karrick had the proper Title IX policies to investigate known repeated sex discrimination, sexual harassment, sexual assaults, and other misconduct by Durbin, Hernandez, McWilliams, Sutton, and Defendants ASP - Chapter and DTD - Chapter.

**ANSWER:**

**Denied as stated.  It is admitted that the University had proper Title IX policies at all times relevant to Plaintiffs' claims.  It is denied that they had sufficient information or a legal obligation to investigate any of Plaintiffs' allegations in the absence of a report or participation by any of the Plaintiffs. Except as so admitted, denied.**

548. Defendant Werner gave a PowerPoint presentation to incoming students during orientation explaining EMU's Title IX policies and procedures.  By Defendant Werner's own admissions via her presentation:

a.    "[Title IX] requires schools to have a Title IX coordinator (Defendant Werner) whose job is to respond effectively to *any* complaints of sexual discrimination." (Emphasis added.)

b.    "If something were to happen to you, or if you hear about something happening to one of your friends, simply contact [Defendant Werner]." (Emphasis added.)

c.    "When should you talk to [Defendant Werner]? If something has happened to you, if something has happened to a friend, or if you have a concern or a question." (Emphasis added.)

d.    "Also please be aware there is no time limit." (Emphasis added.)

e.    "It is very common for individuals who have experienced some type of sexual violence to hold it in and not tell anybody for quite a while.  It could be a week, it could be a month, it might be three years later before they're ready to come and talk and get the help that they might need.  And that is OK.  There is no time limit." (Emphasis added.)

**ANSWER:**

**The University admits that Werner gave a PowerPoint presentation to incoming students during orientation at the University, during which time she made various statements, including those listed in subparagraphs (a) through (e) of this paragraph. Except as so admitted, denied.**

549.   Defendants Regents, EMUPD, Werner, Heighes, and Karrick failed to adhere to said policies.  This failure included, but was not limited to, improper customs, policies and/or procedures for the identification, reporting, investigation and prevention of unlawful discrimination, turning away victims of sexual assault, turning away advocates reporting on behalf of victims of sexual assault, and failing to properly investigate any and all claims of sexual assault.  Said failures amounted to deliberate indifference toward repeated sex discrimination, sexual harassment, and other misconduct.

**ANSWER:**
**Denied.**

550.   When presented with a complaint of sexual assault, Defendant Werner would act as the final decision-maker as to which complaints were worthy of a Title IX investigation.  Upon information and belief, Defendant Werner has stated the following to one or more Plaintiffs:

　　　　a.　　"You can't report the assault, it must be the victim."

　　　　b.　　"There is no point in reporting it."

　　　　c.　　"You're going to have to go through all of this to report it."

d.     "They're in a fraternity.  Greek community is going to back them up."

e.     "No one is going to believe you."

f.     "You don't have enough evidence for a police investigation."

g.     "It's not worth reporting."

h.     "That's not what they said happened."

i.     That victims of sexual assault would have to seek help from YPD, and that "[t]hey're [YPD] not gonna want to deal with this.  They're [YPD] not gonna believe you.  They're [YPD] gonna question everybody at the fraternity and the fraternity is gonna back these guys up."

**ANSWER:**
**Denied.**

551.   Upon information and belief, Defendant Karrick provided a boorish rendition of EMU's Title IX policy to those who ask about it, stating: "...If you have a campus that has a lot of rapes or guys that are catcalling girls or that type of culture, 'No' means 'yes' and 'yes' means 'anal,' then Title IX comes into play to say this is not a safe school for girls to be attending because they cannot get an equal opportunity to get an education with this type of stuff going on."

**ANSWER:**

**Denied as stated. By way of further response, the University incorporates by reference its response to paragraph 14.**

552. Defendants Regents, EMUPD, Werner, Heighes, and Karrick, with deliberate indifference, failed to provide Plaintiffs relief from known and repeated sex discrimination, sexual harassment, sexual assaults, and other misconduct by Durbin, Hernandez, McWilliams, Sutton and Defendants ASP - Chapter and DTD - Chapter.

**ANSWER:**
**Denied.**

553. Durbin, Hernandez, McWilliams, Sutton and Defendants ASP - Chapter and DTD -Chapters' conduct, coupled with the failures of Defendants Regents, EMUPD, Werner, Heighes, and Karrick to investigate, prevent, and protect, demonstrated deliberate indifference resulting in systemic sex discrimination, sexual harassment, sexual assaults, and other misconduct to countless female students, including Plaintiffs.

**ANSWER:**
**Denied.**

554. Durbin, Hernandez, McWilliams, Sutton, and Defendants ASP - Chapter and DTD - Chapters' conduct, coupled with the failures of Defendants Regents, EMUPD, Werner, Heighes, and Karrick to investigate, prevent, and protect, demonstrated deliberate indifference resulting in further and ongoing sex

discrimination, sexual harassment, sexual assaults, and other misconduct to countless female students, including Plaintiffs.

**ANSWER:**
**Denied.**

555. Defendants Regents, EMUPD, Werner, Heighes, and Karrick, with actual knowledge of repeated Title IX complaints stemming from the same bad actors, acted with deliberate indifference resulting in Plaintiffs to be "excluded from participation in" and/or "denied the benefits of" Defendant EMU, and its Title IX protections.

**ANSWER:**
**Denied.**

556. Defendants Regents, EMUPD, Werner, Heighes, and Karrick had actual knowledge that sexual misconduct was pervasive among its Greek community. Defendants ASP - Chapter and DTD - Chapter demonstrated a policy and practice of covering up sexual misconduct by its members (e.g. the "Mystic Circle"); failed to report sexual misconduct committed by its members to law enforcement or relevant EMU administrators, including but not limited to Defendant Werner, Heighes, and/or Karrick (in violation of Defendants ASP - Chapter, ASP - National, DTD - Chapter, and DTD - Nationals' bylaws); engaged in ad-hoc, internal disciplinary procedures that improperly disciplined members that engaged in sexual misconduct; engaged in unequal investigatory procedures that improperly favored

male Greek community members accused of engaging in sexual misconduct over their female student victims; discredited student victims of sexual misconduct committed by its members; tolerated and tacitly approved of systemic sexual violence committed by fraternity members; created an atmosphere whereby the rules applicable to all students did not apply to fraternity members, especially those members of Defendants ASP - Chapter and DTD - Chapter.  Defendant Regents acted with deliberate indifference by acting clearly unreasonably in response to this knowledge.

**ANSWER:**

**The University denies the allegations of this paragraph as they relate to the University, Werner, Heighes, and Karrick.  The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

557.   Defendants Regents, EMUPD, Werner, Heighes, and Karrick, with actual knowledge of repeated Title IX complaints stemming from the same bad actors, acted with deliberate indifference in deviating significantly from the standard of care outlined by Defendant's Title IX policies and procedures.

**ANSWER:**
**Denied.**

558.   Defendants Regents, EMUPD, Werner, Heighes, and Karrick further acted with deliberate indifference to known acts of sexual assault, abuse, and molestation on its premises by:

179

a.    Failing to investigate and address other victim's allegations as required by Title IX;

b.    Failing to adequately investigate and address the complaints regarding members of Defendants ASP - Chapter and DTD - Chapters' conduct; and

c.    Failing to institute corrective measures to prevent members of Defendants ASP - Chapter and DTD - Chapter from violating and sexually abusing other students and individuals, including Plaintiffs.

**ANSWER:**
**Denied.**

559.    Defendants Regents, EMUPD, Werner, Heighes, and Karrick's failure to promptly and appropriately investigate, respond to, and remedy the sexual assaults after receiving notice subjected Plaintiffs to further harassment and a sexually hostile environment, effectively denying their access to educational benefits and opportunities at EMU, including but not limited to, Title IX protections.

**ANSWER:**
**Denied.**

## COUNT II
## RETALIATION IN VIOLATION 20 USC §1681 (TITLE IX)

560.  Plaintiffs hereby incorporate by reference Paragraphs 1 - 559 above as though fully stated herein.

**ANSWER:**

**All foregoing responses by the University are incorporated herein by reference.**

561.  Title IX states, in relevant part:

> "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681

**ANSWER:**

**The averments in this paragraph quote a statute, and the text of that statute speaks for itself.  Accordingly, no response is required.**

562.  Plaintiffs are "persons" under the Title IX statutory language.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

563.  Defendant Regents is a recipient of federal funds and, as such, is subject to Title IX of the Education Amendments of 1972, *as amended*, 20 U.S.C. § 1681, *et. seq.*, 34 CFR § 106.31.

**ANSWER:**
**Admitted.**

181

564.   Defendants Regents, EMUPD, Werner, Heighes, and Karrick are required under Title IX to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

565.   The above-named Defendants, together with Defendants ASP - Chapter and DTD - Chapter are 'appropriate persons' as it pertains to reporting Title IX complaints.

**ANSWER:**

**Denied.**

566.   Plaintiffs engaged and/or attempted to engage in protected activity under Title IX by complaining about and opposing Title IX discrimination.

**ANSWER:**

**Denied.**

567.   Plaintiffs' protected activity was, upon information and belief, actually known to Defendants, which failed to respond and/or concealed Plaintiffs repeated Title IX complaints.

**ANSWER:**

**Denied.**

568.   Defendants Heighes, Karrick, and Werner took adverse action against Plaintiffs by denying sexual assault victims proper avenues to report their assaults,

providing safety from known assailants, turning away advocates of victims, maintaining a gross misunderstanding of Title IX policy based upon known prevalent sexual assaults and misconduct, and failing to properly investigate any and all sexual assault claims, whether reported through Tile IX, fraternities, sororities, or on social media.

