# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

JANE DOE 1, JANE DOE 2, JANE DOE 3,
JANE DOE 4, JANE DOE 5, JANE DOE 6,
JANE DOE 7, JANE DOE 8, JANE DOE 9,
JANE DOE 10, JANE DOE 11, JANE DOE 12,
JANE DOE 13, JANE DOE 14, JANE DOE 15,
JANE DOE 16, JANE DOE 17,
JANE DOE 18, JANE DOE 19,

|  |  |
|---|---|
| Plaintiffs, | Case No. 21-cv-10649-LVP-APP |
| vs. | Hon. Linda V. Parker |

EASTERN MICHIGAN UNIVERSITY
BOARD OF REGENTS, official capacity
only; MELODY WERNER, in her
official capacity as Eastern Michigan
University's Title IX Coordinator, and
individual capacity; KYLE MARTIN,
in his official capacity as Eastern Michigan
University's Greek Life Coordinator, and
individual capacity; EASTERN MICHIGAN
UNIVERSITY POLICE DEPARTMENT, a
municipal corporation; CHIEF OF POLICE
ROBERT HEIGHES, in his official and
individual capacity; DEPUTY CHIEF DANIEL
KARRICK, in his official and individual capacity;
ALPHA SIGMA PHI FRATERNITY - GAMMA
UPSILON CHAPTER; ALPHA SIGMA PHI
FRATERNITY, INC.; DELTA TAU DELTA
FRATERNITY - THETA XI CHAPTER;
DELTA TAU DELTA, INC.; SIGMA KAPPA
SORORITY - DELTA ALPHA CHAPTER;
SIGMA KAPPA, INC.; THETA CHI - EPSILON
MU CHAPTER; THETA CHI FRATERNITY, INC.;

**PLAINTIFFS' AMENDED**
**CONSOLIDATED COMPLAINT**
**AND**
**JURY DEMAND**

Defendants.

| TODD F. FLOOD (P58555)<br>VINCENT J. HAISHA (P76506)<br>JOHN H. MOTT (P81990)<br>Attorneys for Plaintiff<br>Flood Law, PLLC<br>155 W. Congress St., Ste. 603<br>Detroit, MI 48227<br>PH: (248) 547-1032<br>FX: (248) 547-0140<br>tflood@floodlaw.com<br>vhaisha@floodlaw.com<br>jmott@floodlaw.com<br><br>MIKE WEAVER (P43985)<br>Plunkett Cooney<br>38505 Woodward Avenue, Ste. 2000<br>Bloomfield Hills, MI 48304<br>mweaver@plunkettcooney.com | |
|---|---|

## **PLAINTIFFS' FIRST AMENDED COMPLAINT AND JURY DEMAND**

There is no other civil action between these parties arising out of the same transaction or occurrence as alleged in this Complaint pending in this Court, nor has any such action been previously filed and dismissed or transferred after having been assigned to a judge.

NOW COME Plaintiffs JANE DOE 1-19, by and through counsel, Todd Flood and Flood Law PLLC, as well as Michael Weaver and Plunkett Cooney PLC, and for their Complaint against above-named Defendants, collectively referred to as "Defendants" state the following:

## **TABLE OF CONTENTS**

**Introduction**………………………………………………...…………………**8**

**EMU Officials Were Aware and Tacitly Approved of its Campus Rape Culture by Purposefully Disregarding Reports of Rape, Misleading Victims and Discouraging Them from Reporting Their Assaults to Title IX or Law Enforcement**…………………………………………………………………**8**

**Defendants Melody Werner and Kyle Martin had Actual Notice of Sexual Assaults**…………...................................................................................................**11**

**The Fraternity and Sorority Defendants had Actual Notice of Sexual Assaults**……………………………………………………………………...**13**

**Defendant EMUPD and its Chief and Deputy Chief had Actual Notice of Sexual Assaults**…………………………………………………………………...**14**

**Parties**……………………………………………………...………………… **17**

**Jurisdiction and Venue**…………………………………………..…………**22**

**Title IX**………………………………………………………………….....…**23**

**Mandated Reporting of Sexual Misconduct on EMU Campus by Greek Life**…………………………………………………………………………..**28**

**Fraudulent Concealment of Sexual Misconduct on EMU's Campus**………...**34**

**Defendant Melody Werner's Fraudulent Concealment**……………...…….…**37**

**All Defendants' Fraudulent Concealment**…………………………………...**40**

**Factual Allegations**…………………………………………………………**45**

**Jane Doe 1**………………………………………………..……………...**45**
        **Night of the Rape**…………………………………………………**46**
        **Panic by Hernandez and McWilliams**……………………………...**51**
        **Evidence of Fraudulent Concealment and Concert of Actions**………...**52**
        **Mismanagement of Title IX by Defendant Melody Werner**………...…**56**

**Jane Doe 1 Faces Retaliation for Pursuing Title IX Investigation.......57**

**Jane Doe 2**.........................................................................................**58**
    **Night of the Assault**......................................................**59**
    **Subsequent Contact and Actionable Harassment**.......................**61**

**Jane Doe 3**.........................................................................................**61**
    **Night of the Assault**......................................................**61**
    **Subsequent Contact and Actionable Harassment**.......................**67**

**Jane Doe 4**.........................................................................................**67**
    **Night of the Rape**.........................................................**68**
    **Subsequent Contact and Actionable Harassment**.......................**70**

**Jane Doe 5**.........................................................................................**71**
    **Night of the Assault**......................................................**71**
    **Subsequent Contact and Actionable Harassment**.......................**76**

**Jane Doe 6**.........................................................................................**77**
    **Night of the Assault**......................................................**77**
    **Continuous Contact and Threats by Durbin**.............................**83**
    **Retaliation by Defendant Regents and EMU**............................**85**

**Jane Doe 7**.........................................................................................**86**
    **Night of the Rape**.........................................................**87**

**Jane Doe 8**.........................................................................................**89**
    **Night of the Assault**......................................................**89**
    **Subsequent Contact and Actionable Harassment**.......................**94**

**Jane Doe 9**.........................................................................................**95**
    **Night of the First Assault**...............................................**95**
    **Night of Second Assault**.................................................**96**
    **Mystic Circle**..............................................................**99**
    **Subsequent Contact and Actionable Harassment**.......................**100**

**Jane Doe 10**.......................................................................................**101**
    **Defendants' Knowledge Prior to Jane Doe 10's Assault**...........**101**
    **Night of First Assault**...................................................**102**
    **Night of Second Assault**.................................................**104**

**Retaliation by Defendant Regents and EMU**................................**106**
**Subsequent Contact and Actionable Harassment**..................**107**

**Jane Doe 11**................................................................................**107**
**Night of the Assault**................................................................**108**
**Subsequent Contact and Actionable Harassment**....................**110**
**Fraudulent Concealment**.........................................................**111**

**Jane Doe 12**................................................................................**114**
**Something was Not Right**........................................................**115**
**The Rape**................................................................................**116**
**The Morning After**................................................................**117**
**The Cover-Up; Report to Title IX; Fraudulent Concealment;**
**Subsequent Harassment**.........................................................**117**
**Title IX Failure and Timeline of Cover-up and**
**Mismanagement**....................................................................**118**
**The Stall and Delay Tactics Almost Worked for Defendants to Sweep the**
**Rape Under the Rug**................................................................**120**

**Jane Doe 13**................................................................................**123**
**Night of the Assault**................................................................**123**
**The First Round of Rape**.........................................................**125**
**The Second Round of Rape**.....................................................**127**
**Morning After**.......................................................................**127**
**Defendant Melody Werner Misleads Jane Doe 13**....................**128**

**Jane Doe 14**................................................................................**131**
**Night of the Assault**................................................................**132**
**The Assault**............................................................................**133**
**Subsequent Harassment**.........................................................**134**

**Jane Doe 15**................................................................................**134**
**Night of the Assault**................................................................**135**
**The Rape**................................................................................**135**
**Defendant Melody Werner's Inaction**......................................**138**
**Bujaki**....................................................................................**140**

**Jane Doe 16**................................................................................**141**
**Night of the Assault**................................................................**141**
**The Aftermath**.......................................................................**146**

**Jane Doe 16 Reports her Rape to Title IX and YPD**……………….…..**147**

**Jane Doe 17**……………………………………………………..……………**148**
    **Jane Doe 17 Reports her Rape to Title IX and YPD**………...…..……..**150**

**Jane Doe 18**……………………………………………………………...…..**151**
    **First Rape**……………………………………………...……………**151**
    **Second Rape**……………………………………………………...**153**

**Jane Doe 19**……………………………………………………………..…..**155**
    **Within 30 Days of Each Other, Jane Does 18 and 19 are Viciously Raped by Hernandez and McWilliams**………………………...……………….**156**


**Count I: Violation of Title IX – Deliberate Indifference (*Regents*)**………....**160**

**Count II: Violation of Title IX – Hostile Environment (*Regents*)**…...………**168**

**Count III: Violation of Title IX – Retaliation (*Regents*)**………….……….**171**

**Count IV: Violation of 42 USC 1983 – State Created Danger (*Werner, Martin, Heighes and Karrick*)**……………………………………………**173**

**Count V: Violation of 42 USC 1983 – Equal Protection (*Werner, Martin, Heighes and Karrick*)**…………………………..……………………..**176**

**Count VI: Violation of 42 USC 1983 – Bodily Integrity (*Werner, Martin, Heighes and Karrick*)**…………………………………………………..**179**

**Count VII: Violation of ELCA – Sex Discrimination (*All Defendants*)**……...**183**

**Count VIII: Aiding and Abetting in Violation of ELCRA (*All Defendants*)**..**186**

**Count IX: Gross Negligence (*Fraternities and Sorority, National and Chapters*)**………………………………………………………..**187**

**Count X: Negligence (*Fraternities and Sorority, National and Chapters*)**……**190**

**Count XI: Negligent Supervision (*Fraternities and Sorority, National and Chapters*)**…………………………..……………………………**192**

**Count XII**: Negligent Failure to Warn/Protect (*Fraternities and Sorority, National and Chapters*)………………..………………………………………..195

**Count XIII**: IIED (*Defendants EMU Regents, EMUPD, Werner, Martin, Heighes, Karrick ASP – Chapter, DTD – Chapter, SK – Chapter and TC – Chapter*)……………..………………………………………………………198

**Count XIV**: Social Host Liability (*Fraternities and Sorority Chapters, only*).201

**Count XV**: Violation of Art. 1, §17 – State Created Danger (*Regents*)….…..203

**Plaintiffs' Damages**………………………………………………………..205

## INTRODUCTION

## EMU OFFICIALS WERE AWARE AND TACITLY APPROVED OF THE CAMPUS RAPE CULTURE BY PURPOSEFULLY DISREGARDING REPORTS OF RAPE, MISLEADING RAPE VICTIMS AND DISCOURAGING THEM FROM REPORTING THEIR ASSAULTS TO TITLE IX OFFICIALS OR LAW ENFORCEMENT

1.     Students at Eastern Michigan University ("EMU") have been subjected to a long history of hazing, bullying, harassment, and sexual assaults. EMU, through its actions, inactions and deliberate indifference, endorsed and enabled this culture to exist within its campus community through mismanagement of Title IX. For years the EMU campus culture has been overrun with   epidemic levels of underage drinking and sexual assaults, most of which took place at fraternity-sanctioned events, after which credible reports were made to EMU Officials, specifically to Defendants Melody Werner (EMU Title IX Coordinator) and Kyle Martin (EMU Greek Life Coordinator).

2.     Plaintiffs are nineteen females who were victims of sexual assault by EMU students at predominately Greek Life events. As the facts of this Complaint will aptly set out, all of these sexual assaults would have been prevented had Defendants fulfilled its duties to protect Plaintiffs.

3.     For at least seven years, EMU Defendants have purposely failed to investigate credible reports of sexual assault, aggressively discouraged victims from filing complaints, and misled victims into believing that their assaults were isolated

incidents instead of acts perpetrated by repeat offenders. In so doing, EMU intentionally concealed from Plaintiffs its central role in perpetuating a rape culture at EMU as well its own legal culpability.

4.      Upon information and belief,[1] over 30 survivors of rape have come forward since March 25, 2021, upon learning that, from at least 2014 to 2020, EMU officials, including Defendants EMUPD, Melody Werner and Kyle Martin:

      a.      Manipulated or misled survivors of sexual assault;

      b.      Prevented survivors of sexual assault from acquiring information disclosing a right of action;

      c.      Failed to report sexual assaults in compliance with the Clery Act;

      d.      Failed to investigate the assaults pursuant to the mandates of Title IX;

      e.      Discriminated against countless victims of rape by singling them out and aggressively discouraging them from reporting; and

      f.      Wholly misrepresented the legal process to victims.

5.      Between 2014 and 2020, EMU, turned a blind eye to the individuals who made credible reports of sexual assaults, and - even worse - they ignored the fact that many of these reports identified a cadre of serial rapists. [2]

---

[1] Each paragraph herein is made "on information and belief."

[2] For example, law enforcement has charged former EMU student and member of Defendant Alpha Sigma Phi Dustyn Durbin with sexually assaulting/molesting 11 young women. These cases have proceeded through the preliminary

6.     Many of these rapes took place either on fraternities' premises on or near the EMU campus at fraternity and EMU-sanctioned events.  Many EMU officials failed to fulfill their duties to report the sexual assaults as detailed below.

7.     More specifically, Defendants are responsible for Plaintiffs' damages stemming from the sexual assaults by former EMU students many of whom were members of Defendant fraternities including Dustin Durbyn ("Durbyn"), Dalton Brosnan ("Brosnan"), William Bujaki ("Bujaki"), Thomas Hernandez ("Hernandez"), Cameron Layne ("Layne"), D'Angelo "DJ" McWilliams ("McWilliams"), and Clayton Sigmann ("Sigmann").

8.     Defendants placed vulnerable students like Plaintiffs in harm's way by 1) covering up several earlier reports of sexual assault, despite knowing the same were continuing, thereby creating an ongoing and increased risk of danger for EMU's students; 2) acting in a manner that was deliberately indifferent to the knowledge of reported and suspected sexual assaults against EMU's students; 3) failing to follow Defendant Regents Title IX policies and/or protocols; 4) failing to sufficiently train EMU staff and/or related personnel to properly investigate sexual assaults, and 5) committing overt acts of misfeasance and malfeasance. In essence, Defendants effectively and repeatedly provided members of Defendant Fraternities

---

exam stage and have been bound over to Circuit Court. *See Washtenaw County Circuit Court Case No. 20-000503-FC*.

and Sororities with a "Get Out of Jail Free" card. In doing so, Defendants continued to perpetuate the image of EMU and Greek life at EMU as a safe place for young students to reside and earn a diploma.

### *Defendants Melody Werner and Kyle Martin Had Actual Notice of Sexual Assaults*

9.      Both Defendants Werner and Martin were mandatory reporters regarding all claims of sexual assault. In fact, Defendants had a duty to ensure that all proper reports are made and kept in compliance with federal statutes designed to monitor campus safety. (Clery Act 20 U.S.C. sec 1092(f) (2018)).

10.     EMU officials, including but not limited to Defendants Werner, Martin and EMUPD, ignored the mandate set in place by Defendant EMU Board of Regents pursuant to Title IX that all employees and volunteers must report incidents of sexual assaults to proper authorities.  This mandate was enacted, in part, for the purpose of preventing sexual assaults.

11.     Defendant Werner would aid and assist the assailants, when they were facing sexual assault claims by inappropriately meeting with them to go through their version of events and providing special accommodations not similarly advanced to the victims.

12.     Defendant Werner skewed the sexual assault statistics in EMU's Clery Act Report, which mandates reporting of crimes that occur on and off campus.

13.     Defendant Werner and Martin frequently and deliberately failed to memorialize reports of sexual assault. Further, upon information and belief, Defendant(s) knowingly conspired and aided with each other to not follow the mandated reporting protocol.

14.     It was well-known that Defendant Martin worked closely with Defendant Werner, in monitoring reports of sexual assaults and underage drinking within Greek Life.

15.     It was also well-known by Defendants Martin and Werner, that members in Greek Life were at a higher risk of underage drinking and sexual misconduct.

16.     Upon information and belief, Defendant Martin questioned the competency of Defendant Werner in her role as Title IX Coordinator after witnessed the treatment of sexual assaults by Defendant Werner.

17.     Upon information and belief, Defendant Martin received extensive training on sexual assault, was in the process of obtaining his master's degree on sexual assault prevention, and had developed programs designed to work with, support and protect victims.

18.     Despite extensive training and schooling focused on sexual assault prevention, and despite developing serious concerns about Defendant Werner's mishandling of sexual assault complaints, Defendant Martin failed to act on this

knowledge by failing to fulfill his duties as Greek Life Coordinator to protect victims and report their assaults.

### *The Fraternity and Sorority Defendants[3] had Actual Notice of Sexual Assaults.*

19.    EMU policy mandates that officers of fraternities and sororities are deemed mandated reporters of sexual assault.

20.    The Fraternity and Sorority Defendants also maintained policies and procedures requiring their members to report any and all instances of alleged sexual assault to EMU's Title IX department.

21.    Defendant Alpha Sigma Phi members knew about many of the rapes alleged in this Complaint.

22.    In order to cover up at least one rape – but likely more – Defendant Alpha Sigma Phi conducted what was referred to as a "Mystic Circle," during which an alleged rape victim was placed in the middle of an unlit room and was surrounded by Alpha Sigma Phi members who, while seated in a circle, "explained" the facts and circumstances of the alleged rape to the victim.

23.    Defendant Alpha Sigma Phi's Mystic Circle would have the effect of intimidating and threatening a rape victim while putting them through a harrowing

---

[3] Defendants Alpha Sigma Phi Fraternity, Delta Tau Delta Fraternity, Sigma Kappa Sorority, Theta Chi Fraternity, and each of their respective EMU Chapters, are collectively referred to as "the Fraternity and Sorority Defendants."

and traumatizing experience at a fraternity house, all for the purpose of covering up an allegation of rape and to deter the victim from reporting the incident.

24.    After conducting the "Mystic Circle," ASP chapter president, Lucas Coffey ("Coffey"), contacted Defendant EMU Police Chief Robert Heighes ("Heighes") and described to Defendant Heighes the details about what transpired in the "Mystic Circle."

25.    However, Coffey's discussion about the Mystic Circle with Defendant Heighes appears to have been an informal conversation and not a formal report; indeed, Defendant Heighes was previously married to Coffey's aunt, and Defendant Heighes took no steps to initiate an investigation into the sexual assault or otherwise formally investigate the incident.

26.    Coffey and other Defendant EMU fraternity and sorority officers failed to fulfil their duties created by EMU policy that mandates them to report sexual assault, despite actual knowledge of sexual assaults.

### _Defendant EMUPD and its Chief and Deputy Chief had Actual Notice of Sexual Assaults._

27.    The Mystic Circle incident, relayed to Defendant Heighes by Coffey provides but one example of a sexual assault that Defendant EMU Police Department ("EMUPD") knew about yet failed to investigate or otherwise respond to; there are several other examples as set forth below.

28.     Indeed, beginning in at least December 2016, EMUPD had knowledge of systemic rapes and/or sexual assaults that had taken place at EMU and in the surrounding area and failed to take adequate steps to protect victims and further failed to adhere to Title IX policies and procedures.

29.     Another harrowing example of EMUPD's total disregard of a sexual assault involved a female EMU student (hereinafter referred to as "Jane Doe 0" although she is not one of the Plaintiffs) who was sexually assaulted in 2016.

30.     Her contact with EMUPD serves as a glaring example of Defendants failing to protect students from – as well as purposefully concealing from students – EMU's systemic rape culture as accounted below:

      a.     Resident Advisor in an EMU dormitory called 911 to report a female screaming;

      b.     Defendant EMUPD responded finding EMU student and Alpha Sigma Phi member Dustyn Durbin with Jane Doe 0, who was in a shower with the water running, half-dressed and unresponsive; Jane Doe 0 regained consciousness and suddenly started saying "please, please, please." She then blurted out "keys, keys...pants, penis, penis;"

      c.     Jane Doe 0 was transported to the hospital and was later contacted by Defendant EMUPD, while still at the hospital, at which time she could not recall what had happened to her;

      d.     A CSC kit was not administered on Jane Doe 0;

      e.     An hour before Defendant EMUPD arrived, members of Defendant ASP – Chapter had taken an unconscious Jane Doe 0 to the dormitory room, and it was during that hour Durbin sexually assaulted Jane Doe 0; and

   f. Defendant EMUPD failed to properly investigate the sexual assault of Jane Doe 0. In a subsequent police investigation, Durbin, upon information and belief, admits to having sex with Jane Doe 0.

31. Defendant EMUPD failed to report Jane Doe 0's sexual assault to EMU's Title IX department in violation of both EMU policies[4] and Title IX requirements.

32. No Title IX investigation took place.

33. Instead, Defendant EMUPD issued Jane Doe 0 a citation for underage drinking and leveled no charges against Durbin.  It was not until four years later in 2020 that Durbin, was finally charged with multiple counts of sexual assault perpetrated against nine EMU students between 2015-2019.[5]

34. Another glimpse into the culture of EMUPD was captured in 2020 by EMUPD Deputy Chief Daniel Karrick's ("Karrick") attempt to "explain" Title IX to Ypsilanti Police Department Detective Annette Coppock ("Coppock"), the officer in charge ("OIC") of the criminal investigation against several of the alleged EMU

---

[4] Under section V of EMU's "3.7.7 Sexual Misconduct and Interpersonal Violence Policy" (effective July 1, 2016), "[a] **Responsible Employee** is required to **immediately report** to the **University's Title IX Coordinator and DPS** all relevant details **(obtained directly or indirectly)** about an incident of **Prohibited Conduct** that involves **any member** of the EMU community ("**students**", "**employees**" and "**third parties**") as a Complainant, Respondent, and/or witness." (Emphasis added). "**Responsible Employees are all EMU employees except Confidential Employees** . . . Responsible Employees include Resident Advisors, Graduate Assistants, and all other student-employees, when disclosures are made to any of them in their capacities as employees." (Emphasis added).

[5] See https://www.freep.com/story/news/local/michigan/2020/10/14/sex-assaults-eastern-michigan-university-dustin-durbin-trial/3643539001/.

rapists: **"…If you have a campus that has a lot of rapes or guys that are catcalling girls or that type of culture, 'No' means 'yes' and 'yes' means 'anal,' then Title IX comes into play to say this is not a safe school for girls to be attending because they cannot get an equal opportunity to get an education with this type of stuff going on."**

## PARTIES

35.     Plaintiffs JANE DOE 1, JANE DOE 2, JANE DOE 3, JANE DOE 4, JANE DOE 5, JANE DOE 6, JANE DOE 7, JANE DOE 8, JANE DOE 9, JANE DOE 10, JANE DOE 11, JANE DOE 12, JANE DOE 13, JANE DOES 14, JANE DOE 15, JANE DOE 16, JANE DOE 17, JANE DOE 18 and JANE DOE 19 (hereinafter collectively referred to as "Plaintiffs" unless otherwise identified) reside and/or at all times relevant to the instant action resided in the State of Michigan within the Eastern District of Michigan.

36.     At all times relevant to the instant action, Plaintiffs were students and/or guests at EMU located within the Eastern District of Michigan.

37.     Plaintiffs file this case anonymously because of the extremely sensitive nature of the case as Plaintiffs were victims of sexual assault, and the suit will require disclosure of information "of the utmost intimacy;" Plaintiffs are therefore entitled to protect their identities in this public filing by not disclosing their names.  Doe v.

Porter, 370 F.3d 558, 560 (6th Cir., 2004), citing Doe v. Stegall, 653 F.2d 180, 185-86 (5th Cir., 1981).

38.     Defendant EMU BOARD OF REGENTS ("Regents") is the governing body of EMU, a public university and Michigan Corporation that receives Federal financial assistance and is, therefore, among other reasons, subject to Title IX of the Education Amendments of 1972, 20 U.S.C. §1681, et seq., and is a body corporate, with the right to be sued., MCL 390.551, et seq.

39.     At all times relevant to the instant action, Defendant MELODY WERNER ("Werner") resided in the Eastern District of Michigan and was EMU's Title IX Coordinator.

40.     Defendant Werner is being sued in both her individual and official capacity.

41.     At all relevant times to the instant action, Defendant Werner was acting in her official capacity, within the course and scope of her employment as EMU's Title IX Coordinator, employed by EMU and Defendant Regents, and under color of law.

42.     At all times relevant to the instant action, Defendant KYLE MARTIN ("Martin") resided in the Eastern District of Michigan and was EMU's Greek Life Coordinator, employed by Defendant Regents.

43.     Defendant Martin is being sued in both his individual and official capacity.

44.     At all times relevant to the instant action, Defendant Martin was acting in his official capacity, within the course and scope of his employment as EMU's Greek Life Coordinator, employed by Defendant Regents, and under color of law.

45.     Defendant EMUPD a.k.a. EMU Department of Public Safety, with its principal location at 1200 Oakwood Street, City of Ypsilanti, County of Washtenaw, State of Michigan, is located within the Eastern District of Michigan.

46.     At all times relevant to the instant action, Defendant EMUPD was deputized by the Washtenaw County Sheriff, expanding Defendant EMUPD's jurisdiction beyond the borders of EMU's campus as a part of the Eastern Washtenaw Safety Alliance and in collaboration with the Washtenaw County Sheriff's Office, YPD, and the Ann Arbor Transportation Authority. The officers from each agency within the Eastern Washtenaw Safety Alliance, including Defendant EMUPD, share jurisdictional authority and have county-wide arrest powers.

47.     At all times relevant to the instant action, Defendant Karrick resided in the Eastern District of Michigan and was employed by Defendants EMUPD and Regents as EMUPD's Deputy Chief of Police.

48.    Defendant Karrick is being sued in his official capacity and his individual capacity.

49.    At all times relevant to the instant action, Defendant Karrick was acting in his official capacity, within the course and scope of his employment as EMUPD's Deputy Chief of Police, employed by Defendants EMUPD and Regents, and under color of law.

50.    At all times relevant to the instant action, Defendant Heighes resided in the Eastern District of Michigan and was employed by Defendants EMUPD and Regents as the EMUPD Chief of Police.

51.    Defendant Heighes is being sued in his official capacity and in his individual capacity.

52.    At all times relevant to the instant action, Defendant Heighes was acting in his official capacity, within the course and scope of his employment as EMUPD Chief of Police, employed by Defendants EMUPD and Regents, and under color of law.

53.    Defendant ASP FRATERNITY, INC. ("ASP – National") is a foreign corporation which conducts business in the City of Ypsilanti, County of Washtenaw, State of Michigan.

54.     Defendant ASP – Gamma Upsilon Chapter ("ASP – Chapter"), is a Michigan corporation with its location at 411 Ballard Street, City of Ypsilanti, State of Michigan, and is located within the Eastern District of Michigan.

55.     Defendant DTD, INC. ("DTD – National") is a foreign corporation which conducts business in the City of Ypsilanti, County of Washtenaw, State of Michigan.

56.     Defendant DTD FRATERNITY – Theta Xi Chapter ("DTD – Chapter") is a Michigan corporation with its Chapter location at 720 Lowell Street, City of Ypsilanti, State of Michigan, and is located within the Eastern District of Michigan.

57.     Defendant SIGMA KAPPA – NATIONAL ("SK - National") is a foreign corporation based in Carmel, Indiana and conducts business in the City of Ypsilanti County of Washtenaw, State of Michigan.

58.     Sigma Kappa – Delta Alpha Chapter ("SK - Chapter") is a Michigan corporation with its principal place of business located at 415 W. Forrest Ave., Ypsilanti, MI, 48197, and is located within the Eastern District of Michigan.

59.     THETA CHI FRATERNITY INC. ("TC - National"), is a foreign corporation based in Carmel, Indiana and conducts business in the City of Ypsilanti County of Washtenaw, State of Michigan.

60.    THETA CHI - EPSILON MU CHAPTER ("TC - Chapter") is a Michigan corporation with its principal place of business located at 900 Oakwood Street, Ypsilanti, MI, 48197, and is located within the Eastern District of Michigan.

## JURISDICTION AND VENUE

61.    This Court's subject matter jurisdiction is based on 28 USC §§ 1331 and 1343 as the action arises under the United States Constitution and seeks damages under Acts providing for the protection of civil rights pursuant to 42 USC §1983 and other statutes, including Title IX, 20 USC §1681.

62.    This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to Fed. R. Civ. P. 18 and 28 U.S.C. § 1367.

63.    This is an action for creating, fostering and failing to remedy a known sexually hostile environment and failure to protect women in violation of Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681, et seq., 34 C.F.R. § 106.31 et seq., 42 U.S.C. § 1983, and the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act of 1990, 20 U.S.C. § 1092(f) (2018) ("Clery Act").

64.    Defendants are not immune from suit under the Governmental Tort Liability Act, MCL 691.1401 et seq., or any other statute.

65.    Venue is proper in the United States District Court for the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b), as all of the events giving rise

to this action occurred in the County of Washtenaw, State of Michigan, which is located within the Southern Division of the Eastern District of Michigan.

66.     The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), excluding interest, costs, and attorney fees.

67.     Plaintiffs' Complaint is timely filed within the applicable statutes of limitations.

## TITLE IX

68.     Title IX is inherently designed to protect and ameliorate the effects of sexual harassment, sexual assaults and other misconduct.

69.     EMU, as a federal loan recipient and participant in Title IV of the Civil Rights Act of 1964, is required to comply with federal law, including Title IX.

70.     Title IX prohibits gender-based harassment, which may include acts of verbal or nonverbal communication or conduct, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping, regardless of whether those acts include conduct of a sexual nature.

71.     A school is responsible under Title IX for the sexual harassment of a student by another student (i.e., peer sexual harassment) when the school remains deliberately indifferent to severe, pervasive or objectively offensive sexual conduct of which it has actual knowledge.

72.     Under Title IX, a school remains deliberately indifferent to harassment where its response is clearly unreasonable in light of the known circumstances. Evidence of deliberate indifference can include the failure to provide academic accommodations and the failure to adequately discipline the harassing student.

73.     The deliberate indifference standard makes a school liable when, among other things, it refuses to take action to bring the recipient into compliance.

74.     A school is responsible to take prompt and equitable remedial measures, including interim measures reasonably designed to deter retaliation during investigations and promptly advising survivors of credible threats to their safety during the investigatory process[6].