**ANSWER:**
**Denied.**

569.   Defendants Heighes, Karrick, and Werner took further adverse action against Plaintiffs, which includes but is not limited to:

a.    Defendant Werner continued to say: "[t]hey're [YPD] not gonna want to deal with this.  They're not gonna believe you.  They're gonna question everybody at the fraternity and the fraternity is gonna back these guys up."

b.    Defendant Werner met with Hernandez and McWilliams on multiple occasions wherein Hernandez and McWilliams gave statements regarding the assault on JANE DOE 1.  However, contrary to the policy of Title IX investigation, none of these statements were recorded or memorialized.

c.    In a concerted effort, Hernandez and McWilliams, after learning of JANE DOE 1's roommate's aforementioned posts, schemed to go to Defendant Werner to mollify and kill any potential claim

by JANE DOE 1 if/when she reported the incident to Defendant EMU's Title IX department, spearheaded by Defendant Werner.

d.    Defendant Regents and/or EMUPD did not create a perceived protected environment at EMU.  Defendant Regents and/or EMUPD afforded little to no protection victims that were raped and/or sexually assaulted.

e.    JANE DOE 3 was given information from other victims that Defendants EMUPD and/or Werner did not protect victims of sexual assault.

f.    JANE DOE 7 reported her assault to EMU's Title IX department in November 2018.  Her Title IX complaint was closed after no investigation took place.

g.    JANE DOE 11 reported her assault to Defendant EMUPD, but the officer in charge of her case did not make any attempt to contact witnesses regarding the same.

**ANSWER:**
**Denied.**

570.    These adverse actions against Plaintiffs were calculated to and did cause irreparable harm, injury, and damages, including but not limited to physical and severe emotional injuries, all past, present, and future, as well as loss of freedom,

loss of enjoyment of life, humiliation, degradation, loss of reputation, and economic damages.

**ANSWER:**
**Denied.**

571.   As set forth above, there is a direct causal connection between Plaintiffs' protected activity and Defendants' adverse actions against them.   Once Plaintiffs came forward and/or attempted to come forward with Title IX complaints of known sexual misconduct by Durbin, McWilliams, Hernandez and other members of Defendants ASP - Chapter and DTD - Chapter, Defendants made a concerted effort to conceal and/or prevent the same.

**ANSWER:**
**Denied.**

572.   As a direct and proximate cause of Defendants' unlawful actions, Plaintiffs have suffered irreparable harm, injury, and damage: including but not limited to physical and severe emotional injuries, all past, present, and future, as well as loss of freedom, loss of enjoyment of life, humiliation, degradation, loss of reputation, and economic damages.

**ANSWER:**
**Denied.**

## COUNT III
## Violation of Civil Rights Under 42 U.S.C. § 1983 - Unlawful Custom, Policy or Practice – *Monell*

573.  Plaintiffs hereby incorporate by reference Paragraphs 1 - 572 above as though fully stated herein.

**ANSWER:**

**All foregoing responses by the University are incorporated herein by reference.**

574.  Defendant EMUPD has been deputized by the Washtenaw County Sheriff expanding Defendant EMUPD's jurisdiction beyond the borders of Defendant EMU's campus as a part of the Eastern Washtenaw Safety Alliance and in collaboration with the Washtenaw County Sheriff's Office, YPD, and the Ann Arbor Transportation Authority.  The officers from each agency in the alliance share jurisdictional authority, meaning they all have county-wide arrest powers, including Defendant EMUPD.

**ANSWER:**
**Admitted.**

575.  At all times relevant hereto, Defendant EMUPD's actions occurred under the color of law, under color of statutes, ordinances, regulations, policies, customs, and usages of the County of Washtenaw and/or State of Michigan.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

576.   Defendant EMUPD notes that its primary mission is to "provide for the safety and security of all ...students...at our great University."

**ANSWER:**
**Admitted.**

577.   If a governmental agency or agent thereof has a policy, custom, or practice that tolerates commission of unconstitutional acts by its officers and/or employees, then the agency and/or the employees who are in a position to set the policy, custom, or practice may be held liable directly for the consequences of any unconstitutional acts by said persons.

**ANSWER:**
**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

578.   That a local governmental entity may be also liable if it has a policy of inaction and such inaction amounts to a failure to protect constitutional rights.

**ANSWER:**
**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

579.   The Due Process clause of the 14th Amendment provides that the state may not deprive a person of life, liberty or property without due process of law. Therefore, Plaintiffs have a constitutionally protected right to be free from sexual assaults.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

580.   Plaintiffs have a constitutionally protected right to report sexual assaults and have those reports properly investigated pursuant to Title IX.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

581.   Defendant EMUPD is directly involved with and/or responds to EMU and Defendant Werner's Title IX department, and is required to investigate reports of sexual assault, especially those which occur on Defendant Regent's EMU campus.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

582.   Defendant EMUPD's conduct constituted and/or evidenced a custom of toleration and/or acquiescence regarding the investigation of Title IX complaints by its officers, agents, and/or employees, which custom was or became a *de facto* official policy.

**ANSWER:**
**Denied.**

583.   In the alternative, Defendant EMUPD's conduct constituted and/or evidenced a custom of toleration and/or acquiescence regarding the lack of

investigation of Title IX complaints by its officers, agents, and/or employees, which custom was or became a *de facto* official policy.

**ANSWER:**
**Denied.**

584.   Discovery will bear out and provide further support of such policy, custom, or practice.  Defendant EMUPD's allowing a policy, custom or practice of failure to adhere to Title IX rules and regulations regarding proper investigation of Title IX complaints constitutes deliberate indifference to Plaintiffs' rights and safety.

**ANSWER:**
**Denied.**

585.   At all times relevant to the instant action, Defendant EMUPD, by its failure to train, supervise, discipline, and/or correct the behavior of the employees and/or agents, including but not limited to Defendants Heighes, Karrick, and/or Werner under its supervision, knew or should have known, created the potential for the intentional, willful and wanton, reckless, deliberately indifferent, grossly negligent, and/or negligent acts and/or omissions of its employees and/or agents, including but not limited to Defendants Heighes, Karrick, and/or Werner, allowed, acquiesced in, and/or encouraged said employees and/or agents to function as appropriate persons for purposes of reporting sexual assaults under Title IX and their respective misfeasance and/or malfeasance pertaining to Title IX inquiries, thereby proximately causing Plaintiffs to be deprived of their liberty, right to bodily integrity

and their right to be free from sexual assaults as enumerated herein without due process of law, in violation of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, Title IX, and the Clery Act.

**ANSWER:**
**Denied.**

586.   At all times relevant to the instant action, Defendant EMUPD, by its violation of statutory duties, allowed and/or encouraged its employees and/or agents, including but not limited to Defendants Heighes, Karrick, and/or Werner to function as appropriate persons for purposes of reporting sexual assaults under Title IX and their respective misfeasance and/or malfeasance pertaining to Title IX inquiries, thereby proximately causing Plaintiffs to be deprived of their liberty, right to bodily integrity and their right to be free from sexual assaults as enumerated herein without due process of law, in violation of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, Title IX, and the Clery Act.  Defendant EMUPD's actions, inactions, omissions, misfeasance and/or malfeasance as outline herein was the moving force behind Plaintiffs' constitutional violations.

**ANSWER:**
**Denied.**

587.   Defendants Heighes, Karrick, and/or Werner acted with deliberate indifference to Plaintiffs' sexual assault claims under Title IX.  Defendant EMUPD knew about such conduct existing within its department as well as Defendant EMU's

Title IX department, and Defendant EMUPD acted with deliberate indifference to the known conduct thereby acting with deliberate indifference to Plaintiffs' rights and safety. Had Defendant EMUPD not been deliberately indifferent or acquiesced as to the known unlawful conduct, Plaintiffs' sexual assaults would have been prevented and their constitutional rights protected.

**ANSWER:**
**Denied.**

588. As a direct and proximate result of Defendant EMUPD's aforementioned unlawful conduct and constitutional violations, Plaintiffs suffered physical and emotional injuries, all past, present, and future, as well as loss of freedom, loss of enjoyment of life, humiliation, and degradation.

**ANSWER:**
**Denied.**

## COUNT IV
## Violation of Civil Rights Under 42 U.S.C. § 1983 - State Created Danger

589. Plaintiffs hereby incorporate by reference Paragraphs 1 - 588 above as though fully stated herein.

**ANSWER:**
**All foregoing responses by the University are incorporated herein by reference.**

590.   The Due Process clause of the 14th Amendment provides that the state may not deprive a person of life, liberty or property without due process of law.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

591.   Defendants Regents, EMUPD, Werner, Heighes, Karrick, ASP - Chapter, ASP - National, DTD - Chapter, and DTD - National deliberately exposed Plaintiffs to known dangerous sexual predators and serial rapists, Durbin, Hernandez, McWilliams, Sutton and other members of Defendants ASP - Chapter and DTD - Chapter, knowing these individuals and fraternities could and would cause serious damage by sexually assaulting female students on campus.

**ANSWER:**
**Denied.**

592.   This conduct was culpable in the extreme.

**ANSWER:**
**Denied.**

593.   Defendants' conduct includes but is not limited to:

    a.    Once JANE DOE 1 met with Defendant Werner, Defendant Werner told JANE DOE 1 that she had already spoken with JANE DOE 1's alleged attackers regarding her sexual assault. Defendant Werner further stated: "There is no point in reporting it.  You're going to have to go through all of this to report it.