75.     It is a violation of Title IX for a school to delay action until after survivors have graduated simply to avoid disruption.

76.     Defendants had actual knowledge of EMU's Title IX department's deficiencies and the lack of trust in the same by its student body.

77.     Defendants' acts and failures to act, as it relates to each Plaintiff, constitute unlawful discrimination on the basis of gender. The sexual harassment endured by each Plaintiff was sufficiently severe, pervasive, and objectively offensive to constitute "actionable harassment." One or more of EMU's

---

[6] See Page 39 of Title IX Coordinator and Administrator Level One Training and Certification Course; https://www.emich.edu/title-nine/documents/professional-development/atixa-title-ix-coordinator-certification-training.pdf?v=2021-01-29T18:00:51Z

administrators, agents, and/or officials, with authority to take corrective action on Plaintiffs' behalf, had actual knowledge of the sexual assaults of Plaintiffs but discriminated and/or failed to adequately respond in accordance with their own policies in light of the surrounding circumstances. These clearly unreasonable responses amounted to deliberate indifference toward the foreseeable possibility of further actionable harassment of each Plaintiff. As a result of Defendants' acts or failures to act, each Plaintiff was subjected to subsequent harassment and loss of educational opportunities, resources, and/or benefits.

78.    Additionally, EMU failed to implement proper procedures to discover, prohibit or remedy the kind of gender-based discrimination that each Plaintiff suffered. These failures included non-existent or inadequate policies or procedures for the recognition, reporting, investigation, and correction of unlawful gender-based discrimination, as well as the failure to properly assess and monitor the operation of fraternities; the failure to report allegations of sexual misconduct to law enforcement and/or relevant EMU administrators; the policy and/or practice of engaging in ad-hoc, internal disciplinary procedures that resulted in a lack of discipline for male members of fraternities that engaged in sexual misconduct; the policy and/or practice of engaging in unequal investigatory procedures that improperly favored male fraternity students over female student victims of sexual misconduct; the policy and/or practice of discrediting female victims of sexual assault, abuse and/or

misconduct committed by male fraternity members; the policy and/or practice of tolerating and/or tacitly approving sexual misconduct committed by fraternity members; and the creation of a sexually hostile atmosphere whereby the rules applicable to all students did not apply to fraternity members. Defendants acted with deliberate indifference in response to knowledge of institutional, serial rape. Even worse, Defendants intentionally and fraudulently concealed their knowledge of sexual assaults and/or sexual misconduct committed by male members of EMU fraternities and other male EMU students.

79.    As early as 2014, Defendants had actual notice of sexual assaults perpetrated by male members of EMU fraternities and other EMU students but acted with deliberate indifference to the foreseeable possibility of further actionable harassment, in part, by failing to take prompt and reasonable actions in response to this knowledge, thereby subjecting Plaintiffs to subsequent harassment which ultimately deprived Plaintiffs of educational opportunities, resources, and/or benefits.

80.    Defendants acted with deliberate indifference in deviating significantly from the standard of care outlined by the Department of Justice in the Dear Colleague Letter of 2011 and contrary to their own policies.

81.    As a result of Defendants' deliberate indifference, Plaintiffs were forced to endure further actionable harassment and a sexually hostile environment

on campus. In addition, Plaintiffs suffered losses of educational opportunities and/or benefits and incurred, and will continue to incur, attorney fees and other costs of litigation.

82.     At all times relevant hereto, Plaintiffs were unaware of Defendants' pervasive failings with respect to their response to known issues of sexual misconduct within the EMU's Greek system dating back several years prior to the sexual assaults endured by these Plaintiffs. Because Defendants concealed this information from Plaintiffs and the general public, Plaintiffs could not, with reasonable diligence, have learned this information independently.

83.     At all times relevant hereto, Plaintiffs were unaware of Defendants' deliberate indifference to the actual knowledge that members of EMU's fraternities and other EMU students had been accused of sexually assaulting multiple female students, thereby constituting an institutional and pervasive pattern of sexual misconduct of which Defendants were aware. Because Defendants concealed this information and failed to report the same, contrary to the Clery Act, Plaintiffs could not, with reasonable diligence, have discovered this information independently.

84.     At all relevant times hereto, Defendants did not use their best efforts and, in fact, acted in bad faith in response to Plaintiffs' claims of sexual assaults.

***Mandated Reporting of Sexual Misconduct on EMU Campus by Greek
Life***

85.     Defendants ASP - Chapter, DTD - Chapter, TC - Chapter, and SK -
Chapter each played a role in condoning and enabling a culture of sexual assaults on
EMU's campus.

86.     At all times relevant to the instant action, each Greek Life Chapter
organization had a corresponding National organization, which are also Defendants,
that governed, controlled and/or managed their respective local chapters through
bylaws, constitutions and/or codes of conduct regarding all matters, including but
not limited to incidents of harassment and sexual assault.

87.     Members of EMU sorority, Defendant SK - Chapter engaged in hazing,
coercion, and manipulation of other female members, pledges, and/or "rushes," in
particular, JANE DOE 11, rendering her vulnerable to assault. Indeed, the conduct
of members of Defendant SK - Chapter was criminal, violating MCL 750.411t of
the Michigan Penal Code.

88.     Defendant ASP – Chapter has specific bylaws governing its operation
and management.

89.     Defendant ASP – Chapter's bylaws require it to do the following:

   a.     Appoint a Risk Management Director, whose duties and
          obligations include but are not limited to:

          i.     "Reduce exposure to risk and liability of the Chapter and
                 its members;"

      ii.    "Ensure that risk management policies are followed at all Chapter events;"

      iii.   "Communicate at least monthly with the Risk Management Advisor on the Chapter Council;"

      iv.   "Assist the President and Prudential Board with crisis management;"

      v.    "Work with the House Manager to ensure proper health, safety and welfare inspections are carried out…;"

      vi.   "Coordinate at least one educational program related to risk management each term;"

      vii.  "Complete an incident report and submits to Headquarters for all incidents," and

      i.    "Document everything and prepare a transition binder to pass on to the next officer."

b.    Adopt a Risk Management Program that, among other things:

      i.    "Aims to reduce risk;"

      ii.    Helps "undergraduate members of the fraternity better understand that 'risk' is a part of life and that given the tools and resources to recognize 'risk' and individuals' liability and be greatly reduced;"

      iii.   Informs "members of all applicable federal, state, and local laws, as well as college or university and national fraternity policies," including but not limited to EMU's Title IX policies;"

      iv.   "Makes sure that all Chapter policies are consistent with federal, state, and local laws, as well as college or university and national fraternity policies;"

v.  "Ensures that every Chapter activity is evaluated for potential risks and that all possible actions are taken to manage such risks;"

vi.  "Develops and maintains a crisis management plan and make sure each Chapter member is familiar with the actions contained within the plan;" and

vii.  "Educates members on the ASP National Fraternity's alcohol policies."

c.  Ensure that every appointed officer "leads by example."

90.  Defendant ASP – Chapter also enacted a "Code of Conduct" by which all members must abide, which includes but is not limited to, the following affirmations:

a.  "I will respect the dignity of all persons, and therefore, I will not physically, psychologically, or sexually abuse any human being;" and

b.  "I will not abuse, nor support the abuse of, alcohol or controlled substances."

91.  Defendant ASP – Chapter further follows a Health and Safety Policy which explicitly provides that "[t]he Fraternity will not tolerate or condone any form of sexist or sexually abusive behavior on the part of its members, whether physical, mental, or emotional.  This is to include any actions, activities, or events, whether on chapter premises or an off-site location which are demeaning to women or men, including but not limited to verbal harassment, sexual assault by individuals or members acting together."

92.     Every member of Defendant ASP – Chapter must sign a "Membership Agreement and Affiliation Form" which includes, but is not limited to, the following acknowledgements:

> a.    "To follow and comply with all policies and procedures as outlined in the Fraternity Constitution and By-laws, …, the chapter/provisional chapter Constitution and By-laws; and the Ritual of Alpha Sigma Phi Fraternity;"

> b.    "To familiarize myself with and comply with Alpha Sigma Phi Health and Safety Policies… These Policies forbid any form of hazing or assault;" and

> c.    "To comply with the laws of the land and rules, regulations and policies of the institution where I am enrolled as a student," including but not limited to EMU's Title IX policies.

93.     At all times relevant to the instant action, Defendant ASP – National governed, controlled and/or managed Defendant ASP – Chapter via its bylaws, constitution and/or code of conduct.  Defendant ASP – Chapter is required to regularly report to Defendant ASP – National regarding all matters, including but not limited to incidents of harassment and sexual assault.

94.     Defendant DTD – Chapter has specific bylaws governing its operation and management.

95.     Defendant DTD – Chapter's bylaws require:

a.    Appointment of an Executive Board;

b.    Appointment of a Risk Management Officer;

    c.    Prohibition of alcohol and/or illegal substances, which is punishable by fine and/or expulsion;

    d.    "Members or pledges found guilty of conduct detrimental to the best interest of the Fraternity and/or Chapter shall have a hearing with the Honor Board to determine proper action;" and

    e.    "Members and pledges shall maintain proper decorum at all times with respect to the introduction of guests within the Shelter."

96.    At all times relevant to the instant action, Defendant DTD – National governed, controlled and/or maintained Defendant DTD – Chapter via its bylaws, constitution and/or code of conduct.  Defendant DTD – Chapter is required to regularly report to Defendant DTD – National regarding all matters, including but not limited to incidents of harassment and sexual assault.

97.    Defendant DTD – National was on notice of Defendant DTD – Chapter's probationary status for previous violations, including, but not limited to, alcohol consumption on its premises in direct violation of its bylaws.  The same can be alleged in regards to Defendants ASP – National and ASP – Chapter.

98.    Officers and members of Defendants ASP – Chapter, DTD - Chapter, TC - Chapter, and SK - Chapter were all duty-bound and obligated to ensure that all sponsored events included certain safety protocols including assigning a member to serve as a "sober monitor". This was rarely done and often if a "sober monitor" was put in place they were intoxicated.

99.   Defendant SK – National's Policy Handbook ("The Handbook") requires every collegiate chapter, including Defendant SK - Chapter to follow, adhere to, and promote the rules, policies, bylaws, and regulations as set forth by Defendant SK – National.

100.   Similarly, Defendant SK – National's bylaws provide explicit rules and regulations regarding hazing and alcohol consumption on Defendant SK – Chapter's premises.

101.   On its website, SK – Chapter and/or SK National discusses Risk Management, stating:

a.   "Sigma Kappa has a number of policies designed to reduce the potential for harm to our members and to address situations where issues have occurred."

b.   "Sigma Kappa expects that all members will follow Sigma Kappa policy, college/university policy, and all local, state, and federal laws."

c.   "The Sorority expects her members will make informed, reasonable, and responsible choices regarding their personal safety."

d.   "Our policies include detailed information about risk incidents, hazing, social events, transportation, and practices for self-governance."

102.   Defendant Fraternities would encourage and pressure students to drink excess amounts of alcohol at sanctioned events.

103. Defendant Fraternities and Sorority, through their members and officers, aided and abetted the hazing, bullying, coercing, and furnishing alcohol to minors and/or vulnerable female students, encouraging them to become intoxicated at parties and rendering them vulnerable to fraternity members who were both unmonitored and encouraged to assault women.

### *Fraudulent Concealment of Sexual Misconduct on EMU's Campus*

104. Plaintiffs' claims are timely filed as Defendants hid from Plaintiffs the legal claims they had against Defendants. Defendants' fraudulent concealment of Plaintiffs' claims in this fashion tolled the applicable statute of limitations.

105. For many years, Defendants have carefully concealed their role in creating and fostering a pervasive rape culture at EMU, so much so that it was not until the filing of this Complaint on March 25, 2021 that the existence of legal claims against Defendants was discovered.

106. When a Defendant fraudulently conceals the existence of a legal claim from the knowledge of the person entitled to sue, the statute of limitations is tolled as follows:

> If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers or should have discovered, the existence of the claim or the identity

of the person who is liable for the claim, although
the action would otherwise be barred by the period
of limitations. MCL § 600.5855.

107. Here, Defendant Regents, through the bad acts of its officers and
employees, fraudulently concealed the existence of legal claims from the Plaintiffs
as set forth fully throughout this Complaint.

108. Plaintiffs did not discover the wrongful conduct of Defendants Regents,
EMUPD, Werner, Martin, Heighes and Karrick, all of whom concealed causes of
actions that Plaintiffs may have had against Defendants until at least March 25, 2021.
It was not until that date when it was discovered that EMU Defendants (Werner,
Martin, Karrick, Heighes) had engaged in wrongful conduct by concealing their
knowledge of years of ongoing criminal conduct at EMU.  Likewise, it was not until
March 25, 2021 when it was discovered that for many years Defendants failed to
report and/or investigate credible reports of "Prohibited Conduct" (as defined in
**EMU's Sexual Harassment and Interpersonal Violence Policy**[7]) thereby
concealing the existence of viable legal claims from Plaintiffs and enabling this
horrendous activity to continue for years.

---

[7] Under section V of EMU's "3.7.7 Sexual Misconduct and Interpersonal Violence Policy" (effective July 1, 2016),
"[a] **Responsible Employee** is required to **immediately report** to the **University's Title IX Coordinator and DPS**
all relevant details (**obtained directly or indirectly**) about an incident of **Prohibited Conduct** that involves **any
member** of the EMU community ("**students**", "employees" and "**third parties**") as a Complainant, Respondent,
and/or witness." (Emphasis added). "Responsible Employees are all EMU employees except Confidential Employees
. . . Responsible Employees include Resident Advisors, Graduate Assistants, and **all other student-employees**, when
disclosures are made to any of them in their capacities as employees." (Emphasis added).

109.   Defendants cannot avoid application of the fraudulent concealment statute by arguing that they did not directly make any fraudulent statements to Plaintiffs in an effort to conceal Plaintiffs' causes of actions against them because EMU had an affirmative duty to disclose to Plaintiffs the wrongful conduct based on fiduciary relationships with Defendants' students.

110.   Defendants also owed a heightened duty of care to Plaintiffs, most if not all of who were under the legal drinking age at the time they were provided alcohol by members of DTD – Chapter, ASP – Chapter and others and then sexually assaulted.

111.   Defendants had a duty to warn and a duty to protect Plaintiffs and all students enrolled at EMU.

112.  Defendants, through their employees, agents, and representatives fraudulently concealed the existence of Plaintiffs' claims by 1) concealing from Plaintiffs, and those similarly situated, EMU's systemic culture of sexual assaults and/or sexual misconduct 2) concealing the same from Title IX reporting in order to preserve federal funding, 3) concealing from Plaintiffs that EMU and its employees, agents and representatives were aware of the culture of sexual abuse and failed to make a good-faith effort to stop and/or prevent it, 4) affirmatively telling Plaintiffs that their claims were not actionable at law, and 5) publishing  a statement, which was presented to and relied upon EMU students, including but not limited to

Plaintiffs, explaining that anonymous reporting to any "responsible employee"8 was sufficient to put Defendants on actual notice of sexual misconduct.

### *Defendant Melody Werner's Fraudulent Concealment.*

113.   Defendant Werner made affirmative representations (hereinafter "Werner's representations") to Plaintiffs as follows:

a.   That Plaintiffs' claims lacked sufficient evidence to initiate a formal investigation;

b.   That Plaintiffs' complaint of sexual assault was an isolated incident;

c.   That Plaintiffs' assailant had no previous report of assault;

d.   That Plaintiffs would not be believed;

e.   That reporting the assault would negatively impact the Plaintiffs;

f.   That protective measures from further assaults were not available to Plaintiffs, such as No Contact Orders and escorts;

g.   That Plaintiffs should not pursue formal investigations following their sexual assaults;

h.   That Plaintiffs were not sexually assaulted;

i.   That Plaintiffs should not question and/or report the conduct to appropriate authorities; and,

j.   That there was no possible cause of action against their rapist and/or EMU.

---

8 Pursuant to EMU's Sexual Misconduct and Interpersonal Violence Policy, defines a "responsible employee" as "all EMU employees, except Confidential Employees."  The Policy further states that "Responsible Employees include Resident Advisors, Graduate Assistants, and all other student-employees, when disclosures are made to any of them in their capacities as employees."

114.   Defendant Werner's representations were false.

115.   Defendant Werner knew the representations were false.   She intentionally misled female students who had been sexually assaulted to not pursue further action. Upon information and belief, this was done to create a façade that EMU was free of sexual assaults in order to maintain funding.  Defendant Werner knew her response to reported sexual assaults of Plaintiffs by an alleged serial rapist were not proper, appropriate, legitimate, reasonable and/or in accordance with federal Title IX guidelines.

116.   Defendant Werner made the false representations even though she was aware of the culture of sexual assaults.

117.   Defendant Werner aggressively discouraged victims from reporting their rapes during face-to-face meetings so that emails later sent "following up" with Plaintiffs merely created a paper trail of an alleged appearance of "compliance."

118.   Defendant Werner's representations to each Plaintiff that they were not assaulted and/or that the incident they were involved in was not worth reporting, purposefully led each Plaintiff to believe - as Defendant Werner intended - that their assault was an isolated incident. However, in reality, Defendant Werner and others at EMU, instead concealed their knowledge about the pervasive rape culture at EMU, creating a very dangerous environment for vulnerable students, like the Plaintiffs.

119. Defendant Werner's representations were material, in that had Plaintiffs known the representations were false, Plaintiffs would have known about EMU's culpability and direct role in their assault.

120. Defendant Werner's representations and discouragement of victims from reporting their sexual assaults were made knowingly, as Defendant Werner, in a position of power and authority over these victims, knew that that Plaintiffs would rely on any representations that she made. Plaintiffs by and large relied on Defendant Werner's counsel and advice. Defendant Werner's statements were made with the intent of concealing from Plaintiffs that they had a viable cause of action against EMU, its employees, agents, and/or representatives.

121. Plaintiffs relied upon Werner's representations; causing Plaintiffs to discontinue efforts to pursue legal remedies and protections from sexual assaults, resulting in Plaintiffs experiencing further harassment and a deprivation of educational benefits, resources and opportunities.

122. Werner's false representations amount to fraud and were made for the purpose of concealing the truth, which was that Plaintiffs had/have a cause of action against Defendants.

123. Defendant Werner further concealed the fraud by taking affirmative steps to avoid inquiry or investigation into EMU's rape culture when she failed to abide by or follow proper Title IX protocol related to reports of sexual misconduct

committed by the same assailant(s). Specifically, Defendant Werner, when confronted with multiple reports of sexual misconduct by the same assailant, intentionally discouraged and/or declined to investigate patterns of sexual misconduct by repeat assailants, which constituted an institutional pattern of sexual misconduct on EMU's campus.

124. At all times pertinent to this action, Defendant Werner was an agent, apparent agent, servant, and employee of EMU and operated within the scope of her employment, and her fraudulent concealment is imputed to EMU.

125. Accordingly, the statute of limitations on Plaintiffs claims against EMU were tolled by Defendant Werner's fraudulent concealment.

### *All Defendants' Fraudulent Concealment.*

126. Defendants, through their employees, agents, and representatives, including but not limited to Defendants Werner, Martin, EMUPD, and members of EMU's administration, made affirmative representations to Plaintiffs (hereinafter "Defendants' representations") to Plaintiffs as follows:

    a. That Plaintiffs' claims lacked merit;

    b. That members of EMU's Greek Life would be believed and trusted in favor over Plaintiffs;

    c. That Plaintiffs, by virtue of their clothing, makeup or general appearance, must be promiscuous;

    d. That Plaintiffs would not be believed because their accounts of

sexual assault did not align with their accusers' "stories";

e.      That Plaintiffs would have to undergo an arduous process to report and proceed with a Title IX claim;

f.      That Plaintiffs were led to believe that the Ypsilanti Police Department would not investigate their claims due to lack of evidence; and,

g.      That there was no possible cause of action against their rapist and/or EMU.

127.   Defendants' representations were false.

128.   Defendants knew the representations were false. Defendants received several complaints since, at least, 2014 about sexual assaults prior to Plaintiffs' reports.

129.   Defendants made the material representations, knowing they were false and/or made the material representations recklessly, without any knowledge of their truth and as a positive assertion, in that they had previously received strikingly similar complaints of abuse by members of Greek Life from other students and knew that the EMU Title IX department's responses to such allegations had been completely inadequate.

130.   Defendants' representations were material, in that had Plaintiffs known the representations were false, they would have sought alternative action immediately.

131.   Defendants' representations were made with the intent that Plaintiffs would rely on them as Defendants sought to prevent Plaintiffs from discovering they had a cause of action against Defendants.

132.   Plaintiffs did, in fact, rely on Defendants' representations; indeed, the representations led Plaintiffs to refrain from seeking formal resolution and, had they known the representations were false, Plaintiffs would have sought formal resolution.

133.   Defendants knew that Plaintiffs were particularly susceptible to believing Defendants' misrepresentations because:

  a. Plaintiffs were young and impressionable women;

  b. Defendants' representations were made within the context of a pervasive culture created by EMU that supported that Defendant Werner's advice was sound and binding, and she was a competent Title IX coordinator to be trusted and never questioned;

  c. Plaintiffs had no prior experience with legitimate and appropriately pursued claims involving sexual assault, so it was impossible for Plaintiffs to differentiate a legitimate and appropriately performed Title IX response from a clearly unreasonable response;

  d. Plaintiffs respected Defendant Werner's notoriety, status and position of authority over them, and thereby trusted, relied and believed her representations;

  e. Plaintiffs had no reason to believe or be aware that they could possibly sue or had a possible cause of action because they were young women who were not knowledgeable or aware of the civil justice system and applicable remedies at law; and,

      f.     Plaintiffs had never previously heard about allegations in the media or on campus regarding sexual assaults or misconduct by Greek Life members at EMU, as the truth had been concealed from them and there were no such reports.

134.   Accordingly, Plaintiffs did not know, could not have reasonably known, and were reasonably unaware of a possible cause of action that they had against Defendants until the filing of this Complaint on March 25, 2021, at which point Plaintiffs discovered possible causes of action against Defendants.

135.   In addition to affirmative false representations, EMU officials, agents, and representatives failed to disclose to Plaintiffs that they were victims of a culture of ongoing and pervasive sexual assaults.

136.   At all times pertinent to this action, the Title IX employees, staff, supervisors, and directors of Defendants were agents, apparent agents, servants, and employees of Defendants and operated within the scope of their employment and their Fraudulent Concealment is imputed to Defendants.

137.   Defendants committed Fraudulent Concealment, as described in detail above and below.

138.   For plaintiffs who were initially minors when assaulted, Michigan law also provides a safe harbor from statute of limitations in MCL 600.5851b.

139.   Beginning in at least December 2014, Defendant EMUPD had knowledge of the rape culture at EMU and the prevalence of sexual assaults on EMU's campus and in the surrounding area.

140.   Defendant EMUPD officers and/or investigators deliberately failed to enter reports from sexual assault victims into the police CRISnet system and/or other Defendant EMUPD reporting systems and/or software utilized by Defendant EMUPD to create police reports from complaining victims and/or witnesses.

141.   Defendant EMUPD deliberately failed to notify the Ypsilanti Police Department ("YPD") about the brutal rapes against Plaintiffs that reportedly occurred within YPD's jurisdiction. As will be explained more thoroughly herein, Defendants Regents and EMUPD concealed the assaults from YPD for nearly two years, and thus thwarted a proper investigation into Plaintiffs' sexual assault which resulted in catastrophic psychological and physical harm to them, as well as Defendant Regents and EMU's community as a whole.

142.   YPD did not become aware of several sexual assaults to Plaintiffs until 2020 whereupon it initiated and conducted a thorough investigation.

143.   Accordingly, Plaintiffs did not know, could not have reasonably known, and were as reasonably unaware of possible causes of action that they may have against Defendants until they heard about complaints filed against Greek Life members for sexual assaults, at which point Plaintiffs became aware that EMU

indirectly or directly caused the abuse by being aware that members of Greek Life were sexual predators and failing to stop them from harming students.

144.   Plaintiffs incorporates, by reference, the paragraphs above and below regarding damages suffered by Plaintiffs as a result of Defendants' responsibility for their conduct and permitting a cultural of sexual assaults to be prevalent on its campus, Defendants' awareness and responsibility for their fraudulent misrepresentations about the Title IX process, reports of sexual assaults, and/or Defendant Werner's fraudulent misrepresentations.

## **FACTUAL ALLEGATIONS**

145.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

## **JANE DOE 1**

146.   JANE DOE 1 enrolled at EMU in the Fall of 2015.

147.   JANE DOE 1 met Hernandez during her freshman year at EMU, as she and Hernandez lived in the same dorm and on the same floor.

148.   JANE DOE 1 met McWilliams in 2016 through Hernandez, as McWilliams and Hernandez belonged to the same fraternity, Defendant DTD – Chapter.

### *Night of the Rape*

149.   On or around January 18, 2018, JANE DOE 1 went to a fraternity party, which was being held at Defendant DTD – Chapter's fraternity house, with her cousin.

150.   Prior to arriving at the Defendant DTD – Chapter house, JANE DOE 1 and her cousin consumed alcohol so that they would not have to drink at the party.

151.   Despite JANE DOE 1's alcohol consumption, she was fully aware of her surroundings and the events that took place on or around January 18, 2018.

152.   JANE DOE 1 and her cousin walked to Defendant DTD – Chapter's fraternity house, which was approximately one mile from JANE DOE 1's residence.

153.   During the party, as JANE DOE 1 danced with friends, Hernandez persistently stepped in while JANE DOE 1 was dancing with another male.

154.   While dancing with JANE DOE 1, Hernandez repeatedly rubbed against her and tried to kiss her. JANE DOE 1 told Hernandez not to kiss her and that she was not interested, rejecting Hernandez's advances.

155.   JANE DOE 1 also danced with McWilliams during the party. McWilliams did not make sexual advances towards JANE DOE 1 as they danced.

156.   However, on multiple occasions during the party, McWilliams attempted to serve JANE DOE 1 and her cousin "shots" of alcohol, which JANE DOE 1 and her cousin both declined.

157.    The party ended at approximately 2:00 a.m., at which time members of Defendant DTD – Chapter began asking people to leave.

158.    Hernandez and McWilliams told JANE DOE 1 and her cousin that they could "stay and hang out" after the party.

159.    After talking and making sure it was ok with JANE DOE 1, JANE DOE 1's cousin went with a member of Defendant DTD – Chapter to another room.

160.    JANE DOE 1 was then invited by Hernandez and McWilliams to go to another "living room" to watch Netflix until JANE DOE 1's cousin returned.

161.    Instead of a living room, JANE DOE 1 was escorted into a private room with a bed, dresser, and television on top of the dresser. When JANE DOE 1 entered the room, she noticed one of the men locking the door behind her.

162.    After entering the private room, Hernandez grabbed JANE DOE 1 and pulled her into his grip, groping her breasts and buttocks as he tried to kiss her.

163.    JANE DOE 1 was scared and wanted to leave. She told Hernandez "no" and pleaded with him to stop several times.

164.    Undisturbed by JANE DOE 1's pleadings, Hernandez forcefully removed all of JANE DOE 1's clothes.

165.    As Hernandez forcefully removed JANE DOE 1's clothing against her will, McWilliams stood in the corner of the room and watched.

166.    Once JANE DOE 1 was fully nude, Hernandez pushed her onto a bed.

Hernandez then removed all of his clothes and laid on top of JANE DOE 1, where

he continued to grope her as she repeatedly begged him to stop. In response,

Hernandez pushed JANE DOE 1's head into the bed, put his face into her groin, and

bit down hard against her vaginal opening, causing agonizing pain.

167.    JANE DOE 1 then heard Hernandez tell McWilliams, who had

removed all of his clothes except for his shirt, to join him. McWilliams then started

to grope JANE DOE 1 and attempted to kiss her, as well.

168.    Hernandez grabbed JANE DOE 1 by her hair and pulled her up to a

sitting position by the side of the bed. Both Hernandez and McWilliams stood side

by side masturbating to make themselves erect thereinafter forcing JANE DOE 1 to

give them oral sex while they both stood in front of her.

169.    At this point, JANE DOE 1 realized that either Hernandez or

McWilliams was recording the brutal sexual assault on a phone, because she could

see a flash emanating from a camera phone.

170.    Hernandez got onto the bed while forcefully grabbing JANE DOE 1's

hair. Hernandez then forced JANE DOE 1's head back onto his penis.

171.    At the same time, McWilliams stood at the side of the bed with his leg

up behind JANE DOE 1. McWilliams then began penetrating JANE DOE 1's vagina

with his penis.

172.    As Hernandez continued to hold JANE DOE 1's hair and thrust his penis into her mouth, McWilliams penetrated her vaginally. Hernandez and McWilliams raped JANE DOE 1 simultaneously.

173.    Throughout the assault, Hernandez and McWilliams smacked JANE DOE 1's breasts and buttocks as they continued to brutally rape her.

174.    JANE DOE 1 begged Hernandez and McWilliams to stop, indicating that she needed to use the bathroom, needed to find her cousin, and needed to go home to her apartment to let her roommate inside. Hernandez and McWilliams ignored JANE DOE 1's pleadings and continued to rape her.

175.    Hernandez then left the room as McWilliams continued to rape JANE DOE 1.

176.    McWilliams sat on the bed and held JANE DOE 1 by her hair, restricting her movement, and then forced his penis down her throat.

177.    Hernandez then returned to the room as McWilliams continued to brutally rape JANE DOE 1.

178.    In a concerted effort, Hernandez and McWilliams pulled JANE DOE 1 to the edge of the bed, taking turns forcing their penises into JANE DOE 1's mouth while holding her hair.

179.    McWilliams then ejaculated onto JANE DOE 1 face, head, and neck. Once McWilliams finished, he grabbed his clothes and left the room.

180.   JANE DOE 1 again told Hernandez that she needed to use the restroom. Hernandez escorted her, preventing any attempts by JANE DOE 1 to escape. Hernandez then followed JANE DOE 1 into the restroom where he locked the door behind them, trapping JANE DOE 1 yet again.

181.   Inside the restroom, Hernandez continued to grope JANE DOE 1 and told her she needed to "clean up" after McWilliams had ejaculated on her face.

182.   Hernandez pulled JANE DOE 1 by her hair back into the bedroom and continued the assault after she cleaned McWilliams's semen off of her head, face, and neck.

183.   Hernandez continued to rape JANE DOE 1, becoming more violent after McWilliams left the room. Hernandez referred to JANE DOE 1 as his "sex slave."