They're in a fraternity.  The Greek community is going to back them up."

b. JANE DOE 1 was told at this meeting that she would have to explain everything, in detail, regarding the night of her sexual assault.  When JANE DOE 1 started to explain what happened, Defendant Werner continuously interrupted her with comments like "[t]hat's not what they [JANE DOE 1's alleged rapists] said happened."

c. After JANE DOE 1 finished telling Defendant Werner what happened, Defendant Werner explained that because her assault occurred off-campus, EMU's Title IX department would not be investigating it and that she would have to contact YPD on her own.

d. Following the sexual assaults, Plaintiffs told members of Defendants ASP - Chapter and DTD - Chapter in hopes that the fraternity members would follow their respective fraternity's bylaws and regulations requiring mandatory reporting of sexual assaults within their own fraternity and/or to EMU's Title IX department and/or Defendant Werner.

e.   Defendants Regents and/or EMUPD did not create a protected environment that was perceived by JANE DOE 3.  As witnessing other women's accounts of being raped, and Defendants Regents and/or EMUPD affording no protection to her friends that were raped and/or sexually assaulted.

f.   When Plaintiffs did tell friends within Defendant Regents and EMU's Greek community what happened, they exclaimed, "welcome to the club - it happens to everyone," and were ostracized by members of Defendant Regents and EMU's Greek community who believed they had lied.

g.   JANE DOE 3 was given information from other victims that Defendants Regents, EMUPD and/or Werner did not protect victims of sexual assault.

h.   JANE DOE 7 reported her assault to EMU's Title IX department in November 2018.  Her Title IX complaint was closed after no investigation took place.

i.   After reporting JANE DOE 8' s assault to EMUPD in the summer of 2020, JANE DOE 8 was told: "they had received numerous calls about Durbin assaulting women on campus".  Yet

Defendant EMUPD did not look further into any report of Durbin until 2020.

j.      Durbin continued to attend to Defendant ASP - Chapter's fraternity house functions after he was blacklisted.

k.      JANE DOE 11 reported her assault to Defendant EMUPD, but the officer in charge of her case did not make attempts to contact witnesses regarding the same.

**ANSWER:**
**Denied.**

594.   Plaintiffs were foreseeable and certain victims of Defendants' decisions to not investigate the complaints from students that began, upon information and belief, as early as 2015, to not take corrective actions, and to allow Durbin, Hernandez, McWilliams, Sutton and other members of Defendants ASP - Chapter and DTD - Chapter to continue with known pervasive sexual misconduct.

**ANSWER:**
**Denied.**

595.   Plaintiffs' sexual assaults were foreseeable and direct.

**ANSWER:**
**Denied.**

596.   The decisions and actions to deprive Plaintiffs of a safe campus constituted affirmative acts that caused and/or increased the risk of harm, as well as physical and emotional injuries, to Plaintiffs.

**ANSWER:**
**Denied.**

597.   Defendants acted in willful disregard for the safety of Plaintiffs.

**ANSWER:**
**Denied.**

598.   Defendants had a fiduciary duty to protect students, like Plaintiffs, from harm; and Defendants breached that duty by allowing Plaintiffs' sexual assault by placing students in proximate danger of a known sexual predator.

**ANSWER:**
**Denied.**

599.   Defendants   created   the   opportunity   for   Durbin,   Hernandez, McWilliams, Sutton and other members of Defendants ASP - Chapter and DTD - Chapter to sexually assault Plaintiffs, an opportunity that they would not otherwise have had but for Defendants' failure to investigate the complaints from students that began, upon information and belief, as early as 2015, and Defendants' failure to take corrective actions in regard to known sexual predators and serial rapists.

**ANSWER:**
**Denied.**

600.    At all relevant times, Defendants were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendants.

**ANSWER:**
**Denied.**

## COUNT V
## VIOLATION OF CIVIL RIGHTS - EQUAL PROTECTION PURSUANT TO 42 U.S.C. § 1983

601.    Plaintiffs hereby incorporate by reference Paragraphs 1 - 600 above as though fully stated herein.

**ANSWER:**

**All foregoing responses by the University are incorporated herein by reference.**

602.    At all relevant times to the instant action, Defendant Karrick was employed by Defendant EMUPD as the Deputy Chief of Police.

**ANSWER:**

**Admitted in part and denied in part.  It is admitted that during the time period alleged by Plaintiffs in their Complaint, Karrick was employed by the University as the Deputy Chief of Police for EMUPD.  Except as so admitted, denied.**

603.    At all times relevant to the instant action, Defendant Karrick was acting within the course and scope of his employment as Deputy Chief of Police employed by Defendants Regents and EMUPD, and under color of law, under color of statutes,

ordinances, regulations, policies, customs, and usages of the State of Michigan and/or EMU.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

604.   At all times relevant to the instant action, Defendant Heighes was employed by Defendants Regents and EMUPD as the Chief of Police.

**ANSWER:**

**Admitted in part and denied in part.  It is admitted that during the time period alleged by Plaintiffs in their Complaint, Heighes was employed by the University as the Chief of Police for EMUPD.  Except as so admitted, denied.**

605.   At all times relevant to the instant action, Defendant Heighes was acting within the course and scope of his employment as EMUPD Chief of Police, employed by Defendants Regents and EMUPD, and under color of law, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or EMU.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

606.   At all times relevant to the instant action, Defendant Werner was the EMU Title IX Director.

**Admitted in part and denied in part.  It is admitted that during the time period alleged by Plaintiffs in their Complaint, Werner was employed by the University as Title IX Coordinator.  Except as so admitted, denied.**

607.   At all times relevant to the instant action, Defendant Werner was acting within the course and scope of her employment as EMU Title IX Director, employed by Defendant Regents, and under color of law, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or EMU.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

608.   Plaintiffs had a right to fair and equal treatment as females, a member of a protected class, under the laws as guaranteed by the Equal Protection Clause of the Fourteenth Amendment.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

609.   Defendants Heighes, Karrick and Werner violated this right when they intentionally treated Plaintiffs less favorably than other similarly situated persons, without a rational basis for that treatment, and when they failed to intervene in constitutional violations.  This includes but is not limited to:

> a.   In a concerted effort, Hernandez and McWilliams schemed together after seeing the post to go to Defendant Werner to mollify and kill any claim by JANE DOE 1 if/when she reported

the incident to EMU's Title IX department, spearheaded by Defendant Werner.

b.  Defendant Werner meets with Hernandez and McWilliams on multiple occasions wherein Hernandez and McWilliams gave statements regarding the assault on JANE DOE 1. However, contrary to the policy of Title IX investigation, none of these statements were recorded or memorialized.

c.  Once JANE DOE 1 meets with Defendant WERNER, she told JANE DOE 1 that she has already spoken with the gentlemen in this matter. Defendant Werner further states: "There is no point in reporting it. You're going to have to go through all of this to report it. They're in a fraternity. The Greek community is going to back them up."

d.  JANE DOE 1 was told at a meeting with Defendant Werner that she would have to explain everything in detail of what happened that night. When JANE DOE 1 started to explain what happened, Defendant Werner continuously interrupted her with comments like; "[t]hat's not what they said happened."

e.  Defendant Werner continued to say: "[t]hey're [YPD] not gonna want to deal with this. They're not gonna believe you. They're

gonna question everybody at the fraternity and the fraternity is gonna back these guys up."

f.     Defendant Regents and EMUPD did not create a protected environment that was perceived by JANE DOE 3.  As witnessing other women's accounts of being raped, and Defendants Regents and EMUPD affording no protection to her friends that were raped and/or sexually assaulted.

g.     JANE DOE 3 was given information from other victims that Defendants Regents, EMUPD and/or Werner did not protect victims of sexual assault

h.     JANE DOE 7 reported her assault to EMU's Title IX department in November 2018.  Her Title IX complaint was closed after no investigation took place.

i.     JANE DOE 11 reported her assault to Defendant EMUPD but the officer in charge of her case did not make any attempt to contact witnesses regarding the same.

**ANSWER**:
**Denied.**

610.    At all relevant times to the instant action, Defendants Regents and EMUPD were tasked with training, screening, and supervising Defendants Heighes, Karrick and Werner in response to Title IX complaints.

**ANSWER:**
**Denied.**

611.    Defendants Heighes, Karrick and Werner were supervisory personnel engaged in the course of their supervisory duties.

**ANSWER:**
**Denied.**

612.    Defendants Heighes, Karrick and Werner intentionally and deliberately promulgated and/or carried out the aforementioned acts, orders, practices, customs, and directives, with wanton and reckless disregard for Plaintiffs' civil and constitutional rights.

**ANSWER:**
**Denied.**

613.    As a direct and proximate result of Defendants' aforementioned unlawful conduct and constitutional violations, Plaintiffs suffered physical and severe emotional injuries, all past, present, and future, as well as loss of freedom, loss of enjoyment of life, humiliation, degradation, loss of reputation, and economic damages.