184.   Hernandez began biting JANE DOE 1, leaving huge marks and bruises all over her body.

185.   Hernandez then forced JANE DOE 1 to bend over the side of the bed in order to penetrate her vaginally.

186.   Hernandez continued biting JANE DOE 1. Hernandez became so violent that he left a huge mark on her left buttock along with smaller marks on her side.

187.   Hernandez, unable to become erect due to intoxication, laid on his back and pulled JANE DOE 1's hair and head towards his groin.

188.   Hernandez took JANE DOE 1's head and began thrusting his penis into her mouth. Hernandez then pulled JANE DOE 1's head off of his penis, grabbed JANE DOE 1 by her hips, and physically placed her onto his penis, forcing her to sit while he penetrated her vaginally.

189.   JANE DOE 1 again told Hernandez she needed to find her cousin and let her roommate into her apartment. At this point, Hernandez finally permitted JANE DOE 1 to get up.

190.   JANE DOE 1 quickly grabbed her phone and called her cousin, who was downstairs at the time.

191.   Running furiously with her cousin, JANE DOE 1 escaped Defendant DTD – Chapter's fraternity house as Hernandez chased after her. Ultimately, JANE DOE 1 arrived at her apartment where she was in shock and was given aid by her cousin.

### *Panic by Thomas Hernandez and D'Angelo McWilliams*

192.   Both Hernandez and McWilliams started to panic and made several attempts to contact JANE DOE 1 and her cousin in the days following the assault.

193.   After learning of JANE DOE 1's brutal sexual assault, JANE DOE 1's roommate made posts on EMU's social media website, Twitter, and Facebook warning others that Hernandez and McWilliams had raped JANE DOE 1.

194.   In a concerted effort, Hernandez and McWilliams, after learning of JANE DOE 1's roommate's aforementioned posts, conspired to go to Defendant Werner to downplay and discredit any potential claim by JANE DOE 1 if/when she reported the incident to Defendant Regents and EMU's Title IX department.

195.   At all times relevant to the instant action, Hernandez was a well-known figure on EMU's campus. He had served as the President of Interfraternity Council, the local governing board for EMU fraternities, and had developed a working relationship with Defendant Werner based, in part, on the same.

### *Evidence of Fraudulent Concealment and Concert of Actions*

196.   McWilliams had a relationship, both professional and personal, with Defendant Karrick, as McWilliams was employed by the Westland Police Department where Defendant Karrick had been the Deputy Chief.

197.   Defendant Karrick became Deputy Chief of Police for Defendant EMUPD after retiring from the Westland Police Department.

198.   McWilliams ultimately left the Westland Police Department and, while attending EMU, became a Deputy with the Washtenaw County Sheriff's Department.

199.   After McWilliams learned about social media posts accusing him of rape, he confided in Defendant Karrick about the accusations against him because Defendant Karrick was a "brother" in law enforcement and former Deputy Chief of Westland Police Department where McWilliams was employed.

200.   Once a rape is reported to Title IX, an investigation may still be conducted by Defendant EMUPD with little to no assistance from the victim. Further, charges can still be submitted to the local prosecuting agency to determine whether further investigation is required. The decision to investigate is ultimately discretionary. Whether a victim wishes to pursue criminal charges neither impacts nor prohibits proper investigation by Defendants into sexual assaults.

201.   Defendant EMUPD started a criminal investigation into JANE DOE 1's boyfriend for allegedly publishing posts on social media about McWilliams and Hernandez.

202.   EMUPD Detective Susan McLennan ("McLennan") was one of the detectives assigned to the case against JANE DOE 1's boyfriend.

203.   McLennan told the following to law enforcement: "Oh, does it involve D'Angelo McWilliams, the deputy? Because I took that report where he is accused of being a rapist and I had to get him out of it."

204.   After being assigned to investigate JANE DOE 1's boyfriend for allegedly publishing material claiming McWilliams and Hernandez were rapists,

McLennan and EMUPD took very minimal steps to further investigate JANE DOE 1's rape knowing all the while that JANE DOE 1 was hesitant about speaking to police.

205.   McLennan interviewed both McWilliams and Hernandez only as it related to the social media posts allegedly published by JANE DOE 1's boyfriend.

206.   McLennan discovered that sexual acts among McWilliams, Hernandez, and JANE DOE 1 did, in fact, occur. However, McWilliams and Hernandez claimed that the sexual acts were consensual.

207.   McLennan gave the following account of McWilliams and Hernandez: "They seem truthful, but they're frat boys. They seem to be generally concerned, but . . . I know shit happens."

208.   McLennan knew JANE DOE 1's residence, but failed to make contact with JANE DOE 1 to investigate her alleged sexual assaults, which were crimes that carry penalties of up to life in prison.

209.   After interviewing McWilliams and Hernandez, McLennan sought criminal charges against JANE DOE 1's boyfriend for allegedly publishing posts on social media accusing McWilliams and Hernandez of rape.

210.   McLennan never notified local law enforcement, YPD, about the alleged gang rape of JANE DOE 1, which took place within YPD's jurisdiction.

211. McLennan and EMUPD had a duty to provide notice of JANE DOE 1's sexual assault to YPD, as the assault occurred within YPD's jurisdiction.

212. In an effort to cover up JANE DOE 1's sexual assault, McLennan stated that even if information about sexual assault was conveyed to Defendant EMUPD by a third party, they would not get involved unless the victim contacted law enforcement. McLennan further stated that Defendant EMUPD "may or may not do a generic report" in such cases, despite being mandated to do so under the Clery Act.

213. More information about the cover up of sexual assaults at EMU will be found once law enforcement reviews their police reports regarding JANE DOE 1. Upon reviewing the police report generated by Defendant EMUPD about JANE DOE 1's sexual assault, it is clear that the same is lacking critical information. For instance, as it relates to JANE DOE 1, Defendant EMUPD neither entered standard information nor followed protocol for entering sexual assault cases into a law enforcement database such as CLEMIS. This, in turn, hindered and continues to hinder efforts from another law enforcement agency to investigate sexual assaults in relation to JANE DOE 1.

214. Defendant EMUPD focused on investigating JANE DOE 1's boyfriend and clearing McWilliams and Hernandez rather than pursuing other avenues to investigate JANE DOE 1's sexual assault knowing JANE DOE 1's hesitancy of speaking with police.

### *Mismanagement of Title IX by Defendant Melody Werner*

215.   Defendant Werner, on multiple occasions, discussed the assault on JANE DOE 1 with Hernandez and McWilliams.  However, contrary to the policy of Title IX investigations, none of these discussions were either properly recorded or memorialized.

216.   JANE DOE 1's roommate called the Defendant Werner on multiple occasions to inform her of the assault of JANE DOE 1. However, JANE DOE 1's roommate was rebuked by Defendant Werner, who told JANE DOE 1's roommate "you can't report the assault. It must be the victim." This rebuke directly contradicts both Title IX policy and Defendant Werner's admissions, which were advanced during Defendant Werner's orientation presentation explaining the Title IX policy, as seen on YouTube.9

217.   Once JANE DOE 1 met with Defendant Werner, Defendant Werner told JANE DOE 1 that she had already spoken with the JANE DOE 1's alleged attackers regarding her sexual assault. Defendant Werner further stated to JANE DOE 1: "There is no point in reporting it. You're going to have to go through all of this to report it. They're in a fraternity. Greek community is going to back them up."

---

9       See      https://www.youtube.com/watch?v=0mM2P1oQl4k&trk=organization-update-content_share-video-embed_share-article_title.

218.   In an effort to dissuade Jane Doe 1 from reporting the sexual assault, Defendant Werner further told JANE DOE 1 that she would have to contact the YPD herself, and that "no one is going to believe [her]" and "it's not even worth reporting."

219.   Defendant Werner also stated to JANE DOE 1 that she would have to explain–in detail–the events as they occurred the night JANE DOE 1 was sexually assaulted. When JANE DOE 1 started to explain what happened, Defendant Werner continuously interrupted JANE DOE 1 and made comments such as "that's not what they said happened."

220.   After JANE DOE 1 finished telling her account of the sexual assault, Defendant Werner explained that the Title IX department would not investigate because the sexual assault happened off campus and that JANE DOE 1 would have to contact YPD on her own. This assertion directly violates Defendant EMUPD's mandates and investigatory powers.

221.   Defendant Werner continued to say: "[t]hey're [YPD] not gonna want to deal with this. They're [YPD] not gonna believe you. They're [YPD] gonna question everybody at the fraternity and the fraternity is gonna back these guys up."

### *Jane Doe 1 Faces Retaliation for Pursuing Title IX Investigation*

222.   JANE DOE 1 dropped out of EMU due to her sexual assault and the fact that she was unable to receive help from Defendants.

223.   After being rebuked by Defendants Regents and EMU's Title IX department, JANE DOE 1 was forced to witness her boyfriend's arrest by Defendant EMUPD for speaking up against alleged rapists, McWilliams and Hernandez.

224.   JANE DOE 1's boyfriend was, in fact, arrested for publishing notice of McWilliams and Hernandez as rapists on social media.

225.   As a result of having her report of her sexual assault disregarded by Defendant Regents, EMUPD, and EMU's Title IX department, JANE DOE 1 engaged in self harm and developed severe depression and anxiety.

226.   JANE DOE 1 attempted to cope with her anxiety and depression through substance abuse in hopes that the same would "numb" her existence.

227.   In September 2018, JANE DOE 1 attempted to take her own life and was placed in a psychiatric hospital. Upon release in October 2018, JANE DOE 1 attempted suicide for a second time and was placed back into a psychiatric hospital.

228.   JANE DOE 1's trauma stemmed from being physically raped, the utter failure by Defendants to properly investigate JANE DOE 1's sexual assault knowing her reluctancy to speak to police, and being "mentally raped" by Defendants' mismanagement, acts, and words.

## **JANE DOE 2**

229.   JANE DOE 2 enrolled at EMU in the Fall of 2013.

230.   JANE DOE 2 met Durbin during the Fall Semester of 2014 when they were enrolled in a mutual course.

### *Night of the Assault*

231.   Although JANE DOE 2 cannot recall the exact date of her sexual assault, she knows that it occurred between March and early April 2016 when she was invited to watch television and "hang out" with Durbin in his dormitory suite located on EMU's campus. JANE DOE 2 was let into the building by Durbin's roommate.   Durbin's dormitory suite consisted of a common living room, two bedrooms, and a bathroom.

232.   JANE DOE 2 did not wish to have sex with Durbin when she went to his dormitory suite.

233.   JANE DOE 2 and Durbin began kissing while they were alone in Durbin's common living room on a couch. Durbin thereafter removed both his and JANE DOE 2's clothes and proceeded to get on top of JANE DOE 2.

234.   Durbin then attempted to insert his penis into JANE DOE 2's vagina, at which point she told Durbin she was in pain and wanted him to stop.

235.   Durbin began forcefully penetrating JANE DOE 2's vagina while JANE DOE 2 demanded that he stop due to the pain he was causing her.

236.   JANE DOE 2 continued to plead for Durbin to stop, during which time Durbin fully inserted his erect penis into JANE DOE 2's vagina.

237. Durbin continued to penetrate JANE DOE 2 against her will, "thrusting" more forcefully and transcript shortly more rapidly, causing JANE DOE 2 tremendous pain and agony.

238. JANE DOE 2 continued to tell Durbin to stop as he continued to forcefully penetrate her.

239. JANE DOE 2 felt "frozen" and could not move with Durbin on top of her due largely to the significant size disparity between JANE DOE 2 and Durbin.

240. When Durbin finally stopped penetrating JANE DOE 2, Durbin allowed her to leave.

241. JANE DOE 2 returned to her dormitory room and discovered her vaginal area was very swollen and bleeding.

242. Her vaginal area remained swollen and sore for several days after Durbin's brutal sexual assault.

243. JANE DOE 2 later told two friends about her sexual assault, but without much detail, as JANE DOE 2 was still trying to process the trauma of being raped.

244. In July 2020, JANE DOE 2 saw a news report about Durbin's arrest and contacted YPD to provide the details of her assault by Durbin. JANE DOE 2 began to recall previously suppressed emotions and pain after seeing the news report and after speaking to the police.

245.    JANE DOE 2 later testified against Durbin at his preliminary examination held on October 13, 2020, in the 14A District Court before the Honorable Cedric Simpson, case number 20F2-0926-FY.

### *Subsequent Contact and Actionable Harassment*

246.    Durbin continued to harass JANE DOE 2 through text messages, phone calls, and other forms of electronic communication.

247.    For instance, Durbin texted JANE DOE 2 asking her to spend the night. She refused.

### JANE DOE 3

248.    JANE DOE 3 enrolled at EMU in August 2016.

249.    JANE DOE 3 pledged at the sorority Sigma Kappa during her first semester at EMU.  As a result, JANE DOE 3 became friends with members of other fraternities and sororities at EMU.

250.    On or about December 17, 2016, JANE DOE 3 met Durbin at a party held at the Tau Kappa Epsilon ("TKE") fraternity house. JANE DOE 3 did not know Durbin before this event.

### *Night of the Assault*

251.    While at the TKE party, JANE DOE 3 consumed alcoholic beverages to celebrate the end of final exams. Eventually, a friend drove JANE DOE 3 back to

her dormitory where JANE DOE 3 removed her bra and underwear and changed into a tee-shirt and athletic shorts.

252.   Sometime between midnight and 1:00 a.m., JANE DOE 3 received a text message from Durbin asking if she wanted to attend an "after-party" at Defendant ASP – Chapter's fraternity house. JANE DOE 3 agreed.   Durbin subsequently picked up JANE DOE 3 from her dormitory while JANE DOE 3 was still in her eveningwear.  JANE DOE 3 expected the "after party" to be a relaxed social gathering.

253.   JANE DOE 3 did not presume that Durbin wished to have sex with her when he contacted her earlier that night, because it was common for JANE DOE 3 to be invited to "after parties" with other fraternities and sororities.

254.   JANE DOE 3 and Durbin arrived at Defendant ASP – Chapter's fraternity house and proceeded to walk through the parking lot located in the rear.

255.   While walking through the parking lot, JANE DOE 3 slipped on a patch of ice and fell, severely smacking the back of her head on the pavement.

256.   JANE DOE 3 immediately felt a throbbing pain and asked Durbin to take her back to her dormitory.

257.   Instead, Durbin brought JANE DOE 3 inside of Defendant ASP – Chapter's fraternity house. Durbin escorted JANE DOE 3 to a common living area where other fraternity members and guests were conversing.

258.    JANE DOE 3 immediately asked some of the people who were present to take her back to her dormitory, but no one could drive due to their intoxication. JANE DOE 3 decided she could not walk home due to winter conditions and her lack of proper attire to brave the weather.

259.    Durbin brought JANE DOE 3 into his bedroom.

260.    Durbin's bedroom was located on the main floor of Defendant ASP – Chapter's fraternity house, down the hall from the common living area where the fraternity members and guests gathered.

261.    JANE DOE 3 initially sat on Durbin's bed. Durbin suggested she lay down. JANE DOE 3's head continued to throb in pain as she proceeded to lay on Durbin's bed.

262.    Durbin then offered to put on a movie, to which JANE DOE 3 declined and asked to instead be taken back to her dormitory.

263.    JANE DOE 3 repeated her request to leave at least four more times. Durbin either disregarded or denied each of JANE DOE 3's requests.

264.    JANE DOE 3 started crying.

265.    Durbin then put his arm around JANE DOE 3 and attempted to kiss her, which JANE DOE 3 resisted.

266.    Durbin then placed one of his hands down JANE DOE 3's athletic shorts and groped her, putting his fingers between the folds of her vagina.

267.   JANE DOE 3, while uncontrollably sobbing, continued to verbally resist Durbin's advances.

268.   The entire sexual encounter between Durbin and JANE DOE 3 was non-consensual.

269.   After JANE DOE 3 repeatedly told him to stop, Durbin forcefully removed JANE DOE 3's athletic shorts, exposing JANE DOE 3's bare vagina and buttocks. JANE DOE 3 continued to resist Durbin and demanded that he stop his assault.

270.   Due largely to the injuries sustained from her fall in Defendant ASP – Chapter's parking lot, JANE DOE 3 ultimately felt powerless and unable to fight back against Durbin, who was over twice her size.

271.   After quickly removing his clothes, Durbin forcefully removed JANE DOE 3's shirt, exposing her bare breasts.

272.   Durbin held JANE DOE 3 down by her throat, physically choking her as she laid fully nude and helpless.

273.   Durbin continued to assault JANE DOE 3 by penetrating her vagina with his erect penis as JANE DOE 3 continued to resist and was uncontrollably sobbing.

274.   The penetration was excruciatingly painful for JANE DOE 3. As Durbin was vaginally penetrating her, he inserted two to three of his fingers into

JANE DOE 3's anus, causing severe tears both vaginally and rectally. Durbin then asked JANE DOE 3, "why are you so dry?"

275.    By this time, JANE DOE 3 had told Durbin to stop approximately thirty (30) to forty (40) times.

276.    Rather than stop, Durbin became angry, tightening his grip on JANE DOE 3's throat, choking JANE DOE 3 to the point where she could barely breathe.

277.    Durbin eventually stopped his sexual assault of JANE DOE 3 because JANE DOE 3 was, in Durbin's words, "too dry."

278.    Afterwards, JANE DOE 3 pleaded with Durbin to be taken back to her dormitory, to which Durbin responded that he would take JANE DOE 3 back to her dormitory only if she performed oral sex on him.

279.    JANE DOE 3 refused and told Durbin that she wanted to leave.

280.    Durbin then grabbed JANE DOE 3 by her head and forced his erect penis in her mouth and down her throat to the point where JANE DOE 3 could barely breathe. Durbin continued to assault JANE DOE 3 orally.

281.    After Durbin stopped sexually assaulting JANE DOE 3 for a second time, JANE DOE 3 lost consciousness while laying naked on Durbin's bed.

282.    JANE DOE 3 awoke the next morning to Durbin trying to kiss her and cuddle with her.

283.   JANE DOE 3 immediately pushed Durbin away and demanded to be taken back to her dormitory, at which time Durbin finally complied.

284.   As a result of her sexual assault by Durbin, JANE DOE 3 suffered heavy bleeding from both her vagina and anus over the next several days as well as minor bleeding and spotting during the remainder of that week.

285.   As with many rape victims:

    a.   JANE DOE 3 blamed herself for Durbin's vicious sexual assaults;

    b.   JANE DOE 3 did not believe that EMU and Defendants Regents and EMUPD had created a protected environment for sexual assault victims, as JANE DOE 3 had heard accounts of other women that were raped and of EMU and Defendants Regents and EMUPDs' failure to provide aid, guidance, and protection to these women;

    c.   When JANE DOE 3 told her sorority sisters about her sexual assault, they exclaimed "welcome to the club - it happens to everyone.";

    d.   Following the sexual assaults, Plaintiff told members of Defendant ASP – Chapter and DTD – Chapter in hopes that the fraternity members would follow their fraternity's bylaws and regulations involving the mandatory reporting of sexual assaults within their own fraternity and/or to EMU's Title IX department and Defendant Werner.

286.   JANE DOE 3 was told by other female victims of sexual assault at EMU that EMU, Defendant EMUPD, and/or Defendant Werner did not protect victims of sexual assault.

287.   JANE DOE 3 ultimately reported her sexual assault to the YPD in or around 2020 after JANE DOE 3 discovered that the YPD was investigating Durbin and other members of Defendant ASP – Chapter for sexual assault.

### *Subsequent Contact and Actionable Harassment*

288.   Durbin began repeatedly contacting JANE DOE 3 after the sexual assaults. At one point, Durbin told JANE DOE 3 that he would have sex with her to prove that "[JANE DOE 3] did want it the first time."

289.   Further harassment at the hands of Durbin continued as Durbin electronically stalked JANE DOE 3 in an attempt to convince her that he did not rape her.

290.   As a result of her sexual assaults, JANE DOE 3 ultimately transferred to another school in the spring semester. She could no longer tolerate crossing paths with Durbin, who reminded JANE DOE 3 of the agonizing pain he caused her both during the assaults and afterward while he was stalking her.

### JANE DOE 4

291.   JANE DOE 4 enrolled at EMU in September 2016.

292.   JANE DOE 4 met Durbin on the first day she moved onto EMU's campus in 2016. She and Durbin became social acquaintances and had various degrees of social interactions during JANE DOE 4's freshman and sophomore years.

### *Night of the Rape*

293.   On October 12, 2017, JANE DOE 4 was invited to a "Neon Party" at EMU's Delta Sigma Phi fraternity house.

294.   JANE DOE 4 attended the Delta Sigma Phi party with two of her friends, but was unfamiliar with nearly all of the other guests in attendance.

295.   JANE DOE 4 consumed alcohol during the event but did not feel overly inebriated. At some point late in the evening, JANE DOE 4 became separated from her two friends. It was at this point that JANE DOE 4 crossed paths with Durbin.

296.   JANE DOE 4 informed Durbin that she did not wish to remain at the party. She and Durbin agreed to leave together.

297.   Durbin took JANE DOE 4 back to Defendant ASP – Chapter's fraternity house on Ballard Street and walked her up to his room.

298.   JANE DOE 4 was comfortable walking up to Durbin's room because the two had known each other for approximately 18 months.

299.   Once in Durbin's room, JANE DOE 4 sat on Durbin's bed and began to play on her phone. Within moments, Durbin began removing JANE DOE 4's clothes without her consent. The only two people in the room at the time were JANE DOE 4 and Durbin.

300.    JANE DOE 4 distinctly recalls crying and verbally telling Durbin to stop. She further informed Durbin that she was menstruating and was using a tampon at the time.

301.    JANE DOE 4 recalls Durbin responding, "it doesn't matter," at which point Durbin forcefully ripped the tampon out of JANE DOE 4's vagina and threw it on the floor across his room.

302.    JANE DOE 4 began sobbing uncontrollably and repeatedly demanded that Durbin stop. Consistent with his modus operandi, Durbin ignored her demands.

303.    JANE DOE 4 continued to tell Durbin to stop, during which time Durbin forcefully inserted his erect penis into JANE DOE 4's bloody vagina.

304.    Durbin penetrated JANE DOE 4 against her will for approximately one to two minutes and then stopped.

305.    JANE DOE 4, uncontrollably sobbing, repeatedly told Durbin to stop his assault.

306.    JANE DOE 4 was unable to physically stop the assault, as she was laying on her back while Durbin was on top of her with his arms held over her. Moreover, JANE DOE 4 was further hindered from moving due to the significant size disparity between her and Durbin.

307.    Despite her pleas to stop, Durbin continued raping JANE DOE 4 for at least two more minutes.

308.    Once Durbin finally stopped, JANE DOE 4 demanded that Durbin take her home.

309.    Durbin rolled over, facing away from JANE DOE 4, and told JANE DOE 4 to "find her clothes . . . and find your own way home." JANE DOE 4 quickly gathered her belongings and left Durbin's room. JANE DOE 4 then texted a friend and arranged for a ride to pick her up.

310.    Durbin's sexual assault of JANE DOE 4 was painful both during and after the forced penetration. In particular, JANE DOE 4 felt vaginal soreness for a long period after the assault.

311.    After her assault, JANE DOE 4 was horrified and embarrassed and confided in close friends.

312.    In or around the summer of 2020, YPD contacted JANE DOE 4 and asked JANE DOE 4 to recount her sexual assault by Durbin. JANE DOE 4 agreed and ultimately testified against Durbin on October 13, 2020, at the aforementioned hearing at 14A District Court.

### *Subsequent Contact and Actionable Harassment*

313.    Approximately three weeks after her assault, Durbin sent a series of text messages to JANE DOE 4 asking JANE DOE 4 why she was upset with him and acknowledging that he ripped her tampon out of her vagina.

314. Durbin likewise demanded that JANE DOE 4 stop telling people that he sexually assaulted her.

315. Durbin further explained to JANE DOE 4 that his fraternity brothers were questioning him about JANE DOE 4's sexual assault.

316. Later, in 2018, JANE DOE 4 saw Durbin at a party at Defendant DTD – Chapter's fraternity house, at which point Durbin apologized and asked to take JANE DOE 4 out to lunch. JANE DOE 4 rejected Durbin's overture and walked away.

## JANE DOE 5

317. JANE DOE 5 enrolled at EMU in the Fall of 2015.

318. During her first semester, JANE DOE 5 pledged at one of EMU's sororities, Delta Zeta.

319. JANE DOE 5 and Durbin became social acquaintances and had some social interactions during JANE DOE 5's freshman year through EMU's Greek community.

### *Night of the Assault*

320. In November 2015, JANE DOE 5 was invited to a party at Defendant ASP – Chapter's fraternity house where Durbin was present. JANE DOE 5 attended ASP party with her friends and roommates.

321.    During the party, JANE DOE 5 went outside of Defendant ASP – Chapter's fraternity house to smoke a cigarette. Durbin followed her.

322.    Durbin approached JANE DOE 5 while she was leaning against a small sedan. Durbin stood over JANE DOE 5 and placed his hands on the sedan in a manner such that JANE DOE 5 could not move away.

323.    Durbin began to beg JANE DOE 5 to allow him to come to JANE DOE 5's dormitory along with her two roommates and two ASP fraternity members after the party. JANE DOE 5 agreed.

324.    Later, JANE DOE 5 left the party and walked back to her dormitory with her two roommates, two ASP fraternity members, and Durbin.

325.    JANE DOE 5's dormitory room was set up with a common living area, two bedrooms, and a bathroom located in the suite.

326.    After returning to her dormitory room with Durbin, JANE DOE 5 and Durbin moved to the common living area and began to kiss, which was consensual.

327.    Durbin then indicated that he wanted to have sex with JANE DOE 5. JANE DOE 5 told Durbin that sex was not possible because she was on her period.

328.    Durbin immediately became annoyed with JANE DOE 5 and was upset that JANE DOE 5 allowed him to come back to her dormitory while she was menstruating.

329.    Durbin asked JANE DOE 5, "Why did you waste my time? Why did you bother to invite me? And why did you not tell me about your period earlier?" Durbin began audibly huffing, puffing, and grunting.

330.    As JANE DOE 5 and Durbin continued kissing in the living room, Durbin kept pressuring JANE DOE 5 to have sex. JANE DOE 5 reiterated that she did not want to have sex.

331.    Durbin suddenly picked up JANE DOE 5 "like a child," lifting JANE DOE 5 in the air and pressing her chest against his own. Durbin then brought JANE DOE 5 to the bathroom and placed her down onto the counter.

332.    Durbin turned on the shower and proceeded to kiss JANE DOE 5. Durbin then began removing all of JANE DOE 5's clothes.

333.    JANE DOE 5 tried to put her clothes back on while Durbin continued taking them off. As JANE DOE 5 was physically pulling her sweater and shirt back up in an attempt to re-dress herself, she told Durbin that she did not want to get into the shower, remove her tampon, or have sex.

334.    Durbin continued to pressure JANE DOE 5 to get into the shower and have sex. Durbin told JANE DOE 5 that "they needed to have sex" and that "it was not a bad idea to have sex." JANE DOE 5 again told Durbin that she neither wished to get in the shower nor have sex.

335.   JANE DOE 5 was sitting on the counter of the bathroom–still unable to leave–as Durbin stood in front of her.

336.   After JANE DOE 5's repeatedly and consistently denied Durbin's sexual advances, Durbin became upset, left the bathroom, and went into the living room. JANE DOE 5 then left the bathroom and followed Durbin into the living room.

337.   As JANE DOE 5 and Durbin laid next to each other on Durbin's living room couch, JANE DOE 5 and Durbin proceeded to kiss.

338.   Durbin again tried removing JANE DOE 5's clothes while they kissed on the couch.

339.   Durbin then placed one of his hands down JANE DOE 5's pants and tried to digitally penetrate her. JANE DOE 5 could feel Durbin's fingers on her vagina. Durbin then pulled on JANE DOE 5's tampon string. JANE DOE 5 slapped Durbin's hand away saying, "please no, no, no . . . I don't want that."

340.   Again, Durbin became visibly upset and told JANE DOE 5 that it was unfair to deny him sex. Durbin then accused JANE DOE 5 of lying to him and told her that she "at least owed him oral sex."

341.   Out of fear, JANE DOE 5 reluctantly began performing oral sex on Durbin. At the time, JANE DOE 5 believed that she was powerless against Durbin's sexual advances and feared that Durbin would not stop until he got what he wanted.

342.    While JANE DOE 5 performed oral sex, Durbin became forceful. He put his hand on JANE DOE 5's head "like palming a basketball." He continued to forcefully push JANE DOE 5's head down onto his penis, causing her extreme pain and discomfort. Throughout the assault, JANE DOE 5 was unable to move her head away, despite several unsuccessful attempts.

343.    JANE DOE 5 wanted him to stop. She had told Durbin "no" at least 20 times that night. Durbin at some point stopped holding her head onto his penis. JANE DOE 5 then curled up into a ball and fell asleep on the couch.

344.    Following the assault, JANE DOE 5 told her sorority sisters in Delta Zeta that Durbin had raped her. Many members of JANE DOE 5's sorority and others in EMU's Greek community chose not to believe her. Ultimately, JANE DOE 5's sexual assault was disregarded by many as being a "one-time thing."

345.    JANE DOE 5 was subsequently judged and ostracized by the Greek community.

346.    JANE DOE 5 did not attend any fraternity events that included Defendant ASP – Chapter or go anywhere she thought Durbin might be present.

347.    Like other Plaintiffs, JANE DOE 5's sexual assault was ignored by Defendants, as sexual assaults were commonplace within EMU's Greek community.

348.    In 2020, JANE DOE 5 contacted law enforcement about her sexual assault after learning from a friend about another assault perpetrated by Durbin.

349.   JANE DOE 5 ultimately testified for the prosecution against Durbin at the aforementioned preliminary hearing held in 14A District Court.

### *Subsequent Contact and Actionable Harassment*

350.   Durbin contacted JANE DOE 5 after learning that JANE DOE 5 had talked about her sexual assault to other members of the EMU Greek community.

351.   Two months after her sexual assault, Durbin and JANE DOE 5 unknowingly enrolled in a class together. On the first day of the class, Durbin intentionally sat directly behind JANE DOE 5. Throughout the semester, Durbin would breathe on JANE DOE 5's neck, gaze at her, and touch her hair while she was seated.