**ANSWER:**
**Denied.**

## COUNT VI
## VIOLATION OF CIVIL RIGHTS PURSUANT TO 42 U.S.C. § 1983 - RIGHT TO BODILY INTEGRITY

614.   Plaintiffs hereby incorporate by reference Paragraphs 1 - 613 above as though fully stated herein.

**ANSWER:**

**All foregoing responses by the University are incorporated herein by reference.**

615.   The Civil Rights Act, 42 U.S.C. § 1983, provides for civil liability for the deprivation of any right, privilege, or immunity secured by the Constitution and laws of the United States, while committed under color of law.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

616.   Plaintiffs have a right to fair and equal treatment as females, a member of a protected class, under the laws as guaranteed by the Equal Protection Clause of the Fourteenth Amendment.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

617.   Plaintiffs had a right to fair and equal treatment as females, a member of a protected class, under the laws as guaranteed by the Equal Protection Clause of the Fourteenth Amendment.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

618.    At all times relevant to the instant action, Plaintiffs had a clearly established right to liberty protected in the substantive components of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, including but not limited to their rights to personal safety and bodily integrity, namely, to be free from sexual assault, sexual harassment and sexual misconduct, of which reasonable persons in their positions should have known.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

619.    At all relevant times, Defendants Heighes, Karrick and Werner were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the United States Constitution, State of Michigan and/or Defendants.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

620.    Defendants are civilly liable to Plaintiffs pursuant to 42 U.S.C. § 1983 due to all of the aforementioned deliberate, grossly negligent, reckless, willful, wanton, malicious, and/or intentional acts and/or omissions of Defendants Heighes, Karrick and Werner, of which were committed under the color of law and pursuant

to the customs, policies, and/or practices of Defendant Regents and/or EMUPD, all of which subjected Plaintiffs to deprivation of their rights, privileges, and immunities secured by the Fourteenth Amendments to the United States Constitution.

**ANSWER:**
**Denied.**

621. Such conduct on the part of Defendants Heighes, Karrick and Werner violated clearly established law of which they were fully aware at the time they were put on actual notice of Plaintiffs' sexual assaults by Durbin, Hernandez, McWilliams, Sutton and other members of Defendants ASP - Chapter and DTD - Chapter.

**ANSWER:**
**Denied.**

622. At all times relevant to the instant action, Defendants Regents and EMUPD were tasked with training, screening and supervising Defendants Heighes, Karrick, and Werner in response to Title IX complaints.

**ANSWER:**
**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

623. Defendants Heighes, Karrick, and Werner were supervisory personnel engaged in the course of their supervisory duties.

**ANSWER:**
**Denied.**

624.   At all times relevant to the instant action, Defendants Regents and EMUPD had the ultimate responsibility to train and supervise Defendants Heighes, Karrick, and Werner in the appropriate manner of detecting, reporting, and preventing sexual abuse, assault, and molestations and as a matter of acts, custom, policy and or practice, failed to do so with deliberate indifference.

**ANSWER:**
**Denied.**

625.   Defendants Heighes, Karrick, and Werner had a duty to prevent sexual assault, abuse, and molestation on their campus and premises, that duty arising under the above-referenced constitutional rights, as well as established rights pursuant to Title IX.

**ANSWER:**
**Denied.**

626.   As a matter of custom, policy, and/or practice, Defendants Regents, EMUPD, Heighes, Karrick, and Werner had the responsibility and authority to investigate complaints and concerns of sexual nature between peer students and failed to do so with deliberate indifference.

**ANSWER:**
**Denied.**

627.   Defendants Heighes, Karrick, and Werner had an unconstitutional policy, practice, and custom of allowing a culture of sexual violence and harassment to grow and fester with deliberate indifference.

**ANSWER:**
**Denied.**

628.   Defendants also operated under an unconstitutional policy, practice, and custom of failing to provide students a clear method of reporting and/or investigating concerns about sexual discrimination, assault, and molestations within Greek community on Defendant Regents' EMU campus.

**ANSWER:**
**Denied.**

629.   These unconstitutional policies, customs, and/or practices resulted and/or included, but not limited to, the following:

    a.    In a concerted effort, Hernandez and McWilliams schemed together after seeing the post to go to Defendant Werner to mollify and kill any claim by JANE DOE 1 if/when she reported the incident to EMU's Title IX department, spearheaded by Defendant Werner.

    b.    Defendant Werner met with Hernandez and McWilliams on multiple occasions wherein Hernandez and McWilliams gave statements regarding the assault on JANE DOE 1.  However,

contrary to the policy of Title IX investigation, none of these statements were recorded or memorialized.

c.      Once JANE DOE 1 met with Defendant Werner, she told JANE DOE 1 that she had already spoken with JANE DOE 1's alleged attackers regarding her sexual assault. Defendant Werner further stated: "There is no point in reporting it. You're going to have to go through all of this to report it. They're in a fraternity. The Greek community is going to back them up."

d.      JANE DOE 1 was told at a meeting with Defendant Werner that she would have to explain everything in detail of what happened the night she was assaulted. When JANE DOE 1 started to explain what happened, Defendant Werner continuously interrupted her with comments like; "[t]hat's not what they said happened."

e.      Defendant Werner continued to say: "[t]hey're [YPD] not gonna want to deal with this. They're not gonna believe you. They're gonna question everybody at the fraternity and the fraternity is gonna back these guys up."

f.      Defendant Regents and/or EMUPD did not create a protected environment that was perceived by JANE DOE 3. As witnessing

other women's accounts of being raped, and Defendants Regents and/or EMUPD affording no protection to her friends that were raped and/or sexually assaulted.

g.     JANE DOE 3 was given information from other victims that Defendants Regents, EMUPD and/or Werner did not protect victims of sexual assault

h.     JANE DOE 7 reported her assault to EMU's Title IX department in November 2018.  Her Title IX complaint was closed after no investigation took place.

i.     JANE DOE 11 reported her assault to Defendant EMUPD but the officer in charge of her case did not make any attempt to contact witnesses regarding the same.

**ANSWER:**
**Denied.**

630.  Defendants' failure to properly address the initial complaints regarding Durbin, Hernandez, McWilliams, Sutton and other members of Defendants ASP - Chapter and DTD - Chapters' sexually assaultive conduct also led to others being victimized, sexually assaulted, abused and molested by Durbin, Hernandez, McWilliams, Sutton and other members of Defendants ASP - Chapter and DTD - Chapter.

209

**ANSWER:**

**Denied.**

631.   Despite Defendants Heighes, Karrick, and Werner's knowledge of Plaintiffs' fear of retaliation, Defendants Heighes, Karrick, and Werner did nothing to diminish those concerns of those who had misconduct to report, or to protect those who did come forward.   In fact, Defendants Heighes, Karrick, Werner, and/or EMUPD expressly and/or overtly shunned away and/or convinced those who did come forward that "nothing will happen" and/or "no one would believe them."

**ANSWER:**

**Denied.**

632.   Defendant Regents and/or EMUPD held and maintained a culture that permitted a sexually hostile environment to exist affecting numerous individuals on Defendant Regents' EMU campus, including all eleven (11) Plaintiffs.

**ANSWER:**

**Denied.**

633.   Defendants also had a custom, practice, and/or policy of failing to address complaints of sexual discrimination, assault, harassment, and molestation in a prompt and equitable manner which caused and directly contributed to a continuation of the sexually hostile environment Plaintiffs experienced.

**ANSWER:**

**Denied.**

634.   By failing to prevent the aforementioned sexual discrimination, sexual harassment, sexual assault and molestation upon Plaintiffs, and by failing to appropriately respond to reports of the same from Defendant Regents' EMU Greek community, Defendants' actions were so unreasonable as to amount to deliberate indifference, making Defendants liable to Plaintiffs pursuant to 42 U.S.C. §1983.

**ANSWER:**
**Denied.**

635.   Ultimately, Defendants Heighes, Karrick, and Werner failed to adequately and properly investigate the complaints of Plaintiffs and/or other similarly situated individuals by:

- a.   Failing to investigate and address other victim's allegations as required by Title IX;

- b.   Failing to adequately investigate and address the complaints regarding members of Defendants ASP - Chapter and DTD - Chapters' conduct; and

- c.   Failing to institute corrective measures to prevent members of Defendants ASP - Chapter and DTD - Chapter from violating and sexually abusing other students and individuals, including Plaintiffs.

**ANSWER:**
**Denied.**

636.   Defendants are also liable to Plaintiffs under 42 U.S.C. §1983 for maintaining customs, policies, and practices which deprived Plaintiffs of rights

secured by the Fourteenth Amendment, including their constitutionally protected right to bodily integrity.

**ANSWER:**
**Denied.**

637.   As a direct and proximate result of Defendants' aforementioned unlawful conduct and constitutional violations, Plaintiffs suffered physical and severe emotional injuries, all past, present, and future, as well as loss of freedom, loss of enjoyment of life, humiliation, degradation, loss of reputation, and economic damages.

**ANSWER:**
**Denied.**

## COUNT VII
## FAILURE TO TRAIN AND SUPERVISE UNDER 42 U.S.C. § 1983

638.   Plaintiffs hereby incorporate by reference Paragraphs 1 - 637 above as though fully stated herein.

**ANSWER:**
**All foregoing responses by the University are incorporated herein by reference.**

639.   Defendants Regents and/or EMUPD had the ultimate responsibility and authority to train and supervise their employees, agents, and/or representatives including Defendants Heighes, Karrick, and Werner, and all faculty and staff

regarding their duties toward students, faculty, staff and visitors, particularly as they pertain to Title IX complaints and subsequent investigations.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

640. Defendants Regents and/or EMUPD failed to train and supervise their employees, agents, and/or representatives including all faculty and staff, regarding the following duties:

a. Perceive, report, and stop inappropriate sexual conduct on campus;

b. Provide diligent supervision over students and other individuals, including Defendants Heighes, Karrick, and Werner;

c. Report suspected incidents of sexual abuse or sexual assault;

d. Ensure the safety of all students, faculty, staff, and visitors to EMU's premises;

e. Provide a safe environment for all students, faculty, staff, and visitors to EMU's premises free from sexual harassment;

f. Properly train faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment;

g. Properly and diligently investigate and address other victim's allegations as required by Title IX;

h. Properly and diligently investigate and address the complaints regarding members of Defendants ASP - Chapter and DTD - Chapters' conduct;

i. Institute corrective measures to prevent members of Defendants ASP - Chapter and DTD - Chapter from violating and sexually abusing other students and individuals, including Plaintiffs.

j.    The above list of duties is not exhaustive.