352.   JANE DOE 5 attended a sorority party where she felt safe and comfortable with her sorority sisters. While walking up a stairwell, Durbin approached her and put his arm out, blocking both the stairway and JANE DOE 5's path of escape.

353.   Durbin then told JANE DOE 5 that he heard JANE DOE 5 had been talking to others about the sexual assault. Durbin apologized to JANE DOE 5 for what she "thought" had happened and told JANE DOE 5 that he would never want her to think that he had sexually assaulted her. Durbin refused to move away until JANE DOE 5 verbally forgave him.

354.   Overcome with fear, JANE DOE 5 reluctantly accepted Durbin's apology. Durbin then forced JANE DOE 5 to give him a hug, after which he let her leave.

355.   To this day, JANE DOE 5 continues to undergo counseling and is still experiencing symptoms of post-traumatic stress disorder.

## JANE DOE 6

356.   JANE DOE 6 enrolled at EMU in the Fall of 2016.

357.   During her first semester, JANE DOE 6 pledged at one of EMU's sororities, Delta Zeta.

358.   JANE DOE 6 and Durbin became acquaintances and had various degrees of social interactions during JANE DOE 6's freshman year through EMU's Greek community.

### *Night of the Assault*

359.   On or about April 8, 2017, JANE DOE 6 was invited to a registered party at one of EMU's fraternities, TKE.

360.   That same night, but before the TKE party, JANE DOE 6 had attended a formal gathering with a member of EMU's Delta Sigma Phi fraternity. JANE DOE 6 drank at the Delta Sigma Phi formal.

361.   In subsequent contact by Durbin to JANE DOE 6, Durbin admitted that he drank alcohol and ingested narcotics the night of JANE DOE 6's assault.

362.   After meeting Durbin at the TKE party, JANE DOE 6 went back to Defendant ASP – Chapter's fraternity house with Durbin.

363.   Upon arriving to Defendant ASP – Chapter's fraternity house, Durbin led JANE DOE 6 to his bedroom located on the main level of the house.

364.   Once JANE DOE 6 walked inside his bedroom, Durbin locked the door.

365.   JANE DOE 6 had no intention of having sex with Durbin when she went to Defendant ASP – Chapter's fraternity house.

366.   JANE DOE 6 and Durbin began kissing on the edge of Durbin's bed while JANE DOE 6 sat at the lower end of the bed with Durbin standing above her.

367.   Durbin abruptly stood up and pulled his pants and underwear down as he stood over JANE DOE 6.

368.   JANE DOE 6 told Durbin she did not want to have sex with him and to pull his pants back up.

369.   Durbin then leaned over JANE DOE 6, putting his hands on her forearms, and held her down. Durbin tried to convince JANE DOE 6 to have sex, saying, "Why come over if we're not going to have sex? I could have invited someone else over instead . . . Can we please have sex?" JANE DOE 6 expressly rejected Durbin's advances.

370.   Durbin, standing over JANE DOE 6, used his weight to hold her down. JANE DOE 6 was unable to move her arms or legs.

371.   Durbin, while holding JANE DOE 6, used one hand to pull her pants and underwear down. JANE DOE 6 immediately tried pulling her pants and underwear back up. She was in shock and started telling Durbin to stop.

372.   JANE DOE 6 was unable to pull her pants and underwear back up as Durbin put both hands back onto her arms, continuing to restrain JANE DOE 6 on his bed.

373.   Durbin continued kissing JANE DOE 6 despite her resistance. Durbin then used his weight to hold JANE DOE 6 down on his bed. JANE DOE 6's arms began hurting as Durbin used his significant size advantage to restrain her.

374.   Throughout the assault, JANE DOE 6 repeatedly told Durbin "no" and "stop."

375.   Durbin then wedged one leg between JANE DOE 6's legs and attempted to forcibly insert his penis into JANE DOE 6's vagina.

376.   JANE DOE 6 began to thrash her legs so that Durbin's penis would not enter her vagina.

377.   Durbin then continued to forcefully hold JANE DOE 6 down, but harder than before.

378.   While prying JANE DOE 6 legs open, Durbin tried thrusting his penis into her vagina.

379.   Durbin attempted to rape JANE DOE 6; she could feel his penis touching her vagina as he tried to push and/or thrust it inside of her. She continued to tell Durbin to "stop."

380.   Durbin got visibly frustrated with JANE DOE 6 because she would not stop moving. He became visibly angry and raised his voice, upset that JANE DOE 6 was not complying. Durbin continued to touch his penis to her vagina in a thrusting motion.

381.   JANE DOE 6 began to sob in disbelief while she laid in shock as Durbin assaulted her.

382.   After five to ten minutes of forced sexual assault, Durbin finally stopped and stood up over JANE DOE 6.

383.   Durbin, clearly frustrated with JANE DOE 6, pushed her off the bed with her pants and underwear still around her calf and ankle area.

384.   Angry with JANE DOE 6, Durbin told her "he would have invited another girl home so he could have sex," and that he "missed an opportunity for a good night." Durbin then called JANE DOE 6 a "prude."

385.   As JANE DOE 6 tried to stand up and pull her pants and underwear back up, Durbin grabbed her by the arms and forced her to get back onto the bed with him.

386.   JANE DOE 6 tried to leave and asked Durbin multiple times, "can I go home?" Despite her pleas, Durbin forcefully held her down.

387.   Durbin then forced JANE DOE 6 to lay next to him in bed. Durbin tried to cuddle with and kiss JANE DOE 6, but she refused. JANE DOE 6 tried to leave multiple times, but Durbin's grip would tighten every time she moved or asked to go.

388.   After another five to ten minutes, JANE DOE 6 believed that Durbin had fallen asleep and was able to leave Defendant ASP – Chapter's fraternity house.

389.   As she walked back to her dormitory, JANE DOE 6 called two sorority sisters to pick her up.

390.   The following day April 9, 2017, JANE DOE 6 told three of her sorority sisters about the sexual assault.

391.   JANE DOE 6 discussed the sexual assault by Durbin with her sorority sisters and upperclassmen. JANE DOE 6 was convinced that nothing would happen through Defendants' Title IX office or Defendant EMUPD.

392.   On April 11, 2017, JANE DOE 6 photographed bruising on her arms from being held down by Durbin and reported the sexual assault by Durbin to an executive board member of Delta Zeta.

393.   One of JANE DOE 6's sorority sisters told other members of Delta Zeta about JANE DOE 6's assault.

394.   Greek life members at EMU also convinced JANE DOE 6 into believing nothing would happen if she reported her assault to EMU's Title IX department by telling JANE DOE 6 accounts of other students' failed attempts at pursuing Title IX investigations.

395.   JANE DOE 6's name was now associated on campus with Durbin's name and the sexual assault. Many within EMU's Greek community consoled JANE DOE 6 but discouraged her from reporting the assault. However, others within EMU's Greek community bullied, harassed, ostracized, and judged JANE DOE 6.

396.   During the summer of 2017, after enduring the physical and mental assault by Durbin and finding no place of refuge at EMU, JANE DOE 6 contemplated and prepared to commit suicide.

397.   Members of EMU's Greek community and Durbin continued to spread rumors about JANE DOE 6. This was a common tactic used by Durbin and other sexual predators. This tactic was known by Greek officials at EMU as well as volunteers and student employees at EMU.

398.   JANE DOE 6 dropped out of Delta Zeta due to depression in April 2018, despite having to live at the Delta Zeta sorority house from September 2017 to May 2018.

399.   Although JANE DOE 6 reported her assault to several high-ranking member of EMU's Greek community who had a duty to report sexual misconduct

pursuant to the IFC bylaws and EMU Greek Life bylaws, she was never afforded proper and reasonable Title IX protection as a victim of assault.

400.   As with many rape victims, JANE DOE 6 blamed herself for Durbin's vicious sexual assault and believed she deserved what happened to her.

401.   JANE DOE 6 did not believe that EMU and Defendants Regents and EMUPD had created a protected environment for sexual assault victims, as JANE DOE 6 had heard accounts of other women that were raped and of EMU and Defendants Regents and EMUPDs' failure to provide aid, guidance, and protection to the same.

402.   Rather than Greek life keeping JANE DOE 6's assault confidential, there was a concerted effort by male fraternities to spread vicious rumors about JANE DOE 6.

403.   In June 2020, JANE DOE 6 was contacted by law enforcement after hearing of her assault.

404.   Based on a YPD investigation, Durbin has been charged and bound over in circuit court to face charges of criminal sexual conduct in the first degree.

### *Continuous Contact and Threats by Durbin*

405.   Durbin later contacted JANE DOE 6 via Snapchat. When JANE DOE 6 accused Durbin of sexual assault, Durbin told her that he had no recollection of the prior night.

406. Durbin then told JANE DOE 6 that he did not want to discuss the assault over Snapchat and asked JANE DOE 6 to stop saving their messages.

407. Durbin continued to contact JANE DOE 6 for weeks.

408. Durbin began repeatedly apologizing to JANE DOE 6 and attempted to manipulate JANE DOE 6 into thinking that "she took it the wrong way" and that Durbin just liked being "rough."

409. Durbin made continuous contact and pressed for JANE DOE 6 to "un-save" any messages regarding the assault.

410. Durbin later contacted JANE DOE 6 via Snapchat to ask if she was afraid of him, to which JANE DOE 6 replied "yes."

411. In one of the contacts made by Durbin to JANE DOE 6, he became very aggressive and demanded that JANE DOE 6 delete any messages or proof of the sexual assault.

412. In or around the summer of 2017, at a party where both JANE DOE 6 and Durbin were present, JANE DOE 6 was taken, by her sorority sisters and other members of EMU's Greek community, to a room where she was questioned about her sexual assault. As JANE DOE 6 left the party sobbing and attempted to get into her car, Durbin loudly proclaimed that JANE DOE 6 had lied about the assault.

413. Durbin made contact with JANE DOE 6 on multiple occasions, including at academic and social events. During these events, it became common for

Durbin to intimidate JANE DOE 6 so that she would not talk about the sexual assault.

414.   One example of Durbin's intimidation occurred while JANE DOE 6 was using the bathroom at Defendant ASP – Chapter's fraternity house. Unbeknown to JANE DOE 6, Durbin had been in a separate room where the toilet was located. When JANE DOE 6 opened the door, she found Durbin waiting outside for her. Durbin immediately stood over JANE DOE 6 and asked if they "were good." JANE DOE 6, in complete terror, said "yes" and attempted to leave. Durbin, not allowing JANE DOE 6 to leave, repeated again and again "are we good?" After JANE DOE 6 answered "yes" again, Durbin finally allowed JANE DOE 6 to unlock the outside door and leave.

415.   Such behavior by Durbin was continuous. Each time JANE DOE 6 came into contact with Durbin, he forced her to say that they "were good."

416.   JANE DOE 6 has suffered from and continues to suffer post-traumatic stress disorder, depression, and anxiety and is undergoing counseling for the same.

### *Retaliation by Defendant Regents and EMU*

417.   On November 4, 2020, a member of Defendant Regents and EMU's Title IX department contacted JANE DOE 6 via email regarding sexual assault and discrimination.

418.    JANE DOE 6 graduated from EMU in December of 2020 with dreams of becoming a prosecutor. Upon completing her bachelor's degree, JANE DOE 6 prepared to take the Law School Admissions Test ("LSAT") and apply to law school.

419.    When attempting to apply to law schools, JANE DOE 6 was stunned to learn that Defendant Regents and EMU had restricted access to her transcripts under the guise of "pending litigation." JANE DOE 6's transcripts were being held until December 31, 2099. Defendants' act of withholding JANE DOE 6's transcripts denied her the opportunity to excel based on her sexual assault. This act by Defendants has, in essence, victimized JANE DOE 6 once again.

420.    Defendant Regents and EMU knew the instant lawsuit was pending and placed restrictions on access to JANE DOE 6's transcript shortly thereafter. JANE DOE 6's transcripts were previously unrestricted so the restriction at issue cannot be blamed upon any type of clerical error.

421.    The only pending litigation taking place at that time was the prosecution by the state of Michigan against Durbin for sexually assaulting JANE DOE 6.

422.    As a result of Defendants Regents and EMU's actions and betrayal, JANE DOE 6 had to endure a set back of her dreams and is not able to advance her career goals. This is to no fault of JANE DOE 6, a survivor of sexual assault.

## **JANE DOE 7**

423.    Plaintiff JANE DOE 7 enrolled at EMU in the Fall of 2016.

### *Night of the Rape*

424.   In February 2018, JANE DOE 7 went to Defendant ASP – Chapter's fraternity house with a friend for a small party.

425.   At the party, JANE DOE 7 consumed alcohol with friends and other attendees as the night went on.

426.   JANE DOE 7 also played fast-paced drinking games throughout the night with members of ASP – Chapter. As a result, JANE DOE 7 was unable to gauge the amount of alcohol she had consumed.

427.   JANE DOE 7 became intoxicated to the point where she could no longer walk or speak. She had trouble walking up the stairs to use the restroom and struggled to maintain control of her body.

428.   After using the restroom, JANE DOE 7 ended up in Durbin's room located on the second level of Defendant ASP – Chapter's fraternity house.

429.   Due largely to her intoxication, JANE DOE 7 does not remember how she got into Durbin's bedroom that night.

430.   Feeling nauseous, JANE DOE 7 eventually left Durbin's room to throw up in the bathroom across the hall. JANE DOE 7 tripped on her way to the restroom as a result of her severe intoxication.

431.   JANE DOE 7 fell asleep on Durbin's bed after returning to his room. The next thing JANE DOE 7 remembered was Durbin spreading her legs apart while she was laying helpless and intoxicated on his bed.

432.   Durbin then inserted his penis in JANE DOE 7's vagina. JANE DOE 7 was too intoxicated to resist or move away.

433.   The next thing JANE DOE 7 remembered was being on her stomach and wanting to get up but being pushed back down onto her stomach by Durbin. She tried to move but was helpless due to Durbin's size and her level of intoxication.

434.   JANE DOE 7 tried to get up multiple times but was pushed back down as Durbin continued to rape her.

435.   The next morning, JANE DOE 7 woke up in Durbin's room but did not remember anything past Durbin pushing her back down while he raped her. JANE DOE 7 had no clothes on except for Durbin's shirt. She then started to dress back into her clothing.

436.   Prior to leaving Defendant ASP – Chapter's premises, JANE DOE 7 noticed that she had bruises on her legs, inner thighs, and arms.

437.   Per protocol, JANE DOE 7's assault by Durbin was reported to EMU's Title IX department in November 2018. Although her report was submitted anonymously, her Title IX complaint against Durbin was never investigated and subsequent rapes by Durbin took place.

438.    Anonymity does not preclude further investigation into claims of sexual assaults, and is, in fact, offered as an avenue for reporting the same to Title IX.

439.    JANE DOE 7's Title IX complaint explicitly stated "I don't want him [Durbin] to do this to other women."

440.    In Summer 2020, JANE DOE 7 was contacted by law enforcement after hearing of her assault.

441.    JANE DOE 7 ultimately testified for the prosecution against Durbin at the aforementioned preliminary hearing held in 14A District Court.

442.    JANE DOE 7 continues to undergo counseling and is still experiencing symptoms of post-traumatic stress disorder, depression, and anxiety.

## **JANE DOE 8**

443.    JANE DOE 8 enrolled at EMU in the fall of 2016.

444.    During her second semester, JANE DOE 8 pledged at one of EMU's sororities, Delta Zeta.

445.    JANE DOE 8 and Durbin became social acquaintances and had various degrees of social interactions during JANE DOE 8's freshman and sophomore year through the EMU's Greek community.

### *Night of the Assault*

446.    On May 16, 2018, JANE DOE 8 received a Snapchat call from Durbin asking her to come over that night to talk and "hang out." JANE DOE 8 agreed.

447.   JANE DOE 8 went to Durbin's room and sat on his couch while Durbin sat on the bed across from her.

448.   Durbin then asked JANE DOE 8 to come over to the bed to sit with him instead of sitting on the couch. JANE DOE 8 declined and told Durbin that she preferred to stay on the couch.

449.   JANE DOE 8 and Durbin began conversing about a traffic ticket JANE DOE 8 had received that night. Durbin eventually asked JANE DOE 8 again to come to sit on the bed, which she ignored.

450.   JANE DOE 8 continued the conversation before Durbin asked her to sit on the bed for a third time, to which JANE DOE 8 again declined.  At this point, JANE DOE 8 noticed that Durbin had become visibly frustrated.

451.   Durbin then began speaking quietly in a manner that made it difficult for JANE DOE 8 to hear him. JANE DOE 8 asked Durbin to speak up, but he continued to whisper. JANE DOE 8 noticed Durbin's growing frustration.

452.   Durbin once again asked JANE DOE 8 to move from the couch to the bed so that she could hear him better. JANE DOE 8 complied.

453.   While sitting on the bed, Durbin made excuses to touch, nudge, and grab JANE DOE 8's leg. JANE DOE 8 told Durbin that she was "not okay with that [type of behavior]" and that she "did not come here for that [type of behavior]."

454.   JANE DOE 8 sat roughly twelve (12) inches away from Durbin as they began playing video games. Despite JANE DOE 8's rejection of Durbin's previous advances, Durbin continued to inch his way closer to JANE DOE 8, telling her, "oh, I don't bite."

455.   Durbin and JANE DOE 8 moved to the head of the bed to watch a Netflix show. JANE DOE 8 sat with her back against the wall and Durbin laid perpendicular to JANE DOE 8.

456.   Durbin repeatedly asked JANE DOE 8 to move next to him so that the two could have a "deep talk." JANE DOE 8 agreed to sit closer but did not lay down next to Durbin.

457.   JANE DOE 8 and Durbin began conversing about the hardships Durbin was facing in his family life.

458.   Durbin leaned in and attempted to kiss JANE DOE 8 on at least four occasions during their conversation. JANE DOE 8 pulled away each time and told Durbin, "I don't want to do that."

459.   Durbin then forcefully grabbed JANE DOE 8's hand and examined it near his face. Durbin then pushed JANE DOE 8's hand onto his groin area with his pants still on and began to use his hand with JANE DOE 8's hand underneath to squeeze his penis. Durbin kept eye contact with JANE DOE 8 throughout.  JANE

DOE 8 quickly retracted her hand and repeated to Durbin, "I don't want to do that . . . don't do that."

460.    After JANE DOE 8 rejected his advance, Durbin sat in silence. JANE DOE 8 then noticed Durbin becoming visibly angry.

461.    Durbin quickly grabbed JANE DOE 8 and flipped her over, pulling her legs out. Durbin then laid on top of JANE DOE 8, shifting his weight so that JANE DOE 8 could not move from his hold.

462.    Durbin stuck his fingers down JANE DOE 8 throat, making it hard for her to breathe as she tried to move her arms and legs.

463.    JANE DOE 8 was unable to speak with Durbin's fingers down her throat and felt like she was choking.

464.    JANE DOE 8 was pinned underneath Durbin's legs as he straddled her. JANE DOE 8 could not move her arms.

465.    Durbin then sat up and moved his groin in front of JANE DOE 8's face. Durbin ripped down his pants and shoved his penis into JANE DOE 8's mouth while forcefully thrusting.

466.    JANE DOE 8 tried to fight back against Durbin, but he was too strong and kept thrusting. Durbin continued to thrust his penis into JANE DOE 8's mouth making it even more difficult for her to breathe.

467.   Durbin then took his penis out of JANE DOE 8's mouth to readjust. JANE DOE 8 flipped over, trying to escape. Durbin grabbed JANE DOE 8, took down her pants, and began touching her vagina over her underwear.

468.   Durbin tried to digitally penetrate JANE DOE 8's vagina while aggressively groping her over her underwear.

469.   JANE DOE 8, still pinned down by Durbin, laid in shock as Durbin stuck his fingers back into her mouth. JANE DOE 8 told Durbin, "I am on my period - I don't want to do anything" in an attempt to dissuade Durbin's sexual desires.

470.   Durbin grabbed JANE DOE 8's wrists, restraining them above her head. Durbin stood up to crouch his groin in front of JANE DOE 8's face, shoving his penis back into her mouth. Durbin continued to thrust his penis forcefully into JANE DOE 8's mouth as she tried to escape.

471.   Durbin went to readjust his penis again. At this time, JANE DOE 8 rolled off the bed onto the floor and pulled her pants up. JANE DOE 8 asked, "why did you do that? You knew I didn't want to do that. I want to go home."

472.   Durbin then responded, "you didn't let me finish."

473.   JANE DOE 8 tried to collect her belongings while Durbin sat angrily. As JANE DOE 8 was walking out of the room, Durbin told her "you better not tell anyone about this. I'll tell your ex-boyfriend it was consensual."

474.    Months later, JANE DOE 8 told two of her friends about what had occurred. One of JANE DOE 8's friends laughed it off, saying "oh, he's just being aggressive."

475.    In June 2020, JANE DOE 8 contacted law enforcement and EMUPD about her assault.

476.    After reporting her assault to EMUPD in the summer of 2020 she was told: "they had received numerous calls about Durbin assaulting women on campus." Yet EMU did not look further into any report about Durbin's conduct until 2020.

477.    JANE DOE 8 spoke to YPD and EMUPD about her assault.

478.    JANE DOE 8 ultimately testified for the prosecution against Durbin at the aforementioned preliminary hearing held in 14A District Court.

### *Subsequent Contact and Actionable Harassment*

479.    Durbin told JANE DOE 8 not to tell anyone of the assault and that if she told anyone about the assault, he would say it was consensual and it was "his words against hers."

480.    Durbin approached JANE DOE 8 at a party after the assault had occurred. Durbin asked, "how she was doing." At this point, JANE DOE 8 accused Durbin of the assault by saying "you know what you did to me." Durbin then looked at JANE DOE-8 and told her that he had no idea what she was talking about.

481.   JANE DOE 8 continues to undergo counseling and is still experiencing symptoms of post-traumatic stress disorder, depression, and anxiety.

## JANE DOE 9

482.   JANE DOE 9 enrolled at EMU in the fall of 2016.

483.   JANE DOE 9 did not personally know Durbin prior to her sexual assault at his hands.

### *Night of First Assault*

484.   On September 2, 2018, JANE DOE 9 and two friends went to a party at Defendant ASP – Chapter's fraternity house.

485.   When JANE DOE 9 and her friends arrived at the party, there were approximately 20 other people present, including Defendant ASP – Chapter fraternity members.

486.   JANE DOE 9 consumed alcoholic beverages with her friends and decided to stay the night at Defendant ASP – Chapter's fraternity house in Durbin's room.

487.   JANE DOE 9 was intoxicated but coherent and still aware of her surroundings.

488.   JANE DOE 9, her two friends, and Durbin slept together on Durbin's bed. Durbin slept next to JANE DOE 9 on the end of the bed, opposite the wall.

489.   JANE DOE 9 did not intend to have any sexual encounters during her time in Durbin's room.

490.   JANE DOE 9 woke the next morning and found Durbin fondling and/or squeezing her breasts with both hands. JANE DOE 9 was in shock and unable to move as Durbin continued to squeeze her breasts.

491.   As she laid afraid and unsure of what to do, JANE DOE 9 could feel Durbin intentionally breathing into her ear.

492.   Durbin then realized she was awake and moved his hands while rolling over to the other side of the bed.

493.   JANE DOE 9 then got up after a few moments of Durbin squeezing her breasts and went to the bathroom to calm down and process what had just occurred.

494.   JANE DOE 9 then went downstairs to the living room and slept on the couch. JANE DOE 9 was still in shock.

495.   Between September 2, 2018, and May 12, 2019, JANE DOE 9 and Durbin remained acquaintances.

### ***Night of Second Assault***

496.   On May 12, 2019, JANE DOE 9 went to Defendant ASP – Chapter's fraternity house to drink alcohol with members of the fraternity. While at the fraternity house, JANE DOE 9 drank more than half of a bottle of wine.

497.   JANE DOE 9 then received a Snapchat from Durbin asking for her to come to his room located on the second level of Defendant ASP – Chapter's fraternity house.

498.   JANE DOE 9 entered Durbin's room and sat on the couch. The two watched YouTube videos while Durbin sat on his bed across from JANE DOE 9.

499.   Durbin told JANE DOE 9 to finish her bottle of wine and come over to his bed. JANE DOE 9 complied.

500.   Durbin then put his arm around JANE DOE 9 and started to rub one of his hands up and down the side of JANE DOE 9's body.

501.   Durbin began to touch the band of JANE DOE 9's underwear and bra as they sat together on Durbin's bed. JANE DOE 9 then told Durbin that she was tired and wanted to sleep.

502.   JANE DOE 9 moved to Durbin's couch and asked if it was okay if she slept on the couch instead of sharing his bed.

503.   Durbin began arguing with JANE DOE 9 and told her it was "wrong for him to allow her to sleep on the couch . . . he wouldn't tell anyone . . .no one would know."

504.   Durbin ultimately convinced JANE DOE 9 to sleep in his bed with him despite JANE DOE 9's expressed concerns of being uncomfortable.

505.   JANE DOE 9 did not want any sexual contact with Durbin when she went to bed. She just wanted to sleep.

506.   JANE DOE 9 moved to the inside of Durbin's bed toward the wall and started to fall asleep. She was awakened by Durbin asking if they could "cuddle" since he was "having issues with his girlfriend at the time," to which JANE DOE 9 replied "no."

507.   JANE DOE 9 fell asleep again and woke to Durbin violently pinching her nipples. JANE DOE 9 quickly moved away and created more space between herself and Durbin.

508.   After the incident, JANE DOE 9 began to fall asleep again because she was tired and intoxicated.

509.   JANE DOE 9 later awoke to Durbin biting her neck above the collarbone. She did not move and continued to lay there shocked and uncomfortable. Durbin bit JANE DOE 9's collarbone area two times, which hurt JANE DOE 9.

510.   JANE DOE 9 shifted away again, creating a larger gap between her and Durbin, and then flipped onto her stomach.

511.   Durbin woke JANE DOE 9 again, asking if she wanted a back massage. JANE DOE 9 did not respond. Durbin then lifted JANE DOE 9's shirt and began rubbing her back with lotion.

512.   Durbin straddled JANE DOE 9's hips as he rubbed her back. After Durbin had finished massaging JANE DOE 9, she fell asleep and never said a word, due largely to her shock.

### *Mystic Circle*

513.   Defendant ASP – Chapter's fraternity members subsequently held a meeting referred to as the "Mystic Circle" in which JANE DOE 9 reported what had occurred between her and Durbin.

514.   The "Mystic Circle" is considered a judgment-free zone where members of the fraternity are able to confide without fear of revelation, retribution and/or judgment.

515.   JANE DOE 9 asked the president of Defendant ASP – Chapter to hold the "Mystic Circle" so that she could tell the other fraternity members what their friend and brother, Durbin, had done. JANE DOE 9 believed that the "Mystic Circle" would function as an avenue to report her sexual assaults.

516.   JANE DOE 9 explained to members of Defendant ASP – Chapter that Durbin had sexually assaulted her on multiple occasions.

517.   JANE DOE 9 then went and sat in the middle of the room, in the dark, at Defendant ASP – Chapter's fraternity house and told her story. Afterward, a fraternity member of Defendant ASP – Chapter told Durbin about the "Mystic Circle" involving JANE DOE 9.

518. Over the following weeks, many students learned of the aforementioned "Mystic Circle" involving Durbin, including JANE DOE 9's boyfriend, who subsequently posted about Durbin's actions on social media.

519. JANE DOE 9's boyfriend posted, on multiple social media platforms, information about Durbin's notorious sexual assaults at EMU.

520. In or around June 2020, JANE DOE 9 was contacted by law enforcement about her assault by Durbin.

521. JANE DOE 9 ultimately testified for the prosecution against Durbin at the aforementioned preliminary hearing held in 14A District Court.

### *Subsequent Contact and Actionable Harassment*

522. After both assaults took place, Durbin would contact JANE DOE 9 asking her to remind him of what he had done. Durbin would repeatedly apologize for the assault and ask JANE DOE 9 not to tell anyone else.

523. Durbin continuously contacted JANE DOE 9 via phone calls and/or electronic messages to see if she had told anyone else of the assaults.

524. Durbin told JANE DOE 9 that he blamed her for his depression, anxiety, and current relationship struggles.

525. Durbin continued to "check-up" on JANE DOE 9 via Snapchat messages, asking JANE DOE 9 "are we good? . . . are we okay?"

526.   JANE DOE 9 began to ignore Durbin's messages when he spoke of the assault, asking if she had told anyone.

527.   JANE DOE 9 continues to undergo counseling and is still experiencing symptoms of post-traumatic stress disorder, depression, and anxiety.

## JANE DOE 10

528.   JANE DOE 10 enrolled at Defendant University in the fall of 2016.

529.   JANE DOE 10 and Durbin became social acquaintances through several social interactions during JANE DOE 10's college career at EMU.

### *Defendants' Knowledge Prior to Jane Doe 10's Assault*

530.   Defendants had notice that Durbin had sexually assaulted other victim EMU students.

531.   Further, Defendants had notice of the excessive number of rapes and/or sexual assaults occurring on EMU's campus, both reported and unreported, which is evidenced by Defendants' report titled "Action Planning for IFC at EMU," dated December 19, 2018.

532.   The president of IFC at the time of the aforementioned report was Hernandez, who was the subject of an investigation for a sexual assault about which Defendants were aware.

533.    Defendant Regents convened a special meeting on October 31, 2018, to address the rise in sexual assaults on EMU's campus and the root causes of the assaults.

534.    Although Defendants knew about Durbin, they failed to use ordinary care to protect future victims, including but not limited to JANE DOE 10, from a serial rapist.

### *Night of First Assault*

535.    JANE DOE 10 went to Defendant ASP – Chapter's fraternity house while waiting for a friend with whom she was supposed to head home. JANE DOE 10's friend failed to arrive. JANE DOE 10 decided to stay at Defendant ASP – Chapter's fraternity house to hang out with Durbin.

536.    JANE DOE 10 went to Durbin's room. Upon entering and sitting on Durbin's couch, Durbin insisted that JANE DOE 10 move from the couch to his bed. JANE DOE 10 agreed and moved to Durbin's bed, placing her back against the wall.

537.    Durbin then confessed to JANE DOE 10 that he wanted to cheat on his girlfriend with JANE DOE 10 and other women. In response, JANE DOE 10 told Durbin "don't cheat on your girlfriend . . . she's pretty . . . she's a nice girl."

538.    Durbin then told JANE DOE 10 that she had to keep his secret and that in order to do so, she had to kiss him. JANE DOE 10 told Durbin "no."