**ANSWER:**

**Denied.**

641.  Defendants Regents and/or EMUPD failed to adequately train and/or supervise Defendants Heighes, Karrick, and Werner, and others regarding the aforementioned duties which led to violations of Plaintiffs' rights, which included but is not limited to:

a.    Defendant Werner continued to say: "[t]hey're [YPD] not gonna want to deal with this.  They're not gonna believe you.  They're gonna question everybody at the fraternity and the fraternity is gonna back these guys up."

b.    Defendant Werner met with Hernandez and McWilliams on multiple occasions wherein Hernandez and McWilliams gave statements regarding the assault on JANE DOE 1.  However, contrary to the policy of Title IX investigation, none of these statements were recorded or memorialized.

c.    In a concerted effort, Hernandez and McWilliams schemed together after seeing the post to go to Defendant Werner to mollify and kill any claim by JANE DOE 1 if/when she reported the incident to Defendant Regents and EMU's Title IX department, spearheaded by Defendant Werner.

d.    JANE DOE 3 was given information from other victims that Defendants Regents, EMUPD, and/or Werner did not protect victims of sexual assault.

e.    JANE DOE 7 reported her assault to EMU's Title IX department in November 2018.  Her Title IX complaint was closed after no investigation took place.

f.    JANE DOE 1 's roommate called Defendant Werner on multiple occasions to inform her of the assault of JANE DOE 1.  However, the roommate was rebuked by Defendant Werner saying "you can't report the assault.  It must be the victim." This was in direct contrast to both Title IX policy and Defendant Werner's admissions.  These admissions were advanced during Defendant Werner's orientation presentation explaining the Title IX policy.

g.    Once JANE DOE 1 met with Defendant Werner, Defendant Werner told JANE DOE 1 that she had already spoken with JANE DOE 1's alleged attackers regarding her sexual assault. Defendant Werner further stated: "There is no point in reporting it.  You're going to have to go through all of this to report it. They're in a fraternity.  The Greek community is going to back them up."

h.    JANE DOE 1 was told at this meeting that she would have to explain everything in detail of what happened the night of her assault.  When JANE DOE 1 started to explain what happened, Defendant Werner continuously interrupted her with comments like; "[t]hat's not what they said happened."

i.    After JANE DOE 1 finished telling Defendant Werner what happened, Defendant Werner explained that because this happened off-campus, their department would not be investigating it and that she would have to contact YPD on her own.

j.    Following the sexual assaults, Plaintiffs told members of Defendants ASP - Chapter and DTD - Chapter in hopes they would follow bylaws and regulations of reporting sexual assaults within their own fraternity and/or to EMU's Title IX department and Defendant Werner.

k.    Defendants Regents and/or EMUPD did not create a protected environment that was perceived by JANE DOE 3.  As witness to other women's accounts of being raped, and Defendants Regents and/or EMUPD afforded no protection to her friends that were raped and/or sexually assaulted.

l.    When Plaintiffs did tell friends within Defendant Regents and EMU's Greek community what happened, they exclaimed, "welcome to the club - it happens to everyone," and were ostracized by members of Defendant Regents and EMU's Greek community who believed they had lied.

m.    JANE DOE 3 was given information from other victims that Defendants Regents, EMUPD, and/or Werner did not protect victims of sexual assault.

n.    After reporting JANE DOE 8 's assault to EMUPD in the summer of 2020, JANE DOE 8 was told: "they had received numerous calls about Durbin assaulting women on campus". Defendant EMUPD did not look further into any report of Durbin until 2020.

o.    Durbin still came to Defendant ASP - Chapter's fraternity house after he was blacklisted.

p.    JANE DOE 11 reported her assault to Defendant EMUPD but the officer in charge of her case did not make any attempt to contact witnesses regarding the same.

**ANSWER:**
**Denied.**

217

642. Defendants Regents and/or EMUPD's failure to adequately train and/or supervise was the result of Defendants' deliberate indifference toward the well-being of students, including Plaintiffs.

**ANSWER:**
**Denied.**

643. Defendants Regents and/or EMUPD's failure to adequately train and/or supervise is closely related to or actually caused Plaintiffs' injuries.

**ANSWER:**
**Denied.**

644. As a result, Defendants Regents and/or EMUPD deprived Plaintiffs of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

**ANSWER:**
**Denied.**

## COUNT VIII
## SEX DISCRIMINATION
## IN VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT

645. Plaintiffs hereby incorporate by reference Paragraphs 1 - 644 above as though fully stated herein.

**ANSWER:**

**All foregoing responses by the University are incorporated herein by reference.**

218

646.   EMU is a place of public accommodation, a public service, and an educational institution as defined in Michigan's Elliott -Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq*. (ELCRA).

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

647.   Defendants Heighes, Karrick, and Werner are "person(s)" as that term is defined in ELCRA and were agents of Defendant Regents and EMU.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

648.   Plaintiffs' sex was the sole factor motivating Sutton, Durbin, McWilliams, Hernandez and other members of Defendants ASP - Chapter and DTD Chapter to select Plaintiffs as victims of their sexual assaults.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

649.   Had Plaintiffs been male, they would not have been targeted as victims by Sutton, Durbin, McWilliams, Hernandez and other members of Defendants ASP Chapter and DTD - Chapter.  Indeed, had Plaintiffs been male, Sutton, Durbin, McWilliams, Hernandez and other members of Defendants ASP - Chapter and DTD Chapter would have encouraged them to act in the same or similar manner towards Plaintiffs and other female students of Defendant Regents and EMU.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

650.   Had Plaintiffs been male, they would have been believed, treated with more respect, protected, and been entitled to the proverbial "benefit of the doubt" by Defendants EMUPD, Heighes, Karrick, Werner, ASP - Chapter and DTD - Chapter. Indeed, had Plaintiffs been male, they would have had the support and safety of Defendant Regents and EMU's community, as well as Defendant Regents and EMU's Greek community.

**ANSWER:**
**Denied.**

651.   By failing to train, supervise, and/or adhere to Title IX procedures, policies and requirements, a protection that was denied to female students, including Plaintiffs, Defendants Regents, EMUPD, ASP - Chapter, and DTD - Chapter, through agents, representatives, and employees, including Defendants Heighes, Karrick, and Werner were predisposed to discriminate based on Plaintiffs' sex and acted in accordance with that predisposition, as well as Defendant Regents and EMU's recognized culture of sexual misconduct.

**ANSWER:**
**Denied.**

652.   By failing to train, supervise, and/or adhere to Title IX procedures, policies and requirements, a protection that was denied to female students, including

Plaintiffs, Defendants Regents, EMUPD, ASP - Chapter, and DTD - Chapter, through agents, representatives, and employees, including Defendants Heighes, Karrick, and Werner, treated Plaintiffs differently from similarly situated male students who rarely used the Title IX program, and were arguably primarily the aggressors and/or abusers, based on unlawful consideration of sex.

**ANSWER:**

**Denied.**

653. Defendants Regents, EMUPD, Heighes, Karrick, Werner, ASP - Chapter, and DTD - Chapters' discrimination of Plaintiffs based on their sex includes but is not limited to:

> a.   Defendant Werner continued to say: "[t]hey're [YPD] not gonna want to deal with this.  They're not gonna believe you.  They're gonna question everybody at the fraternity and the fraternity is gonna back these guys up."
>
> b.   Defendant Werner met with Hernandez and McWilliams on multiple occasions wherein Hernandez and McWilliams gave statements regarding the assault on JANE DOE 1.  However, contrary to the policy of Title IX investigation, none of these statements were recorded or memorialized.

c.    JANE DOE 3 was given information from other victims that Defendants Regents, EMUPD, and/or Werner did not protect victims of sexual assault.

d.    JANE DOE 7 reported her assault to Defendant Regents and EMU's Title IX department in November 2018.  Her Title IX complaint was closed after no investigation took place.

e.    JANE DOE 1 's roommate called Defendant Werner on multiple occasions to inform her of the assault of JANE DOE 1.  However, the roommate was rebuked by Defendant Werner saying "you can't report the assault.  It must be the victim." This was in direct contrast to both Title IX policy and Defendant Werner's admissions.  These admissions were advanced during Defendant Werner's orientation presentation explaining the Title IX policy.

f.    Once JANE DOE 1 met with Defendant Werner, Defendant Werner told JANE DOE 1 that she had already spoken with JANE DOE 1's alleged attackers regarding her sexual assault. Defendant Werner further stated: "There is no point in reporting it.  You're going to have to go through all of this to report it. They're in a fraternity.  The Greek community is going to back them up."

g.    JANE DOE 1 was told at this meeting that she would have to explain everything in detail of what happened that night.  When JANE DOE 1 started to explain what happened, Defendant Werner continuously interrupted her with comments like "[t]hat's not what they said happened."

h.    Defendant Regents and/or EMUPD did not create a protected environment that was perceived by JANE DOE 3.  As witnessing other women's accounts of being raped, and Defendant EMU affording no protection to her friends that were raped and/or sexually assaulted.

i.    JANE DOE 3 was given information from other victims that Defendants Regents, EMUPD, and/or Werner did not protect victims of sexual assault.

j.    After reporting JANE DOE 8's assault to EMUPD in the summer of 2020 she was told: "they had received numerous calls about Durbin assaulting women on campus". Defendant EMU did not look further into any report of Durbin until 2020.