539.   Durbin persisted, reiterating to JANE DOE 10 that she had to kiss him, to which JANE DOE 10 responded "no" several more times.

540.   Durbin then grabbed JANE DOE 10 by her shoulders, pushing her down onto the bed.

541.   Durbin mounted himself on top of JANE DOE 10 to the point where she could not move as Durbin held her down. JANE DOE 10 told Durbin "no . . . we don't have to do this . . . I won't tell anyone."

542.   Durbin then began forcefully kissing JANE DOE 10 as she tried to push him off of her.  At this point, JANE DOE 10 was terrified of Durbin.

543.   JANE DOE 10 continued to tell Durbin to stop and repeated that she wouldn't tell anyone, but Durbin continued the sexual assault.

544.   Durbin grabbed JANE DOE 10's breasts as he fondled and/or groped them with one of his hands. As Durbin continued to hold her down, JANE DOE 10 fought back in an effort to get him off her.

545.   Durbin then grabbed JANE DOE 10's shirt and lifted it to take a picture of her bare breasts. JANE DOE 10 laid in shock, scared that Durbin would do something if she told him "no." JANE DOE 10 has a tattoo below her breast making the image identifiable to her and her closest friends.

546.   Durbin took a picture of JANE DOE 10's bare breasts and told JANE DOE 10 that he would use the image as blackmail if she spoke of the sexual assault.

547.   JANE DOE 10 agreed to not speak out of what happened and left Durbin's room. She was terrified at the thought that her nude image would be disseminated by Durbin throughout EMU's campus.

548.   JANE DOE 10 maintained contact with Durbin following the first assault in fear that he would distribute the image.

### *Night of Second Assault*

549.   Due to a fight with her roommates, JANE DOE 10 stayed at Defendant ASP – Chapter's fraternity house on March 30, 2019.

550.   JANE DOE 10 stayed in her boyfriend's room located on the first level of Defendant ASP – Chapter's fraternity house. JANE DOE 10's boyfriend was out of town and let her use his room while he was away.

551.   Durbin contacted JANE DOE 10 via Snapchat, telling JANE DOE 10 that he was coming to her boyfriend's room.

552.   Durbin came into JANE DOE 10's boyfriend's room and asked if she told anyone about her sexual assault on December 8, 2018. JANE DOE 10 told Durbin that she hadn't told anyone.

553.   Durbin then sat down on the bed next to JANE DOE 10. As they talked, Durbin continued to inch closer to JANE DOE 10 while consistently asking if she had told any one of her sexual assault.

554.   Durbin suddenly grabbed JANE DOE 10 by her shoulders and pushed her down onto the bed. Durbin began kissing JANE DOE 10 as she tried to push him off while pleading for him to stop.

555.   Durbin put his hands inside of JANE DOE 10's pants and inserted his fingers in her vagina. JANE DOE 10 immediately told Durbin "stop . . . I don't want to do this."

556.   JANE DOE 10 told Durbin to stop multiple times while he was sexually assaulting her. She tried pushing Durbin's shoulders to move him off of her, but JANE DOE 10 did not want to upset Durbin out of fear that he would become even more aggressive.

557.   Durbin stopped after JANE DOE 10 was finally able to push him off of her. Durbin left the room to go upstairs, telling JANE DOE 10 that he would come back down.

558.   JANE DOE 10 locked and dead-bolted the door after Durbin left.

559.   JANE DOE 10 went into the bathroom located within the locked bedroom and noticed she was bleeding vaginally from Durbin's violent sexual assault.

560.   JANE DOE 10 then heard Durbin coming back downstairs for a second time.

561.   After he arrived at the locked room, Durbin persistently knocked on the door. Durbin then proceeded to send Snapchat messages to JANE DOE 10, of which JANE DOE 10 did not respond. After several minutes, Durbin finally left and went back upstairs.

562.   In July 2020, JANE DOE 10 was contacted by law enforcement about her sexual assault by Durbin.

563.   JANE DOE 10 ultimately testified for the prosecution against Durbin at the aforementioned preliminary hearing held in 14A District Court.

### *Retaliation by Defendant Regents and EMU*

564.   JANE DOE 10 had aspirations of continuing her education after graduation. Although her grades had dropped following her sexual assault, she still carried over a "B" average from EMU.

565.   After applying to graduate school, JANE DOE 10 learned that her EMU transcripts were being withheld by Defendant Regents and EMU due to "pending litigation." Defendants' acts of withholding JANE DOE 10's transcripts denied her the opportunity to excel based on her sexual assault. The only pending litigation was the criminal prosecution of Durbin by the State of Michigan. This act by Defendants has, in essence, victimized JANE DOE 10 once again.

566.   Defendant Regents and EMU knew the instant lawsuit was pending and placed restrictions on JANE DOE 10's transcript access shortly thereafter. JANE

DOE 10's transcripts were previously unrestricted so the restriction at issue cannot be blamed upon any type of clerical error.

567.   By retaliatorily restricting JANE DOE  10's access to her transcripts, Defendant Regents and EMU prevented JANE DOE 10 from being admitted into graduate school in the fall of 2021.

### *Subsequent Contact and Actionable Harassment*

568.   Durbin messaged JANE DOE 10 days after the second assault insisting "you're not going to tell anyone right . . . no one is going to believe you."

569.   JANE DOE 10 was threatened, intimidated, and blackmailed by Durbin to keep quiet of her assault. Durbin consistently told her that "it was his word against hers" and reminded JANE DOE 10 that he had a nude photograph of her.

570.   Furthermore, JANE DOE 10 was told by others that nothing would happen unless she had other evidence besides her word, which is consistent with the actions of Defendant Werner with the other plaintiffs.

571.   JANE DOE 10 continues to undergo counseling and is still experiencing symptoms of post-traumatic stress disorder, depression, and anxiety.

## **JANE DOE 11**

572.   JANE DOE 11 enrolled at EMU in the fall of 2016.

573.   JANE DOE 11 met Sutton for the first time the night of October 9, 2016. JANE DOE 11 had never previously come into contact with Sutton prior to her sexual assault.

### *Night of the Assault*

574.   On October 10, 2016, JANE DOE 11 was at her dormitory, which was located in Putnam Hall on EMU's campus.

575.   JANE DOE 11's suitemate invited her boyfriend and Sutton over to her and JANE DOE 11's dormitory room, where the four watched the movie "The Sound of Music."

576.   JANE DOE 11 was on a bed with Sutton during the movie. Her suitemate and her suitemate's boyfriend were watching across the room on a separate bed.

577.   JANE DOE 11 only wanted to cuddle during the movie and did not want any sexual relations with Sutton.

578.   After the movie ended, JANE DOE 11's suitemate and suitemate's boyfriend fell asleep, leaving JANE DOE 11 and Sutton awake together on the opposite bed. At the time, both JANE DOE 11 and Sutton were fully clothed.

579.   JANE DOE 11 and Sutton began "making out" on the bed and "cuddling" consensually. After a short amount of time Sutton rolled over on top of JANE DOE 11 and asked, "are we going to do this?"

580.   JANE DOE 11 told Sutton "no . . .no" to having sexual intercourse while pushing Sutton away.

581.   Sutton then forced JANE DOE 11's hand down onto his penis. JANE DOE 11 could tell Sutton had an erection that she could feel over his clothing.

582.   Sutton dropped his shorts while in the bed with JANE DOE 11. He then grabbed JANE DOE 11's head and pushed her down onto his groin area and penis. Sutton forced JANE DOE 11 to perform oral sex; it lasted several minutes.

583.   Sutton then attempted to vaginally rape JANE DOE 11, who immediately started sobbing and stating "no."

584.   JANE DOE 11 was then physically forced by Sutton to perform oral sex again.

585.   After the assault JANE DOE 11 left her suite-mate's dorm and walked into her room through the shared bathroom.

586.   JANE DOE 11 woke up her roommate to tell her what had occurred. Shortly after they heard Sutton getting out of the bed and making his way into the bathroom.

587.   Both JANE DOE 11 and her roommate were able to lock the door leading into their dorm room.

588.    JANE DOE 11 did not return to her suite-mate's dorm until the following day. Sutton was gone the next morning but neither her suite mate nor her boyfriend was present.

589.    JANE DOE 11 reported the assault to Defendant EMUPD, Officer John E. Phillips, on December 11, 2016. Officer John E. Phillips told JANE DOE 11 that "nothing would happen" regarding a prosecution because it was too late.

590.    The officer in charge of JANE DOE 11's case did not make any attempt to contact witnesses to her assault.

591.    JANE DOE 11 also reported the assault to Defendant Werner and gave notice that Sutton was coming into contact with her, as his classes were next to each other.

### *Subsequent Contact and Actionable Harassment*

592.    Sutton came into contact with multiple times in her class, despite Defendant Werner telling her there was a no "contact order" in place.

593.    Under information and belief, a "no contact" order was never issued to Sutton.

594.    JANE DOE 11 suffered severe and extreme physical anxiety when Sutton intentionally came into contact with JANE DOE 11, ultimately causing her drop out of school.

595.   JANE DOE 11 continues to undergo counseling and is still experiencing symptoms of post-traumatic stress disorder, depression, and anxiety.

### *Fraudulent Concealment*

596.   The Statute of Limitations ("SOL") is tolled when "a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim." MCL 600.5855

597.   Defendants, through their employees, agents and/or representatives, fraudulently concealed the existence of Plaintiffs' claims by committing affirmative acts and/or making misrepresentations, among other things, to victims.

598.   The reporting of student-on-student sexual assault claims was systematically denied at EMU.

599.   When victims came to Defendants with reports of sexual assault, they were told not to report to the YPD.

600.   In an effort to discourage sexual assault victims from reporting to police, sexual assault victims, including Plaintiffs, that came to Defendants Werner and EMUPD were told by Defendants that they did not have enough evidence. Plaintiffs relied on this erroneous advice.

601.   Defendant Werner was neither an investigator nor trained in conducting forensic interviews of sexual assault victims. Regardless, Defendant Werner was the gatekeeper of sexual assault claims at EMU.

602.   Defendant Werner told Plaintiff that she had the authority to issue and would issue a "no contact order" against her assailant. However, this advice was contrary to Defendant Regents and EMU's policy. Furthermore, Defendant Werner did not have the authority to issue a Personal Protection Order signed by a circuit court judge and failed to inform Plaintiff about the options available to her.

603.   Defendants created such a hostile environment among the student body, and EMU's Greek life in particular, that victims of sexual assault, including Plaintiffs, were told that nothing would happen if they sought assistance from Defendants.

604.   Defendant Werner told authorities that she "is not an investigator" and that she neither possessed special training nor special knowledge with regard to interviewing victims of sexual assault. Further, Defendant Werner told authorities that she was "just a coordinator" and that she would refer reported cases of sexual assault to the Title IX investigators. However, before trained investigators could be assigned to a case, Defendants had already discouraged going forward.

605.   Defendant Werner was given notice, via Defendant Regents and EMU's reporting system, that Durbin had sexually assaulted an EMU student in 2018. Defendant Werner did not report the same to law enforcement, which allowed Durbin to continue his serial sexual assaults, including the rape of JANE DOE 10.

606.   Defendant Werner told EMU students misinformation about violations of Title IX during a breakout session after EMU's 2016 freshman orientation. Defendant Werner told freshmen students that "there is a grey area with violations of Title IX and alcohol – it's very complicated." Such information completely flies in the face of the Title IX protocol as laid out in EMU's handbook and in the common teaching at universities across the United States.

607.   McWilliams and Hernandez held positions of authority both with Defendants Werner and EMUPD, wherein the McWilliams and Hernandez were given special treatment by Defendants, including assistance in covering up sexual assaults.

608.   Defendant EMUPD would manipulate sexual assault reports and, at times, deliberately fail to enter sexual assault reports into police systems.

609.   Defendant EMUPD would enter sexual assault cases as "Suspicious Circumstances" as opposed to "Sexual Assaults." Furthermore, Defendant EMUPD would not enter reports into the system.

610.   Defendant Werner knew that EMU students, including Plaintiffs, were particularly susceptible to believing Defendant Werner's misrepresentations because:

      a.    Plaintiffs were young and naïve adults;

      b.    Defendants created a culture such that nothing would happen to young college women who were raped; and

      c.    Defendants knew that Plaintiffs had little to no experience with the criminal justice system and were, in fact, looking for the guidance of Title IX to ensure that they were properly informed.

611.   Plaintiffs were, in fact, particularly susceptible to believing Defendant Werner's misrepresentations

612.   Accordingly, Plaintiffs did not know, could not have reasonably known, had no reason to make inquiry, and were reasonably unaware of possible causes of action against Defendants until Plaintiffs started reading articles in late summer of 2020 and then went to Court for a preliminary examination in October of 2020. **Only after learning how Defendants betrayed their trust did Plaintiffs begin to comprehend the actions of the Defendants.**

## JANE DOE 12

613.   On December 23, 2014, JANE DOE 12, was 18 years old. JANE DOE 12 along with a friend went to an Eastern Michigan University (EMU) basketball game.

614.   After the game, JANE DOE 12 went to a party hosted by members of DTD – Chapter at an "annex" with her friend.

615.   When JANE DOE 12 and her friend arrived at the party, they stayed on the upper level for a period of time. The atmosphere of the party was consistent with all DTD – Chapter functions: alcohol games, partying and pressure to consume alcohol.

616.   JANE DOE 12 was pressured to drink hard liquor, but she didn't like it, so she faked drinking it just to pacify others in her surroundings.

617.   JANE DOE 12 and her friend decided to go downstairs where the members of DTD – Chapter were. When JANE DOE 12 and her friend went downstairs, they were the only two females in that area.

618.   The members were playing drinking games and drinking beer. The guys offered JANE DOE 12 a beer and she took one.

619.   Executive officers and members of DTD - Chapter will confirm that it was commonplace at parties to both supply and pressure others into drinking.

620.   While JANE DOE 12 was in the lower level she was approached by Brosnan (her assailant). Brosnan attempted to engage with JANE DOE 12 by engaging in conversation and acting as though he knew her. JANE DOE 12 didn't fall for it and acted like she was texting with another person. Brosnan handed her a second beer and went back to his drinking games.

621.   Further, not only did DTD - Chapter and/or DTD - National knowingly disregard regulations and rules, this was commonly known to EMU, Werner, and Martin.

### *Something was not right*

622.   JANE DOE 12 suddenly became confused and disoriented. She noticed that it was only her and Brosnan in the basement. JANE DOE 12 knew something

was wrong and nothing made sense to her. JANE DOE 12 didn't have much to drink, but she felt as though she was completely out of it.

623.   JANE DOE 12 blacked out. When she came to, JANE DOE 12 remembered looking up to seeing her assailant pulling off her pants. As JANE DOE 12 saw her surroundings, she noticed she was on a mattress on the floor, (later to be discovered in the attic of the DTD – Chapter's fraternity house).

### ***The Rape***

624.   JANE DOE 12 told Brosnan to stop, repeatedly pleaded with him to leave her alone and attempted to push him off. However, JANE DOE 12 was no match for Brosnan in her fight to stop the rape.

625.   Brosnan got on top of JANE DOE 12, as she tried to push him off, he inserted his penis inside her taking away her virginity.

626.   JANE DOE 12 begging Bronson to stop as she was crying telling him he was hurting her. In a horrific space in time JANE DOE 12, stopped with her plea and just wanted the assault to end.

627.   Once Bronson finished, he rolled over and fell asleep. JANE DOE 12 put her clothes on and found her way downstairs to a living room where there were three guys and two girls. One of the guys asked JANE DOE 12 if she was ok and got her a glass of water.

628.   JANE DOE 12 asked the gentleman, who was a member of DTD –

Chapter, if he could help her find her phone. They both went back up to the attic

where Brosnan was sleeping. The member pulled off the sheets where there was

JANE DOE'S 12 blood all over the mattress. Also, it appeared as though Brosnan

and urinated in the bed as well. Unfortunately, they were not able to find the phone,

so they went back downstairs.

629.   JANE DOE 12 used the members phone to call her friend, but she didn't

answer. JANE DOE 12 was stranded and ended up falling asleep in the living room

of DTD – Chapter's fraternity house.

### *The Morning After*

630.   JANE DOE 12 awoke the next morning still writhing in pain from

Brosnan's rape with bruising and bleeding.

631.   On Christmas Day, two days after Brosnan's rape, JANE DOE 12 went

to the emergency room at University of Michigan Hospital.

### *The Cover-Up, the Report to Title IX, Fraudulent Concealment, and Subsequent Harassment*

632.   Brosnan sent a series of text messages to JANE DOE 12 wherein

Brosnan apologized to JANE DOE 12 at least eight (8) times.

633.   Further, the text messages contradict the statements by the assailant not

remembering what happened. Under information and belief, the exchange that took

place on Christmas Eve 2014 in part went as follows:

**By the Assailant:** "Hey I am so sorry about last night. Seriously like I don't know what happened and idk wtf was going on. Sorry about everything.

**By JANE DOE 12:** Did you use a condom?

**By the Assailant:** Yes it was on the floor this morning when I cleaned his room up. I didn't finish last night anyways though because I stopped when you said it hurt and I fell asleep.

**By the Assailant:** Is everything okay though? Like I really just want to make sure you are alright.

**By JANE DOE 12:** Honestly, no.

**By the Assailant:** I'm so sorry...Like I was too messed up for that. What is bothering you the most?? And is there anything I can do to help?

**By the Assailant:** Yeah that was not a good night...I barely remember anything at all and there were no good decisions made..Like fuck..Do you remember anything at all?

**By JANE DOE 12:** Yeah I remember crying and telling you to get off of me….

**By the Assailant:** What the hell?! You were crying?? I ended up getting off of you right? I am so fucking sorry I dont remember that at all.

### **_Title IX Failure and Timeline of Coverup and Mismanagement_**

634.   Plaintiffs do not have to advance further argument to show that Brosnan

violated the rights of JANE 12 pursuant to EMU "Policy" and Title IX protocols.

635.   Werner incompetently told10 the students of EMU that when it comes

to alcohol and sex it is a complicated topic, making students believe that if you are

---

10    _See_        https://www.youtube.com/watch?v=0mM2P1oQl4k&trk=organization-update-content_share-video-embed_share-article_title.

intoxicated consent can be given. This could not be further from the truth or the law. Consent can't be given when either intoxicated or drugged.

636.   Notice was given to a mandated reporter of Title IX on JANUARY 16, 2015, when Karrick takes a report from a clinical social worker regarding the sexual assault of JANE DOE 12.

637.   This date of January 16, 2015 is the starting point of when Title IX is given notice. As will be explained in more depth to follow in the factual statements below, Werner, under information and belief attempts to cover up the timing of when the notice of this sexual assault comes into her office in a written memo.

638.   Karrick, under information and belief, notes that JANE DOE 12 wanted to pursue charges against her assailant Bronson. Karrick, only after hearing that several adults, a social worker, U of M hospital and Ann Arbor PD had known about the incident, tells JANE DOE 12: "because this happened at DTD – Chapter's fraternity house off campus, it was not within Eastern Michigan University PD jurisdiction, and he would have to turn it over to Ypsilanti PD." This is contrary to both prior and subsequent acts by Karrick.

639.   After notice was given to YPD, notice was also given to Title IX in January of 2015 and investigations started on both fronts.

640.   Through skilled criminal defense counsel, both cases, the criminal prosecution and the Title IX investigation are denied and closed respectively.

However, JANE DOE 12 is never contacted by Title IX regarding the investigation being closed, only the defense attorney is.

641. JANE DOE 12 rights under Title IX were clearly violated as she was never told about the closing of the investigation and never received any due process that should have been afforded to her.

642. Upon making contact with Defendant Werner in the later months of 2015, JANE DOE 12 was told by Defendant Werner that the investigation was still "ongoing" and that it was difficult to pursue because there was alcohol consumed on the night of the assault. Defendant Werner's statement was both incorrect (based on Werner's statements to Brosnan regarding the closure of the investigation) and misleading JANE DOE 12 into believing that nothing would happen due to the fact that she had consumed alcohol prior to her rape.

643. Consistent with a common scheme and plan, Defendant Werner's actions were consistent with how she influenced and dissuaded other JANE DOE's from pursuing their constitutional rights.

### *The Stall and Delay Tactics Almost Worked for Defendants to Sweep the Rape Under the Rug.*

644. JANE DOE 12 repeatedly requested updates from Defendant Werner and became confused by EMU's Title IX process and the continual delays.

645. In late 2016 and early parts of 2017, JANE DOE 12 sought advice through her therapist of what she should do about the Title IX investigation and was

advised by her therapist something was not right. The advice was to contact another Title IX Director at a different university.

646.   JANE DOE 12 heeded the advice and sought counsel from a Title IX counselor at the University of Toledo who in turn made contact with Defendant Werner.

647.   After getting called by another Title IX Director, Defendant Werner is put into a position where she must attempt to answer why JANE DOE 12's constitutional rights were violated.

648.   Defendant Werner wrote a letter in August of 2017 to a review panel member regarding JANE DOE 12's investigation and attempts to explain away why EMU failed JANE DOE 12.

649.   Defendant Werner told the following information to the panel member:

a.   First, that the purpose of the letter was to explain why there was a delay beyond the typical 60-day timeframe for a Title IX investigation of JANE DOE 12's rape.

b.   Second, that the case was not opened until **APRIL 27, 2017**.[11]

c.   Third, that Werner had to hire an outside investigator to work the case.

d.   Fourth, that the investigation was given to an outside investigator because the original EMU investigator had quit her position due to not being paid by EMU.

---

[11] Defendant Werner's representation that the case was not opened until April of 2017 is a complete fabrication of the truth. In fact, as of April 27, 2015, criminal charges against Brosnan stemming from the rape of JANE DOE 12 were denied by the prosecutor.

650.   Defendant Werner, by her overt acts of misconduct and/or deliberate misfeasance, not only violated the protections of Title IX but also illuminated how Defendants used a common scheme and plan to violate the rights of students at EMU.

651.   Brosnan objected to the 2017 "reopening" of the Title IX investigation into the rape of JANE DOE 12 and stated to EMU that the same was a violation of his constitutional protection against double jeopardy. At this time, Brosnan resided outside of Michigan.

652.   EMU's Title IX department continued its investigation and ultimately prepared a draft investigation report for both JANE DOE 12 and Brosnan to review in person, per EMU's policies. When Defendant Werner reached out to both JANE DOE 12 and Brosnan to inform them of the same, both JANE DOE 12 and Brosnan requested that Defendant Werner email them copies of the draft report, as they each lived outside of Michigan. Despite the fact that the investigator's report found that Brosnan did, in fact, violate EMU's sexual misconduct policies, Defendant Werner agreed to email the draft report to Brosnan, but denied the same accommodation to JANE DOE 12, who instead had to drive to EMU's campus from Ohio.

653.   Moreover, due to Defendant Werner's intentional and/or negligent delays, Brosnan faced no repercussions from EMU for his brutal assault of JANE DOE 12.

654.    Brosnan has since been criminally charged for the rape of JANE DOE

12 on December 23, 2020, and is awaiting a preliminary exam in district court

sometime in July of 2021.

## JANE DOE 13

655.    JANE DOE 13 enrolled at EMU in the Fall of 2018.

656.    During the Fall of 2018, JANE DOE 13 pledged at the sorority SK–

Chapter.

657.    In the pledging process, there are certain rules and guidelines that must

be followed by SK – Chapter to ensure the anti-hazing protocol is followed,

including but not limited to alcohol consumption.

658.    Members of SK – Chapter, namely Yoheny Yanes and Mia Arnold,

knowingly and negligently violated those rules as it related to JANE DOE 13,

specifically section VII of the National Sorority Handbook, in coercing her to

consume excessive amounts of alcohol on October 12, 2018. At the time, JANE

DOE 13 was eighteen (18) years old.

659.    As a result, JANE DOE 13 was savagely raped in the early morning

hours of October 12, 2018.

### *Night of the Assault*

660.    The names of the witnesses to the assault:

- Yoheny Yanes ("Yanes")
- Mia Arnold ("Arnold")

- David Galvan ("Galvan")
- Addison Bank ("Bank")
- Assailant William Bujaki ("Bujaki")

661.   Prior to her assault, JANE DOE 13 knew of her assailant, Bujaki, from a brief encounter at a sanctioned intramural sports game at EMU.

662.   On or about October 11, 2018, JANE DOE 13, a pledge of SK – Chapter, was taken by Yanes and Arnold, two senior members of SK – Chapter, to an off-campus location to drink alcohol in violation of the hazing protocol. Thereafter, Yanes and Arnold took Jane Doe 13 to a Delta Zeta sorority after-party at an apartment back on EMU's campus to have Jane Doe 13 consume more alcohol.

663.   It was at this after-party that JANE DOE 13 met fraternity members of DTD – Chapter, including her assailant, Bujaki.

664.   After leaving the party, said members of DTD - Chapter, including Bujaki, escorted JANE DOE 13, Yanes, and Arnold to DTD – Chapter's fraternity house.

665.   While en route to DTD – Chapter's fraternity house, Yanes and Arnold admitted to the group that they would not be allowed to return to SK – Chapter because of how intoxicated they got JANE DOE 13 - a violation of SK – Chapter and/or SK – Nationals' anti-hazing policy.

666.   Once at DTD – Chapter's fraternity house, Yanes, Arnold, Galvan, Bank, and Bujaki escorted JANE DOE 13 into Bujaki's room. JANE DOE 13 was

continually coerced to imbibe alcohol by members of SK – Chapter and DTD – Chapter, including but not limited to Yanes, Arnold, Galvan, Bank, and Bujaki.

667.   During this time, JANE DOE 13 became even more intoxicated and visibly unsteady.

668.   During this state of intoxication, JANE DOE 13 participated in a game of "spin the bottle." JANE DOE 13 was sitting on the floor with Galvan, Bank, and Bujaki next to a bed while the game was being played; Yanes was sitting on the bed next to where the others were on the floor.

669.   During the game, the aforementioned witnesses noticed the aggressiveness that Assailant Bujaki was exhibiting.

670.   At one point, when Bujaki spun the bottle in the direction of JANE DOE 13, he moved in an eerily aggressive manner towards JANE DOE 13, and forcefully kissed her.

### *The First Round of Rape*

671.   As the game progressed, Yanes, while still sitting on Bujaki's bed, was attempting to say something to JANE DOE 13; however, JANE DOE 13 could not hear what Yanes was saying. It appeared to JANE DOE 13 as though Yanes wanted JANE DOE 13 to come closer to tell her something.

672.    JANE DOE 13 got up off the floor, put her knees against the bed, and placed her hands on the bed leaning into Yanes to hear what she was saying. JANE DOE 13 was in a vulnerable position where her back was to Bujaki.

673.    While JANE DOE 13 was bent over, Bujaki suddenly ripped her pants down off her body, pulled her thong to the side, and inserted his penis inside JANE DOE 13. While in shock at what was happening, JANE DOE 13 tried to scream but no words would come out.

674.    Bank became very uncomfortable with the scene and ugliness of Bujaki's actions and started to exit the room. Instead, it is understood that Bank stood outside the bedroom door listening to the sound of "skin hitting skin."

675.    As the brutal rape occurred, JANE DOE 13 summoned as much energy as possible to tell her assailant, Bujaki, to stop; but again, no words could come out of her mouth.

676.    Bujaki continued with his assault while forcefully shoving JANE DOE 13's head into a crack between the bed and the wall, to the point where JANE DOE 13 could barely breathe and could not speak as Bujaki's assault was ongoing.

677.    After Bujaki had his way with JANE DOE 13, which felt like an eternity to her, JANE DOE 13 was physically unable to escape being brutally traumatized and intoxicated. JANE DOE 13 could only curl up into a ball, shaking and crying while lying on the bed.

678.   JANE DOE 13, overwhelmingly exhausted, intoxicated, and in a state of shock, was unable to stay awake while still in a fetal position on the bed.

### *The Second Round of Rape*

679.   Shockingly, JANE DOE 13 was brought out of a state of sleep by Bujaki violently raping her again. Once more, JANE DOE 13 tried to scream but nothing would come out as Bujaki continued to have his way.

680.   JANE DOE 13 attempted to physically stop Bujaki, but she was no match to thwart his persistent attack.

681.   At some point, JANE DOE 13 noticed that Galvin and Yanes were in the bed next to where she was being raped.

682.   After this second assault, JANE DOE 13 again passed out in exhaustion as she was left on the bed at DTD – Chapter's fraternity house.

### *Morning After*

683.   In the morning after the assaults, JANE DOE 13 attempted to leave DTD but was told by Yanes that she had to wait there until the coast was clear back at SK – Chapter's sorority house.

684.   As soon as JANE DOE 13 was allowed to leave DTD – Chapter's fraternity house she confided to members of SK – Chapter that she had been raped by Bujaki. JANE DOE 13, a pledge and holding lower status as a new member to the sorority, was strong-armed into believing it was her fault and should be ashamed.

685.   JANE DOE 13 was experiencing physical pain from injuries that she sustained as a result of the rape.  Further, members of SK – Chapter informed her that Bujaki was "dirty." JANE DOE 13 thereafter obtained a blood and urine test at a local urgent care clinic in Ann Arbor.

686.   JANE DOE 13 went several days without telling anyone else about the sexual assault and, as a result, became increasingly depressed and outwardly anxious. When her two closest friends confronted her about this dramatic change in her demeanor, JANE DOE 13 broke down and revealed the details of the brutal assault that she endured on October 12, 2018.

### *Defendant Werner Misleads Jane Doe 13*

687.   On or about October 16, 2018, JANE DOE 13 and her two friends reported to Ethan Antonishak ("Antonishak"), the President of DTD - Chapter at the time, that Bujaki had raped JANE DOE 13 on October 12, 2018.

688.   On or about October 16, 2018, Kaley Austin, the president of SK – Chapter at the time, wrote an email to both Antonishak and Defendant Martin, EMU's Greek Life Coordinator, and mandated reporter to both Title IX and EMUPD under EMU's policies, notifying Antonishak and Defendant Martin that JANE DOE 13 had been raped by Bujaki on October 12, 2018, at DTD - Chapter's fraternity house.

689.   On or about that same date, Antonishak submitted an online sexual misconduct reporting form to EMU's Title IX Department, including Defendant Werner, stating that Bujaki had raped a pledge of SK – Chapter on October 12, 2018, at DTD – Chapter's fraternity house and requesting Defendant Werner to contact him. A day later, Defendant Werner replied to Antonishak indicating that she had recently received another sexual misconduct report regarding the same incident.