**ANSWER:**
**Denied.**

654.    Defendants Regents, EMUPD, ASP - Chapter, and DTD - Chapter violated ELCRA and deprived Plaintiffs of their civil rights by, among other things, subjecting Plaintiffs, because of their sex, to conduct of a physical and sexual nature that had the purpose or effect of denying Plaintiffs the full benefit of the educational program of EMU and full and equal access to the use and privileges of public accommodations, public service, and educational opportunity.

**ANSWER:**
**Denied.**

## COUNT IX
## GROSS NEGLIGENCE

655.    Plaintiffs hereby incorporate by reference Paragraphs 1 - 654 above as though fully stated herein.

**ANSWER:**
**All foregoing responses by the University are incorporated herein by reference.**

656.    Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National owed Plaintiffs a duty to use due care to ensure their members abstained from sexual assault, abuse, and molestation students and guests alike interacted with their members, representatives, and/or agents, including Anderson.

**ANSWER:**
**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

657.   As agents and/or representatives of Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National, Durbin, McWilliams, and Hernandez owed Plaintiffs a duty of due care as guests of Defendant ASP - Chapter and DTD - Chapter.  These include but are not limited to:

a.    Reduce exposure to risk and liability of the Chapter and its members;

b.    Aims to reduce risk;

c.    Completes an incident report and submits to Headquarters for all incidents;

d.    Educate members on the ASP and/or DTD National Fraternity's alcohol policies;

e.    To respect the dignity of all persons, and therefore, will not physically, psychologically, or sexually abuse any human being;

f.    To not abuse, nor support the abuse of, alcohol or controlled substances;

g.    To not tolerate or condone any form of sexist or sexually abusive behavior on the part of its members, whether physical, mental, or emotional.  This is to include any actions, activities, or events, whether on chapter premises or an off-site location which are demeaning to women or men, including but not limited to verbal

harassment, sexual assault by individuals or members acting together;

h.      To familiarize and comply with ASP and/or DTD Health and Safety Policies. . . These Policies forbid any form of hazing or assault;

i.       Prohibition of alcohol and/or illegal substances, which is punishable by fine and/or expulsion; and,

j.       Members and pledges shall maintain proper decorum at all times with respect to the introduction of guests within the Shelter.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

658.    Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National's grossly negligent conduct includes but is not limited to:

a.      Supporting, protecting, concealing, overlooking repeated sexual assault complaints at the hands of its members.  For example, Defendant Werner continued to say: "[t]hey're [YPD] not gonna want to deal with this.  They're not gonna believe you.  They're gonna question everybody at the fraternity and the fraternity is gonna back these guys up."

226

b.  In a concerted effort, Hernandez and McWilliams schemed together after seeing the post to go to Defendant Werner to mollify and kill any claim by JANE DOE 1 if/when she reported the incident to Defendant Regents and EMU's Title IX department, spearheaded by Defendant Werner.

c.  Defendant Werner continued to say: "[t]hey're [YPD] not gonna want to deal with this.  They're not gonna believe you.  They're gonna question everybody at the fraternity and the fraternity is gonna back these guys up."

d.  Once JANE DOE 1 met with Defendant Werner, Defendant Werner told JANE DOE 1 that she had already spoken with JANE DOE l's alleged attackers regarding her sexual assault. Defendant Werner further stated: "There is no point in reporting it.  You're going to have to go through all of this to report it. They're in a fraternity.  The Greek community is going to back them up."

e.  Plaintiffs told members of Defendants ASP - Chapter and DTD - Chapter following the sexual assaults in hopes they would follow bylaws and regulations of reporting sexual assaults within

their own fraternity and/or to Defendant Regents and EMU's Title IX department and Defendant Werner.

f.    When Plaintiffs did tell friends within Defendant Regents and EMU's Greek community what happened, they exclaimed, "welcome to the club - it happens to everyone," and were ostracized by members of Defendant Regents and EMU's Greek community who believed they had lied.

g.    Durbin still came to Defendant ASP - Chapter's fraternity house after he was blacklisted.

h.    Upon information and belief, Defendants ASP - Chapter and/or ASP - National knew about many of the rapes and in at least one instance, conducted what was referred to as a "Mystic Circle" where an alleged rape victim was placed in the middle of an unlit room, surrounded by ASP members, seated in a circle, who "explained" the facts and circumstances of the alleged rape to the victim.

i.    JANE DOE 9 had asked the president of Defendant ASP - Chapter to hold the "Mystic Circle" so she could tell the fraternity members what their friend and brother (Durbin) had done, and as an avenue to report her assaults.

**ANSWER:**

**Denied as to the University and Werner. The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

659.   Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National's failure to adequately supervise Durbin, McWilliams and Hernandez, especially after Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National knew or should have known of complaints regarding their nonconsensual sexual assaults and sexual penetrations occurring on Defendants ASP - Chapter and/or DTD - Chapters' premises was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

660.   Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National's conduct demonstrated a willful disregard for precautions to ensure Plaintiffs' safety and bodily integrity.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

661.   Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National's conduct as described above, demonstrated a willful disregard for the substantial risk of injuries to Plaintiffs.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

662.   Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National breached duties owed to Plaintiffs and were grossly negligent when they conducted themselves by the actions described above, said acts having been committed with reckless disregard for Plaintiffs' health, safety, constitutional and/or statutory rights, and with a substantial lack of concern as to whether an injury would result.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

**COUNT X**
**NEGLIGENCE**

663.   Plaintiffs hereby incorporate by reference Paragraphs 1 - 662 above as though fully stated herein.

**ANSWER:**

**All foregoing responses by the University are incorporated herein by reference.**

230

664.  Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National owed Plaintiffs a duty of ordinary care to ensure their safety and freedom from sexual assault, abuse, and molestation while students and guests alike interacted with their members, representatives and/or agents.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

665.  As agents and/or representatives of Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National, Durbin, McWilliams and Hernandez owed Plaintiffs a duty of due care.  These include but are not limited to:

a.  Reduce exposure to risk and liability of the Chapter and its members;

b.  Aims to reduce risk;

c.  Completes an incident report and submits to Headquarters for all incidents;

d.  Educate members on the as an agent and/or representative of Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National's alcohol policies;

e.  To respect the dignity of all persons, and therefore, will not physically, psychologically, or sexually abuse any human being;

231

f.    To not abuse, nor support the abuse of, alcohol or controlled substances;

g.    To not tolerate or condone any form of sexist or sexually abusive behavior on the part of its members, whether physical, mental, or emotional.  This is to include any actions, activities, or events, whether on chapter premises or an off-site location which are demeaning to women or men, including but not limited to verbal harassment, sexual assault by individuals or members acting together;

h.    To familiarize and comply with as an agent and/or representative of Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National Health and Safety Policies. . . These Policies forbid any form of hazing or assault;

i.    Prohibition of alcohol and/or illegal substances, which is punishable by fine and/or expulsion; and,

j.    Members and pledges shall maintain proper decorum at all times with respect to the introduction of guests within the Shelter.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

232

666.   Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National's negligent conduct includes but is not limited to:

a.   Supporting, protecting, concealing, overlooking repeated sexual assault complaints at the hands of its members.  For example, Defendant Werner continued to say: "[t]hey're [YPD] not gonna want to deal with this.  They're not gonna believe you.  They're gonna question everybody at the fraternity and the fraternity is gonna back these guys up."

b.   In a concerted effort, Hernandez and McWilliams schemed together after seeing the post to go to Defendant Werner to mollify and kill any claim by JANE DOE 1 if/when she reported the incident to Defendant Regents and EMU's Title IX department, spearheaded by Defendant Werner.

c.   Defendant Werner continued to say: "[t]hey're [YPD] not gonna want to deal with this.  They're not gonna believe you.  They're gonna question everybody at the fraternity and the fraternity is gonna back these guys up."

d.   Once JANE DOE 1 meets with Defendant Werner, Defendant Werner told JANE DOE 1 that she has already spoken with JANE DOE 1's alleged attackers regarding her assault.

Defendant Werner further stated: "There is no point in reporting it. You're going to have to go through all of this to report it. They're in a fraternity. The Greek community is going to back them up."

e.   Plaintiffs told members of Defendants ASP - Chapter and DTD - Chapter following the sexual assaults in hopes they would follow bylaws and regulations of reporting sexual assaults within their own fraternity and/or to Defendant Regents and EMU's Title IX department and Defendant Werner.

f.   When Plaintiffs did tell friends within Defendant Regents and EMU's Greek community what happened, they exclaimed, "welcome to the club - it happens to everyone," and were ostracized by members of Defendant Regents and EMU's Greek community who believed they had lied.

g.   Durbin still came to Defendant ASP - Chapter's fraternity house after he was blacklisted.

h.   Upon information and belief, the ASP - Chapter and/or ASP - National fraternity knew about many of the rapes and in at least one instance, conducted what was referred to as a "Mystic Circle" where an alleged rape victim was placed in the middle of

an unlit room, surrounded by ASP members, seated in a circle, who "explained" the facts and circumstances of the alleged rape to the victim.

    i.    JANE DOE 9 had asked the president of Defendant ASP - Chapter to hold the "Mystic Circle" so she could tell the fraternity members what their friend and brother, Durbin, had done, and as an avenue to report her assaults.