690.   In the days following Bujaki's rape of JANE DOE 13, Bank provided his eye-witness account of JANE DOE 13's assault to both DTD – Chapter's President and Vice President of Internal Affairs, placing DTD – Chapter on further notice of sexual assaults committed by its members.

691.   Within ten days of being sexually assaulted, JANE DOE 13 and her friend met with Defendant Werner. At the meeting, JANE DOE 13 went through the details of the sexual assaults with Defendant Werner.

692.   Defendant Werner is not trained forensically in conducting sensitive interviews of rape victims. However, consistent with a pattern of conduct, Defendant Werner proceeded in having JANE DOE 13 go through the facts and circumstances of the rape JANE DOE 13 suffered.

693.   Defendant Werner had been given several red flags and notice about the assailant Bujaki prior to meeting JANE DOE 13 as noted above.

694.   After JANE DOE 13 went through the details of the rape, Defendant Werner typed something into her computer in front of JANE DOE 13. After a brief pause, Defendant Werner looked at JANE DOE and her friend and stated: that because Bujaki is not in the system she is not required to report this to the police.

695.   During this meeting, Defendant Werner told JANE DOE 13 that she could report her rape to the police but said that not much could be done at the time and that it would be difficult to prove anything because of the support the fraternity would give to Bujaki.

696.   Defendant Werner's counsel to JANE DOE 13 violated EMU's Title IX policies, as well as the applicable laws in the State of Michigan.

697.   Due to intimidation by Bujaki and the misleading statements of Defendant Werner, JANE DOE 13 thought that it was useless for her to go to law enforcement.

698.   On several occasions between October 30, 2018, and November 5, 2018, Defendant Werner met with Bujaki regarding his sexual assault of JANE DOE 13 and guided Bujaki so that he could avoid any form of retaliation.

699.   Defendant Werner's pattern of conduct, working with the assailant, was followed with the same common scheme and plan used in JANE DOE 1, when she met with Hernandez and McWilliams.

700.   During these communications, Bujaki was assisted in not being expelled from EMU nor punished by Title IX immediately thereafter.

701.   Defendant Werner never reported Bujaki as a potential suspect of sexual assault to EMUPD nor did she report the same to YPD (where the law enforcement jurisdiction would have been appropriate).

702.   On or about November 5, 2018, Defendant Werner informed Bujaki that there was no pending Title IX complaint against him.

703.   Bujaki thanked Defendant Werner for assisting him through the Title IX investigation.

704.   A three-page anonymous letter was also addressed to Defendant Martin, the Greek Life Coordinator at the time of the assault, stating that multiple issues regarding sexual assault had been brought to Martin and EMU's fraternities, but nothing had been done.

705.   Unsurprisingly, in November 2018, Bujaki sexually assaulted JANE DOE 14. This assault took place less than 30 days after Bujaki was reported, by JANE DOE 13 and several others, to EMU and Defendant Werner.

## JANE DOE 14

706.   JANE DOE 13 AND JANE DOE 14 were sexually assaulted on the same night by two different assailants at DTD – Chapter's Fraternity house. That night was October 12, 2018.

707.   As in all assaults committed on the property of and/or by members of DTD – Chapter, alcohol, and minors were a common denominator.

708.   JANE DOE 14 enrolled at EMU in the fall of 2018, when she was eighteen (18) years old. Thus, at the time, JANE DOE 14 was under the age of twenty-one (21).

709.   JANE DOE 14 had not met the assailant in person prior to October 12, 2018. However, they had connected through text messages and social media.

### *Night of the Assault*

710.   On or around October 12, 2018, JANE DOE 14 attended a registered party at DTD – Chapter's fraternity house.  JANE DOE 14 arrived after the party had started.

711.   DTD – Chapter habitually supplied excessive alcohol for their parties, including the evening of October 12, 2018. Although possessing alcohol is in direct violation of DTD – Chapter's bylaws, EMU's rules and regulations, as well as local, state, and federal laws, were nonetheless commonplace at DTD – Chapter.

712.   At some point during DTD - Chapter's party, Cameron Layne ("Layne"), an EMU student, walked up to JANE DOE 14 asking to dance.  At this time, Layne was visibly intoxicated. JANE DOE 14 declined his offer to which Layne became upset and stormed off into the crowd of partygoers.

713.   Sometime later, Layne reapproached JANE DOE 14 insisting she dance with him. Again, JANE DOE 14 declined, which made Layne more upset.

### *The Assault*

714.   Unbeknownst to JANE DOE 14, Layne walked up behind her a third time and began sexually molesting JANE DOE 14.

715.   Layne groped JANE DOE 14's butt and breasts while grinding his genitals on her backside.

716.   At or around the same time, Layne proceeded to put his hand down JANE DOE 14's pants touching the outside of her vagina.

717.   While doing all of this, Layne urged JANE DOE 14 to leave the party with him.  JANE DOE 14 declined.

718.   Layne became more agitated and pugnacious towards JANE DOE 14 for repeatedly being turned away by JANE DOE 14.

719.   When JANE DOE 14 refused to leave with Layne, he aggressively grabbed her wrist to forcefully take her with him.

720.   JANE DOE 14's friend, having witnessed Layne sexually assault JANE DOE 14 and his attempt to take her away from the party, helped her escape from Layne's grip.

*__Subsequent Harassment__*

721.   Between the early morning hours of 1:00 am and 4:00 am on October 13, 2018, JANE DOE 14 received harassing text messages from Layne.

722.   In his text messages, Layne stated that JANE DOE 14 was "fat and disgusting, should get pregnant, stop having sex with people, and that he wished there were fewer people like her in the world because she was a hoe."

723.   JANE DOE 14 immediately blocked Layne from social media in an attempt to stop Layne's harassment.

## JANE DOE 15

724.   JANE DOE 15 enrolled at EMU in the Fall of 2017 when she was 18 years old.

725.   JANE DOE 15 met her assailant, William Bujaki ("Bujaki"), in 2017. JANE DOE 15 and Bujaki were in a consensual relationship for roughly a year prior to her assault.

726.   During their relationship, JANE DOE 15 became aware of Bujaki's romantic involvement with another female. JANE DOE 15 also discovered that Bujaki had sexually assaulted someone in DTD – Chapter's fraternity house. Further, JANE DOE 15 noticed Bujaki was becoming more aggressive, especially when he consumed alcohol. Thus, JANE DOE 15 wanted to end her relationship with Bujaki.

### *Night of the Assault*

727.   Bujaki requested to meet with JANE DOE 15 in the early morning hours of November 1, 2018, to discuss the status of their relationship. JANE DOE 15, determined to end her relationship with Bujaki, agreed to meet with him at DTD – Chapter's fraternity house where he resided.

728.   DTD – Chapter members hosted a Halloween Party at DTD – Chapter's fraternity house earlier that same evening. At the time, JANE DOE 15 was under the age of twenty-one (21).

729.   Bujaki consumed a significant amount of alcohol at the Halloween Party with other members of DTD – Chapter.

730.   Prior to the Halloween Party, members of EMU's Inter-Fraternity Council ("IFC"), the governing board that regulates activities within Greek Life at EMU, were aware of the allegation that Bujaki had sexually assaulted JANE DOE 13 and were investigating the same. Despite this awareness, IFC sanctioned the Halloween Party.

### *The Rape*

731.   JANE DOE 15 met Bujaki at DTD – Chapter's fraternity house where he brought her to his bedroom.

732.   In the room, Bujaki pleaded with JANE DOE 15 to continue their relationship; however, JANE DOE 15 repeatedly told him no. Soon after, JANE

DOE 15 attempted to leave, but Bujaki demanded she stay longer and became increasingly aggressive as JANE DOE 15 tried to go. Ultimately, JANE DOE 15 decided her safest course of action was to leave after Bujaki fell asleep.

733. Bujaki did not go to sleep. Instead, he proceeded to grope JANE DOE 15, placing his hands on her body in an attempt to engage in sexual activities with her. Bujaki began by touching JANE DOE 15's stomach, eventually moving his hand down onto her pubic bone.

734. JANE DOE 15 promptly removed Bujaki's hand and told him that she did not want to have sex.

735. Bujaki refused to comply and continued groping JANE DOE 15.

736. JANE DOE 15, for a second time, removed Bujaki's hands and again told Bujaki to stop and that she did not want to have sex.

737. Bujaki refused JANE DOE 15's commands and began groping JANE DOE 15's breasts.

738. As JANE DOE 15 attempted to remove Bujaki's hands from her body, he suddenly forced himself onto her, straddling JANE DOE 15's torso as she laid on her back, restricting her movement. Bujaki then began kissing JANE DOE 15's neck and cheek as JANE DOE 15 attempted to push him off of her, to no avail.

739. Bujaki continued his assault as JANE DOE 15 attempted to push him off of her, but Bujaki's weight and strength were too much for JANE DOE 15 to

overcome. Each time JANE DOE 15 resisted, Bujaki pushed back even harder using his body weight to overcome JANE DOE 15's resistance to the point where JANE DOE 15 felt like she was suffocating. JANE DOE 15, realizing her life was in danger, continued to resist.

740.   Bujaki, overpowering JANE DOE 15's resistance, forcefully pulled down her pants and underwear.

741.   JANE DOE 15 attempted to kick Bujaki, but he grabbed her legs, pinned them down with his knees, and began kissing her neck again as JANE DOE 15 repeatedly pleaded with him to stop.

742.   JANE DOE 15 attempted to gain distance between her and Bujaki by pushing her forearm into his throat. However, due to Bujaki's size and strength, JANE DOE 15 could not gain enough leverage to push him off.

743.   Feeling defeated and in great fear for her life, JANE DOE 15 reasoned that if she ceased resisting and laid limp, Bujaki's assault would end sooner.

744.   At the same time, Bujaki used his legs to pry apart JANE DOE 15's legs, at which time Bujaki proceeded to insert his penis into her vagina, causing JANE DOE 15 excruciating pain as Bujaki raped her.

745.   Bujaki eventually removed his erect penis from JANE DOE 15's vagina and ejaculated onto her sweatshirt. Bujaki then fell asleep next to JANE DOE 15.

746.   Upon realizing Bujaki was asleep, JANE DOE 15 immediately got dressed and left DTD – Chapter's fraternity house. When she arrived back at her dormitory, she cried until she fell asleep.

### *Defendant Melody Werner's Inaction*

747.   Less than three weeks before Bujaki raped JANE DOE 15, Defendant Werner received an online sexual misconduct reporting form stating that Bujaki had raped a pledge of SK – Chapter (JANE DOE 13) on October 12, 2018, at DTD – Chapter's fraternity house from Ethan Antonishak ("Antonishak"), the President of DTD – Chapter at the time.

748.   Defendant Werner replied to the inquiry indicating that she had recently received another sexual misconduct report regarding the same incident.

749.   Defendant Werner met with the victim of Bujaki's October 12, 2018 rape (JANE DOE 13) less than one week after Antonishak's online sexual misconduct report and provided Werner with details of her assault, including her assailant's name (Bujaki) and the location where her rape occurred (DTD – Chapter's fraternity house).

750.   Defendant Werner told JANE DOE 13 that she was not required to report her rape to the police because Bujaki's name was not in the system.

751.   During the three weeks between Bujaki's rape of JANE DOE 13 and JANE DOE 15, Defendant Werner met with Bujaki and worked with him to help clear his name regarding his sexual assault of JANE DOE 13.

752.   This pattern of conduct by Defendant Werner–namely, deterring sexual assault victims from reporting and investigating their assailant(s) and then, in turn, working with the victims' alleged assailant(s) to help vindicate them– was followed with the same common scheme and plan used in prior claims of assault, particularly when she met with Hernandez and McWilliams.

753.   During these communications with Bujaki, Defendant Werner kept Bujaki from being expelled from EMU's campus.

754.   Defendant Werner did not report Bujaki as a potential suspect of sexual assault to either EMUPD or to YPD.

755.   Defendant Werner's failure to report Bujaki to proper authorities violated EMU's Title IX policies as well as the applicable laws in the State of Michigan and constituted misconduct of her duties as EMU's Title IX Coordinator.

756.   Because Defendant Werner never reported Bujaki as a potential suspect of sexual assault to proper authorities, Bujaki was free to rape other females, including JANE DOE 15.

757.   Less than a month elapsed between Bujaki's rape of JANE DOE 13 and his rape of JANE DOE 15.

758.   JANE DOE 15 confided in her aunt about Bujaki's rape, telling her that she could not report the assault because she was afraid of the process, indicating that she had no protection or recourse.

### ***Bujaki***

759.   Bujaki went to high school with Hernandez, and that it was Hernandez who influenced Bujaki to become a member of DTD – Chapter.

760.   Bujaki sought and received guidance from Hernandez to "clear his name" in regard to his sexual assault of JANE DOE 13.

761.   Hernandez told Bujaki that Defendant Werner helped him (Hernandez) a lot when he and McWilliams were reported to have raped a woman in 2018.

762.   Bujaki was aware of the fact that he had sexually assaulted JANE DOE 15.  Further, Bujaki was aware he had been accused of a previous sexual assault during his sophomore year at EMU.

763.   Bujaki sent JANE DOE 15 a message via Snapchat during the summer of 2019. JANE DOE 15 had blocked all contact with Bujaki following the rape and thus, did not reply.

764.   Around the same time, Bujaki sent a personal message to JANE DOE 15 via Instagram again attempting to make contact with her.

765.   Although EMU and DTD – Chapter and/or DTD – National had been made aware of Bujaki's rape of JANE DOE 13 on October 16, 2018, no steps were

taken to ensure that women on campus were protected, permitting Bujaki to remain at DTD - Chapter where he went on to assault other women, including JANE DOE 15.

## JANE DOE 16

766.    JANE DOE 16 enrolled at EMU in the Fall of 2017.

767.    JANE DOE 16 met her assailant, Clayton Sigmann ("Sigmann"), in the Fall of 2017 during her freshman year at EMU as the two lived on the same floor of Wise Hall on EMU's campus.

768.    Prior to her assault, JANE DOE 16 and Sigmann had consensual sex on approximately two occasions.

769.    However, JANE DOE 16 hadn't seen or spoken with Sigmann for approximately one year prior to her assault.

### *Night of the Assault*

770.    On or around September 23, 2018, JANE DOE 16 attended a registered fraternity party at TC – Chapter's fraternity house located at 510 West Cross Street in the city of Ypsilanti, Michigan.

771.    On information and belief, the party at TC – Chapter's fraternity house ("Theta Chi party") was the first IFC-sanctioned party of the school year, meaning TC – Chapter had to first seek approval and permission for the party, as well as subsequently following rules and regulations put into place by IFC. Per the rules and

regulations, TC – Chapter was required to have "sober monitors" at the side door to the house - the side door was the sole entry and exit point, no doors were to be locked, the basement cellar was off-limits, all partygoers were required to bring and consume their own alcohol, and all partygoers were required to be on a list to gain entry.

772. The Theta Chi party was TC – Chapter's first social event of the year and the first IFC-sanctioned Greek Life party of the school year.

773. The Theta Chi party was the first Greek Life party to follow EMU's ban on Greek Life parties.

774. TC – Chapter had been disbanded approximately twenty (20) years prior to the Theta Chi party due to a sexual assault incident. TC – Chapter was recolonized and officially recognized as a sanctioned fraternity on EMU's campus on or around March 2017, approximately eighteen (18) months prior to the Theta Chi party.

775. Sigmann was a "founding father" of TC – Chapter on EMU's campus. In other words, Sigmann was instrumental in reestablishing TC – Chapter's presence at EMU.

776. During the Theta Chi party, JANE DOE 16 consumed a large amount of alcohol, provided and offered by members of TC – Chapter, and became

inebriated to the point of "blacking out." At the time, JANE DOE 16 was under the age of twenty-one (21).

777.    Prior to her assault, JANE DOE 16 had been in the common area of TC – Chapter's fraternity house dancing with friends when JANE DOE 17 suddenly approached JANE DOE 16, aggressively grabbed her by the wrist and pulled her towards the front door. At the same time, JANE DOE 17 was being pulled by Sigmann.  JANE DOE 16 was not aware that JANE DOE 17 was being pulled by Sigmann, creating a chain between Sigmann, JANE DOE 17, and JANE DOE 16.

778.    Sigmann knowingly violated IFC Rules by leading JANES DOES 16 and 17 out the front door, an undesignated and unmonitored point of exit.

779.    Without explanation, Sigmann dragged both women out of the front door and beyond the sight of the "sober monitors," who were required to overlook the safety of partygoers, including but not limited to JANE DOE 16 and JANE DOE 17.

780.    Sigmann led JANE DOE 16 and JANE DOE 17 to the rear of the house and down a staircase into the basement cellar, a locked area only accessible from the exterior of the house.

781.    Sigmann unlocked the cellar door, led both women into the cellar, and immediately locked the door behind them.  At this point, JANE DOE 16 was not free to leave.

782.   JANE DOE 16 looked around the cellar and noted that the room consisted of only a small table and a dirty sectional couch. JANE DOE 16 further noted that the walls of the cellar were made of fieldstones and the floor was dirt.

783.   JANE DOE 16, at that point very inebriated and unable to consent to sexual activity, immediately became anxious and uncomfortable upon realizing that no other partygoers were present in the cellar.

784.   Due to her intoxication, anxiety, and sudden panic, JANE DOE 16 lost consciousness. When JANE DOE 16 awoke, she found Sigmann naked and fully erect lying on the couch. JANE DOE 16 blacked out again from intoxication and panic.

785.   Moments later, JANE DOE 16 regained consciousness. When she came to, JANE DOE 16 realized that she was fully nude and that Sigmann had his erect penis inside of her. JANE DOE 16 could not remember how she became undressed.

786.   JANE DOE 16 began to experience the initial stages of a panic attack. She then stood up and placed distance between herself and Sigmann.

787.   Sigmann peered over to JANE DOE 17 and proclaimed, "it's her turn."

788.   JANE DOE 16 quietly walked towards the side of the room in an attempt to locate her phone and message for help.

789.   JANE DOE 16 sent a message via Snapchat to her friend and member of TC – Chapter, Andrew Guillaume ("Guillaume"), who was also a sober monitor

at the Theta Chi party. In the message, JANE DOE 16 asked Guillaume to rescue her and JANE DOE 17 from the cellar.

790.   As JANE DOE 16 began putting her clothes back on in the corner of the cellar, she noticed that JANE DOE 17 was with Sigmann and that JANE DOE 17 appeared to be in and out of consciousness. JANE DOE 16 witnessed Sigmann insert his erect penis into JANE DOE 17.

791.  At some point shortly thereafter Sigmann began masturbating, eventually ejaculating onto JANE DOE 17's hands and face whereupon JANE DOE 17 objected, yelling, "gross."

792.   Guillaume then started to bang on the cellar door, demanding that Sigmann let him inside. Sigmann refused.   and attempted to barricade the door from inside, preventing Guillaume from entering.

793.   As Guillaume continued banging on the door and demanding to be let inside, Sigmann attempted to coerce JANE DOE 16 and 17 into telling Guillaume that the two women came to the cellar with Sigmann of their own volition and that "everything was fine."

794.   Guillaume began to break down the door as Sigmann continued to barricade it from inside. Guillaume eventually gained entry by bending the door off of its hinges.

795.   Guillaume forced his way into the cellar while Sigmann hid behind the door. Both women were escorted out of the cellar stunned and in shock from what had just occurred.

796.   After a brief conversation, Guillaume left JANE DOE 16 alone in a gravel lot near the top of the cellar. JANE DOE 16 collapsed and began to sob over what had just occurred. JANE DOE 16 and JANE DOE 17 were eventually escorted to the Alpha Sigma Phi – Chapter's fraternity house by members of Alpha Sigma Phi – Chapter.

797.   Upon arrival at Alpha Sigma Phi – Chapter's fraternity house, both JANE DOE 16 and JANE DOE 17 sat in silence as members tried to console them. A member of Alpha Sigma Phi – Chapter eventually drove both women to JANE DOE 17's home.

### *The Aftermath*

798.   The following morning, JANE DOE 16 experienced the worst hangover of her life. In addition, her urine was full of blood, which was concerning because JANE DOE 16 was not on her menstrual cycle. JANE DOE 16 attributed the vaginal bleeding to her sexual assault the previous evening.

799.   JANE DOE 16 also suffered from bruising in her inner thigh and a sprained wrist from being aggressively dragged out of TC – Chapter's fraternity house.

### *Jane Doe 16 Reports Her Rape to Title IX and YPD*

800.   JANE DOE 16 and JANE DOE 17 initially avoided talking about the assault until JANE DOE 16, just two days later, broke down and became unable to control the flashbacks, depression, and crying fits she was experiencing post-assault. Both women then agreed to go to the Ypsilanti Police Department ("YPD") to report their assaults.

801.   During the investigation, YPD advised JANE DOE 16 to have a Sexual Assault Nurse Examination ("SANE") performed after the interview.

802.   The morning following the assault, JANE DOE 16 began to receive messages via Snapchat from Sigmann.

803.   In the messages, Sigmann asked JANE DOE 16 if she had spoken with Guillaume about the rape and again badgering her to lie and tell Guillaume that Sigmann and the two women had gone to the cellar consensually so that they could smoke.

804.   Because JANE DOE 16 also came into contact with Sigmann multiple times during Greek life events, she no longer attended those events.

805.   JANE DOE 16 continued to see Sigmann throughout campus, including at a baseball game and at Walmart. She eventually began skipping class and staying out of the public so as to avoid seeing him.

806.   At some point, JANE DOE 16 and JANE DOE 17 go together to report their sexual assaults to Defendant Martin, EMU's Greek Life Coordinator.

807.   The two women provide details to their respective rapes in an effort to obtain protection and assistance from EMU's Title IX department.

## JANE DOE 17

808.   JANE DOE 17 enrolled at EMU in the Fall of 2016.

809.   On or about September 23, 2018, JANE DOE 16 was attending a registered fraternity party at TC – Chapter's fraternity house ("Theta Chi party") located at 510 West Cross Street, City of Ypsilanti, State of Michigan. Prior to the Theta Chi party, JANE DOE 17 had never before met Sigmann.

810.   During the Theta Chi party, JANE DOE 17 consumed large amounts of alcohol with partygoers and her fellow sorority sisters, including JANE DOE 16, and became extremely intoxicated. At the time, JANE DOE 17 was under the age of twenty-one (21).

811.   At or around 1:00 a.m., as JANE DOE 17 was in the common room of the fraternity house where the Theta Chi party was taking place, she was abruptly and forcibly grabbed by an unknown male, who later turned out to be Sigmann.

812.   JANE DOE 17 had never previously met Sigmann and did not know why he was forcibly dragging her through the crowd of partygoers and towards the

front of the house. As Sigmann continued aggressively escorting JANE DOE 17 to the front exit, a fearful JANE DOE 17 grabbed the wrist of JANE DOE 16.

813.   Sigmann continued to drag both women beyond the sight of the "sober monitors," to the rear of the house and down a staircase leading into the fraternity's basement cellar.

814.   Sigmann unlocked the cellar door, brought both women down into the cellar, and immediately locked the door behind them.

815.   JANE DOE 17, was very intoxicated and looked at JANE DOE 16 in bewilderment as she heard Sigmann tell the two women, "don't start without me."

816.   JANE DOE 17 then observed Sigmann sitting naked on the couch with an erection as he asked the women, "who's first?"

817.   JANE DOE 17 then lost consciousness. Moments later, when JANE DOE 17 came to, she observed that JANE DOE 16 was naked.

818.   Sigmann then turned to JANE DOE 17 and announced, "it's her turn." The next thing JANE DOE 17 remembered was being naked and looking down at Sigmann with his erect penis inside her.

819.   JANE DOE 17 forced herself off of Sigmann, but he continued to assault her, masturbating to the point of ejaculation onto JANE DOE 17's hand and face.

820.   In shock, JANE DOE 17 began to wipe off the seminal fluid on her face using her hands and clothes.

821.   As JANE DOE 17 was getting dressed, Guillaume kicked in the cellar door and escorted both her and JANE DOE 16 out of the cellar and upstairs where they were met by several partygoers.

822.   JANE DOE 17 and JANE DOE 16 were then escorted to the Alpha Sigma Phi – Chapter's fraternity house. A member of the fraternity eventually took both women back to JANE DOE 17's home.

823.   The following morning, JANE DOE 17 noticed bruising on her inner thigh, bruising on her arm where Sigmann had grabbed her, and bleeding in her anus.

### *Jane Doe 17 Reports Her Rape to Title IX and YPD*

824.   JANE DOE 17 and JANE DOE 16 initially avoided talking about the assault until JANE DOE 16, just two days later, broke down and became unable to control the flashbacks, depression, and crying fits she was experiencing post-assault. Both women then agreed to go to the Ypsilanti Police Department ("YPD") to report their assaults.

825.   During the investigation, YPD advised JANE DOE 17 to have a Sexual Assault Nurse Examination ("SANE") performed after the interview.

826.   At some point, JANE DOE 16 and JANE DOE 17 go together to report their sexual assaults to Defendant Martin, EMU's Greek Life Coordinator.

827. The two women provide details to their respective rapes in an effort to obtain protection and assistance from EMU's Title IX department.

## JANE DOE 18

828. JANE DOE 18 enrolled at EMU in the Fall of 2014.

829. JANE DOE 18 pledged at the Alpha Xi Delta sorority in the Fall of 2014 during her first semester at EMU. As a result, JANE DOE 18 became friends with members of local fraternities, including Thomas Hernandez ("Hernandez") and D'Angelo McWilliams ("McWilliams").

830. Prior to her first sexual assault at DTD – Chapter's fraternity house, JANE DOE 18 had been romantically involved with Hernandez. As such, JANE DOE 18 had visited Hernandez at his residence on various occasions and knew that Hernandez and McWilliams shared a room at DTD – Chapter's fraternity house.

831. Prior to her first assault at DTD – Chapter's fraternity house, JANE DOE 18 and McWilliams had developed a friendly but platonic relationship. The two shared many classes together at EMU as both were criminal justice majors.

### *First Rape*

832. On or about the end of September 2016 or the beginning of October 2016, JANE DOE 18 attended a party at DTD – Chapter's fraternity house.

833. During the party, members of DTD – Chapter served alcohol to JANE DOE 18 and others. At the time, JANE DOE 18 was under the age of twenty-one

(21). Throughout the night, JANE DOE 18 consumed a large amount of said alcohol and became extremely intoxicated.

834.   As the party was winding down, JANE DOE 18 began feeling sick and went to lay down in Hernandez's bed, who also shared a room with McWilliams. When she arrived, she noticed that McWilliams was asleep in his own bed. JANE DOE 18 then joined Hernandez in his bed, and the two started to engage in sex.

835.   At this point, JANE DOE 18 "blacked out" from the effects of the alcohol she consumed. When she briefly came to, JANE DOE 18 became horrified as she realized that McWilliams was sexually penetrating her from behind and Hernandez was sexually penetrating her from the front. Moments later, JANE DOE 18 "blacked out" again.

836.   Despite her prior relations with Hernandez, JANE DOE 18 had neither consented to engage in group sex with Hernandez and McWilliams nor to engage in sexual relations in any capacity with McWilliams.

837.   The next day, JANE DOE 18 asked Hernandez to explain his account of what occurred the previous night with her, Hernandez, and McWilliams. Hernandez replied, "nothing happened."

838.   Within days of JANE DOE 18's first sexual assault by Hernandez and McWilliams, JANE DOE 18 was approached by various members of DTD - Chapter saying that they did not realize JANE DOE 18 was the "type of girl" to engage in

group sex with Hernandez and McWilliams. The "type of girl" references meant to imply that JANE DOE 18 was sexually promiscuous.

839.   On or around Homecoming 2016 at EMU, JANE DOE 18 approached Hernandez at a tailgate to ask why members of his fraternity were suggesting that she had engaged in consensual group sex with Hernandez and McWilliams when Hernandez had told JANE DOE 18 that "nothing happened." In response, Hernandez maintained that nothing happened that evening.

### *Second Rape*

840.   A few weeks later, on or around the end of October 2016, JANE DOE 18 and her roommate went to DTD – Chapter's fraternity house for a social gathering.

841.   JANE DOE 18 and her roommate consumed alcohol prior to arriving at DTD – Chapter's fraternity house but were nonetheless served alcohol by members of the DTD - Chapter upon arrival.

842.   Shortly after arriving, the roommate and her boyfriend left JANE DOE 18 inside of a random bedroom, alone. JANE DOE 18, although mildly intoxicated, realized she was lost inside DTD – Chapter's fraternity house, so she sent a message to McWilliams saying she was drunk and asking him to come to find her.

843.   Minutes later, McWilliams arrived at the bedroom JANE DOE 18 was in and told her to come with him. At this point, JANE DOE 18 believed McWilliams

to be a friend and assumed he wished to take her back to where her friends were inside the house.

844.   McWilliams then took JANE DOE 18 by the arm and forcefully pulled her out of the room and up multiple flights of stairs until they reached the upper level of the fraternity house. McWilliams then brought JANE DOE 18 into the attic of DTD – Chapter's fraternity house which contained a single mattress on the floor. McWilliams then demanded that JANE DOE 18 perform oral sex on him.

845.   JANE DOE 18 cried and told McWilliams "no."

846.   McWilliams ignored JANE DOE 18's pleas and instead pulled down his pants and exposed his penis to JANE DOE 18.

847.   McWilliams then forced JANE DOE 18's head down onto his penis so hard that she vomited.

848.   JANE DOE 18 continued sobbing as she told McWilliams that she did not want to do anything.

849.   McWilliams only stopped his sexual assault of JANE DOE 18 upon receiving a text message from his girlfriend.  McWilliams pulled up his pants and told JANE DOE 18 that his girlfriend messaged him saying that she was downstairs in his room. McWilliams then left.

850.   JANE DOE 18, distraught from being raped for a second time by McWilliams at DTD – Chapter's fraternity house, sat alone in the attic and cried until she was able to gather herself to leave.

851.   JANE DOE 18 was 'blacklisted' from Delta Tau Delta parties following the assault.

## JANE DOE 19

852.   JANE DOE 19 entered her freshman year at EMU in the fall of 2015 with the dream of entering the medical field.

853.   JANE DOE 19 met one of her assailants, Hernandez, as they were in the same orientation group and they both resided in the same dorm at EMU as Freshman.