**ANSWER:**

**Denied as to the University and Werner. The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

667.  Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National's failure to adequately supervise Durbin, McWilliams, and Hernandez, especially after Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National knew or should have known of complaints regarding their nonconsensual sexual assaults and sexual penetrations occurring on Defendants ASP - Chapter and DTD - Chapters' premises was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

668.    Upon information and belief, Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National had notice through its own members, agents, and/or representatives as early as 2015, of complaints of a sexual nature related to Durbin, McWilliams, and Hernandez's predatory and criminal sexual misconduct of female students and guests.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

669.    Upon information and belief, Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National did or should have known of the foreseeability of Durbin, McWilliams, and Hernandez's sexual abuse of female students and guests, from 2015 onward.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

670.    Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National's failure to properly investigate, address, and/or remedy complaints regarding Durbin, McWilliams, and Hernandez's conduct was a breach of their duty to use ordinary care.

236

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

671.    Durbin, McWilliams, and Hernandez's conduct in sexually assaulting, abusing, and molesting Plaintiffs during their membership, agency, and/or representation of Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National was a breach of the duty to use ordinary care.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

### COUNT XI
### VICARIOUS LIABILITY

672.    Plaintiffs hereby incorporate by reference Paragraphs 1 - 671 above as though fully stated herein.

**ANSWER:**

**All foregoing responses by the University are incorporated herein by reference.**

673.    Vicarious liability is indirect responsibility imposed by operation of law where a principal is bound to keep its agents within their proper bounds and is responsible if it fails to do so.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

674.    Vicarious liability essentially creates agency between the principal and its agent, so that the principal is held to have done what the agent has done.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.**

675.    Upon information and belief, Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National provided membership and/or held Durbin, McWilliams, and Hernandez out to be their agents and/or representatives from approximately 2015 through 2019.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

676.    Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National are vicariously liable for the actions of Durbin, McWilliams, and Hernandez, and other members' conduct which includes but is not limited to:

a.    Supporting, protecting, concealing, overlooking repeated sexual assault complaints at the hands of its members.  For example, Defendant Werner continued to say: "[t]hey're [YPD] not gonna want to deal with this.  They're not gonna believe you.  They're gonna question everybody at the fraternity and the fraternity is gonna back these guys up."

238

b.   In a concerted effort, Hernandez and McWilliams schemed together after seeing the post to go to Defendant Werner to mollify and kill any claim by JANE DOE 1 if/when she reported the incident to Defendant Regents and EMU's Title IX department, spearheaded by Defendant Werner.

c.   Defendant Werner continued to say: "[t]hey're [YPD] not gonna want to deal with this.  They're not gonna believe you.  They're gonna question everybody at the fraternity and the fraternity is gonna back these guys up."

d.   Once JANE DOE 1 met with Defendant Werner, Defendant Werner told JANE DOE 1 that she had already spoken with JANE DOE l's alleged attackers regarding her sexual assault. Defendant Werner further stated: "There is no point in reporting it.  You're going to have to go through all of this to report it. They're in a fraternity.  The Greek community is going to back them up."

e.   Plaintiffs told members of Defendants ASP - Chapter and DTD - Chapter following the sexual assaults in hopes they would follow bylaws and regulations of reporting sexual assaults within

their own fraternity and/or to Defendant Regents and EMU's Title IX department and Defendant Werner.

f.  When Plaintiffs did tell friends within Defendant Regents and EMU's Greek community what happened, they exclaimed, "welcome to the club - it happens to everyone," and were ostracized by members of Defendant Regents and EMU's Greek community who believed they had lied.

g.  Durbin still came to Defendant ASP - Chapter's fraternity house after he was blacklisted.

h.  Upon information and belief, the ASP - Chapter and/or ASP - National fraternity knew about many of the rapes and in at least one instance, conducted what was referred to as a "Mystic Circle" where an alleged rape victim was placed in the middle of an unlit room, surrounded by ASP members, seated in a circle, who "explained" the facts and circumstances of the alleged rape to the victim.

i.  JANE DOE 9 had asked the president of Defendant ASP - Chapter to hold the "Mystic Circle" so she could tell the fraternity members what their friend and brother, Durbin, had done, and as an avenue to report her assaults.

240

**ANSWER:**

**Denied as to the University and Werner. The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

677.   Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National had the right to supervise Durbin, McWilliams and Hernandez's conduct. Indeed, Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National had an obligation and/or duty to supervise Durbin, McWilliams, and Hernandez following claims, reports, and/or investigations of alleged sexual misconduct.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

678.   Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National are vicariously liable for the actions of Durbin, McWilliams, and Hernandez as described above that were performed during their membership, representation, and/or agency with Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

## COUNT XII
## NEGLIGENT SUPERVISION

679.   Plaintiffs hereby incorporate by reference Paragraphs 1 - 678 above as though fully stated herein.

**ANSWER:**

**All foregoing responses by the University are incorporated herein by reference.**

680.   Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National had a duty to provide reasonable supervision of their fraternity members, agents and/or representatives, in particular Durbin, McWilliams, and Hernandez, during membership, agency or representation with Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD National and while they interacted with guests of Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National, including Plaintiffs.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

681.   It was reasonably foreseeable, given Defendants Regents, EMUPD, ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - Nationals' knowledge, that Durbin, McWilliams, and Hernandez were sexual predators of young college female students at the time Defendants received complaints regarding sexual misconduct involving members of Defendants ASP - Chapter and/or ASP -

National and DTD - Chapter and/or DTD - National in 2014, upon information and belief.

**ANSWER:**

**The averments in this paragraph state legal conclusions to which no response is required and are accordingly denied.  To the extent a response is required, the University denies the allegations.  The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

682.   Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National, by and through their members, agents, managers and/or assigns, knew or reasonably should have known of Durbin, McWilliams, and Hernandez's conduct and/or that Durbin, McWilliams, and Hernandez were unfit members, agents, and/or representatives of Defendants ASP - Chapter and/or ASP- National and DTD - Chapter and/or DTD - National because of their repeated sexual misconduct of female guests, including Plaintiffs.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

683.   Per Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - Nationals' rules, regulations, and bylaws, its members are to conduct themselves in the following, non-exhaustive ways:

    a.   Reduce exposure to risk and liability of the fraternity and its members;

b.    Aim to reduce risk;

c.    Complete an incident report and submit the same to Headquarters for all incidents;

d.    Educate members on the Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - Nationals' alcohol policies;

e.    To respect the dignity of all persons, and therefore, avoid physical, psychological, or sexual abuse any human being;

f.    To not abuse, nor support the abuse of, alcohol or controlled substances;

g.    To not tolerate or condone any form of sexist or sexually abusive behavior on the part of its members, whether physical, mental, or emotional. This is to include any actions, activities, or events, whether on chapter premises or an off-site location which are demeaning to women or men, including but not limited to verbal harassment, sexual assault by individuals or members acting together;

h.    To familiarize and comply with Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD -

Nationals' Health and Safety Policies, which explicitly forbid any form of hazing or assault;

i.    Prohibition of alcohol and/or illegal substances, which is punishable by fine and/or expulsion; and

j.    Members and pledges shall maintain proper decorum at all times with respect to the introduction of guests within the Shelter.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

684.    Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - Nationals' negligent supervision includes but is not limited to:

a.    Supporting, protecting, concealing, overlooking repeated sexual assault complaints at the hands of its members.  For example, Defendant Werner continued to say: "[t]hey're [Ypsilanti PD] not gonna want to deal with this.  They're not gonna believe you. They're gonna question everybody at the fraternity and the fraternity is gonna back these guys up."

b.    In a concerted effort, Hernandez and McWilliams schemed together after seeing the post to go to Defendant Werner to mollify and kill any claim by JANE DOE 1 if/when she reported

the incident to Defendant Regents and EMU's Title IX department, spearheaded by Defendant Werner.

c.     Once JANE DOE 1 met with Defendant Werner, Defendant Werner told JANE DOE 1 that she had already spoken with JANE DOE l's alleged attackers regarding her sexual assault. Defendant Werner further stated: "There is no point in reporting it.  You're going to have to go through all of this to report it. They're in a fraternity.  The Greek community is going to back them up."

d.     Following their sexual assaults, Plaintiffs told members of Defendants ASP - Chapter and/or DTD - Chapter in hopes that they would follow the bylaws and regulations of reporting sexual assaults within their own fraternity and/or to Defendant Regents and EMU's Title IX department and Defendant Werner.

e.     When Plaintiffs did tell friends within Defendant Regents and EMU's Greek community what happened, they exclaimed, "welcome to the club - it happens to everyone," and were ostracized by members of Defendant Regents and EMU's Greek community who believed they had lied.

     f.     Durbin still came to Defendant ASP - Chapter's fraternity house after he was blacklisted.

     g.     Upon information and belief, Defendant ASP - Chapter and/or ASP - National knew about many of the rapes and in at least one instance, conducted what was referred to as a "Mystic Circle" where an alleged rape victim was placed in the middle of an unlit room, surrounded by ASP members, seated in a circle, who "explained" the facts and circumstances of the alleged rape to the victim.

     h.     JANE DOE 9 had asked the president of Defendant ASP - Chapter to hold the "Mystic Circle" so she could tell the fraternity members what their friend and brother, Durbin, had done, and as an avenue to report her assaults.