854.   The following year, in the Fall of 2016, Hernandez was a Greek Life Member at DTD – Chapter. JANE DOE 19 was in the process of going through sorority recruitment.

855.   JANE DOE 19 built a friendship with Hernandez as they shared the Greek Life orientation at EMU during the Fall of 2016.

856.   JANE DOE 19 was trusting of Hernandez as they became friends throughout their freshman year, along with the shared experiences of Greek Life at the beginning of the 2016 school year.

### *Within 30 Days of Each Other, Jane Doe 19 and 19 are Viciously Raped by Thomas Hernandez and D'Angelo McWilliams*

857.   On the night of September 25, 2016, Hernandez invited JANE DOE 19 over to DTD – Chapter's fraternity house to "hang out." This was not unusual as JANE DOE 19 had hung out at the DTD – Chapter's fraternity house before.

858.   JANE DOE 19 knew that Hernandez, although a minor, had been drinking that evening. Further, she knew that it was common for DTD - Chapter to allow minors to drink.

859.   JANE DOE 19 and Hernandez agreed to watch a movie in Hernandez's room. When JANE DOE 19 got to the room, she met Hernandez's roommate McWilliams.

860.   When JANE DOE 19 introduced herself to McWilliams she stated, "I never met you before." McWilliams then introduced himself to JANE DOE 19 and he oddly displayed his police badge.

861.   Hernandez turned on a movie and then turned the lights off in the room. JANE DOE 19 felt something was off and stated that she was going to leave because she had to get up early for a recruitment function.

862.   Hernandez told JANE DOE 19 that she did not have to go because they were doing a joint function the next morning with DTD - Chapter.

863.   Hernandez then grabbed JANE DOE 19's arms pulling her down onto his bed.

864.   Thereafter, Hernandez quickly moved his hand sliding down her inner thigh on the outside of her clothing, rubbing her vaginal area with his hand. JANE DOE 19 immediately told Hernandez "NO! This is not ok! I have a boyfriend!"

865.   JANE DOE 19 sat up from the bed and stated: "I am going home." Hernandez ordered, "No you're not!" and grabbed her arm pulling her back down to the bed. Hernandez then grabbed her leggings, forcefully stripping her of her clothes as JANE DOE 19 yelled, "No, don't do this!"

866.   JANE DOE 19 could not believe this was happening while McWilliams stood idly. JANE DOE 19 was struggling to stop Hernandez, but she was no match for his strength as Hernandez got on top of her. At this point, JANE DOE 19 noticed that Hernandez had no pants on. JANE DOE 19 was pleading with Hernandez to stop, telling him multiple times: "No, No, Stop, No!" Hernandez would not stop as he inserted his erect penis inside her.

867.   While Hernandez was raping JANE DOE 19, McWilliams was shouting encouragement to Hernandez by yelling: "Yeah bro yeah! Way to go bro!"

868.   As in earlier accounts, Hernandez and McWilliams began howling like dogs as JANE DOE 19 was enduring the assault.

869.   Once Hernandez ejaculated, he rolled off JANE DOE 19 and said, "Hey, how about giving some to my boy [McWilliams]?" JANE DOE 19, screamed NO and got up immediately to leave the room. At this time, McWilliams exclaimed,

"Yeah, hey I didn't get anything!" McWilliams then grabbed and forced JANE DOE 19's head in his groin area by placing both hands on her head, shoving his penis in her mouth.

870.   While McWilliams was forcing JANE DOE 19 to perform oral sex, Hernandez came up from the rear and raped JANE DOE 19 again by inserted his penis inside of her.

871.   As JANE DOE 19 was enduring this unimaginable assault, both Hernandez and McWilliams started to howl like dogs and encourage each other with statements like: "way to go bro!"

872.   Following the assault, McWilliams posted a photo of himself to DTD – Chapter's social media page with the caption: "Literally fucked a girl and kicked her to my roommates bed 5 minutes later and he fucked her."

873.   The howling from McWilliams and Hernandez could be heard throughout DTD – Chapter's fraternity house. However, none of the members of DTD – Chapter attempted to stop Hernandez and McWilliams' rape of JANE DOE 19. Under information and belief, they called that room "The Dog Pound."

874.   Vivid in JANE DOE 19's mind is how both McWilliams and Hernandez were laughing when they finished.

875.   JANE DOE 19, being part of Greek Life, was intimidated by both Hernandez and McWilliams and their status. Further, JANE DOE 19 was led to

believe that nothing would happen to them because of past claims made by other victims.

876.   Defendant Martin had direct knowledge about the sexual assault of JANE DOE 19 and gave the information to Werner.

877.   Even though Defendant Martin and Defendant Werner had actual knowledge of this sexual assault, they made no contact with law enforcement, failed to reach out to JANE DOE 19, and did not follow protocol regarding sexual assaults.

878.   Following the rape, Hernandez would walk in the direction of JANE DOE 19 every time he saw her on EMU's campus. In turn, JANE DOE 19 would continuously have to walk in different directions from Hernandez; this caused her daily distress and fear.

879.   Subsequent to the Rape, McWilliams came into contact with JANE DOE 19 while wearing a law enforcement uniform. JANE DOE 19 working in a position at the hospital was required to escort McWilliams to a separate room with a prisoner. JANE DOE 19 immediately went into a major panic attack and cried huddling by herself over the next hour.

880.   A few close friends noticed severe changes in JANE DOE 19 and made a CARES report through EMU.

## COUNT I
## SEXUAL HARASSMENT/ASSAULT IN VIOLATION OF 20 U.S.C. §1681
## (TITLE IX)

### *As to all EMU Defendants[12]*

881.   Plaintiffs hereby incorporate by reference the paragraphs above and below as though fully stated herein.

882.   Title IX states, in relevant part:

> "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 USC §1681

883.   Plaintiffs are "persons" as defined in Title IX.

884.   The U.S. Department of Education's Office of Civil Rights has explained that Title IX covers all programs of a school, including fraternities and sororities, and extends to sexual harassment and assault by employees, students and third parties.

885.   EMU is a recipient of federal funds and, as such, is subject to Title IX of the Education Amendments of 1972, as amended, 20 USC §1681, et seq., 34 CFR §106.31.

886.   Pursuant to Title IX, EMU is prohibited from discriminating on the basis of sex.

887.   EMU Defendants are required to investigate allegations of sexual assault, sexual abuse, and sexual harassment pursuant to Title IX.

---

[12] "EMU Defendants" include EMU Regents, Werner, Martin, EMUPD, Heighes, and Karrick.

888.   EMU Defendants are considered appropriate persons and/or mandated reporters for Title IX purposes, and based on EMU's definition of a "Responsible Employee" under its own Sexual Misconduct and Interpersonal Violence Policy (effective July 1, 2016), because they had/have the authority to:

    a.    Address and/or report sex discrimination;

    b.    Address and/or report sexual misconduct and/or sexual abuse;

    c.    Request investigations; and/or

    d.    Institute corrective measures.

889.   Plaintiffs were students and/or guests at EMU when they were subjected to, based upon their sex, known sexually hostile environments, systemic sexual harassment, sexual assaults, abuse, and/or otherwise prohibited conduct by members of EMU's fraternities and sororities, constituting Title IX violations.

890.   Plaintiffs were participants in activities and programs of EMU at the time they were subjected to, based upon their sex, known sexually hostile environments, systemic sexual harassment, sexual assaults, abuse, and/or otherwise prohibited conduct by members of EMU's fraternities and sororities, constituting Title IX violations. These "activities" and/or "programs" were part of the operations of and sanctioned by EMU.

891.   EMU Defendants had actual knowledge of the pervasive culture of sexual assaults being treated as acceptable that had been created and cultivated by EMU for many years.

892.   EMU Defendants had actual knowledge that this pervasive culture of sexual assaults at EMU would lead to more sexual assaults, such as those suffered by Plaintiffs.

893.   EMU Defendants had actual knowledge of Defendant Fraternities' sex discrimination, sexual harassment, sexual assaults, and other misconduct against Plaintiffs.

894.   The sex discrimination, sexual harassment, sexual assaults, and other misconduct suffered by Plaintiffs was severe, pervasive, and objectively offensive.

895.   One or more administrators or officials of Defendants EMU Regents, and/or EMUPD, including but not limited to Defendants Werner, Martin, Heighes, and Karrick, (a) possessed authority to take corrective and preventative action on Plaintiffs' behalf, (b) had substantial control over the assailants, campus locations where the assaults occurred, and the  context in which the sex discrimination, sexual harassment, sexual assaults, rapes and other prohibited conduct occurred,  (c) were capable of determining a resolution for preventing the prohibited conduct committed by third-parties on EMU's campus and/or at EMU-sanctioned events, (d) had actual notice of said discrimination and failed to adequately respond, and (e) failed to

provide security in violation of Title IX and EMU's own policies designed, drafted, and enacted by EMU Defendants. EMU Defendants' failures were clearly unreasonable in light of surrounding circumstances and amounted to deliberate indifference toward the repeated sex discrimination, sexual harassment, sexual assaults, rapes and other prohibited conduct suffered by Plaintiffs.

896. Pursuant to Title IX, EMU Defendants were required to investigate reported, known, and/or repeated sex discrimination, sexual harassment, sexual assaults, and/or other prohibited conduct, including but not limited to prohibited conduct by members and representatives of Defendants ASP – Chapter, DTD – Chapter, TC – Chapter and SK – Chapter.

897. EMU Defendants had the proper Title IX policies to investigate known repeated sex discrimination, sexual harassment, sexual assaults and other misconduct committed within EMU's Greek Life.

898. Defendant Werner gave a PowerPoint presentation to incoming students during orientation explaining EMU's Title IX policies and procedures. By Defendant Werner's own admissions via her presentation:

  a.  "[Title IX] requires schools to have a Title IX coordinator (Defendant Werner) **whose job is to respond effectively to *any* complaints of sexual discrimination**." (Emphasis added.)

  b.  "If something were to happen to you, **or if you hear about something happening to one of your friends,** simply contact [Defendant Werner]." (Emphasis added.)

c. "When should you talk to [Defendant Werner]?  If something has happened to you, **if something has happened to a friend**, or if you have a concern or a question." (Emphasis added.)

d. "Also please be aware there is **no time limit**." (Emphasis added.)

e. "It is **very common** for individuals who have experienced some type of sexual violence **to hold it in and not tell anybody for quite a while**.  It could be a week, it could be a month, **it might be three years later** before they're ready to come and talk and get the help that they might need. And **that is OK**.  **There is no time limit**." (Emphasis added.)

899.   EMU Defendants failed to adhere to said policies. This failure included, but was not limited to, improper customs, policies and/or procedures for the identification, reporting, investigation and prevention of unlawful discrimination, turning away victims of sexual assault, turning away advocates reporting on behalf of victims of sexual assault, and failing to properly investigate any and all claims of sexual assault.  Said failures were clearly unreasonable in light of surrounding circumstances amounted to deliberate indifference toward repeated sex discrimination, sexual harassment, and other misconduct.

900.   When presented with a complaint of sexual assault, Defendant Werner would act as the final decision-maker as to which complaints were worthy of a Title IX investigation.

901.   Defendant Werner has stated the following to one or more Plaintiffs:

a. Only the victim can report the assault;

b. There is no point in reporting it;

    c.     That based on Plaintiffs' appearance and/or clothing, they were promiscuous;

    d.     The process of reporting is arduous;

    e.     Their claims lacked merit;

    f.     Members of Greek Life would be believed over Plaintiffs; and,

    g.     YPD will not believe Plaintiffs and will not want to investigate their claims.

902.  EMU Defendants possessed actual knowledge of sex discrimination, sexual harassment, sexual assaults and other prohibited misconduct occurring on campus via reports submitted by victims, reports anonymously submitted on behalf of victims, and their knowledge of general Greek Life culture at EMU which is known to include alcohol, minors consuming alcohol, illicit drugs, parties, and sex.

903.  A glimpse into the Greek Life culture at EMU is captured by Deputy Chief of Police Karrick's attempt to explain Title IX to Detective Coppock with the Ypsilanti PD, further establishing EMU Defendants actual knowledge. (Detective Coppock is the Officer in Charge of the criminal investigation against the defendants). "…If you have a campus that has a lot of rapes or guys that are catcalling girls or that type of culture, 'No' means 'yes' and 'yes' means 'anal,' then Title IX comes into play to say this is not a safe school for girls to be attending

because they cannot get an equal opportunity to get an education with this type of stuff going on." (Hereinafter "Karrick's Title IX Description")

904.   When attempting to report, Plaintiffs, young and impressionable, were often dissuaded by Defendants to report because of the aforementioned representations.

905.   In some instances, Plaintiffs, and those seeking assistance on behalf of Plaintiffs anonymously, report the sexual assaults to EMU's Greek system and local chapters, trusting that members of the same would follow their own bylaws and regulations.  In response, Plaintiffs were ostracized by certain Defendants, as well as the entire Greek community, believing they had lied.

906.   EMU Defendants' conduct, coupled with their failures to investigate, prevent, and protect from known and repeated systemic sex discrimination, sexual harassment, sexual assaults, and other misconduct to countless female students, including Plaintiffs, were clearly unreasonable in light of surrounding circumstances and demonstrated deliberate indifference.  Moreover, Defendants' conduct deviated significantly from the requirements and obligations contained in both federal laws, as well as EMU's policies and procedures.

907.   EMU Defendants, with actual knowledge of repeated Title IX complaints stemming from prohibited and pervasive conduct, acted clearly unreasonably in light of surrounding circumstances and with deliberate indifference

resulting in Plaintiffs being "excluded from participation in" and/or "denied the benefits of" Defendant EMU, and its Title IX protections.

908. Defendants ASP – Chapter, DTD – Chapter, TC – Chapter and SK – Chapter demonstrated policies and practices of covering up sexual misconduct by its members: (a) failing to report sexual misconduct committed by its members to law enforcement or relevant EMU administrators, including but not limited to EMU Defendants (in violation of pertinent EMU Greek Life bylaws); (b) engaging in ad-hoc, internal disciplinary procedures that failed to properly discipline members that engaged in sexual misconduct; (c) engaging in unequal investigatory procedures that improperly favored male Greek community members accused of engaging in sexual misconduct over their female student victims; (d) discrediting student victims of sexual misconduct committed by its members; (e) tolerating and tacitly approving systemic sexual violence committed by fraternity members; and (f) creating an atmosphere whereby the rules applicable to all students did not apply to fraternity members, especially those members of Defendants ASP – Chapter, DTD – Chapter, TC – Chapter and SK – Chapter.

909. EMU Defendants further acted clearly unreasonable in light of surrounding circumstances and with deliberate indifference to known acts of sexual assault, abuse, and molestation on its premises by:

      a.    Failing to investigate and address other victim's allegations as required by Title IX;

   b. Failing to adequately investigate and address the complaints regarding EMU's Greek Life members' conduct; and

   c. Failing to institute corrective measures to prevent EMU's Greek Life members from violating and sexually abusing other students and individuals, including Plaintiffs.

910. Defendants' responses were clearly unreasonable in light of the known circumstances, as members of EMU's Greek system and others continued to sexually assault EMU students until 2020 when YPD began its investigation.

911. EMU Defendants' failure to promptly and appropriately investigate, respond to, and remedy the sexual assaults after receiving notice, subjected Plaintiffs to further harassment and a sexually hostile environment, effectively denying their access to educational benefits and opportunities at EMU, including but not limited to, Title IX protections.

**COUNT II**
**SEX DISCRIMINATION/SEXUALLY HOSTILE EDUCATIONAL ENVIRONMENT IN VIOLATION OF 20 U.S.C. §1681 (TITLE IX)**
**As to All EMU Defendants**

912. Plaintiffs hereby incorporate by reference the paragraphs above and below as though fully stated herein.

913. Title IX states, in relevant part:

  "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education

program or activity receiving Federal financial assistance." 20 USC §1681.

914.   Plaintiffs are "persons" as defined in Title IX.

915.   The U.S. Department of Education's Office of Civil Rights has explained that Title IX covers all programs of a school, including fraternities and sororities, and extends to sexual harassment and assault by employees, students and third parties.

916.   EMU is a recipient of federal funds and, as such, is subject to Title IX of the Education Amendments of 1972, as amended, 20 USC §1681, et seq., 34 CFR §106.31.

917.   Pursuant to Title IX, EMU is prohibited from creating and/or maintaining a sexually hostile educational environment.

918.   EMU Defendants, through their actions and inactions, fostered and condoned a sexually hostile educational environment that victimized and damaged Plaintiffs.

919.   EMU officials at the highest levels, including EMU Defendants, knew or should have known of the sexually hostile environment within EMU and its Greek system and did nothing when action was required by law.

920.   Defendant EMU Regents, individually and collectively, are responsible for setting and approving public policy at EMU, while the President of EMU is responsible for administering those policies. At all relevant times, EMU's policies,

including complaint procedures, training and reporting, and response procedures were in violation of Title IX.

921. EMU's failure to act and failure to provide federally mandated procedures and protections created a sexually hostile educational environment for Plaintiffs.

922. The harassment and hostile environment which EMU Defendants fostered and condoned operated to deny and/or limit Plaintiffs' abilities to participate in or benefit from EMU's educational programs.

923. Plaintiffs were students and/or guests at EMU when they were subjected to, based upon their sex, known sexually hostile environments, systemic sexual harassment, sexual assaults, abuse, and/or otherwise prohibited conduct by members of EMU's fraternities and sororities, constituting Title IX violations.

924. EMU Defendants had actual knowledge of sex discrimination, sexual harassment, sexual assaults and other prohibited misconduct occurring on campus via reports submitted by victims, reports anonymously submitted on behalf of victims, and general knowledge of Greek Life culture at EMU which is known to include alcohol, minors consuming alcohol, illicit drugs, parties, and sex.

925. Defendant Karrick's Title IX Description to Det. Coppock not only provides actual knowledge of the repeated sexual assaults, discrimination and other

misconduct, but depicts EMU's dangerous Greek Life culture, acquiesced to by EMU Defendants.

926.   At the very most, EMU's officials, including but not limited to, EMU Defendants responded to reports of sexual harassment with referrals to inadequate resolution procedures and suggestions that Plaintiffs were powerless against their assailants.

927.   EMU Defendants left Plaintiffs to their own skills to avoid further victimization, often at the expense of giving up educational classes, programs and experiences.

928.   Despite these increased burdens on Plaintiffs, EMU Defendants held Plaintiffs to a higher standard than their male peers. Students, including Plaintiffs, were treated different than their male peers with respect to protection from reported assailants further increasing the hostile environment.

## COUNT III
## RETALIATION IN VIOLATION 20 U.S.C. §1681 (TITLE IX)
### As to all EMU Defendants

929.   Plaintiffs hereby incorporate by reference the paragraphs above and below as though fully stated herein.

930.   Title IX states, in relevant part:

> "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education

program or activity receiving Federal financial assistance." 20 U.S.C. § 1681.

931. Plaintiffs are "persons" under the Title IX statutory language.

932. Defendant Regents is a recipient of federal funds and, as such, is subject to Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681, et seq., 34 CFR § 106.31.

933. EMU Defendants are required under Title IX to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

934. EMU Defendants, together with Defendants ASP – Chapter and DTD – Chapter are 'appropriate persons' as it pertains to reporting Title IX complaints.

935. Plaintiffs engaged and/or attempted to engage in protected activity under Title IX by reporting Title IX discrimination to "Responsible Employees" and/or mandated reporters at EMU.

936. Plaintiffs' protected activity was actually known to Defendants, which failed to respond and/or concealed Plaintiffs' repeated Title IX complaints.

937. EMU Defendants took adverse action against Plaintiffs by denying them proper avenues to report their assaults; failing to provide safety from known assailants; ignoring reports of sexual assault by advocates of victims; and failing to properly investigate any and all sexual assault claims, whether reported to "Responsible Employees" through Title IX, EMU fraternities, EMU sororities, or on social media accounts of EMU students.

938.   EMU Defendants took further retaliatory action by withholding certain Plaintiffs' educational transcripts, directly impeding Plaintiffs' ability to pursue higher education as Plaintiffs required their transcripts for this.

939.   As set forth above, there is a direct causal connection between Plaintiffs' protected activity and Defendants' adverse actions against them.

940.   These adverse actions against Plaintiffs were calculated to and did cause irreparable harm, injury, and damages, including but not limited to physical and severe emotional injuries, all past, present, and future, as well as loss of freedom, loss of enjoyment of life, humiliation, degradation, loss of reputation, and economic damages.

## COUNT IV
## Violation of Civil Rights Under 42 U.S.C. § 1983 – State Created Danger
### *As to Defendants Werner, Martin, Heighes and Karrick*

941.   Plaintiffs hereby incorporate by reference the paragraphs above and below as though fully stated herein.

942.   Plaintiffs enjoyed a substantive due process right guaranteed by the Fourteenth Amendment to avoid the risk of harm or danger created or increased by an affirmative act of the State.

943.   This right is violated when the State:

    a.    Engages in an affirmative act which either created or increased the risk that a plaintiff would be exposed to an act of violence by a third party;

b.     Created or enhanced a special danger to the plaintiff wherein the State's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and

c.     The State knew or should have known that its actions specifically endangered the plaintiff.

944.   The Defendants Werner, Martin, Heighes and Karrick's (hereinafter "EMU Individual Defendants") acts consisted of, but were not limited to, 1) permitting and condoning out of control fraternity parties where under-aged individuals were encouraged to consume alcohol such that they could not consent to sexual activity or advances allowing fraternity members to have sexual access to EMU students and guests and 2) lying about or concealing their knowledge that fraternities and their members were permitted to carry out their unlawful and abhorrent behavior.

945.   EMU Individual Defendants' affirmative acts created or increased the risk that Plaintiffs would be exposed to an act of sexual violence which imposes a duty to protect from the same.

946.   EMU Individual Defendants' conduct created a special danger to Plaintiffs with whom Defendants had a special relationship as described above. The actions of Defendants specifically put this discrete group at increased risk in that the individual EMU Defendants knew that fraternity members were causing students,

many under the legal drinking age, to become intoxicated and then sexually assaulting them.

947. EMU Individual Defendants knew or should have known that their affirmative acts specifically endangered Plaintiffs.

948. EMU Individual Defendants acted in ways that permitted, condoned, and promoted sexually hostile behavior.

949. EMU Individual Defendants' actions included:

    a.    Failing to supervise, train and educate fraternities and their members about alcohol, service of alcohol to minors, sexually assaulting intoxicated females so that, in the absence of this supervision, training, and education the unlawful activities of the Defendant fraternities and their members could be carried out;

    b.    Actively concealing the fraternity members' abhorrent behavior;

    c.    Outright lying to students, parents, investigators, and law enforcement when confronted with the allegations against various fraternity members prevented the detection of the repeated and subsequent sexual misconduct and served to cover up Defendants' liability for the damage they caused; and

    d.    Promoting EMU as a safe campus for females, and by doing so, enabled fraternity members to gain unfettered sexual access to more females.

950. Often times, after Plaintiffs would report their sexual assaults, Defendants would terminate any investigation before it could even begin, blaming a lack of response from Plaintiffs, even though Defendants had actual knowledge of

both the sexual assaults and the fact that they did not need the victim to investigate the claims.

951.   EMU Individual Defendants' acts of permitting, condoning, and promoting Greek life as a safe enhancement of the EMU educational experience, granted fraternity members unfettered sexual access to female students and placing Plaintiffs specifically at risk to unspeakable invasions of their bodily integrity which were so egregious and outrageous that it shocks the conscience.

## COUNT V
## VIOLATION OF CIVIL RIGHTS – EQUAL PROTECTION PURSUANT TO 42 U.S.C. § 1983
### *As to Defendants Werner, Martin, Heighes and Karrick*

952.   Plaintiffs hereby incorporate by reference the paragraphs above and below as though fully stated herein.

953.   Plaintiffs have a right to fair and equal treatment as females, a member of a protected class, under the laws as guaranteed by the Equal Protection Clause of the Fourteenth Amendment.

954.   Plaintiffs further have a clearly established right to be free from sexual assault and/or sexual misconduct, as a student at EMU, a member of a protected class, under the laws as guaranteed by the Equal Protection Clause of the Fourteenth Amendment.

955.   The Sixth Circuit has held that sexual assault qualifies as being severe, pervasive, and objectively offensive sexual harassment.

956.   EMU Individual Defendants violated this right when they intentionally treated Plaintiffs and other female students less favorably than other similarly situated persons regarding reports of sexual harassment, sexual assaults and other prohibited conduct occurring within EMU's Greek system, without a rational basis for such treatment.

957.   At all relevant times to the instant action, Defendants Regents and EMUPD were responsible for training, screening, and supervising EMU Individual Defendants in response to Title IX complaints.

958.   EMU Individual Defendants were supervisory personnel engaged within the scope and course of their supervisory duties.

959.   When presented with a complaint of sexual assault, Defendant Werner would act as the final decision-maker as to which complaints were worthy of a Title IX investigation.

960.   Defendant Werner has stated the following to one or more Plaintiffs:

    a.   Only the victim can report the assault;

    b.   There is no point in reporting it;

    c.   That based on Plaintiffs' appearance and/or clothing, they were promiscuous;

    d.   The process of reporting is arduous;

    e.   Their claims lacked merit;

    f.   Greek Life would be believed over Plaintiffs; and,

g.   YPD will not believe Plaintiffs and will not want to investigate their claims.

961.   When attempting to report, Plaintiffs, young and impressionable, were often dissuaded by Defendants to report because of the aforementioned representations.

962.   In some instances, Plaintiffs, and those seeking assistance on behalf of Plaintiffs anonymously, reported the sexual assaults to EMU's Greek system and local chapters, trusting that members of the same would follow their own bylaws and regulations.  In response, Plaintiffs were ostracized by certain Defendants, as well as the entire Greek community, believing they had lied.

963.   Often times, after Plaintiffs would report their sexual assaults, Defendants would terminate any investigation before it could even begin, blaming a lack of response from Plaintiffs, even though Defendants had actual knowledge of both the sexual assaults and the fact that they did not need the victim to investigate the claims.

964.   EMU Individual Defendants intentionally and deliberately promulgated and/or carried out the aforementioned acts, orders, practices, customs, and directives, with wanton and reckless disregard for Plaintiffs' civil and constitutional rights.  Such conduct constitutes deliberate indifference and/or disparate treatment of Plaintiffs.

## COUNT VI
## VIOLATION OF CIVIL RIGHTS PURSUANT TO 42 U.S.C. § 1983 – RIGHT TO BODILY INTEGRITY
### *As to Defendants Werner, Martin, Heighes and Karrick*

965.  Plaintiffs hereby incorporate by reference the paragraphs above and below as though fully stated herein.

966.  Plaintiffs enjoy the constitutionally protected Due Process right guaranteed by the Fourteenth Amendment to be free from the invasion of bodily integrity through sexual assault, abuse, or molestation.

967.  At all times relevant hereto, EMU Individual Defendants were acting under color of law.

968.  The acts as alleged above amount to a violation of these clearly established constitutionally protected rights, of which reasonable persons in the EMU Individual Defendants' positions should have known.

969.  At all times relevant hereto, EMU Individual Defendants had the ultimate responsibility and authority to train and supervise their employees, subordinates, agents, and/or representatives in the appropriate manner of detecting, reporting, and preventing sexual abuse, assault, and molestation and as a matter of acts, custom, policy, and/or practice, failed to do so with deliberate indifference.

970.  As a matter of custom, policy, and/or practice, EMU Individual Defendants had the ultimate responsibility and authority to investigate complaints against their employees, subordinates, and representatives from all individuals

including, but not limited to students, visitors, faculty, staff, or other employees, agents, and/or representatives, and failed to do so with deliberate indifference.

971.   At all relevant times hereto, EMU Individual Defendants had a duty to report and/or furnish results of their investigation into complaints of sexual harassment, sexual assault and other prohibited conduct.

972.   At all times relevant hereto, EMU Individual Defendants had a duty to prevent sexual assault, abuse, and molestation on their campus and premises, that duty arising under the above-referenced constitutional rights, as well as established rights pursuant to Title IX.

973.   EMU's internal policies provided that all University employees were expected to promptly report sexual misconduct or relationship violence that they observed or learned about and that involved a member of the University community (faculty, staff, or student) or occurred at a university event or on university property.

974.   EMU's above-mentioned internal policies were violated when the EMU Individual Defendants took no actions to address the complaints regarding sexual assaults at the hands of fraternity members.

975.   Often times, after Plaintiffs would report their sexual assaults, Defendants would terminate any investigation before it could even begin, blaming a lack of response from Plaintiffs, even though Defendants had actual knowledge of

both the sexual assaults and the fact that they did not need the victim to investigate the claims.

976. EMU Individual Defendants' failure to address these complaints led to an unknown number of individuals, including Plaintiffs, being victimized, sexually assaulted, abused, and molested by members of multiple fraternities.

977. EMU Individual Defendants' aforementioned failures were repetitious and over time became a deeply embedded acquiesced policy to provide disparate treatment to victims of sexual harassment, sexual assaults and other prohibited conduct.

978. EMU Individual Defendants acted with deliberate indifference and these failures and the harm they caused shock the conscience.

979. The EMU Individual Defendants, who had or should have had knowledge of sexual misconduct, were the moving forces or causes of repeated constitutional injuries to Plaintiffs and others based on their failures to report, train, supervise, investigate, or otherwise act in response to complaints of alcohol-fueled sexual misconduct by fraternities and their members.

980. Ultimately, the EMU Individual Defendants failed to adequately and properly investigate complaints of abuse including, but not limited to, failing to:

   a. Perform a thorough investigation into sexual misconduct by fraternities and their members dating back to at least 2014;

    b.    Thoroughly review and investigate all policies, practices, procedures, and training materials related to the circumstances surrounding the conduct of fraternities and their members;

    c.    Recognize sexual assault when reported as early as 2014 and permitting University officials to deem a sexual assault as "medically appropriate" and "not of a sexual nature";

    d.    Ensure all institutional guidelines issued following the 2014 reported rape, described above, were satisfied; and,

    e.    Properly report results of investigations and take remedial action.

981. By failing to prevent the above-mentioned sexual assaults and abuse, and by failing to appropriately respond to reports of alcohol-fueled sexual assaults and abuse, in a manner that was so clearly unreasonable it amounted to deliberate indifference, the EMU Individual Defendants are liable to Plaintiffs pursuant to 42 U.S.C. §1983.

982. EMU Individual Defendants' conduct and failures to act deprived Plaintiffs of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. §1983.