**ANSWER:**

**Denied as to the University and Werner. The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

685.   Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National breached their duty to provide reasonable supervision of Durbin, McWilliams, and Hernandez, and permitted Durbin, McWilliams and Hernandez to commit the pervasive acts against Plaintiffs.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

686.   The sexual abuse occurred while Plaintiffs and Durbin, McWilliams, and Hernandez were on the premises of Defendant Regents, specifically the premises of Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National, and while Durbin, McWilliams, and Hernandez were acting in the course of their membership, agency, and/or representation of Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National.

**ANSWER:**

**The University denies that Defendants ASP-Chapter and/or ASP-National and DTD-Chapter and/or DTD – National's housing is located on the premises of EMU.  The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

687.   Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline such individuals, with the result that Durbin, McWilliams, and Hernandez were allowed to violate the rights of persons such as Plaintiffs with impunity.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

## COUNT XIII
## NEGLIGENT FAILURE TO WARN OR PROTECT

688.   Plaintiffs hereby incorporate by reference Paragraphs 1 - 687 above as though fully stated herein.

**ANSWER:**

**All foregoing responses by the University are incorporated herein by reference.**

689.   Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National knew or should have known that Durbin, McWilliams, and Hernandez posed a risk of harm to Plaintiffs or those in Plaintiffs' situation.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

690.   Upon information and belief, as early as 2015, Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National had direct and/or constructive knowledge as to the dangerous conduct of Durbin, McWilliams, and Hernandez and failed to act reasonably and responsibly in response.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

691.   Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National knew or should have known Durbin, McWilliams, and

Hernandez committed sexual assaults, abuse, and molestations and/or were continuing to engage in such conduct.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

692.   Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National had a duty to warn or protect Plaintiffs and others in Plaintiffs' situation against the risk of injury by Durbin, McWilliams, and Hernandez.  These include but are not limited to:

a.   Reduce exposure to risk and liability of the fraternity and its members;

b.   Aim to reduce risk;

c.   Complete an incident report and submit the same to Headquarters for all incidents;

d.   Educate members on the Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - Nationals' alcohol policies;

e.   To respect the dignity of all persons, and therefore, avoid physical, psychological, or sexual abuse any human being;

f.   To not abuse, nor support the abuse of, alcohol or controlled substances;

g.     To not tolerate or condone any form of sexist or sexually abusive behavior on the part of its members, whether physical, mental, or emotional.  This is to include any actions, activities, or events, whether on chapter premises or an off-site location which are demeaning to women or men, including but not limited to verbal harassment, sexual assault by individuals or members acting together;

h.     To familiarize and comply with Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - Nationals' Health and Safety Policies, which explicitly forbid any form of hazing or assault;

i.     Prohibition of alcohol and/or illegal substances, which is punishable by fine and/or expulsion; and,

j.     Members and pledges shall maintain proper decorum at all times with respect to the introduction of guests within the Shelter.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

693.  Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - Nationals' negligence includes but is not limited to:

a.  Supporting, protecting, concealing, overlooking repeated sexual assault complaints at the hands of its members.  For example, Defendant Werner continued to say: "[t]hey're [YPD] not gonna want to deal with this.  They're not gonna believe you.  They're gonna question everybody at the fraternity and the fraternity is gonna back these guys up."

b.  In a concerted effort, Hernandez and McWilliams schemed together after seeing the post to go to Defendant Werner to mollify and kill any claim by JANE DOE 1 if/when she reported the incident to Defendant Regents and EMU's Title IX department, spearheaded by Defendant Werner.

c.  Once JANE DOE 1 met with Defendant Werner, Defendant Werner told JANE DOE 1 that she had already spoken with JANE DOE 1's alleged attackers regarding her sexual assault. Defendant Werner further stated: "There is no point in reporting it.  You're going to have to go through all of this to report it. They're in a fraternity.  The Greek community is going to back them up."

d.  Following their sexual assaults, Plaintiffs told members of Defendants ASP - Chapter and DTD - Chapter in hopes that they

would follow the bylaws and regulations of reporting sexual assaults within their own fraternity and/or to Defendant Regents and EMU's Title IX department and Defendant Werner.

e.    When Plaintiffs did tell friends within Defendant Regents and EMU's Greek community what happened, they exclaimed, "welcome to the club - it happens to everyone," and were ostracized by members of Defendant Regents and EMU's Greek community who believed they had lied.

f.    Durbin still came to Defendant ASP - Chapter's fraternity house after he was blacklisted.

g.    Upon information and belief, Defendant ASP - Chapter and/or ASP - National knew about many of the rapes and in at least one instance, conducted what was referred to as a "Mystic Circle" where an alleged rape victim was placed in the middle of an unlit room, surrounded by ASP members, seated in a circle, who "explained" the facts and circumstances of the alleged rape to the victim.

**ANSWER:**

**Denied as to the University and Werner.  The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

694.   JANE DOE 9 had asked the president of Defendant ASP - Chapter to hold the "Mystic Circle" so she could tell the fraternity members what their friend and brother, Durbin, had done, and as an avenue to report her assaults.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and they are therefore denied.**

695.   The duty to disclose this information arose by the relationship between Durbin, McWilliams, and Hernandez as members, agents, and or representatives of Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National and Plaintiffs.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

696.   Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National breached said duties by failing to warn Plaintiffs and/or by failing to take reasonable steps to protect Plaintiffs from Durbin, McWilliams, and Hernandez.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

697.   Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National breached their duties to protect Plaintiffs by failing to:

a.  Respond to allegations of sexual assault, abuse, and molestation;

b.  Act on evidence of sexual assault, abuse, and molestation; and,

c.  Investigate, adjudicate, and terminate Durbin, McWilliams and Hernandez's membership with Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

698.  Defendants ASP - Chapter and/or ASP - National and DTD - Chapter and/or DTD - National willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect Plaintiffs from Durbin, McWilliams, and Hernandez's conduct.

**ANSWER:**

**The University lacks sufficient knowledge or information to form a belief as to the truth of the allegations as they relate to the other defendants in this lawsuit they are therefore denied.**

## GENERAL DENIAL

The University denies each and every allegation in the Complaint that is not specifically admitted herein.

## RELIANCE ON JURY DEMAND

The University hereby relies on Plaintiffs' jury demand, and demands for itself trial by jury on each and every count of Plaintiffs' Complaint so triable in law or in equity.

## AFFIRMATIVE DEFENSES

The University submits the following as Affirmative Defenses to the allegations contained in Plaintiffs' Complaint:

1.    One or more of Plaintiffs' claims are barred by the statute of limitations.

2.    Plaintiffs' Complaint fails to state a claim upon which relief may be granted.

3.    Plaintiffs' claims do not arise from the same common nucleus of law and fact, and as a result, have been misjoined in violation of the Federal Rules of Civil Procedure and must be severed.

4.    The University acted reasonably and in good faith at all times with regard to the decisions at issue in the Complaint.

5.    The University complied at all times with its written policies and procedures and the law.

6.      The University did not discriminate against Plaintiffs on the basis of their genders, or any other protected class.

7.      One or more Plaintiffs' claims of alleged harassment or discrimination was not pervasive.

8.      One or more of Plaintiffs' claims of alleged harassment was not reported to an appropriate person and deprived the University of notice of the alleged harassment.

9.      The University was not deliberately indifferent to any alleged unlawful sexual conduct.

10.     The University did not create a hostile environment for Plaintiffs.

11.     The University did not retaliate against Plaintiffs.

12.     One or more of Plaintiffs' claims is barred because the underlying events occurred outside the University's control. The University is not responsible for the alleged acts or omissions of any other parties and/or defendants, including but not limited to the defendants named herein.

13.     One or more of Plaintiffs' claims is barred by sovereign immunity.

14.     Plaintiffs have failed to state a claim for punitive damages.

15.     Plaintiffs failed to mitigate their damages.

16.     The University reserves the right to assert additional defenses if any become evident through discovery or investigation.

**WHEREFORE**, the University requests judgment in its favor and against Plaintiffs, together with all other relief this Court deems just and proper.

May 19, 2021

Respectfully submitted,

SAUL EWING ARNSTEIN & LEHR LLP

/s/ *Joshua W. B. Richards*
Joshua W. B. Richards
1500 Market Street, 38th Floor
Philadelphia, Pennsylvania  19102
(215) 972-7737
joshua.richards@saul.com

Bridgitte E. Mott
131 Dartmouth Street, Suite 501
Boston, MA 02116
(617) 912-0905
bridgitte.mott@saul.com

*Attorneys for Defendants Eastern Michigan University Board of Regents and Eastern Michigan University Police Department*

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2021, I electronically filed the foregoing motion and brief with the Clerk of the Court using the ECF system which will send notification of such filing to:

Todd F. Flood
tflood@floodlaw.com

Michael D. Weaver
mweaver@plunkettcooney.com

Joshua I. Arnkoff
Joshua.Arnkoff@Ceflawyers.com

Michael C. Osborne
MOsborne@cokinoslaw.com

Jaskiran K. Samra
JSamra@cokinoslaw.com

/s/ *Joshua W. B. Richards*
Joshua W. B. Richards
SAUL EWING ARNSTEIN & LEHR LLP
1500 Market Street, 38th Floor
Philadelphia, Pennsylvania 19102
(215) 972-7737
joshua.richards@saul.com

Bridgitte E. Mott
SAUL EWING ARNSTEIN & LEHR LLP
131 Dartmouth Street, Suite 501
Boston, Massachusetts 02116
(617) 912-0905
bridgitte.mott@saul.com

*Attorneys for Defendants Eastern Michigan University Board of Regents and Eastern Michigan University Police Department*

259