983. EMU Individual Defendants tolerated, authorized, and/or permitted a custom, policy, practice, or procedure of insufficient supervision and failed to adequately screen, counsel, monitor, or discipline the fraternities and the fraternity members, with the result that the fraternity and its members could violate the rights of persons such as Plaintiffs with impunity.

<u>**COUNT VII**</u>
<u>**SEX DISCRIMINATION –**</u>
<u>**IN VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT**</u>
*As to All Defendants*

984.  Plaintiffs hereby incorporate by reference the paragraphs above and below as though fully stated herein.

985.  EMU is a place of public accommodation, a public service, and an educational institution as defined in Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 et seq. (ELCRA).

986.  All Defendants are "person(s)" as defined in ELCRA, and EMU Individual Defendants were agents of Defendant Regents and EMU.

987.  ELCRA prohibits:

    a.    Discriminating against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of sex;

    b.    Following a policy of denial of educational opportunities because of sex. MCL 37.2402.

988.  Defendants' acts and omissions constitute sex discrimination and violate Plaintiffs' rights under ELCRA by subjecting Plaintiffs to unwelcome sexual advances, assault and other conduct, both verbal and physical, of a sexual nature, all the while having actual knowledge of the same.

989.    Defendants were aware, or should have been aware through reports, discussions, and accepted Greek Life culture that a sexually hostile environment existed on the EMU campus.

990.    When presented with a complaint of sexual assault, Defendant Werner would act as the final decision-maker as to which complaints were worthy of a Title IX investigation.

991.    Defendant Werner has stated the following to one or more Plaintiffs:

a.    Only the victim can report the assault;

b.    There is no point in reporting it;

c.    That based on Plaintiffs' appearance and/or clothing, they were promiscuous;

d.    The process of reporting is arduous;

e.    Their claims lacked merit;

f.    Greek Life would be believed over Plaintiffs; and,

g.    YPD will not believe Plaintiffs and will not want to investigate their claims.

992.    Despite notice of the sexually hostile environment, Defendants failed to take prompt and adequate remedial action to end the ongoing sexual assaults and harassment of the Plaintiffs and other female students.

993.    Often times, after Plaintiffs would report their sexual assaults, Defendants would terminate any investigation before it could even begin, blaming a

lack of response from Plaintiffs, even though Defendants had actual knowledge of both the sexual assaults and the fact that they did not need the victim to investigate the claims.

994.    When attempting to report, Plaintiffs, young and impressionable, were often dissuaded by Defendants to report because of the aforementioned representations.

995.    In some instances, Plaintiffs, and those seeking assistance on behalf of Plaintiffs anonymously, reported the sexual assaults to EMU's Greek system and local chapters, trusting that members of the same would follow their own bylaws and regulations.  In response, Plaintiffs were ostracized by certain Defendants, as well as the entire Greek community, believing they had lied.

996.    Defendants violated ELCRA and deprived Plaintiffs of their civil rights by, among other things, denying adequate protection from sexual assaults, failing to investigate and take remedial action, subjecting Plaintiffs, because of their sex, to conduct of a physical and sexual nature that had the purpose or effect of denying Plaintiffs the full benefit of the educational programs of EMU and full and equal access to the use and privileges of public accommodations, public service, and educational opportunity.

## COUNT VIII
## AIDING AND ABETTING IN VIOLATION OF THE ELCRA
### *As to All Defendants*

997. Plaintiffs hereby incorporate by reference the paragraphs above and below as though fully stated herein.

998. EMU is a place of public accommodation, a public service, and an educational institution as defined in Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 et seq. (ELCRA).

999. All Defendants are "person(s)" as defined in ELCRA, and EMU Individual Defendants were agents of Defendant Regents and EMU.

1000. ELCRA prohibits:

    a.    Discriminating against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of sex;

    b.    Following a policy of denial of educational opportunities because of sex. MCL 37.2402.

1001. Defendants violated ELCRA and deprived Plaintiffs of their civil rights by, among other things, denying adequate protection from sexual assaults, failing to investigate and take remedial action, subjecting Plaintiffs, because of their sex, to conduct of a physical and sexual nature that had the purpose or effect of denying Plaintiffs the full benefit of the educational programs of EMU and full and equal

186

access to the use and privileges of public accommodations, public service, and educational opportunity.

1002. Through the exercise of reasonable care, Defendants could have limited the accessibility of sexual predators to female students.

1003. By creating and condoning an environment in which sexually predatory individuals were allowed access to female students, Defendants aided and abetted the creation of a sexually hostile environment in violation of MCL 37.2701(b).

1004. Defendants' actions have deprived Plaintiffs of the full and equal enjoyment of the educational programs of EMU and full and equal access to the use and privileges of public accommodations, public service, and educational opportunity.

### COUNT IX
### GROSS NEGLIGENCE
*As to Defendants ASP – Chapter/National, DTD – Chapter/National, SK – Chapter/National and TC – Chapter/National*

1005. Plaintiffs hereby incorporate by reference the paragraphs above and below as though fully stated herein.

1006. ASP – Chapter, ASP – National, DTD – Chapter, DTD – National, SK – Chapter, SK – National, TC – Chapter and/or TC – National (the "Fraternity and Sorority Defendants") owed Plaintiffs a duty to use due care to ensure Durbin, McWilliams, Bujaki, Sigmann, Layne, Ascencio and Hernandez and other Fraternity

members abstained from sexual assault, abuse, and molestation students and guests alike when interacting with their members, representatives, and/or agents.

1007. As agents and/or representatives of the Fraternity and Sorority Defendants, Durbin, McWilliams, Bujaki, Sigmann, Layne, Ascencio and Hernandez owed Plaintiffs a duty of due care as guests of ASP – Chapter, DTD – Chapter, SK – Chapter, and TC – Chapter. These duties include but are not limited to:

    a.    Reduce exposure to risk and liability of the Chapter and its members;

    b.    Complete an incident report and submit it to Headquarters for all incidents;

    c.    Educate members on alcohol policies;

    d.    Respect the dignity of all persons, and therefore, not physically, psychologically, or sexually abusing any human being;

    e.    Do not abuse, nor support the abuse of, alcohol or controlled substances;

    f.    Do not tolerate or condone any form of sexist or sexually abusive behavior on the part of its members, whether physical, mental, or emotional.  This includes any actions, activities, or events, whether on chapter premises or an off-site location which are demeaning to women or men, including but not limited to verbal harassment, sexual assault by individuals or members acting together;

g.　　Familiarize and comply with Health and Safety Policies that forbid any form of hazing or assault;

h.　　Prohibit alcohol and/or illegal substances, which is punishable by fine and/or expulsion; and

i.　　Maintain proper decorum at all times with respect to the introduction of guests within the Shelter.

1008. The Fraternity and Sorority Defendants' failure to adequately supervise its members - especially after the Fraternity and Sorority Defendants knew or should have known of complaints regarding Durbin, McWilliams, Bujaki, Sigmann, Layne, Ascencio and Hernandez's nonconsensual sexual assaults occurring on their premises - was so reckless as to demonstrate a substantial lack of concern for whether Plaintiffs would be injured.

1009. The Fraternity and Sorority Defendants' conduct demonstrated a willful disregard for precautions to ensure Plaintiffs' safety and bodily integrity.

1010. The Fraternity and Sorority Defendants' conduct described above demonstrated a willful disregard for the substantial risk of injuries to Plaintiffs.

1011. The Fraternity and Sorority Defendants' breached duties owed to Plaintiffs and were grossly negligent when they conducted themselves by the actions described above, said acts having been committed with reckless disregard for Plaintiffs' health, safety, constitutional and/or statutory rights, and with a substantial lack of concern as to whether Plaintiffs would be injured.

## COUNT X
## NEGLIGENCE
### *As to Fraternity and Sorority Defendants*

1012. Plaintiffs hereby incorporate by reference the paragraphs above and below as though fully stated herein.

1013. The Fraternity and Sorority Defendants owed Plaintiffs a duty of ordinary care to ensure their safety and freedom from sexual assault, abuse, and molestation while students and guests alike interacted with their members, representatives and/or agents.

1014. As agents and/or representatives of the Fraternity and Sorority Defendants, members owed Plaintiffs a duty of due care. These include but are not limited to:

   a.    Reduce exposure to risk and liability of the Chapter and its members;

   b.    Complete an incident report and submit it to Headquarters for all incidents;

   c.    Educate members on alcohol policies;

   d.    Respect the dignity of all persons, and therefore, do not physically, psychologically, or sexually abuse any human being;

   e.    Do not abuse, nor support the abuse of, alcohol or controlled substances;

   f.    Do not tolerate or condone any form of sexist or sexually abusive behavior on the part of its members, whether physical, mental, or emotional.    This includes any actions, activities, or events,

whether on chapter premises or an off-site location which are demeaning to women or men, including but not limited to verbal harassment, sexual assault by individuals or members acting together;

g.    Familiarize and comply with Health and Safety Policies that forbid any form of hazing or assault;

h.    Prohibit alcohol and/or illegal substances, which is punishable by fine and/or expulsion; and,

i.    Maintain proper decorum at all times with respect to the introduction of guests within the Shelter.

1015. The Fraternity and Sorority Defendants' failure to adequately supervise its members, especially after The Fraternity and Sorority Defendants knew or should have known of complaints regarding their nonconsensual sexual assaults and sexual penetrations occurring on their premises was so reckless as to demonstrate a substantial lack of concern for whether Plaintiffs would be injured.

1016. The Fraternity and Sorority Defendants had notice through its own members, agents, and/or representatives as early as 2014, of complaints of a sexual nature related to their members' predatory and criminal sexual misconduct of students and guests.

1017. The Fraternity and Sorority Defendants knew or should have known of the foreseeability of its members' sexual abuse of students and guests.

1018. The Fraternity and Sorority Defendants' failure to properly investigate, address, and/or remedy complaints regarding sexual misconduct was a breach of their duty to use ordinary care.

## COUNT XI
## NEGLIGENT SUPERVISION
### *As to the Fraternity and Sorority Defendants*

1019. Plaintiffs hereby incorporate by reference the paragraphs above and below as though fully stated herein.

1020. The Fraternity and Sorority Defendants had a duty to provide reasonable supervision of their fraternity members, agents and/or representatives, in particular Durbin, McWilliams, Bujaki, Sigmann, Layne Ascencio and Hernandez, during membership, agency or representation with the Fraternity and Sorority Defendants and while they interacted with guests of the Fraternity and Sorority Defendants including Plaintiffs.

1021. The National's maintained control over the local chapters. Indeed, each National maintained rule which were presented to the Local Chapters and the Local Chapters were required to follow those rules that imposed requirements on members and officers about chain of command, a code of conduct, and a process for disciplining members who do not comply with the national rules, among other things. The rules highlight the close relationship and mutually beneficial relationship between the National fraternity and its local chapter and individual members. The

National Attorneys impose a complex hierarchy of rules and regulations on local chapters and individual members along with the fraternities' National Constitution that sets out a clear command structure to which the local chapters must adhere.

1022. It was reasonably foreseeable, given Defendants Regents, EMUPD, and the Fraternity and Sorority Defendant's knowledge, that Durbin, McWilliams, Bujaki, Sigmann, Layne Ascencio and Hernandez were sexual predators of young college female students at the time Defendants received complaints regarding sexual misconduct involving members of the Fraternity and Sorority Defendants in 2014.

1023. The Fraternity and Sorority Defendants by and through their members, agents, managers and/or assigns, knew or reasonably should have known of Durbin, McWilliams, Bujaki, Sigmann, Layne Ascencio and Hernandez's conduct and/or that Durbin, McWilliams, Bujaki, Sigmann, Layne Ascencio and Hernandez were unfit members, agents, and/or representatives of the Fraternity and Sorority Defendants because of their repeated sexual misconduct of female guests, including Plaintiffs.

1024. Per the Fraternity and Sorority Defendants' rules, regulations, and bylaws, its members are to conduct themselves in the following, non-exhaustive ways:

a. Reduce exposure to risk and liability of the fraternity and its members;

b. Aim to reduce risk;

c.     Complete an incident report and submit the same to Headquarters for all incidents;

d.     Educate members on the Fraternity and Sorority Defendants' alcohol policies;

e.     Respect the dignity of all persons, and therefore, avoid physical, psychological, or sexual abuse any human being;

f.     Do not abuse, nor support the abuse of, alcohol or controlled substances;

g.     Do not tolerate or condone any form of sexist or sexually abusive behavior on the part of its members, whether physical, mental, or emotional.  This is to include any actions, activities, or events, whether on chapter premises or an off-site location which are demeaning to women or men, including but not limited to verbal harassment, sexual assault by individuals or members acting together;

h.     Familiarize and comply with the Fraternity and Sorority Defendants' Health and Safety Policies, which explicitly forbid any form of hazing or assault;

i.     Prohibit alcohol and/or illegal substances, which is punishable by fine and/or expulsion; and

j.     Maintain proper decorum at all times with respect to the introduction of guests within the Shelter.

1025. The Fraternity and Sorority Defendants breached their duty to provide reasonable supervision of Durbin, McWilliams, Bujaki, Sigmann, Layne, Ascencio and Hernandez, and permitted these fraternity members to commit the pervasive acts against Plaintiffs.

1026. The sexual abuse occurred while Plaintiffs and Durbin, McWilliams, Bujaki, Sigmann, Layne Ascencio and Hernandez were on the premises of Defendant Regents, specifically the premises on EMU's campus of the Fraternity and Sorority Defendants, and while Durbin, McWilliams, Bujaki, Sigmann, Layne Ascencio and Hernandez were acting in the course of their membership, agency, and/or representation of the Fraternity and Sorority Defendants.

1027. The Fraternity and Sorority Defendants tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline such individuals, with the result that Durbin, McWilliams, and Hernandez were allowed to violate the rights of persons such as Plaintiffs with impunity.

## COUNT XII
## NEGLIGENT FAILURE TO WARN OR PROTECT
### *As to the Fraternity and Sorority Defendants*

1028. Plaintiffs hereby incorporate by reference the paragraphs above and below as though fully stated herein.

1029. The Fraternity and Sorority Defendants knew or should have known that Durbin, McWilliams, and Hernandez posed a risk of harm to Plaintiffs or those in Plaintiffs' situation.

1030. The Fraternity and Sorority Defendants had direct, actual knowledge as to the dangerous conduct of Durbin, McWilliams, Bujaki, Sigmann, Layne Ascencio and Hernandez and failed to act reasonably and responsibly in response.

1031. The Fraternity and Sorority Defendants knew or should have known Durbin, McWilliams, Bujaki, Sigmann, Layne Ascencio and Hernandez committed sexual assaults, abuse, and molestations and/or were continuing to engage in such conduct.

1032. The Fraternity and Sorority Defendants had a duty to warn or protect Plaintiffs and others in Plaintiffs' situation against the risk of injury by Durbin, McWilliams, Bujaki, Sigmann, Layne Ascencio and Hernandez. These include but are not limited to:

   a.   Reduce exposure to risk and liability of the fraternity and its members;

   b.   Complete an incident report and submit the same to Headquarters for all incidents;

   c.   Educate members on the Fraternity and Sorority Defendants' alcohol policies;

   d.   Respect the dignity of all persons, and therefore, avoid physical, psychological, or sexual abuse any human being;

   e.   Do not abuse, nor support the abuse of, alcohol or controlled substances;

   f.   Do not tolerate or condone any form of sexist or sexually abusive behavior on the part of its members, whether physical, mental, or emotional.  This is to include any actions, activities, or events,

whether on chapter premises or an off-site location which are demeaning to women or men, including but not limited to verbal harassment, sexual assault by individuals or members acting together;

g.    Familiarize and comply with the Fraternity and Sorority Defendants' Health and Safety Policies, which explicitly forbid any form of hazing or assault;

h.    Prohibit of alcohol and/or illegal substances, which is punishable by fine and/or expulsion; and,

i.    Maintain proper decorum at all times with respect to the introduction of guests within the Shelter.

1033. The duty to disclose this information arose by the relationship between Durbin, McWilliams, and Hernandez as members, agents, and or representatives of the Fraternity and Sorority Defendants and Plaintiffs.

1034. The Fraternity and Sorority Defendants breached said duties by failing to warn Plaintiffs and/or by failing to take reasonable steps to protect Plaintiffs from Durbin, McWilliams, and Hernandez.

1035. The Fraternity and Sorority Defendants breached their duties to protect Plaintiffs by failing to:

a.    Respond to allegations of sexual assault, abuse, and molestation;

b.    Act on evidence of sexual assault, abuse, and molestation; and,

c.    Investigate, adjudicate, and terminate Durbin, McWilliams and Hernandez's membership with Defendants ASP – Chapter and/or ASP – National and DTD – Chapter and/or DTD – National.

1036. The Fraternity and Sorority Defendants willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect Plaintiffs from sexually violent and perverse conduct by its members.

## COUNT XIII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### *As to Defendants EMU Regents, EMUPD, Werner, Martin, Heighes, Karrick ASP – Chapter, DTD – Chapter, SK – Chapter and TC – Chapter*

1037. Plaintiffs hereby incorporate by reference the paragraphs above and below as though fully stated herein.

1038. Defendants ASP – Chapter, DTD – Chapter, SK – Chapter and/or TC – Chapter were aware that their members committed and/or were committing sexual assaults of students and guests of EMU.

1039. Defendants ASP – Chapter, DTD – Chapter, SK – Chapter and/or TC – Chapter tolerated and/or permitted their members to sexually, abuse, and rape students and guests of EMU after they knew or should have known of complaints and claims of sexual assaults occurring since 2014.

1040. Defendants ASP – Chapter, DTD – Chapter, SK – Chapter and/or TC – Chapter tolerated and/or permitted its members to engage in hazing of its pledges after they knew or should have known of complaints and claims of hazing.

1041. Defendants ASP – Chapter, DTD – Chapter, SK – Chapter, and/or TC – Chapter's supplying and serving of excessive amounts of alcohol to students and

guests on campus at parties was known, expected, accepted, or acquiesced as commonplace among Defendants ASP – Chapter, DTD – Chapter, SK – Chapter, and/or TC – Chapter.

1042. Members of Defendants ASP – Chapter, DTD – Chapter, SK – Chapter and/or TC – Chapter threatened, misled, and otherwise discouraged victims from reporting hazing and/or sexual assaults by members of Defendants ASP – Chapter, DTD – Chapter, SK – Chapter and/or TC – Chapter to the appropriate persons at EMU, Title IX, or other law enforcement.

1043. Defendants ASP – Chapter, DTD – Chapter, SK – Chapter and/or TC – Chapter chose not to adequately supervise members and/or prevent members from committing acts of hazing, sexual assaults, and rapes.

1044. By routinely ignoring, disregarding, and failing to investigate evidence of hazing and sexual assaults by members of Defendants ASP – Chapter, DTD – Chapter, SK – Chapter and/or TC – Chapter, Defendants created a culture and environment in which victims understood and/or were told that their complaints would be met with disbelief, indifference, and a cold shoulder, and thus victims understood and/or were told that no measures would be reasonably calculated to end the abuse.

1045. Defendants ASP – Chapter, DTD – Chapter, SK – Chapter and/or TC – Chapter's conduct, and conduct of members, as described above has been

consistently condemned as outrageous and intolerable in modern society by state and federal legislature, EMU student policies, bylaws, and regulations of the Fraternity and Sorority Defendants and other members of the public.

1046. Defendants ASP – Chapter, DTD – Chapter, SK – Chapter and/or TC – Chapter's conduct, and conduct of members, as described above was intentional and/or reckless.

1047. Defendants ASP – Chapter, DTD – Chapter, SK – Chapter and/or TC – Chapter's conduct, and conduct of members, as described above was extreme, outrageous, and of such character as not to be tolerated by a civilized society.

1048. Any reasonable person would know that emotional distress would result from Defendants ASP – Chapter, DTD – Chapter, SK – Chapter and/or TC – Chapter's reckless conduct, and reckless conduct of members, described above.

1049. Defendant EMU Regents abused their positions to bolster and sustain EMU's national reputation.

1050. Defendants EMU Regents, ASP – Chapter, DTD – Chapter, SK – Chapter and/or TC – Chapter threatened, misled, and otherwise discouraged students/Plaintiffs from reporting sexual assault to the appropriate persons at EMU or to law enforcement.

1051. By routinely ignoring, disregarding, and failing to investigate sexual assault allegations, Defendants created a culture and environment in which sexual

abuse victims understood that their complaints would be met with hostility, disbelief and indifference, and thus victims understood that the university would not take any measures reasonably calculated to end the abuse.

1052. Defendants performed a deficient and biased investigation into sexual assaults and allowed perpetrators to remain on campus, where they were permitted access to female students and, in some cases, they continued to sexually assault.

1053. Defendants' conduct as described above has been consistently condemned as outrageous and intolerable in modern society by members of the public, members of the media, students, alumni, and other members of the public.

1054. Defendants' conduct as described above was intentional and/or reckless.

1055. Defendants' conduct as described above was extreme, outrageous, and of such character as not to be tolerated by a civilized society.

1056. Any reasonable person would know that emotional distress would result from Defendants' reckless conduct described above.

## COUNT XIV
## SOCIAL HOST LIABILITY
## VIOLATION OF MCL §436.1701
### As to Defendants ASP – Chapter, DTD – Chapter, SK – Chapter and TC – Chapter

1057. Plaintiffs hereby incorporate by reference the paragraphs above and below as though fully stated herein.

1058. All Plaintiffs were under the age of 21 and could not legally drink alcohol in the State of Michigan.

1059. Defendants DTD – Chapter, ASP – Chapter, SK - Chapter and TC – Chapter repeatedly supplied and served alcohol at functions on EMU's campus, in direct violation of local and national bylaws and regulations, as well as policies as set forth by Defendant Regents.

1060. Defendants DTD – Chapter, ASP – Chapter, SK - Chapter and TC – Chapter knowingly, intentionally, and/or recklessly created a dangerous environment by serving excessive amounts of alcohol.

1061. Defendants DTD – Chapter, ASP – Chapter, SK - Chapter and TC – Chapter were negligent when they failed to make diligent inquiry into whether Plaintiffs were of the age that allowed them to legally drink in violation of MCL §436.1701.

1062. Defendants DTD – Chapter, ASP – Chapter, SK - Chapter and TC – Chapter served alcohol to Plaintiffs at all chapter parties including those attended by Plaintiffs, including but not limited to the dates and times when Plaintiffs were subjected to sexual harassment, sexual assaults and other prohibited conduct by chapter members.

1063. Defendant's actions and/or inaction constitute a violation of MCL §436.1701.

1064. Defendants' actions and/or inactions in violation of MCL §436.1701 necessarily led to Plaintiffs' sexual assaults.

**COUNT XV**
**VIOLATION OF ARTICLE 1, § 17 SUBSTANTIVE DUE PROCESS –**
**STATE CREATED DANGER**
*AS TO DEFENDANT EMU REGENTS*

1065. Plaintiffs hereby incorporate by reference the paragraphs above and below as though fully stated herein.

1066. Plaintiffs enjoy a substantive due process right under the Michigan Constitution to avoid the risk of harm or danger created or increased by an affirmative act of the State.

1067. This right is violated when the State (1) engaged in an affirmative act which either created or increased the risk that a plaintiff would be exposed to an act of violence by a third party; (2) placed a plaintiff in a special danger, as distinguished from a risk that affects the public at large; and, (3) knew or should have known that its actions specifically endangered Plaintiff.

1068. Defendants EMU Regents, EMUPD, Werner, Martin, Heighes and Karrick's affirmative acts consisted of:

      a.      Failure to investigate;

      b.      Failure to report;

      c.      Failure to take remedial action;

      d.      Failure to protect students;

      e.     Failure to follow state and federal laws including, but not limited to, Title IX, ELCRA, and the Clery Act.

1069.  These affirmative acts created or increased the risk that Plaintiffs would be exposed to an act of violence or sexual assault by EMU's Greek system, namely Defendants ASP – Chapter, DTD – Chapter, SK – Chapter and TC - Chapter.

1070. Defendants EMU Regents, EMUPD, Werner, Martin, Heighes and Karrick's conduct created a special danger to Plaintiffs and others alike because Defendants' actions specifically put this discrete group – female students and/or guests of EMU, some of whom are particularly vulnerable, especially minors who are provided intoxicants on or within the jurisdiction of EMU's campus – at increased risk in that the Defendants knew that EMU's Greek system, namely Defendants ASP – Chapter, DTD – Chapter, SK – Chapter and TC – Chapter were taking advantage of the same in order to carry out sexual harassment, sexual assaults, and other prohibited conduct against Plaintiffs and other members of the same discrete group.

1071. Defendants EMU Regents, EMUPD, Werner, Martin, Heighes and Karrick knew or should have known that its affirmative acts specifically endangered Plaintiff.

1072. Defendants EMU Regents, EMUPD, Werner, Martin, Heighes and Karrick established official policies, customs and practices, which permitted,

condoned and actually promoted EMU's Greek Life culture of repeated sexual harassment, sexual assaults, and other prohibited conduct.

1073. The decisions resulting in Defendants' violation of Plaintiffs' constitutional rights as alleged in this Complaint were made by high level officials of Defendants.

1074. Defendants' official policies, customs and practices violated Plaintiffs' rights which each independently violated Plaintiffs' rights.

1075. EMU Defendants' policies, customs and practices of permitting, condoning and concealing sexual harassment, sexual assaults, and other prohibited conduct, which enabled EMU's Greek Life, namely Defendants ASP – Chapter, DTD – Chapter, SK – Chapter and TC – Chapter to gain unfettered sexual access to female students and/or guests of EMU, exposed them to unspeakable invasions of their bodily integrity which were so egregious and outrageous that it shocks the conscience.

## **PLAINTIFFS' DAMAGES**

1076. Plaintiffs' damages arise from three distinct and exclusive harms: 1) the physical sexual harassment, assaults and/or prohibited conduct; 2) Defendants' failure to properly investigate the Title IX violations occurring on EMU's campus and/or within Defendant EMUPD's jurisdiction; and 3) Defendants' collaborative

efforts to actively conceal any and all reports of sexual harassment, sexual assaults and/or other prohibited conduct.

1077. Since the revelation of Defendants' fraudulent concealment of Title IX violations, Plaintiffs for years have been suffering shame, shock, humiliation, emotional distress and related physical manifestations thereof, embarrassment, loss of self-esteem, and disgrace.

1078. Defendants' conduct and concealment of the same has disturbed Plaintiffs' innate sense of self-worth and self-identity, leading to anxiety and depression.

1079. The revelation – that despite knowing of EMU's Greek Life culture of alcohol abuse and sexual misconduct, Defendants knowingly protected its Greek Life members allowing them unfettered access to prey upon female students and guests – has been traumatic and emotionally and psychologically damaging, forcing Plaintiffs to relive the trauma of what Defendants had previously kept hidden.

1080. Plaintiffs have been shattered psychologically and emotionally to learn the university they held so much trust and pride in betrayed them, and many others, by failing to properly investigate countless reports of sexual harassment, sexual assaults and other prohibited conduct and actively concealing the same in an effort to maintain the image of a safe environment while at the same time continue to receive federal funding.

1081. As a direct and/or proximate result of Defendants' conduct, Plaintiffs suffered, and will continue to suffer discomfort, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, suicidal ideations and self-injurious conduct, drop in academic performance, withdrawal from classes and school, ostracism by members Greek Life, loss of earnings and earning capacity, and such other injuries and physical manifestations as may be revealed through the course of discovery and trial in this matter.

1082. These irreparable harms Plaintiffs suffer, and will continue suffering, are proven damages typically suffered by young women when sexually assaulted and not provided proper attention, concern, and investigation.

1083. Symptoms of sexual abuse can last for decades and affect Plaintiffs' lives in many ways from causing sexual discomfort and inability to engage in close relationships with others to confusion about sexual identity, embarrassment and depression.

1084. When sexual abuse is reported and subsequently concealed, victims often lack the ability to comprehend the abuse due to their trust in the system and their detrimental reliance upon those in a position of authority who can take preventive action and provide support, and commonly suffer from emotional distress and humiliation.

1085. In whole or in part, as a result of some or all of the above actions and/or inactions of Defendants, Plaintiffs have and continue to suffer irreparable harm.

WHEREFORE, Plaintiffs JANE DOE 1 – 19, respectfully request that this Honorable Court enter a judgment against Defendants, jointly and severally, in an amount in excess of $75,000.00, together with interest, costs, attorney fees, and all other equitable relief, including but not limited to exemplary and/or punitive damages, that this Honorable Court deems just and proper.

Plaintiffs further seek non-monetary relief, including the establishment of a Truth and Reconciliation Commission, who will require all Defendants and their agents and employees to fully and unequivocally admit their responsibility for permitting, condoning, and promoting a culture of sexual assault at EMU and who will create a process to provide for historical accountability and healing with a focus on the survivors, future supervision, monitoring, and auditing. The Plaintiffs further request that EMU commit to the will hiring of an independent, trauma-informed Expert, with experience in childhood sexual abuse involving betrayal trauma/institutional betrayal, to be selected to work in conjunction with the Truth and Reconciliation Commission whose members will include Survivors and EMU officials and who will study past institutional failures with the goal to create an accountable, effective and equitable institution by identifying future needs to help survivors heal and implement steps to ensure student safety and well-being.

Respectfully submitted,
*/s/ Todd F. Flood*
Todd F. Flood (P58555)
Vincent J. Haisha (P76506)
John H. Mott (P81990)
Flood Law PLLC
Attorneys for Plaintiff
155 W. Congress St., Ste. 603
Detroit, MI 48227
Tel: (248) 547-1032
tflood@floodlaw.com
vhaisha@floodlaw.com
jmott@floodlaw.com

Mike Weaver (P43985)
Plunkett Cooney
38505 Woodward Avenue, Ste. 2000
Bloomfield Hills, MI 48304
mweaver@plunkettcooney.com

Date: September 7, 2021

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs JANE DOE 1-19, by and through counsel Todd Flood and Flood

Law PLLC, and Michael Weaver and Plunkett Cooney PLC, hereby demand a trial

by jury in the above-captioned matter.


Respectfully submitted,
*/s/ Todd F. Flood*
Todd F. Flood (P58555)
Flood Law PLLC
Attorneys for Plaintiff
155 W. Congress St., Ste. 603
Detroit, MI 48227
Tel: (248) 547-1032
tflood@floodlaw.com


Date: September 7, 2021